# EXHIBIT A
## Brad Mols' Employment Agreement with Alliantgroup

# EMPLOYMENT AGREEMENT

## ARTICLE I.
## PARTIES

This EMPLOYMENT AGREEMENT (this "Agreement") is executed to be effective as of the date last shown below (the "Effective Date"), by and between ALLIANTGROUP, LP, a Texas limited partnership having its principal place of business located at Three Riverway, Suite 1400, Houston, Texas, 77056 ("ALLIANTGROUP"), and BRAD MOLS ("MOLS"). ALLIANTGROUP and MOLS are sometimes collectively referred to as the "Parties."

## ARTICLE II.
## RECITALS

*WHEREAS*, MOLS desires to be employed by ALLIANTGROUP as a Regional Managing Director and ALLIANTGROUP desires to employ MOLS, on the terms, covenants, and conditions hereinafter set forth;

*NOW, THEREFORE*, for the reasons set forth above and in consideration of the mutual promises, agreements and consideration hereinafter set forth, ALLIANTGROUP and MOLS agree as follows:

## ARTICLE III.
## TERM OF EMPLOYMENT

A.     The term of this Agreement shall be effective from September 12, 2007 to September 12, 2008, unless otherwise terminated in accordance with the terms of this Agreement. At the end of this term, should the parties mutually consent to continue the employment relationship, then this Agreement (including all terms and conditions found herein) shall continue indefinitely until this Agreement is terminated by one of the parties by providing fourteen (14) days written notice. Mutual consent of the parties shall be inferred if the employment relationship continues past September 12, 2008, without either party providing notice of termination.

B.     The Parties agree that the provisions of this Article may not be waived.

## ARTICLE IV.
## COMPENSATION and BENEFITS

A.     **Compensation:** During the term of this Agreement, MOLS shall be paid a base salary in the amount of SIX THOUSAND DOLLARS DOLLARS ($6,000.00) per month.[1]

---

[1] The base salary amount due for the first and last pay periods shall be pro-rated based on the actual number of work days worked by EMPLOYEE in the work period as compared to the total number of work days in that work period if EMPLOYEE works for less than the full work period.

In addition, MOLS shall receive, as a Draw, FIVE THOUSAND DOLLARS ($5,000.00) per month. "Draw" for the purposes of this Agreement shall be defined as an advanced payment which MOLS is required to reimburse ALLIANTGROUP upon accumulation of commissions and referral fees due to MOLS pursuant to Article V, Paragraph C of this Agreement. Upon accumulation of commissions and referral fees due to MOLS by ALLIANTGROUP, as required in Article V, Paragraph C below, ALLIANTGROUP shall withhold 100% of said commissions and referral fees owed to MOLS until the entire Draw amount has been repaid by MOLS. If MOLS's employment is terminated by either party, regardless of whether it is terminated for cause or not, all outstanding Draw amounts which have not been repaid to ALLIANTGROUP shall be immediately due and payable to ALLIANTGROUP.

MOLS's salary, Draw, discretionary bonuses, commissions and referral fees shall be paid on the fifteenth day or nearest work day and on the last work day of every month (subject to any other mutually agreed payment schedule or in accordance with the payment schedule of all other ALLIANTGROUP employees) after accrual. MOLS's salary, Draw, commissions, referral fees and any discretionary bonuses paid by ALLIANTGROUP to MOLS are subject to all applicable local, state and federal taxes and laws, including, but not limited to, withholding taxes such as FICA or similar charges including, if applicable, any required MOLS contributions to any health or other benefit plan then in effect for ALLIANTGROUP's employees or as otherwise authorized by MOLS.

B.   **_Bonuses_**: Bonuses, if any, shall be paid in the sole and absolute discretion of ALLIANTGROUP, and may be based upon any of the following: company profits; performance evaluation of MOLS; and/or any other factor determined by ALLIANTGROUP. MOLS understands that he is not entitled to any bonus under this Agreement.

