1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4  ALLIANTGROUP, LP                        4:16-cv-03114

5
                                           June 12, 2017
6  VS.                                     Houston, Texas
                                           12:01 p.m.
7  MOLS

8

9

10
                      MOTION HEARING
11
          BEFORE THE HONORABLE NANCY K. JOHNSON
12
              UNITED STATES MAGISTRATE JUDGE
13
   APPEARANCES:
14
   For Plaintiff              Matthew L. Simmons
15                            Littler Mendelson, PC
                              1301 McKinney Street
16                            Suite 1900
                              Houston, Texas 77010
17
                              John Thomas Simpson, Jr.
18                            Alliantgroup, LP
                              3009 Post Oak Boulevard
19                            Suite 2000
                              Houston, Texas 77056
20
   For Defendants            Brian S. Humphrey, II
21                            Abraham, Watkins, Nichols,
                                 Sorrels, Agosto & Aziz
22                            800 Congress Street
                              Houston, Texas 77002
23

24

25
   Proceedings from official electronic sound recording;
    transcript produced by court approved transcriber.

   DIGITAL SCROLL TRANSCRIPTION                  281.382.9862

```
 1  Appearances (Cont'd)

 2  For Third Party Witnesses    Rob Hennig
                                 Hennig Ruiz, PC
 3                               1925 Century Park East
                                 Suite 1960
 4                               Los Angeles, California 90067

 5  Court Clerk                  Shannon Jones

 6  Electronic Recording         Monica Balboa
        Operator                 U. S. District Clerk's Office
 7                               515 Rusk
                                 Houston, Texas 77002
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.

2              Good afternoon, everyone.  Please be seated.

3              All right.  Let's see.

4              I guess the first thing that we need to talk

5     about is – at least the oldest one – Daniel Lewicki's Motion

6     to Quash.

7              Who wants to talk about that?

8          MR. SIMMONS:  Your Honor?

9          THE COURT:  Mr. Harris?

10         MR. SIMMONS:  Mr. Har- --

11         THE COURT:  Yes.

12         MR. SIMMONS:  Sorry, Your Honor.  Mr. Harris and Mr.

13    Nguyen are apparently not here on behalf of Mr. Lewicki's

14    Motion to Quash.

15             Plaintiff on all of our counsel –

16         THE COURT:  Tell me your name.

17         MR. SIMMONS:  Matt Simmons, Your Honor.

18         THE COURT:  Mr. Simmons.

19             All right.

20         MR. SIMMONS:  We have brought everyone in response to

21    your appearance today.

22         THE COURT:  All right.  So, who's here for Mr.

23    Lewicki's Motion to Quash?  Nobody?

24         MR. HENNIG:  That would be me, Your Honor.

25         THE COURT:  Okay.  All right.  Tell me your name?

1       MR. HENNIG:  My name is Rob Hennig.

2       THE COURT:  Mr. Hennig.

3       MR. HENNIG:  I am here to be admitted pro hac vice,

4  Your Honor.  I thought it would be most relevant that I would

5  come versus the attorneys from Texas, because I am more fairly

6  familiar with the issues, Your Honor.

7       THE COURT:  All right.  So, as I understand it, your

8  client was served with a subpoena on April 28th, was supposed

9  to turn over information on May 29th and didn't.  You filed

10  this motion on May 30.

11       MR. HENNIG:  Yes, Your Honor.  It was a Sunday.

12  Excuse me, Your Honor.  May 29th, if I remember correctly was

13  Memorial Day, so we filed it on the next court date, Your

14  Honor, on the 30th.

15       THE COURT:  And there's – you couldn't have filed it

16  before the weekend?

17            I mean, why – if he's served on May – April

18  28th, why are you taking a whole month then to not respond?

19       MR. HENNIG:  Your Honor, I believe we had until the

20  30th.  I mean, obviously, we don't always like to do things at

21  the last minute, but we were working rather diligently to try

22  to get all this information together to file the motion, Your

23  Honor.  So, if we – I mean, obviously, it's always good to get

24  things in early, but we were timely as to the motion.

25       THE COURT:  All right.  So, your reason for seeking

1 protection is what?

2       MR. HENNIG: Well, briefly, Your Honor – would you

3 like me to –

4       THE COURT: Of course.

5       MR. HENNIG: Thank you, Your Honor.

6         Briefly, Your Honor. Mr. Lewicki is the head of

7 Alliant, so they are seeking, I believe something like sixty

8 different categories of documents, many of which involve trade

9 secrets and other information. Basically, seeking from a

10 director and head of Alliantgroup, there's a great concern as

11 to that issue, and secondly, that there would be a right to

12 privacy as to maybe to stop and insure.

13         So, our concerns are even if we turned over

14 those documents –

15       THE COURT: So, you need to go back and tell me,

16 because when I look at this I am not seeing trade secrets. I

17 am not seeing privacy, things that cannot be addressed by a

18 Protective Order. What I see is, I really don't want to

19 respond. So, you're going to have to do a better job on

20 explaining to me what the trade secret is.

21       MR. HENNIG: Mr. Lewicki is in direct competition

22 with Alliantgroup in the fact that he has a client customer

23 list that is being sought by Alliantgroup. If you wanted to

24 go – I'm happy to go through the specific documents, Your

25 Honor.

1    THE COURT:  And who is Mr. Lewicki in connection with

2  Mr. Mol?

3    MR. HENNIG:  That's a good question, Your Honor.

4        Mr. Lewicki has had some relationship with Prime

5  Tax Group and Parakore, but that's to the best of my knowledge

6  the extent of why he's been hauled in here.

7    THE COURT:  Okay.  So, it seems like he has some

8  relevant information.

9    MR. HENNIG:  Well, it would – that may be the case,

10  Your Honor, but the question that is relevant is this – and

11  this is – and let me just say one thing, Your Honor.

12        Mr. Simpson is the attorney for Alliantgroup.

13  He's the lead attorney here.  So, to the extent that we're

14  going to have a Protective Order in place – and I think

15  that – to the extent the Court would like that – I have

16  concerns about how we would do this with, you know, not

17  allowing the Alliantgroup to have these trade secrets, even if

18  we were to produce this information and the role of Mr.

19  Simpson as to that, because of his role as the counsel for

20  Alliantgroup, Your Honor.

21    THE COURT:  Well, this is a concern in many, many,

22  many lawsuits, and generally, they get produced anyway.

23    MR. HENNIG:  But the Court has the power to define

24  the terms of that production, Your Honor.  So even if the

25  Court were inclined to order Mr. Lewicki to produce all trade

1   secrets that – and, for example, clients list and such, all of

2   those interactions with the various different companies and

3   tax advisory groups with the A organizations, even if the

4   Court were so inclined, Your Honor, you would still have to

5   craft a limitation to prevent this information from directly

6   falling in the hands of this director at the Alliantgroup, and

7   that was my concern, Your Honor. And I would just ask for the

8   Court's concerns, Your Honor.

9        THE COURT: And normally, that's done by attorney's

10   eyes only. I don't know why this is such a big problem. I

11   mean, I don't understand why you all haven't worked this out,

12   you know, with all these production problems. And I'm not

13   testifying, and I'm not testifying that that's notice at the

14   last minute. I don't understand that. I really don't.

15   Generally, lawyers work these things out.

16        MR. HENNIG: I would agree with you, Your Honor,

17   that – to the extent that there's a pouch in everyone's couch,

18   Your Honor, that that is the case, but it is not so, you know.

19   I'm here representing third party witnesses. I'm not a party.

20   None of these folks are parties to this case. Mr. Lewicki is

21   not a party to this case. He's being hauled in by

22   Alliantgroup and asked very, very detailed information.

23        THE COURT: And that's not a persuasive argument,

24   because everyone has the right to people's testimony. Yes, it

25   is inconvenient to be a witness. Yes, it's inconvenient to be

1   hauled in for a deposition. But that is our legal system.

2   So, it's not going to cut any ice with me that, you know, he

3   doesn't want to do it; he has privacy interest. You know, he

4   doesn't really on – on – when he's a witness, he's got to

5   testify. Yes, it's inconvenient, and, yes, it's going to be

6   somewhat intrusive.

7        MR. HENNIG: Understood, Your Honor. So, what's I'm

8   asking here today and these are important specific things is

9   working on ways to subtract it.

10         Now, having said that, the reason why this is

11   important is because I do not – our attempts to confer with

12   Alliantgroup were unsuccessful in terms of notations asked in

13   the subpoena, and again, there's different categories which I

14   think are quite a large burden for a third party witness, Your

15   Honor, and secondly, with regard to scope of these witnesses.

16         So, Your Honor, I hear you, and if I may, I hear

17   the Court's impatience. I am here today to take

18   responsibility for what we have done, to work this out, but

19   most importantly to protect the interest of my clients in such

20   a way that their information does not fall into the hands of

21   the competitor.

22        THE COURT: So what is your suggestion?

23        MR. HENNIG: Well, my suggestion, Your Honor, is that

24   a Protective Order be entered that if there are any documents

25   produced that would be trade secrets by Mr. Lewicki be