C.   **_No Advances_**: MOLS shall not be entitled to any advance compensation payments except as described above.

### ARTICLE V.
### DESCRIPTION OF MOLS'S DUTIES

A.   **_Job Duties_**: MOLS agrees to devote his entire professional time, attention and energies to the employment responsibilities as defined herein and supplemented from time to time as ALLIANTGROUP's business demands make necessary. The primary responsibilities and duties of MOLS under this Agreement shall include, but are not limited to, providing Research and Development Tax consulting services to various clients and prospects of ALLIANTGROUP and any of its related entities (each, a "Client"), marketing Research and Development Tax Credit Studies (each, an "R&D Tax Credit Study") and other tax services (corporate tax consulting services) on behalf of ALLIANTGROUP, as well as such other responsibilities and duties as ALLIANTGROUP may direct MOLS from time to time. MOLS's relationship to ALLIANTGROUP shall be that of employer-employee and shall not be that of an independent contractor.

B.   **_Job Performance_**: MOLS further agrees to faithfully, industriously, and to the best of his ability, experience, and talents, perform all of the duties that may be reasonably required of him pursuant to the express and implied terms of this Agreement, to the reasonable satisfaction of

ALLIANTGROUP. MOLS recognizes that it is impossible to reduce to writing every single responsibility and duty that ALLIANTGROUP may reasonably expect MOLS to perform pursuant to this Agreement. Accordingly, MOLS agrees to perform such additional and different duties related to the business of ALLIANTGROUP (or other responsibilities) as may be reasonably assigned to him by ALLIANTGROUP from time to time and which are consistent with MOLS'S position at ALLIANTGROUP.

C.   *__Commission Structure:__* In consideration for the marketing services to be rendered by MOLS, MOLS will receive commissions (also referred to as "Referrals" or "referral fees") equal to the following percentage of fees collected from R&D Tax Credit Studies provided by ALLIANTGROUP, that resulted from MOLS's direct marketing of ALLIANTGROUP's services and the servicing of Clients through collection of fees:

For the time period from September 12, 2007 until termination of this Agreement, MOLS shall receive 7.5% of professional fees (excluding expenses reimbursed to ALLIANTGROUP) paid by Clients with respect to which MOLS procures a signed engagement letter, ALLIANTGROUP provides R&D Tax Credit Studies for such Clients, and ALLIANTGROUP receives payment for said R&D Tax Credit Studies.

Regardless of the date of procurement of the engagement letter, MOLS shall receive 5% of professional fees (excluding expenses reimbursed to ALLIANTGROUP) paid by Clients for follow-up R&D Tax Credit Studies for such Clients with respect to which MOLS procures a signed engagement letter, ALLIANTGROUP provides R&D Tax Credit Studies for such Clients, and ALLIANTGROUP receives payment for said R&D Tax Credit Studies.

➢   The above stated commission percentages are subject to change in ALLIANTGROUP's sole discretion.

➢   Upon the submission of appropriate documentation, ALLIANTGROUP will reimburse MOLS for approved expenses which are related to procuring and servicing various engagements.

➢   All sales commissions and referral fees described above shall only be paid on actual fees collected from Clients.

➢   It is anticipated that ALLIANTGROUP may expand the service lines it offers to Clients during the course of MOLS's employment. In the event that ALLIANTGROUP offers services other than R&D Tax Credit Studies, ALLIANTGROUP may, in its sole discretion, determine a commission structure for MOLS related to the sale of those service lines.

To the extent ALLIANTGROUP provides R&D Tax Credit Studies and/or other tax related services to any Client procured by MOLS or a contact made by MOLS (each a "Contact") under a fee arrangement in which ALLIANTGROUP ultimately refunds some or all of its fees to such Client or Contact, MOLS agrees to refund to ALLIANTGROUP his pro-rata share of the fee paid to MOLS by ALLIANTGROUP based on the fee paid and collected by ALLIANTGROUP from such Client or

Contact and repaid to such Client or Contact. MOLS further agrees that he is obligated to refund any fees to ALLIANTGROUP under this paragraph.