1  attorney's eyes only and that Mr. Simpson be exempted, in

2  other words, not eligible for those documents because of his

3  role directly as counsel for Alliantgroup.  Judge, the

4  interest of Alliantgroup would be protected by Littler;

5  they're outside counsel.

6          THE COURT:  So –

7          MR. HENNIG:  And with that, Your Honor, if the Court

8  would entertain that, we would then be able to review the

9  documents and most likely to be responsive to his requests, to

10 the extent that they are there, to the extent he has these

11 documents.

12         THE COURT:  Well, as to some of your objections

13 that – like, here's one – Mr. Lewicki has never spoken to

14 Steve Thompson or Sopak (phonetic), thus the requests are

15 irrelevant.

16         MR. HENNIG:  A better way of phrasing that, Your

17 Honor, would be there's no responsive documents.

18         THE COURT:  Correct.

19             And that gives them the assurance that there's

20 no respective document as opposed to, you know – and it's in

21 writ- -- it's under oath.

22         MR. HENNIG:  Understood, Your Honor.  Those responses

23 were perhaps in artful.  And so, we would I personally would

24 go back and review and just tell them which categories or

25 documents there are no responsive documents, and I – to the

1  extent we can say, there's no response on that to insure

2  that –

3          THE COURT:  Would that be agreeable?

4          MR. SIMMONS:  We're fine, obviously with a Protective

5  Order, I think that's something that needs to happen in this

6  case, something they have been unwilling to discuss.

7              And one of the caveats Mr. Hennig put in there,

8  which I think is really an important note, is he said to the

9  extent that Mr. Lewicki has the documents.  Well, it is Mr.

10 Hennig's contention that Mr. Lewicki and all the other non

11 parties, third parties involved in this action don't have

12 possession of any documents related to trade secrets or

13 anything else.  They belong to these third party entities in

14 California.

15              So, his agreement to produce –

16          THE COURT:  And who were the third party entities?

17 Who actually has possession of the documents?

18          MR. SIMMONS:  Prime Tax Group and its managing member

19 is Parakor, P-A-R-A-K-O-R.  Mr. Hennig also represents them.

20          THE COURT:  All right.  So, is that correct, Mr.

21 Hennig?

22          MR. HENNIG:  That I represent Prime Tax Group?  Yes.

23          THE COURT:  That these companies have possession of

24 the documents sought by Plaintiff.

25          MR. HENNIG:  Generally – generally, Your Honor, that

1   is correct.  The – Mr. Lewicki – now, again –

2         THE COURT:  Maybe you could draw on the board the

3   relationship between your clients, all your clients –

4         MR. HENNIG:  If – if the Court would like –

5         THE COURT:  That would be helpful.

6         MR. HENNIG:  Sure.

7         THE COURT:  So, I could understand why certain

8   documents are not being produced.

9         MR. HENNIG:  Sure.

10          So, first we have Jared Kaufman and his father

11  Norbert Kaufman.  As best I can tell, the only reason that Mr.

12  Jar- -- Norbert Kaufman is here is for a deposition, and they

13  still are seeking his deposition is because he's the father of

14  Jared Kaufman.

15         THE COURT:  Well, surely not.

16         MR. SIMMONS:  That's correct.

17         THE COURT:  So, what is the – what do you think the

18  relationship between Jared and Norbert is?

19         MR. SIMMONS:  We – we have evidence that Mr. Norbert

20  Kaufman's home is being used for Mr. Jared Kaufman's business.

21  I won't really get into the details on that.

22         THE COURT:  This is of his residence?

23         MR. SIMMONS:  His residence.

24         THE COURT:  Okay.

25         MR. SIMMONS:  Norbert Kaufman's residence is being

1  used by Jared Kaufman to conduct a business.

2          THE COURT:  With employees in it?

3          MR. SIMMONS:  No.  It's just a single person.

4            So, Jared Kaufman works and his dad – he uses

5  his dad's residence for at least part of his business that he

6  conducts, which we believe is intertwined with the client,

7  Parakore –

8          THE COURT:  Okay.  So, is Jared living there in this

9  house owned by his father?

10         MR. SIMMONS:  We believe he may be staying there for

11  a certain period of time to evade service from the subpoenas

12  that we were trying to serve at his address, which is a fairly

13  close distance away.  His car is parked there.  Other evidence

14  suggests that he spends time at his father's residence and

15  conducts business there.

16         THE COURT:  All right.  And so, your inquiry to

17  Norbert Kaufman is to determine the legal relationship with

18  this home or the use of the residence?

19         MR. SIMMONS:  It's with the – his involvement, if

20  any – which we believe that we have evidence that there is

21  involvement with his business, so we want to know to the

22  extent that this involvement – involvement with Mr. Kaufman's

23  business as well as any access or dissemination of trade

24  secrets that Mr. Kaufman may have conveyed to his father,

25  whether purposefully or otherwise in order to assist Mr.

1   Kaufman in conducting his business.

2         THE COURT:  All right.  So, Mr. Hennig proceed.

3         MR. HENNIG:  All right.  So, Jared Kaufman has a

4   antique business completely unrelated to any of the issues as

5   far as I can tell in this litigation.  Secondly, Mr. Kaufman

6   does occasionally do computer internet – use websites.  Okay?

7   So, website production – he produced the website for Prime Tax

8   Group.

9         Mr. Kaufman's deposition was taken on Friday,

10  6/9.  At no time were questions asked about Norbert Kaufman's

11  association with Jared Kaufman in Mr. Jared Kaufman's

12  deposition or was there any evidence from Mr. Jared Kaufman

13  that Mr. Norbert Kaufman was associated with him in terms of

14  this business.  So, I am rather surprised of Mr. Simmons to

15  have made these allegations now, because the reason we have

16  contended that Mr. Kaufman is being subpoenaed was solely to

17  harass him because he was the father of Jared Kaufman, and

18  there is a letter which – Exhibit C to the Declaration of

19  Duyen Nguyen, which we submitted to the Court last night.

20        THE COURT:  All right.  This last night?

21        MR. HENNIG:  Yes, Your Honor.

22        THE COURT:  What – I've got a lot of things up here,

23  Mr. Hennig.

24        MR. HENNIG:  Well, Your Honor.  This was done on an

25  emergency basis, so unfortunately, everything is rather

1  rushed.

2      THE COURT:  Oh, I'm just trying to find it.

3          Shannon, do we have that?

4      COURT CLERK:  Which number is it?

5      THE COURT:  Yeah, which number?  That would help me

6  find it.

7    (Pause in the proceedings.)

8      MR. SIMMONS:  Your Honor, while he's looking for it,

9  but the deposition, I believe, occurred on Friday; it was

10 something that I've never seen, and I just wanted to bring

11 that up because he's saying that the basis that Norbert

12 Kaufman is harassing is because we had already had the

13 Deposition of Jared Kaufman.

14          I would say the majority of the speaking during

15 the deposition was by Mr. Hennig.  Out of less than 500

16 questions, almost half of them by Mr. Kaufman were either "I

17 don't know"; "I don't recall," things like that.  And it's

18 important to note that Mr. Kaufman – and one of the reasons

19 why it's really vital to this case – is that he actually

20 called Alliantgroup's counsel, general counsel right here,

21 John Simpson, and the secretary of the CEO of the company,

22 informing them that we have it right, the fix is in.  They

23 were taking trade secrets beforehand, printing stuff out.

24 They had a company laptop.  All this information that was

25 less – it was conveyed to our counsel, less than sixty days

1  ago.

2         When we get to the deposition, Mr. Hennig calls

3  this guy after he gets service and says, hey, I'm representing

4  you, and, you know – it was my impression from the deposition

5  that Mr. Hennig was bullying his own witness, his own client

6  into saying, I don't recall; I don't know.  That's the only

7  logical explanation that I can think of for someone's complete

8  lack of memory of any conversations with counsel, with the

9  CEO's secretary or anything else related to this case.  And

10  so –

11         THE COURT:  Mr. Kaufman – Jared Kaufman didn't recall

12  conversations he had two months earlier.

13         MR. SIMMONS:  Didn't even recall calling him.  And as

14  additional evidence, he actually got – Mr. Kaufman just lodged

15  the domain name for dhavaljadav.com.  Well, Dhaval Jadav is

16  Alliantgroup's CEO.  When asked about getting that domain name

17  two weeks ago, Mr. Kaufman then responded that "It's a popular

18  name."

19         When we questioned him, "Does it have anything

20  to do that Dhaval Jadav is the name of the CEO of

21  Alliantgroup?"  He said, "No."

22         The fact that there was a deposition and there

23  were questions asked it's true, but the substance and the

24  clarity and the truthfulness of the deposition is

25  unquestionably not there.  And we should have the video here

1 | today.  If you watch the first 20 minutes of the deposition,
2 | you'll be shocked.  I've never thought in my life that I would
3 | come to a deposition and experience what I experienced.  It
4 | was so – Mr. Hennig would – refused to wear his microphone for
5 | the video deposition, continued to rustle things over the
6 | microphone so that his objections couldn't be heard.  He
7 | constantly instructed his client.  They're asking you to
8 | speculate; do not speculate.  If you don't know, don't answer
9 | it.  He went on a two to three-minute diatribe on the
10 | question, where are you currently employed.

11 | THE COURT:  All right.  So, let's do this.  You know,