For example, assume that ALLIANTGROUP charges a fee of $100,000 to one of MOLS's Clients or Contacts for an R&D Tax Credit Study performed, and according to this Agreement, ALLIANTGROUP pays a 7.5% commission to MOLS ($7,500). If ALLIANTGROUP is required to refund $10,000 of its total fee ($100,000) to the Client or Contact, MOLS must refund a pro-rata portion of his fee to ALLIANTGROUP. Thus, in this example, a $10,000 refund results in a 10% refund of ALLIANTGROUP's fee (10% of $100,000) and therefore, MOLS must refund 10% of his commission fee back to ALLIANTGROUP ($750 of the $7,500 commission fee, that is, 10% of $7,500 is $750).

D.   ***No Outside Employment:***  MOLS specifically agrees not to be employed by or perform any work for any other employer during the time that this Agreement is in effect unless authorized in writing by the senior management of ALLIANTGROUP.

E.   ***Other Employment Agreements:***  MOLS agrees and acknowledges that this Agreement replaces and supersedes all previous agreements, whether oral or written, between ALLIANTGROUP and MOLS.

F.   ***Compliance With Rules and Procedures:***  MOLS agrees to obey and comply with all rules, regulations, policies and procedures now in effect or subsequently promulgated by ALLIANTGROUP, including but not limited to, ALLIANTGROUP's Employment Handbook, and any revisions thereto. However, ALLIANTGROUP's Employment Handbook does not provide MOLS with any compensation, benefits, rights or privileges beyond those set forth in this Agreement and ALLIANTGROUP's Employment Handbook is not a contract between MOLS and ALLIANTGROUP.

## ARTICLE VI.
## TERMINATION

A.   ***Termination for Cause***:  ALLIANTGROUP or MOLS may terminate this Agreement for cause by providing the other party with written notice of termination upon the occurrence of any of the events or omissions described below which are defined as causes for termination. Such a written notice of termination shall be without prejudice to any other remedy to which ALLIANTGROUP may be entitled either at law, in equity, or under this Agreement.

1.   **Termination by ALLIANTGROUP**: With respect to termination by ALLIANTGROUP of MOLS, "for cause" shall include, but is not limited to, any of the following actions of MOLS:

(a)   Material breach of any covenant or provision of this Agreement;

(b)   Disclosure of any Trade Secret or Confidential Information (as each such term is hereinafter defined);

ALLIANTGROUP's business.  In addition, ALLIANTGROUP promises to provide MOLS with additional Confidential Information and trade secrets ("Trade Secrets") necessary for MOLS to provide the required services hereunder.  The Confidential Information and Trade Secrets shall include ALLIANTGROUP's R&D Tax Credit Study materials, information regarding Clients or potential Clients and other valuable information relating to its business.

B.   **_Unfair Competition Prohibited_**

1.      MOLS acknowledges and recognizes the highly competitive nature of the business of ALLIANTGROUP and its affiliates (the "Business") and that MOLS will receive substantial Confidential Information and Trade Secrets relating to ALLIANTGROUP, its products, employees, customers, and methods of doing business during his employment with ALLIANTGROUP. Accordingly MOLS agrees, in consideration for and in connection with the provision to him of Confidential Information and Trade Secrets, as follows:

(a)      **Covenant Not to Compete During Employment:**  MOLS agrees that during the Employment Term, he shall not, either directly or indirectly, engage in any employment, occupation, consulting, or other business activity in competition with ALLIANTGROUP.