12 | I appreciate your concerns on the deposition.  If you want to
13 | file a motion to retake that deposition based on obstruction –
14 | obstructive conduct by counsel, file your motion.  I'll look
15 | at the deposition, and I'll decide if you need another
16 | opportunity.  This time it would in court.

17 | MR. HENNIG:  Your Honor –

18 | THE COURT:  So –

19 | MR. HENNIG:  -- I'm very concerned, because my
20 | reputation has been impugned by Mr. Simmons in a most dramatic
21 | way.  I deny all of these; I'm absolutely outraged.  It is
22 | intended – I didn't in any way obstruct –

23 | THE COURT:  And I'm happy to look at the deposition,
24 | Mr. Hennig, and make up my own mind.  That's why I'm
25 | suggesting that he file a separate motion, and I will address

1 | whether or not that deposition should be retaken.  If there's
2 | sanctionable conduct, I don't know; file your motion.  So –
3 |         MR. HENNIG:  I should also mention, Your Honor, that
4 | Mr. Simpson took the deposition; so, he's directly asking the
5 | witness about question- -- about – it's apparently
6 | conversations he contends that he had with Mr. Kaufman, which
7 | I found most unusual.  Normally, a witness to the situation
8 | doesn't get to take a deposition of the situation, Your Honor.
9 | And that's –
10 |         THE COURT:  I would agree that's unusual.
11 |         MR. HENNIG:  It's –
12 |         THE COURT:  I don't think it's sanctionable, but it
13 | definitely is unusual.  So, file your motion.
14 |         Let's get back to the call – who you are
15 | representing.
16 |         MR. HENNIG:  Yes, Your Honor.
17 |         So, two – by the way – and I should add this –
18 | we have yet to see any meeting to confer as to any of this
19 | Motion to Compel, Your Honor.  So, I mean, I come here to
20 | court – I am ordered to court; the next business day I fly to
21 | Houston.  I'm happy to do that, Your Honor.  But there has
22 | been a failure, an abject failure of meeting and conferring by
23 | the – by Plaintiff Alliantgroup as to any of these issues.
24 | They simply filed their motion, hauled us into court on an
25 | emergency basis, Your Honor, on an expedited basis.  This is

1   inconvenient to the Court. It is inconvenient to everyone

2   else, Your Honor. And I have yet to see the emergency that

3   have yet to state, so.

4         THE COURT: Well, discovery ends at the end of the

5   month, so it's getting there.

6            So, let's talk about your clients.

7         MR. HENNIG: Yes. So, Jared Kaufman did the website

8   production. That's what he testified about. By the way, Mr.

9   Kaufman was instructed not to answer only like approximately

10   three questions, Your Honor. He answered all the questions.

11   That Mr. Simmons is unhappy with that, that's new to me,

12   because they never met and conferred about that again from the

13   deposition.

14         Mr. Kaufman did the website for Prime Tax Group

15   and for Para- -- Parakore is a corporation -- is related to

16   Prime Tax Group.

17         THE COURT: And what's the relationship between Prime

18   Tax Group and Parakore?

19         MR. HENNIG: I believe Parakore owns Prime Tax;

20   they're related entities, Your Honor. That's the best I can

21   tell you at this point.

22         THE COURT: And who is the principal of Parakore?

23         MR. HENNIG: The principal is a woman by the name of

24   Angela Torres, who is, even as we speak, being sued for the

25   exact same allegations of violation of the noncompete

1    agreement, violation of trade secrets by Alliantgroup in

2    arbitration in California.  So, one of the concerns we have,

3    Your Honor, is they want free discovery as to this arbitration

4    which is not yet even then – it hasn't started yet.

5              THE COURT:  So – and how does Parakore own Prime Tax

6    Group?

7              MR. HENNIG:  Your Honor – you mean by shares or

8    something like that?

9              THE COURT:  Yeah, I mean – I mean, how is that

10   working?  Who owns Prime Tax Group then?

11             MR. HENNIG:  Well –

12             THE COURT:  Or who are the principals of Prime – is

13   it the same thing?

14             MR. HENNIG:  Ms. Torres could be the principal for

15   both of these organizations, Your Honor.

16             THE COURT:  Okay.

17             MR. HENNIG:  Okay.  So –

18             THE COURT:  Um-hmm.

19             MR. HENNIG:  And then, finally, we have Mr. Dan

20   Lewicki.  And Mr. Lewicki to the best of my knowledge has

21   performed some work for Prime Tax Group and Parakore.

22             THE COURT:  What's the difference between what he

23   does for Prime Tax Group and what he does for Parakore?

24             MR. HENNIG:  It would be related, Your Honor.

25             THE COURT:  I don't know what that means.

1        MR. HENNIG:  Well, essentially, Prime Tax Group and

2   Parakore functioned to perform this incompe- --

3        THE COURT:  They do the same thing?

4        MR. HENNIG:  Yes.

5        THE COURT:  They're not – do they have separate books

6   and records, separate clients?

7        MR. HENNIG:  You know, Your Honor.  I have to be

8   candid.  I do not know the specifics of how they are different

9   in that sense.  Okay?  The individual relationship versus the

10  difference between the two.

11        THE COURT:  And does Mr. Lewicki work for both of

12  them or just one of them?

13        MR. HENNIG:  Your Honor, I don't want to – my

14  understanding is that it might – it might be just Prime Tax

15  Group, but I don't know for sure.  Okay, Your Honor?

16        THE COURT:  Well, it makes a difference if Mr.

17  Lewicki is acting like "I don't have any documents," and the

18  doc- -- he does work for Prime Tax Group, but the documents

19  somehow are in the possession of Parakore.

20        MR. HENNIG:  That would be – that would be – that

21  would – you're right, Your Honor.  And I apologize.

22        THE COURT:  That's going to be a problem for me.

23  You're going to have to explain that.

24        MR. HENNIG:  I'm going to – Your Honor, I'm going to

25  have to explain?

1      THE COURT:  Why if Mr. Lewicki cannot turn over

2   documents because he does have them; they have found their way

3   to another corporation for which he does not work?

4      MR. HENNIG:  Well, he – he – my understanding, Your

5   Honor, is that Mr. Lewicki did – to the extent he worked for

6   one of – or both of them – they would have these documents.  I

7   do not think that – you know, that we're contending that – if

8   Parakore has documents, we're going to object and not really –

9      YHE COURT:  So, Mr. Lewicki is going to turn over his

10  documents; is that what you're saying?  Because he either

11  worked for Prime Tax Group or he worked for Parakore.  He's

12  turning over – he's got possession of those documents; he's

13  going to turn them over.

14      MR. HENNIG:  To the extent he has those documents, we

15  will cooperate with the – you know – not my – given the

16  concerns that I raised earlier, the Protective Order.

17      THE COURT:  Protective Order.  Well, not everything

18  that people do in tax consultation is a trade secret.

19      MR. HENNIG:  That's correct, Your Honor.

20           But clearly, working for particular clients, we

21  would – we would think the –

22      THE COURT:  That's not a trade secret.  Come on.

23  Come on.  Tax work –

24      MR. HENNIG:  Well, Your Honor, that is, in fact, the

25  allegations that Alliantgroup was making, I understand, as to

1  the larger implications against Mr. Mols that he is – because

2  he –

3          THE COURT:  Well, that's a noncompete.  That's a

4  little different.

5          MR. HENNIG:  Okay.  Fair enough.

6          THE COURT:  All right.  So, where are we on Mr.

7  Lewicki turning over documents or claiming he doesn't have

8  documents?  What – what is he claiming he doesn't have – what

9  has he been asked to turn over that he says, I don't have?

10          MR. HENNIG:  Well, he – as I said, there were a

11  number of in artful explanations, but – and I believe that for

12  many of these requests, for example, Requests 5 through 14 or

13  15, he may not have those.  Again, you know, his own –

14          THE COURT:  Those aren't on your list, on your

15  motion; I don't think.

16          MR. HENNIG:  I'm sorry.

17          THE COURT:  I don't think that was on your motion for

18  protection, five through –

19          MR. HENNIG:  That's because they don't – that's

20  because – my understanding is they're – there aren't documents

21  on that, Your Honor.

22          THE COURT:  Oh, I see where they are.  All right.

23              You're claiming you don't have any documents for

24  those, and it's not that you don't have them; it's –

25          MR. HENNIG:  Mr. Lewicki, Your Honor.

1          THE COURT:  Mr. Lewicki doesn't have them.  Does

2    Prime Tax Group have them then?

3          MR. HENNIG:  Well, Prime Tax Group would have certain

4    types of documents.  I – Your Honor, these are listed as

5    various CPA notes.  That's my understanding.  Okay?  And my

6    understanding is that Prime Tax Group does have certain

7    documents related to some of the CPAs and not others, but I

8    don't know which ones, as I stand here before you.

9          THE COURT:  So, is he taking the position that he's

10   employed by Prime Tax Group, but anything he does for Prime

11   Tax Group is not his and you have to ask Prime Tax Group?

12         MR. HENNIG:  He's taking the position that he was – I

13   don't think an employee but an independent contractor, so

14   therefore, that he would have very limited documents.

15   Obviously, to the extent he has them we will produce them.

16   But the meat of what they're asking is really goes to Prime

17   Tax Group and Parakore, Your Honor.

18         THE COURT:  And have you subpoenaed those documents?

19         MR. SIMMONS:  We have, and he said that he will not

20   produce any documents related because they're trade secrets

21   and that we are a competitor, and so since –