(b)      **Non-Solicitation of Employees:**  MOLS agrees that during the Employment Term and until the date twelve (12) months following the date MOLS ceases to be employed by ALLIANTGROUP for any reason (the "Restricted Period"), he shall not, without the prior written consent of ALLIANTGROUP, directly or indirectly, as a sole proprietor, member of a partnership, stockholder or investor, officer or director of a corporation, or as an employee, associate, consultant, independent contractor or agent of any person, partnership, corporation or other business organization or entity other than ALLIANTGROUP solicit or endeavor to entice away from ALLIANTGROUP any person or entity who is, or, during the then most recent 12-month period, was employed by, or had served an agent or key consultant of ALLIANTGROUP.

(c)      **Non-Solicitation of Contractors:**    During the Restricted Period, MOLS will not, directly or indirectly, solicit or encourage any consultant then under contract with ALLIANTGROUP or its affiliates or any referring CPAs to cease working with or referring business to ALLIANTGROUP or its affiliates.

(d)      **Non-Solicitation of Customers/Clients.**  MOLS agrees that during the Employment Term and thereafter he shall not, without the prior written consent of ALLIANTGROUP, directly or indirectly, as a sole proprietor, member of a partnership, stockholder or investor, officer or director of a corporation, or as an employee, associate, consultant, independent contractor or agent of any person, partnership, corporation or other business organization or entity other than ALLIANTGROUP use proprietary information, including but not limited to customer lists, to solicit or endeavor to entice away from ALLIANTGROUP any of ALLIANTGROUP's customers or suppliers to do business with any business entity in competition with ALLIANTGROUP.

(e)      **Reasonableness of Restrictions:**    It is expressly understood and agreed that although MOLS and ALLIANTGROUP consider the restrictions contained in this Article VII to be

---

**EMPLOYMENT AGREEMENT**                                                                      **Page 7**
Doc ID ROYEL-884592
8397-001

reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against MOLS, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

C.   **Duty to Not Disclose Confidential Intellectual Property.**

1.     MOLS will not at any time (whether during or after MOLS's employment with ALLIANTGROUP): (a) retain or use for the benefit, purposes or account of MOLS or any other Person; or (b) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside ALLIANTGROUP (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information --including without limitation trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals -- concerning the past, current or future business, activities and operations of ALLIANTGROUP, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to ALLIANTGROUP on a confidential basis ("Confidential Information") without the prior written authorization of the senior management of ALLIANTGROUP.

2.     "Confidential Information" shall not include any information that is (a) generally known to the industry or the public other than as a result of MOLS's breach of this covenant; (b) made legitimately available to MOLS without a confidentiality restriction by a third party without breach of any confidentiality obligation of that third party; or (c) required by law to be disclosed; provided that MOLS shall give prompt written notice to ALLIANTGROUP of such requirement, disclose no more information than is so required, and cooperate with any attempts by ALLIANTGROUP to obtain a protective order or similar treatment.

3.     Except as required by law, MOLS shall not disclose to anyone, other than MOLS's immediate family and legal or financial advisors, the existence or contents of this Agreement; provided that MOLS may disclose to any prospective future employer the provisions of this Article VII provided they agree to maintain the confidentiality of such terms.

4.     Upon termination of MOLS's employment with ALLIANTGROUP for any reason, MOLS shall (a) cease, and not thereafter commence, use of any Confidential Information, Trade Secret or intellectual property (including without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) owned or used by ALLIANTGROUP, its subsidiaries or affiliates; (b) immediately return to ALLIANTGROUP, at ALLIANTGROUP's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in MOLS's possession or control (including any of the foregoing stored or located in MOLS's office, home, laptop or other computer, whether or not property of ALLIANTGROUP or its affiliates or subsidiaries) that contain Confidential Information or otherwise relate to the business of ALLIANTGROUP, its affiliates and subsidiaries, except that MOLS may retain only those portions of any personal notes, notebooks and diaries that do not contain any Confidential Information or Trade Secret; and (z) notify and fully cooperate with ALLIANTGROUP regarding the delivery or destruction of any other Confidential Information of which MOLS is or becomes aware.