22         THE COURT:  All right.

23         MR. SIMMONS:  -- we don't have any evidence, he

24   doesn't have to give us anything.

25              And then, along the lines of Mr. Lewicki –

1  there's real- -- even though there's sixty-four plus, just
2  like opposing counsel did in his motion – you can narrow them
3  down to a seven or plus – communications of Mols,
4  communications of Kaufman.  And then, we just went more
5  specific with CPA firms that we know or have reason to believe
6  that have been improperly solicited by Mr. Mols.

7          So, all of these questions are completely
8  intertwined to find specific information and not conduct a
9  fishing expedition and as to any and all clients that Mr.
10 Lewicki has worked on or Mr. Mols has worked on, just the ones
11 that we're contending that have been improperly solicited by
12 Mr. Mols.

13         THE COURT:  All right.  So, has your client turned
14 over any e-mail communications with any of these other CPAs or
15 other firms?

16         MR. HENNIG:  Which client, Judge?

17         THE COURT:  Well, any of them, your –

18         MR. HENNIG:  We're in the process of meeting and
19 conferring.  Defense counsel neglected to mention that we have
20 a meeting to confer conference call tomorrow, as to the
21 documents from Prime Tax and Parakore, with the partner of
22 this case, Mr. Neighbors.

23         So, we are trying to get to what they want, what
24 we can produce and to turn those over in a prompt fashion,
25 Your Honor, but they neglected to mention the fact that we

1  have been cooperating on this issue, Your Honor.  I mean,

2  that's why I'm not quite sure why I'm here, Your Honor, on an

3  expedited basis, when we're trying to cooperate, and they,

4  frankly, do not give the Court the full story.

5          THE COURT:  So – well, let's talk about what are you

6  cooperating in?  I mean, where are you on a document

7  production for all your related clients?

8          MR. HENNIG:  Your Honor, we anticipate having a

9  document production to the Plaintiff.  Today is the 12th.

10          THE COURT:  Um-hmm.

11          MR. HENNIG:  It was going to – in two weeks, which

12  would be the 26th.

13          THE COURT:  And that is four days before discovery

14  ends.

15          MR. HENNIG:  Well, we can try it for a little

16  earlier.  What would the Court –

17          THE COURT:  Well –

18          MR. HENNIG:  What would the Court suggest?

19          THE COURT:  Well, I'm just saying, this case is

20  assigned to Judge Lake.  You're not from around here.  But he

21  loves his deadlines very, very much.

22          MR. HENNIG:  Understood, Your Honor.

23              So, what I would suggest – I mean, keep in mind,

24  Your Honor, when – you know, that – you know – this case has

25  been ongoing for a while and that these subpoenas are

1 approximately a couple of months old, a month old, something

2 like that.  So, I mean –

3           THE COURT:  That's not helping your – you out, I

4 mean.

5           MR. HENNIG:  Not helping my case.  I understand.

6               So, Your Honor, if the Court – if it pleases the

7 Court, I will work and try to have a production, a full

8 production one week from today.  Today is the 12th.  That

9 would be the 19th.  Well – if I could have until the 22nd, Your

10 Honor.  That's what I would ask for.  That would give them

11 eight days.

12           THE COURT:  Sounds like you're going to need an

13 extension of the discovery deadline.  Is that true or not

14 true?

15           MR. SIMMONS:  Yes, Your Honor.  And because of this

16 we have actually filed a motion for a continuance for a

17 ninety-day extension.

18           THE COURT:  When did you do that?

19           MR. SIMMONS:  Roughly a month ago –

20           THE COURT:  A month ago?

21           MR. SIMMONS:  -- I believe.

22               Whenever all of this started.

23           THE COURT:  Oh, I see it.

24               And what were you asking for?

25           MR. SIMMONS:  Ninety days extension of the discovery

1 | period and the Docket Call.

2 |       THE COURT:  Is anyone opposed to that?

3 |       MR. SIMMONS:  Mr. Humphrey is opposed.

4 |       THE COURT:  Mr. Humphrey?

5 |       MR. HUMPHREY:  In light of this hearing, Your Honor,

6 | we'll withdraw our opposition to that.

7 |       THE COURT:  All right.

8 |         Well, let's print it out.

9 |    (Pause in the proceedings.)

10 |       THE COURT:  Did he give you a mediation deadline?  I

11 | bet he didn't.

12 |       MR. SIMMONS:  I don't believe so, but this case –

13 | yeah, I don't believe so.

14 |       MR. SIMPSON:  Actually, Judge.  He did give us a

15 | mediation deadline.  We did mediate.

16 |       MR. HUMPHREY:  Actually --

17 |       MR. SIMMONS:  I --

18 |       MR. HUMPHREY:  -- Judge, he did give us a

19 | mediation --

20 |       MR. SIMMONS:  He gave --

21 |       MR. HUMPHREY:  -- deadline.  We did mediate, Your

22 | Honor.

23 |       MR. SIMMONS:  Oh, we did --

24 |       THE COURT:  You did mediate?  Who did it?

25 |       MR. HUMPHREY:  Hal Levin, Your Honor.

1           MR. SIMMONS:  Correct.

2           MR. HUMPHRET:  I believe our --

3           THE COURT:  So, you paid a lot of money?

4           MR. HUMPHREY:  We paid a fair amount, Your Honor.

5           MR. SIMMONS:  Correct again, Judge.

6           MR. HUMPHREY:  And I believe our dispositive motion

7   deadline is tied to 30 days after Mr. Levin declares impasse,

8   which he hasn't done yet.  There's still some off and on

9   negotiations going on.

10          THE COURT:  Say that again.

11          MR. HUMPHREY:  With regards, Your Honor - with

12  regards to, since we're talking about a motion for

13  continuance --

14          THE COURT:  Yeah.

15          MR. HUMPHREY:  -- the --

16          THE COURT:  Yeah, yeah, yeah --

17          MR. HUMPHREY:  -- docket control order, the

18  dispositive motion deadline is tied to 30 days after an

19  impasse is declared, which hasn't happened.  So, I don't

20  know if that means that we had consideration --

21          THE COURT:  Yeah, that's -- definitely, you know,

22  you're off of that, that -- you know, that you never have to

23  file one.

24          MR. SIMPSON:  Yeah.  And just for the record,

25  Judge --

1          MR. HUMPHREY:  Yeah.

2          MR. SIMPSON:  -- we don't agree with that position;

3   that's the state of the case post mediation.

4          THE COURT:  Well --

5          MR. SIMPSON:  We believe the mediation is over

6   and done with and has been for some months.

7          THE COURT: All right.  So you're asking for

8   discovery out through September 28th.

9              All other pretrial motions due one month

10  before discovery ends, how does that work?  That's not right.

11  Whose idea was that?  Explain that.

12         MR. SIMMONS:  It -- it -- it --

13         MR. SIMPSON:  That was Judge Lake, I believe.

14             We didn't have a lot of input in --

15         THE COURT:  He likes --

16         MR. SIMPSON:  -- any of those deadlines.

17         THE COURT:  No, Judge Lake likes motions for summary

18  judgement to be filed --

19         MR. SIMPSON:  So --

20         THE COURT:  -- kind of earlier before discovery ends

21  because, you know, typically, you've got the facts out, you're

22  just hassling with experts.

23         MR. SIMMONS:  Sure.  That would be --

24         THE COURT:  But all other motions in that --

25         MR. SIMMONS:  We're certainly amenable to a month

1  after the discovery deadline and then docket call 30 days

2  after that, if -- if that's what you're getting at.  That --

3  that makes sense.

4        THE COURT:  No.  Well, let's -- what would stop you

5  from being able to file a motion for summary judgment on

6  August 31st --

7        MR. HUMPHREY:  I don't think there's --

8        THE COURT:  -- one month before discovery ends?

9        MR. HUMPHREY:  I don't think there's anything, Your

10  Honor.

11        THE COURT:  Anything?

12        MR. HUMPHREY:  I can't think of any --

13        THE COURT:  You'd have everything, all the fact

14  discovery done?

15        MR. HUMPHREY:  I -- I believe --

16        THE COURT:  You're the --

17        MR. HUMPHREY:  -- I will, Your Honor.

18        THE COURT:  -- usual suspect on this --

19        MR. HUMPHREY:  Yes.

20        THE COURT:  -- right?

21        MR. HUMPHREY:  I believe I will, Your Honor.

22        THE COURT:  Okay.

23        MR. SIMMONS:  Your Honor, usually, for that --

24  and, obviously, and in a trade secret case, the documents

25  aren't all in our possession, custody, or control, as you've

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  seen here.  So as long as we're able to get the documents we

2  need to prosecute our case and defend against a no-evidence

3  summary judgment motion by that time, which given this

4  hearing, I think it's likely, then we're fine with that

5  deadline.  But, again, that's not something that we

6  necessarily have control over, that's more --

7           THE COURT:  Well --

8           MR. SIMMONS:  -- under Mr. Hennig's control.

9           THE COURT:  So if discovery is bumped out to August

10 28th, motions for summary judgement are filed August 31st, if

11 you need a continuance because blah -- you know, Rule 56 gives

12 you that ability to file a motion, and I'm not going to put

13 you on a docket call until the case is ready to go to trial.

14 That's typically how I do it.  So, this will be to be set.

15 I'll give you another -- do you need to bump out expert

16 reports?  Have those all been taken care of so far?

17          MR. HUMPHREY:  I believe so, Your Honor.

18          THE COURT:  Everyone's happy with that?

19          MR. SIMMONS:  Yes, Your Honor.

20          THE COURT:  Okay.  Then we'll take that up

21 later.

22               All right.  So, we've got some time.  You want

23 until the 22nd, or do you now need a little bit more time?

24          MR. HENNIG:  Your Honor, I would appreciate a little

25 more time.  At the Court's pleasure, perhaps --