5.     **Intellectual Property**:  If MOLS has created, invented, designed, developed, contributed to or improved any works of authorship, inventions, intellectual property, materials, documents or other work product (including without limitation, research, reports, software, databases, systems, applications, presentations, textual works, content, or audiovisual materials), either alone or with third parties, prior to MOLS's employment by ALLIANTGROUP, that are relevant to or implicated by such employment, MOLS hereby grants ALLIANTGROUP a perpetual, non-exclusive, royalty-free, worldwide, assignable, sub-licensable license under all rights and intellectual property rights (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) therein for all purposes in connection with ALLIANTGROUP's current and future business.

6.     The provisions of this Article VII shall survive the termination of MOLS's employment for any reason.

## ARTICLE VIII.
## RETENTION BONUS

A.     **Bonus:**  ALLIANTGROUP will pay MOLS the gross amount of FIFTY THOUSAND DOLLARS ($50,000.00) as a retention bonus within the first thirty (30) days after the Effective Date.

B.     **Refund:**   In the event that MOLS voluntarily resigns his employment with ALLIANTGROUP for any reason or is terminated for cause as defined in Article VI of this Agreement, then MOLS must repay ALLIANTGROUP the entire gross amount of the Retention Bonus provided in Article VIII, Paragraph A.  MOLS authorizes ALLIANTGROUP to withhold this amount from any monies due MOLS at termination.  Any amount not satisfied by this withholding must be paid by MOLS within thirty (30) days of his termination.

## ARTICLE IX.
## MISCELLANEOUS

A.    _**Assignment:**_ MOLS may not assign or delegate performance under this Agreement to any other Person or entity.

B.    _**Waiver of Breach**_: The waiver by either ALLIANTGROUP or MOLS of any breach of any provisions of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach of any provision of this Agreement. No waiver of any provision of this Agreement shall be valid unless in writing and signed by both MOLS and ALLIANTGROUP.

C.    _**Waiver or Modification**_: This Agreement may be modified or extended with the mutual written consent of the parties. Waiver or modification of any covenant, condition, or limitation contained herein, shall be valid only if in writing and duly executed by the party to be charged therewith.

D.    _**Severability**_: All agreements and covenants contained herein are severable, and in the event any of them, with the exception of those contained in Articles IV and V, shall be held to be invalid by any competent court, administrative body or arbitration panel, this Agreement shall be interpreted as if such invalid agreements or covenants were not contained herein.

E.    _**Choice Of Law/Jurisdiction/Venue**_: This Agreement shall be governed in all respects, including, but not limited to, validity, interpretation, effect and performance by the laws of the State of Texas. The parties agree that proper subject matter and personal jurisdiction shall be had solely in State of Texas. The sole venue for disputes arising hereunder shall be in Harris County, Texas.

F.    _**Attorneys Fees**_: ALLIANTGROUP shall be entitled to recover its reasonable attorneys' fees and costs incurred in the enforcement of any provision of this Agreement in the event that MOLS is in breach.

G.    _**Headings**_: The headings of the sections contained in this Agreement are for convenience only and shall not be deemed to control or effect the meaning or construction of any provision of this Agreement.

H.    _**Entire Agreement**_: This Agreement contains the complete agreement concerning the employment arrangement between ALLIANTGROUP and MOLS. The parties stipulate that neither of them has made any representation with respect to the subject matter of this Agreement or any representations, including the execution and delivery hereof, except such representations as are specifically set forth herein and each of the parties hereto acknowledges that they have relied on their own judgment in entering into this Agreement.

**I HAVE READ AND UNDERSTAND THE ABOVE EMPLOYMENT AGREEMENT INCLUDING THE NONSOLICITATION, NONDISCLOSURE, AND NONCOMPETITION PROVISIONS AND I AGREE TO ITS TERMS.**

_____
BRAD MOLS

_____
Date    9/17/07

ALLIANTGROUP:    _____
Sonny Grover, Senior Managing Director

_____
Date    9/18/07