```
 1              THE COURT:  I will --

 2              MR. HENNIG:  -- like --

 3              THE COURT:  -- give you to June 29th --

 4              MR. HENNIG:  Thank you.

 5              THE COURT:  -- to get your production in.  And if

 6     there's any problems, call Shannon up and you'll come back in

 7     and you can all explain it.

 8                   Now, what else are we doing on -- there's some

 9     issues on discovery on Brad Mols, correct?

10                   Does this take care of Mr. -- issues with

11      Mr. Hennig and his client?

12              MR. SIMMONS:  Yes, Your Honor.

13              THE COURT:  All right.

14              MR. SIMMONS:  With the exception of the motion

15     for sanctions which -- which outlines the reason for the

16     emergency hearing.

17              THE COURT:  And let's go over that again.

18              MR. SIMMONS:  Sure.

19              THE COURT:  You wanted sanctions -- where is that?

20              MR. SIMMONS:  It is Document Number --

21              THE COURT:  35 -- 35 --

22              MR. SIMMONS:  35?

23              THE COURT:  Well, I must have read it online.

24                   Can you print that out?

25          (Pause in the proceedings.)
```

1          THE COURT:  Oh, here it is.  I've got it.

2               So, this was over the Kaufman deposition?

3          MR. SIMMONS:  Yes, Your Honor, among other things.

4    So, two of Mr. Hennig's other clients canceled last minute in

5    their depositions.  We ended up getting Certificates of

6    Nonappearance.  So, we're looking for costs associated with

7    those as well as any costs associated with the service of Mr.

8    Kaufman, which he evaded service for roughly 30 days, and he

9    actually ended up being served after he purposely backed into

10   the process server and got into a car wreck.  And I've

11   seen the video of that, and it is clearly intentionally he's

12   trying to get away.

13         THE COURT:  All right.  So, do you want a -- did you

14   respond to this, Mr. Hennig?

15         MR. HENNIG:  Yes, we did, Your Honor.

16         THE COURT:  And when was that?

17         MR. HENNIG:  That came last night.  It was the same

18   as the motion to compel.  It was the same – it was the same

19   document, Your Honor.

20         THE COURT:  Same document, Number -- no --

21         MR. HENNIG:  That's --

22         THE COURT:  -- I don't see that.  Let's see.

23         COURT CLERK:  14?  Was it just -- just filed?

24         MR. HENNIG:  Well, what had happened, Your Honor, is

25   originally, we filed a motion -- we filed opposition to the

1  motion for sanctions, and then we just this morning joined

2  that same opposition to be -- as to the underlying motion --

3        THE COURT:  All right.

4        MR. HENNIG:  -- to compel.

5        THE COURT:  So tell me -- let's first talk about the

6  service.

7        MR. HENNIG:  Yes, Your Honor.

8        THE COURT:  Why does it take 30 days to serve

9  Mr. Kaufman?

10        MR. HENNIG:  Your Honor, I -- I don't know.  I mean,

11  the idea that -- that I somehow am responsible for -- first of

12  all, Mr. Kaufman was not my client until after he was served.

13        THE COURT:  Okay.

14        MR. HENNIG:  So they served him; it's over with.  So

15  if they're seeking -- if they're seeking - if they're seeking

16  sanctions, Your Honor, for evasion of service, that should be

17  against Mr. Kaufman personally.

18        THE COURT:  Oh, no question.

19        MR. HENNIG:  Okay.  Secondly, Your Honor, is there's

20  an incomplete record as to this, as to this idea of evasion.

21        THE COURT:  So does -- are you offering to bring Mr.

22  Kaufman in and he can tell me something to complete the

23  record?

24        MR. HENNIG:  I can -- I can certainly file a

25  Declaration on behalf of Mr. Kaufman, Your Honor, but the main

1   point about it is that he did have his deposition taken, Your

2   Honor.  It was taken on Friday.  So --

3          THE COURT:  Right.  Well, they're seeking service

4   costs on Mr. Kaufman as I understand --

5          MR. HENNIG:  Well, we have no idea --

6          THE COURT:  -- it.  Right?

7          MR. HENNIG:  -- how much this is.  He's saying

8   thousands of dollars.  I have no idea.

9          THE COURT:  All right.

10          MR. HENNIG:  He has not given us any actual estimate.

11          THE COURT:  All right.  So file -- file a Declaration

12   outlining this, under oath, what happened.

13              You can respond to that.

14          MR. HENNIG:  Okay.

15          THE COURT:  And I may consider that.  I mean, evading

16   service of process is not something that the Court smiles

17   fondly on, so we'll see where we go on that.

18          MR. HENNIG:  Understood, Your Honor.

19          MR. SIMMONS:  We also --

20          MR. HENNIG:  Understood.

21          MR. SIMMONS:  -- have a surveillance video from the

22   dash cam of the service processor's car which clearly shows

23   that the guy was backing out, hit him, and he was trying to

24   get away.

25          THE COURT:  Okay.

```
 1            MR. HENNIG:  Well --

 2            THE COURT:  So -- and will that be something that I

 3  can see on a --

 4            MR. SIMMONS:  Absolutely.

 5            THE COURT:  -- normal computer?  I don't need any

 6  special software or anything to --

 7            MR. SIMMONS:  Absolutely --

 8            THE COURT:  -- see it.

 9            MR. SIMMONS:  -- Your Honor.

10            MR. HENNIG:  This is news to me.  So, I obviously

11  would like --

12            THE COURT:  Obviously --

13            MR. HENNIG:  -- to see it.

14            THE COURT:  -- you would love to see it, too.

15            MR. HENNIG:  I would love to see it, Your Honor.

16            THE COURT:  So, let's talk about the two

17  cancellations, then, which I understand were instigated

18  by you.  Correct?

19            MR. HENNIG:  No, Your Honor, what had happened is we

20  had just -- we had just came in to represent I believe that

21  was Mr. Norbert Kaufman and Mr. Dan Lewicki for their

22  depositions.  We just simply said that we were not available

23  at that time.  Your Honor, I -- I would be the one defending

24  those depositions.  I do have --

25            THE COURT:  Correct.  So --
```

1          MR. HENNIG:  -- a busy schedule.

2          THE COURT:  So what --

3          MR. HENNIG:  And we did offer dates -- alternative

4 dates, Your Honor.  That's the thing.  So we said we can't

5 make it here for these dates; here are other dates that we

6 can.  And, in fact, Mr. Lewicki's deposition has now been

7 rescheduled to the satisfaction of everyone, and Mr. Kaufman,

8 Mr. Norbert Kaufman, they have yet to actually seek his

9 deposition.

10          THE COURT:  So. let's talk about Mr. Lewicki first.

11 When was he served the subpoena?  Was that on

12 April 28th?  Is that right --

13          MR. SIMMONS:  I believe --

14          THE COURT:  -- Mr. Simmons?

15          MR. SIMMONS:  -- so, Your Honor.

16          THE COURT:  Is that the same day you served the

17 document?

18          MR. SIMMONS:  Yes, Your Honor.

19          THE COURT:  Okay.  So that's served on April 28th for

20 a deposition on May 25th.

21          MR. SIMMONS:  Actually, I believe he was served a

22 little bit later.

23          THE COURT:  It looks like he was served on May 9th.

24          MR. SIMMONS:  Correct.

25          THE COURT:  All right.  For a deposition on May 25th.

1      MR. HENNIG:  And we --

2      THE COURT:  And --

3      MR. HENNIG:  -- sent a letter on May 18th, Your Honor,

4  saying we weren't able to make it at that date, offered

5  alternative dates.  Your Honor, I – when we can't make a

6  deposition, as counsel, that's what we do, we offer

7  alternative dates.  Mr. Simmons refused and took a notice of

8  nonappearance knowing that we were not available on that

9  date, Your Honor.  The costs he incurred were entirely of

10  their own doing, Your Honor.

11      THE COURT:  All right.  Is that correct, Mr. Simmons,

12  you -- he sent a letter on May 18th saying they could not

13  attend.

14      MR. SIMMONS:  That is correct, Your Honor.  And so --

15      THE COURT:  What was the reason offered for not

16  attending.

17      MR. SIMMONS:  There was no reason.  It was that it

18  just didn't work with their dates.  And it was by a letter.

19  There was no motion to quash, there was no other formal

20  recognition.  And during this same period of time, he also

21  sent a letter saying Norbert Kaufman isn't going to show up to

22  his deposition, which was three days.  So, I mean, it was the

23  22nd.

24      THE COURT:  Okay.

25      MR. SIMMONS:  So, given the pattern and practice of -

1  - of counsel and the delay tactics that he kept on going

2  through, we thought it appropriate and necessary to show up at

3  these depositions because we don't know at the last minute he

4  may show up, which is exactly what happened with Mr. Kaufman's

5  deposition.

6          THE COURT:  Well --

7          MR. SIMMONS:  He filed his --

8          THE COURT:  Well, let's go back.  So on --

9          MR. SIMMONS:  I'm sorry.

10          THE COURT:  -- May 18th, they send a letter saying,

11  we're not coming.  Did you respond to that and say, we're not

12  letting you off the date?

13          MR. SIMMONS:  Absolutely, Your Honor.

14          THE COURT:  All right.  So, once you know that

15  they're not letting you off the date, where's your motion to

16  quash or --

17          MR. HENNIG:  I -- I -- it --

18          THE COURT:  -- your motion for protection.

19          MR. HENNIG:  Well, Your Honor, I believe it wasn't

20  timely at that point, that it was -- it was past the deadline.

21          THE COURT:  What was past the deadline?

22          MR. HENNIG:  Well, the mot- -- we -- Your Honor, we

23  could have, I -- I suppose, up until that day.  Part of this

24  is we were ramping up on this.  Look, let me explain, Your

25  Honor.  In between Mr. Lewicki, we're also trying to meet and

1   confer as to context.  This has -- this has sucked an enormous

2   amount out of my practice in terms of, you know, we're a five-

3   member firm, Your Honor.  This is taking an enormous amount,

4   an inordinate amount of time.

5             We could have filed a motion.  I do want to con-

6   -- now, I do want to concede that.  But let me suggest this to

7   you, Your Honor.  In my many years of practice, I have yet to

8   see a situation in which we're suggesting that we're not

9   available on a date and opposing counsel has refused, just

10   categorically refused to move that date.  And that's with

11   regard to Mr. Lewicki.

12             I'll address the other two people when we talk

13   about the other two people.  But as to Mr. Lewicki, we offered

14   -- we gave them a week.  I -- I think that's very sufficient.

15             We offered alternative dates.  And, ultimately,

16   we have scheduled Mr. Lewicki's deposition.

17         THE COURT:  All right.  But he was subpoenaed, and

18   that has some compulsion.  You can't just ignore a subpoena.

19         MR. HENNIG:  We didn't ignore a subpoena.  We wrote a

20   letter, and, Your Honor --

21         THE COURT:  You wrote a letter, but you didn't move

22   to quash it.

23         MR. HENNIG:  Your Honor --

24         THE COURT:  It's a court process.  It's --

25         MR. HENNIG:  Understood.

1      THE COURT:  -- not just a starting or a phone call.

2      MR. HENNIG:  I -- I appreciate that, of course, Your

3  Honor.  And let me just -- let me -- let me also suggest,

4  again, these are third-party witnesses, Your Honor.  I'm

5  trying my best here.  This won't happen again, given the --

6      THE COURT:  Well --

7      MR. HENNIG:  -- situation.

8      THE COURT:  -- third-party --

9      MR. HENNIG:  I can --

10      THE COURT:  -- witnesses, I think that's the -- part

11  of the problem is they think it's somebody else's problem and

12  they're not going to be inconvenienced.  And so, they are not

13  taking this seriously, and it is serious.  I mean, it was --

14  he was subpoenaed to attend a deposition --

15      MR. HENNIG:  Your Honor --

16      THE COURT:  -- and he didn't.  So what were your

17  costs on that, on the Lewicki deposition?

18      MR. SIMMONS:  I believe the -- and we can certainly

19  submit an affidavit on that, but I believe it was the cost of

20  the court reporter, which is a little over a hundred dollars;

21  attorney time, which is .2, something like that, in order to

22  attend the CNA.

23          Other than that, Mr. Lewicki's deposition was in

24  Houston, Texas, so there were no travel costs or any expenses.

25      THE COURT:  Okay.  So I will award you those costs

1 for Mr. Lewicki, court reporter Certificate of Nonappearance

2 plus attorney time, two tenths of an hour, if that's what

3 you're saying it is.

4           MR. SIMMONS:  I believe so, Your Honor, yes.

5           THE COURT:  And that will be assessed against

6 Mr. Lewicki.

7                Now, you also have one on Mr. Kaufman,

8 correct?

9           MR. SIMMONS:  Correct, Your Honor, Norbert

10 Kaufman.

11           THE COURT:  So what was the situation that was -- you

12 told Mr. Hennig that you were not going to agree to a

13 continuance.

14           MR. SIMMONS:  That's correct, Your Honor.

15           THE COURT:  And that was for what date?

16           MR. SIMMONS:  So he sent the letter on the same date,

17 May 18th.

18           THE COURT:  May 18th.  Okay.

19           MR. SIMMONS:  The deposition was scheduled in Irvine,

20 California, for May 22nd, so that Monday.

21           THE COURT:  And what were your costs on that?

22           MR. SIMMONS:  It would be attorney travel time, the

23 CNA time, and travel expenses.

24           MR. HENNIG:  May I be heard, Your Honor?

25           THE COURT:  Yes.

1      MR. HENNIG:  Thank you, Your Honor.

2           As to Mr. Norbert Kaufman, first, Your Honor,

3  as we detailed, they appeared to basically serve him to harass

4  him because he was Jared Kaufman's father, and that's the --

5  that is the -- that is the letter from their own private

6  investigator that we included as a dec- -- as part of the

7  declaration, in the order, and that is as Exhibit B, Your

8  Honor, to the declaration.

9      THE COURT:  Yes --

10     MR. HENNIG:  Basically threatening him if he did not

11 cooperate in helping Mr. Kaufman -- in helping them obtain Mr.

12 Nor- -- Jared Kaufman's cooperation, basically ordering him

13 he's supposed to cooperate somehow in -- in helping them to

14 serve a subpoena, that they were going to make him a witness.

15 And that is the letter in itself.

16          So I'm very concerned that the basis for Mr.

17 Norbert's Kaufman's deposition was solely to harass him

18 because he was Jared Kaufman's father.  And, most importantly,

19 Your Honor, to this day we offered, again, available dates for

20 Mr. Norbert Kaufman.  They have yet to seek his deposition.

21     THE COURT:  All right.

22     MR. HENNIG:  They have yet to seek an alternative

23 date.

24     MR. SIMMONS:  And as far as the offer of altern- --

25 alternative dates, it was made after Mr. Jared Kaufman's

1    deposition, and after that deposition, we obviously want to

2    get some sort of Court supervision over any and all other

3    depositions that Mr. Hennig's involved in.  And we'll

4    certainly file a motion on that.  That's --

5              THE COURT:  And how --

6              MR. SIMMONS:  -- the reas- --

7              THE COURT:  -- am I going to do that?

8              MR. SIMMONS:  Well, we -- yeah, we'll – we have to

9    file a motion, just like you said earlier, as far as Mr. Jared

10   Kaufman's deposition and the actions that happened last Friday

11   during that.

12             THE COURT:  But these are people not in the State of

13   Texas.

14             MR. SIMMONS:  That is correct.

15             THE COURT:  So how am I going to supervise a

16   deposition?  All I can do -- and I think -- I don't know if

17   this is your only remedy.  This is all I'm thinking about is

18   if the deposition is obstructive, wasteful, whatever, I can

19   impose sanctions, but, you know, I can't bring a deponent here

20   to Texas.  We don't -- there's no subpoena authority for that.

21             MR. SIMMONS:  I understand, Your Honor.

22                  And -- and maybe it's wishful thinking on my

23   part that we wouldn't have to go through an obstructionist

24   deposition again and then file a motion again after that, but

25   I -- I understand where you're coming from, and we will follow

1   the rule of law and make sure that everything is documented.

2   Hopefully, after this hearing today, the -- the tone and

3   argumentative nature during the depositions changes.

4         THE COURT: So will you still be taking Norbert

5   Kaufman's deposition, or do you need to think about that?

6         MR. SIMMONS: We will be taking his deposition.

7         THE COURT: And the topics you will be covering on

8   that deposition will be?

9         MR. SIMMONS: His business relations with Jared

10   Kaufman, his access -- his access to Alliantgroup trade --

11         THE COURT: What does that mean?

12         MR. SIMMONS: If he's ever seen Alliantgroup

13   trade secret information, if he's ever utilized Allia0ntgroup

14   trade secret information.

15         THE COURT: How would he have done that? I mean –

16         MR. SIMMONS: We don't -- we don't know the extent of

17   his involvement with his son's business at this point. We

18   just don't.

19         THE COURT: Why --

20         MR. SIMMONS: We know --

21         THE COURT: -- do you think --

22         MR. SIMMONS: -- that --

23         THE COURT: -- he has any involvement?

24         MR. SIMMONS: We know that several packages and

25   instruments from his son's business that we purchased have

1  been sent from Mr. Norbert Kaufman's address, so it clearly

2  shows that he has some involvement in Jared Kaufman's

3  business, albeit may be clerical, but he has knowledge and

4  information likely that would be discoverable and important to

5  be able to -- to find out what the extent and scope of the

6  unfair competition and communication to Mols and everything

7  else may be.

8           THE COURT:  So, really, all you've said so far is

9  Jared Kaufman is sending stuff out from his father's

10  residence.

11           MR. SIMMONS:  Uh-huh.

12           THE COURT:  And does the father live there?

13           MR. SIMMONS:  The father does live there, and we

14  don't know if Jared Kaufman's sending it out or his father is

15  sending it out.  So, we don't know his involvement.  But we

16  don't expect that to be a long deposition, certainly.

17           THE COURT:  I wouldn't think so.

18           MR. HUMPHREY:  Well, Your Honor, I don't really have

19  a dog in the fight as far as the subpoena goes, but I would

20  say that the struggle to find anything relevant for Mr.

21  Kaufman to testify to suggests that perhaps it would be a

22  waste of the parties' time and money to travel to Irvine,

23  California, for his deposition and just --

24           MR. HENNIG:  Your Honor --

25           MR. HUMPHREY:  -- I'll voice that, Your Honor.

1        MR. HENNIG:  -- I -- I would propose a solution.

2        THE COURT:  Let's hear it.

3        MR. HENNIG:  If they would like to take Mr. Norbert

4   Kaufman's deposition, they can, subject, obviously, to Mr.

5   Kaufman seeking a motion for sanctions if his time is wasted

6   or my time is wasted as well.

7            Because I think there's no basis for it, but

8   having said that, they've made their offer.  If they want to

9   go ahead, I would suggest they tread very carefully.

10       THE COURT:  Why don't you do this.  If you think your

11  client, Mr. Kauf- -- Norbert Kaufman has limited information,

12  maybe he can proffer information or answer some -- a

13  deposition on written questions and you can see if that will

14  make you happy and he's subject to sworn testimony that if

15  someone else comes along and says later, "Dad was really

16  involved," as opposed to, "Dad just, you know, mailed a parcel

17  or allowed his address to be used."

18       MR. HENNIG:  Yeah, but the question seems to be from

19  the antique business, which I -- again, I'm not quite sure how

20  that's relating to a company that has --

21       THE COURT:  So this is why I don't think that that's

22  -- I mean, it's interesting but people use -- they have an

23  established business; they've got an account; they use the

24  antique business's, you know, mail account for whatever, it's

25  easy, whatev- -- you know, I mean, it's totally explainable,

1  but it's not sinister.

2          MR. HENNIG:  Well --

3          THE COURT:  I mean --

4          MR. HENNIG:  -- but it's not relevant either.  That's

5  true.

6          THE COURT:  It may be relevant.

7          MR. HENNIG:  Oh, fair.

8          THE COURT:  That's the point.  I mean --

9          MR. HENNIG:  Well --

10          THE COURT:  -- you know, I used -- I've done a number

11  of criminal cases where, you know, they were running it

12  through another business.

13          MR. HENNIG:  Fair enough, Your Honor.  So I -- I --

14  I'm open to such a resolution.  I – I personally think there

15  hasn't been a showing made, but, Your Honor, it's -- it's

16  obviously your call to make.  We just --

17          THE COURT:  I'm real concerned about not filing a

18  motion to quash; he goes out there; yes, it may be a fool's

19  errand but he doesn't know that until he gets there and he

20  spent a lot of money doing it.  So --

21          MR. HENNIG:  I believe he knew it was a fool's

22  errand.  I think it was solely to --

23          THE COURT:  Well --

24          MR. HENNIG:  -- concerning my client.

25          THE COURT:  -- you know, we're talking about

1  evidence here, Mr. Hennig, not anything else.  So --

2       MR. HENNIG:  Fair enough.

3       THE COURT:  I will sanction Mr. Norbert Kaufman the

4  travel time, for the attorney time -- attorney travel times,

5  what the Certificate of Nonappearance cost, and the travel

6  expenses.

7       MR. HENNIG:  Your Honor --

8       THE COURT:  And that's for not quashing it in

9  advance.

10      MR. HENNIG:  Your Honor, that may -- that -- that

11 amount appears to amount to thousands of dollars.

12      THE COURT:  It might be.

13      MR. HENNIG:  Mr. Kaufman has a limited amount of

14 money.  We would ask the Court that he be able to submit a

15 declaration give his limited resources to be able to pay this,

16 Your Honor, and I would ask that the Court --

17      THE COURT:  You can file the motion.  But they've

18 already paid it.  This is why it's good to get these things

19 addressed on the front end, getting into court, and not just

20 ignoring it because they don't think that -- they think it's

21 irrelevant.  So, there we go.

22           Now, you Mr. Humphrey, have -- also have a

23 motion, right?

24      MR. HUMPHREY:  Well, I filed a motion for protection,

25 Your Honor.

1         THE COURT: For protection?

2         MR. HUMPHREY: But I don't know if it's on the

3 docket for today, but if it didn't, I filed it--

4         THE COURT: Well, we can -- and that's on the

5 privilege issue?

6         MR. HUMPHREY: That's on -- that's the -- the

7 spousal testimony privilege and then, alternatively, the

8 confidential communication that she doesn't have any

9 information on.

10         THE COURT: Okay.

11         MR. HUMPHREY: Confidential communication.

12           Sorry.

13         THE COURT: So your client has a dilemma, and

14 that is that if he has his wife keeping his books and records,

15 then, you know, maybe that's a waiver. You can't not produce

16 it. Either he's going to have to figure out what it is. You

17 know, it's his business. He can't hide behind his wife.

18         MR. HUMPHREY: Well, he's not hiding behind his wife,

19 Your Honor. He -- he said that his wife --

20         THE COURT: His --

21         MR. HUMPHREY: -- cashes checks for him.

22         THE COURT: Yes.

23         MR. HUMPHREY: That's -- that's it.

24         THE COURT: Cashes checks that he gave her?

25         MR. HUMPHREY: That --

1          THE COURT:  Yeah.

2          MR. HUMPHREY:  That they get in the mail from the --

3          THE COURT:  Yeah.

4          MR. HUMPHREY:  -- business; that's correct.

5          THE COURT:  So --

6          MR. HUMPHREY:  I mean, I've argued in response to a

7   request for produc- -- to their request for production that

8   his bank records are not relevant and unfortunately is the

9   case, Your Honor, but if the Court thinks they are, he can

10  produce those.  I mean, he's not saying he can't produce his

11  own bank records.  We just don't think they're relevant to the

12  case.

13         THE COURT:  And the bank records would show?

14         MR. SIMMONS:  Damages.  They go --

15         THE COURT:  Damages.

16         MR. SIMMONS:  -- straight to the heart of our damages

17  model, and they can't prove --

18         THE COURT:  And does --

19         MR. SIMMONS:  -- damages without --

20         THE COURT:  -- he have his bank records?

21         MR. HUMPHREY:  Sure, he's got his bank records, Your

22  Honor.  I would just point out that they've asked explicitly

23  for commissions he received from clients who were not

24  Alliantgroup clients, explicitly those documents.  I don't

25  know what relevance those have to -- at all in this case.

1          THE COURT:  Well, wouldn't you want to be carving

2     those out for damage -- damage purposes, I mean, saying, well,

3     we have this money that's from Joe, and Joe is not an Alliant

4     client?  I mean --

5          MR. SIMMONS:  That's what --

6          THE COURT:  -- you're going to have to figure out

7     where your damages are, but you are -- you're going to have to

8     figure out what you're claiming is damage.  Bank records are

9     not going to -- I mean, just check registers --

10          MR. SIMMONS:  We're -- we're -- we've requested

11    for -- for checks, for pay stubs.  So Mr. Mols, Mr. Lewicki,

12    and Mr. Kaufman, all of them work as independent

13    contractors.  They submit invoices to Prime, to Parakore,

14    and they're paid on those.  They're paid commissions.

15              So they don't get paid on something unless they

16    sell something, unless they do some work.  So every dollar

17    that they receive is attached to a particular CPA firm, a

18    particular client.  They will then be able to trace and ensure

19    that that particular damages is allocated towards our damages

20    model.  Otherwise, it's -- it's just guessing and saying, "Oh,

21    okay, well, I made 'x' amount. I would say 30 percent of my

22    business came from Alliantgroup's CPA firm, so 30 percent of

23    'x.'"  But there is actual invoices that they as independent

24    contractors submit, pay stubs back, and things like that.  Or

25    for Mr. Lewicki's case, he -- typically, for people like him

1   who would do these R&D studies, they perform on a billable

2   hour rate just like attorneys. So he'd actually have to

3   submit a billable hour rate to the client and to prime

4   Parakore, which obviously would show who he's doing the work

5   for so we can determine whether that entity falls within the

6   scope of the nonsolicitation/noncompete.

7          THE COURT: Okay.

8          MR. HUMPHREY: I would simply say, Your Honor,

9   that having him cull through all of his bank records for

10   this as opposed to simply producing the bank records that deal

11   with one of your clients, which there aren't any, I'm not sure

12   that this is really tailored to the needs of this case.

13          THE COURT: Yeah, but your -- your answer presumes

14   that he hasn't done anything. So that's the pr- -- you know,

15   I mean, you're not giving him discovery, and, you know, you're

16   not showing him what you did do. You're just going to like,

17   "Trust me, I didn't do it." So that's generally not a good

18   response in discovery. I mean, he's got to -- he's got to

19   turn over his financial records. You know, I don't really

20   want to get into the marital privilege, which I think is

21   dicey when you get into this is his business. He's

22   putting his wife in there. You're not going to have a

23   spousal privilege for a bookkeeper. That's what she's --

24          MR. HENNIG: Sure, Your Honor. I --

25          THE COURT: -- doing. I mean, it's not a -- it's not

1  a communication that is related to the marriage.

2        MR. HUMPHREY:  Well, Your Honor, the -- well, the

3  privilege assertion dealt -- deals with a testimonial

4  privilege, a privilege not to testify against a spouse.

5  But regarding her being a bookkeeper, that -- that's simply

6  not what the evidence is.  The evidence is that she cashes

7  checks, she takes a check, takes it to the bank, puts it in

8  the bank.  She's not keeping his books and records.

9        THE COURT:  Okay.  Well, then that seems pretty

10  confusing to me that -- that you would even interpose the wife

11  as the wife knowing something about the business.

12        MR. HUMPHREY:  I have never interposed that, Your

13  Honor.

14        THE COURT:  Okay.

15        MR. HUMPHREY:  And my client has never interposed

16  that.

17        THE COURT:  So he's --

18        MR. HUMPHREY:  They asked him --

19        THE COURT:  -- capable of answering questions about

20  checks and money and his records, that sort of thing.  He's

21  not going to say --

22        MR. HUMPHREY:  He's --

23        THE COURT:  -- "I don't know.  My wife does that"?

24        MR. SIMMONS:  He did say that, Your Honor.

25        MR. HUMPHREY:  He said, "My wife cashes the checks,"

1 | Your Honor.

2 | THE COURT: Okay.

3 | MR. HUMPHREY: I mean, he -- he doesn't re- -- he

4 | doesn't remember all the checks he looked at in his

5 | deposition. We've objected to producing the checks. Based on

6 | what the Court has said, I think we'd be happy to go ahead and

7 | do that. We'll just -- we'll produce his bank statements and

8 | whatever we can from his bank. I mean, he's -- he's an

9 | independent contractor, Your Honor. He was doing a very small

10 | amount of business for them. We're not talking about a very

11 | voluminous operation. It was also not something he was paying

12 | a great deal of attention to as far as his money goes.

13 | But he's not relying on this to make a living, so that's why

14 | he doesn't recall specific amounts of money.

15 | THE COURT: Well, he's --

16 | MR. HUMPHREY: But -- so --

17 | THE COURT: -- going to have to figure it out.

18 | MR. HUMPHREY: Sure.

19 | MR. SIMMONS: Well, this is actually directly from

20 | his testimony.

21 | "So the commission check that you received

22 | doesn't have a bank name on it?"

23 | ANSWER: "My wife gets the check and puts it in the

24 | bank."

25 | QUESTION: "So you never see the check?"

1          ANSWER:  "I've never seen it once."

2          QUESTION:  "Why does your wife get the check?"

3          ANSWER:  "She does all that stuff.  She's good like

4          that.  I don't do any -- I don't do any of that

5          stuff."

6          THE COURT:  And this is a guy you're relying on for

7  taxes?

8          MR. HUMPHREY:  We'll produce the bank records, Your

9  Honor.

10          THE COURT:  I mean, is he endorsing the check?  I

11  mean, come on.  This is --

12          MR. HUMPHREY:  He probably is.

13          MR. SIMMONS:  Your Honor --

14          THE COURT:  He probably is.

15          MR. SIMMONS:  Your Honor, even counsel's first

16  invoice, attorneys' fees, was addressed to Mr. Mols's wife,

17  not to Mr. Mols.  That's how involved she is with his finances

18  and how little he is involved with his finances.

19          MR. HUMPHREY:  It's -- Your Honor, it was not

20  addressed to his wife; it was addressed to his wife's e-mail

21  address where I e-mailed him the checks.  It was addressed to

22  "Brad Mols."  It said right on the top of the invoice.  He's

23  mischaracterizing --

24          THE COURT:  All right.

25          MR. HUMPHREY:  -- that.  I've never spoken to his

1  wife once.

2          THE COURT:  This sounds like something you ought to

3  be able to work out.  I'm not real sympathetic on your client

4  acting like, "I have no idea about my finances, talk to my

5  wife."  And if that's -- that's business stuff, I'm not sure

6  that's totally privileged.  I mean, he's going to have to

7  disclose these checks.  He can't just say, "My wife does it.

8  I don't know, and I" – you know.  All right?

9          So, let's do this.  Let me -- you're meeting and

10 conferring tomorrow.  Why don't you do it today or whenever --

11 you know, I mean, as soon as possible.  If there's any other

12 discovery problems, call Shannon up, and let's get in here and

13 not just waste a lot of time fussing around.  I don't have a

14 lot of patience about this.  Judge Lake likes his cases to

15 move.  It's -- the case is going to move; and you're going to

16 figure out, Mr. Simmons, whether or not you have a case or

17 not.  All right?

18          MR. SIMMONS:  Thank you, Your Honor.

19          THE COURT:  Anything else we need to talk about?

20          MR. HENNIG:  Thank you, Your Honor.  I just want a

21 clarification, and that is, the 29th deadline for production

22 of documents is contingent upon counsel being able to have a

23 protective order, at least as to the trade secret information

24 will be attorney's eyes only.

25          THE COURT:  Correct.

1          MR. HENNIG:  Thank you.  I appreciate that

2    clarification.

3          MR. SIMMONS:  We'll enter into the same protective

4    order that we've entered into with

5          Mr. Humphrey.  That way --

6          MR. HENNIG:  I'm happy to --

7          MR. SIMMONS:  -- as to all the --

8          THE COURT:  All right.

9          MR. SIMMONS:  -- bank and -- we'll get it done.

10         MR. HUMPHREY:  With that in mind, we certainly

11   can live with that.

12         THE COURT:  All right.  Then you-all may be excused.

13         MR. SIMMONS:  Thank you, Your Honor.

14         MS. JONES:  All rise.

15         THE COURT:  Get that done.

16      (Proceedings concluded at 1:09 p.m.)

17

18

19

20

21

22

23

24

25

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1                   IN THE UNITED STATES DISTRICT COURT

2                    FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4

5        I, Linda Griffin, court approved transcriber, certify that

6    the foregoing is a correct transcript from the official

7    electronic sound recording of the proceedings in the above-

8    entitled matter.

9

10   /s/ Linda Griffin                        July 3, 2017
     Linda Griffin                               Date
11   Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIGITAL SCROLL TRANSCRIPTION                           281.382.9862