<pre>
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF TEXAS

 3                         HOUSTON DIVISION

 4   ALLIANTGROUP, LP                          4:16-cv-03114

 5
     VS.                                       July 21, 2017
 6                                             Houston, Texas
                                               12:01 p.m.
 7   BRAD MOLS

 8

 9

10

11                   #80 - MOTION HEARING

12          BEFORE THE HONORABLE NANCY K. JOHNSON

13             UNITED STATES MAGISTRATE JUDGE

14   APPEARANCES:

15   For Plaintiff              Matthew L. Simmons
                                Matthew Marzullo
16                              Adams Perkins
                                Littler Mendelson, PC
17                              1301 McKinney Street
                                Suite 1900
18                              Houston, Texas 77010

19                              Kimberly L. Miers
                                Littler Mendelson, PC
20                              2001 Ross Avenue
                                Dallas, Texas 75201
21
     For Defendants            Brian S. Humphrey, II
22                             Abraham, Watkins, Nichols,
                                  Sorrels, Agosto & Aziz
23                             800 Congress Street
                                Houston, Texas 77002
24

25
     Proceedings from official electronic sound recording;
      transcript produced by court approved transcriber.

     DIGITAL SCROLL TRANSCRIPTION                    281.382.9862
</pre>

1  Appearances (Continuing)

2  For Jared Kaufman              Michael I. Schneider
                                  Thompson Knight, LLP
3                                 333 Clay Street, Suite 3300
                                  Houston, Texas 77002
4
   For Daniel Lewicki             Rob Hennig
5                                 Hennig Ruiz, PC
                                  1925 Century Park East
6                                 Suite 1960
                                  Los Angeles, California 90067
7
   Court Clerk                    William Bostic
8
   Electronic Recording           Suzanne Guevara
9     Operator                    U. S. District Clerk's Office
                                  515 Rusk
10                                Houston, Texas 77002

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right.  Good morning, everyone.

2               Please be seated.

3          Okay.  All right.  Thank you-all for coming.

4               All right.  We have a number of things to talk

5     about; don't we?  I think the first thing I want to talk about

6     are the Motions for Reconsideration, 68 and 69.

7               Well, let me -- actually, let me get

8     announcements of counsel.

9               Who's here for Plaintiff?

10         MR. SIMMONS:  Matt Simmons, Kimberly Miers,

11    Matt Marzullo, Adam Perkins are here for the Plaintiff,

12    Alliantgroup.

13         THE COURT:  All right.  And for Mr. Mols?

14         MR. HUMPHREY:  Brian Humphrey by himself.

15         THE COURT:  Don't want to join the party,

16    Mr. Humphrey?

17         MR. HUMPHREY:  Yeah, that was just a – a nice seat,

18    Your Honor.

19         THE COURT:  You are a party.

20         MR. HUMPHREY:  That's true, Your Honor.

21         THE COURT:  And then, we've got Mr. Lewicki.  I see

22    Mr. Hennig.

23         MR. HENNIG:  Thank you, Your Honor.

24         THE COURT:  And Mr. Schneider, also for Mr. Kaufman,

25    correct?

1       MR. SCHNEIDER:  Yes, Your Honor.  And this -- in

2  the courtroom, I have my summer law clerk, Al Witchy with me

3  (phonetic), who will be assisting, at the table.

4       THE COURT:  Excellent.  Good to see you, Mr. Witchy.

5            All right.  Let's take up this -- the sanctions

6  on Mr. Norman Kaufman.

7            In light of Mr. Schneider's correctly pointing

8  out to me that I had no authority under Rule 45 to do anything

9  `about a subpoena until the char- -- the district in which the

10  compliance is owed refers it back, I am vacating those

11  sanctions.  If you want to do something about that,

12  Mr. Simmons, you'll have to file out in California and see if

13  that judge will either hear it or refer it back to me.

14       MR. SIMMONS:  And --

15       THE COURT:  Either way.

16       MR. SIMMONS:  And that's for Norbert Kaufman,

17  Your Honor?

18       THE COURT:  Yes.

19       MR. SIMMONS:  Okay.  And then just as far as the --

20  the motion that I filed in reply to the motion that he -- that

21  Mr. Schneider filed yesterday afternoon, it appears that --

22       THE COURT:  That's on Jared Kaufman, I thought.  I

23  didn't --

24       MR. SIMMONS:  That's --

25       THE COURT:  -- think Mr. Schneider --

1            MR. SIMMONS:  That's correct.

2            THE COURT:  -- was representing Norman Kaufman.

3            MR. SIMMONS:  That's correct.  And that's what I

4     thought that you said, that you would rely on what Mr.

5     Schneider had said.

6            THE COURT:  Well --

7            MR. SIMMONS:  Sorry.

8            THE COURT:  -- I did.

9            MR. SIMMONS:  Okay.

10           THE COURT:  I did.  But I think that's the problem

11    with my ruling.

12           MR. SIMMONS:  Just as far as Norbert Kaufman or all

13    of them?

14           THE COURT:  Well, we are going to talk about --

15    Mr. Kaufman has a couple of different issues, Mr. Jared

16    Kaufman.

17           MR. SIMMONS:  Okay.  Understood.

18           THE COURT:  So Mr. Norbert Kauf- -- Norman Kaufman,

19    I'm vacating that sanction.  You can seek sanctions out in

20    wherever he is.  Is that L.A.?

21           MR. SIMMONS:  I believe it's Irvine --

22           THE COURT:  Okay.

23           MR. SIMMONS:  -- area.

24           THE COURT:  And if the judge refers it back, I

25    will rehear that.  So those sanctions that I issued June

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  12, vacated.

2         Now, as to Mr. Jared Kaufman, I am concerned

3  when I see a lawyer interpose objections as to form for

4  almost every question, Mr. Hennig. I think you were --

5  this is not how things are done here. Maybe that's super fun

6  in L.A. to do that. It is not the practice here to do that,

7  and I think you would be hard pressed to justify objections as

8  to form on the questions. I've read that deposition. I just

9  think you're way out of line, and I honestly think that it was

10 done to harass. And I'm giving everyone warning now, I am

11 tired of it.

12         So, Mr. Hennig, if things continue like that at

13 future depositions, you know, I'd have to consider taking back

14 the pro hac status, because I just can't allow you to do that.

15 I just won't tolerate it.

16         And the rest of you guys, you're under my thumb

17 anyway, so you're going to have to be nice. All right? I

18 think I've made my point.

19         Now, as to what happens with Mr. Jared Kaufman's

20 deposition, when he took an amazing position of I don't recall

21 to so many things, it is completely incredible. But what I'm

22 concerned about is whether or not you can prove, Mr. Simmons,

23 that this is a -- a game. And I guess what you were saying in

24 his deposition is he -- you had a conversation with him,

25 correct, where he told you a lot of things? That's what it

1  kind of sounded like when I read the deposition.

2  MR. SIMMONS:  Actually, he -- he called the general

3  counsel of Alliantgroup.  Mr. Simpson is the lead attorney on

4  the case and he just happens to be on vacation this week.  It

5  was not moveable.  But he called him on two occasions, told

6  him all sorts of things that were asked in there, and, you

7  know, essentially, it would be proving our case if

8  everything he said was correct.  And -- and he had all these

9  documents and all this information implicating that they were

10  working -- that Mr. Mols and Ms. Torres were working together

11  at Alliantgroup against Alliantgroup's interests before they

12  left, you know.

13  But, obviously, during his deposition, even to

14  the most broad question, what did we talk about, he didn't

15  recall a single thing that -- that he discussed with Mr.

16  Simpson.  Or Mr. Kaufman also called – so, there's three phone

17  calls that occurred, I believe all in April, just a few --

18  like a month before this deposition, where he tried to get

19  ahold of the CEO of Alliantgroup, ended up speaking with the

20  CEO's assistant, telling her essentially the same story and

21  saying that he wanted to help.  And then all of a sudden

22  he shows up at the deposition; he meets Mr. Hennig for

23  the first time that morning, and Mr. Hennig says, hey,

24  I'm -- I'm going to represent you; you don't have to pay me.

25  And he suddenly doesn't recall a single thing about what he

1   talked about, the substance of it.  Any documents that

2   he said he had he certainly didn't produce that -- that

3   implicated Mols and Torres working together against

4   Alliantgroup's interests.

5              So, yeah, all of those things put together

6   clearly show that -- that he didn't remember anything.

7   And from Mike he can confer obligation that -- that Mr.

8   Schneider and I went through; his actual explanation

9   apparently is that Ms. Torres had filed -- they had broken up,

10  and they had filed or she had filed a police report against

11  him and spreading rumors about him or something, so he wanted

12  to get back to her -- get -- get back at her, knew she was in

13  this lawsuit, knew Mols was in this lawsuit, and so, he called

14  up Alliantgroup and lied to us.  That's now his explanation,

15  certainly not a "I don't recall."  But that's now his

16  explanation on why he said, "I don't recall."

17             And I think it's also important to note that

18  under Rule 30, if there were any modifications or

19  clarifications that -- that he needed to make to his

20  deposition, he had 30 days to do that.  He got -- he

21  received his deposition on June 12th.  It's now July 21st.  He

22  hasn't made any attempt to clarify any of those "I don't

23  recalls" or supplement it or anything.

24             So, we're kind of at an impasse on what we can

25  do to -- to get him to properly answer these questions other

1 than his counsel's assurances that if he's re-deposed that he

2 will tell the truth this time.

3         THE COURT:  Can you prove that they're in a

4 conspiracy together and you can attribute one conspirator

5 statement against the other?

6         MR. SIMMONS:  What do you mean by a "conspiracy

7 together," between Kaufman and Torres?  I mean, all of them

8 have the same attorney.

9         THE COURT:  But that -- that's not enough.  That's

10 not enough.

11         MR. SIMMONS:  And I know that he admits to at least

12 helping develop their website.  We believe that he even

13 obtained the domain name for the Parakore or the contact

14 group's website even before both Mols and Torres left

15 Alliantgroup on May 2nd.

16         THE COURT:  Okay.

17         MR. SIMMONS:  So that -- that in and of itself means

18 that he was involved before with -- with this whole scheme.

19         THE COURT:  Just interested.

20         Mr. Schneider, what's your client's explanation

21 for his lack of recall, anything?

22         MR. SCHNEIDER:  Your Honor, there's a couple of

23 things I'd like to respond to.  On the recall issue, I was

24 thinking about it.  As I read through the -- I saw the

25 deposition video and read through the transcript, I guess over

1   the weekend.  I got it on Friday.  And I thought about

2   conversations I've had with people and like what would I do

3   facing – sitting in a deposition asked the same type of

4   questions about, "Did you say to me I have documents that show

5   that they had tricked -- that they stole our information?"

6           And I -- I honestly thought about a

7   conversation that I had with you outside of this courtroom at

8   the Astros game sometime earlier this year.  And I thought

9   about what did I talk to Judge Johnson about; could I recall

10   specifically and testify under oath about what exactly I said

11   to her.  And then I thought, wait, when was that conversation?

12   I know it was this season.  I said it had to be in June.  So,

13   I looked at my text messages with the group of friends that I

14   went to the Astros with that day.  It was May 3rd.  It feels

15   like it was a month ago.  Did I show Judge Johnson -- did I

16   talk to Judge Johnson about my dad?  I don't -- may- --

17   probably, because we usually do when I see -- when I see Judge

18   Johnson, but I can't – I would not testify under oath.  The

19   right answer to, "Did you talk to Judge Johnson about your dad

20   at the Astros game on May 3rd," is, "I don't recall."

21           And the issue with the deposition is that --

22   and -- and with all respect to Alliantgroup's counsel, they

23   left the answer out, "I don't recall."  They didn't attempt to

24   expand on -- to ask the question in a different way, to expand

25   on it.  If -- if there was an actual effort during that six --

1 there in the six hours that they had the opportunity to -- to

2 expand and test his knowledge and really show this Court that

3 he was being evasive about relevant information related to Mr.

4 Mols' lawsuit, which is a whole separate issue, that he – so

5 moving on from that.

6 In reading Mr. -- Alliantgroup's –- my Motion to

7 Strike last night, one of the things that they indicated that

8 Mr. Kaufman answered evasively is why he -- why he obtained a

9 domain name in Alliantgroup's -- or allegedly obtained --

10 THE COURT: Um-hmm.

11 MR. SCHNEIDER: -- their CEO's website, something

12 that happened after all these lawsuits were filed and

13 something that has nothing to do with the facts at issue in

14 Mr. Mols' dispute, let alone any dispute between Alliantgroup

15 and Mr. Hennig's client.

16 So, the final piece of this is, as part of our

17 meet and confer with my -- my proposed solution would have

18 been or is, is if there are specific questions that they want

19 the -- that they want a thorough answer to, send us a

20 Deposition on Written Questions. I will make sure that Mr.

21 Kaufman answers it fully. If there's a problem with a

22 question or it's ambiguous or vague, I'll call Mr. Simmons and

23 say, "Hey, I don't under- -- this -- this -- what do you --

24 what do you mean by this? Can you give a clarification?

25 And then Jared will provide the answer to the best that he

1  can with my supervision and not coaching but making sure that

2  he's being fully and answering the question, which I think he

3  was honestly trying to do at the deposition, and -- and then

4  give him a second opportunity even to if they have follow-up

5  questions on his answer, they can ask one more set of a

6  depo on written questions.  And that way, we don't -- that

7  way, Jared doesn't have to pay for myself to fly to California

8  or another lawyer in California to sit at his deposition, and

9  then only for Mr. Simmons to be unhappy with his answers again

10  and come right back here all over again.

11      THE COURT:  So why do we have to give your client so

12  much grace when he didn't choose to even try to be helpful at

13  the deposition?

14      MR. SCHNEIDER:  Your Honor, that's the -- that's not

15  why -- so, first, I think -- I don't think -- I don't think he

16  was unhelpful.  I think he actually answered the -- the

17  depositions questions for -- on -- on the most part the way a

18  depo depone- -- deposition deponee, with the way they were

19  showing in law school as to how your ideal witness is

20  answering the questions.  But on top of that, the real thing

21  is that Alliantgroup didn't object to a single one of his

22  answers during the deposition, as required by the Rules

23  in order to preserve their objections.  Their objections

24  were -- they could have corrected this whole -- they could

25  have stopped -- they could have stopped their question and

1  said, "I know that you're not being" -- if -- if they didn't

2  want to go into a different line of questioning, they could

3  have said, "We object.  I know your -- you told this to me."

4  Which also, the fact that Mr. Simpson was taking this raises

5  certain ethical issues that he's going to have to testify

6  about what, if -- if it comes to a tru- -- telling the truth

7  that Mr. Simpson becomes a witness.  Setting that aside, he

8  could have objected, said, "Nonresponsive, I move to

9  strike your answer.  You're not being honest.  We're going to

10  get the judge on the phone, and we're going to resolve this

11  right now," before moving for sanctions.

12       THE COURT:  And how does the Judge resolve it on the

13  phone if a deponent is determined to lie about something?  I'm

14  not saying your client is lying, but, you know, this happens

15  in depositions all the time, Mr. Schneider; deponent's are not

16  truthful or they really can't remember.  And to get someone on

17  the line every time saying, "I think you're lying or you're

18  not being completely honest," what am I going to do?  Say,

19  "I'm really wearing a black dress right now.  You better

20  listen up and answer the question."  It doesn't make sense to

21  me.

22       MR. SCHNEIDER:  But so what -- what's the difference

23  between you saying it now versus on the phone during the

24  deposition?  The big -- the difference is that now Mr. Kaufman

25  has to expend the costs of this --

1          THE COURT:  Yes.

2          MR. SCHNEIDER:  -- proceeding and we me to go back to

3     court, me -- me to fly to California --

4          THE COURT:  Costs can be --

5          MR. SCHNEIDER:  -- and sit in a deposition.

6          THE COURT:  -- very persuasive.

7          MR. SCHNEIDER:  That's -- that is the -- the -- if it

8     happened then and -- and then there was a problem and then

9     there was -- and then we had to end up in front of you because

10    he violated your instruction to stop answering questions

11    evasively, "I think -- I think you're being evasive.  Answer

12    everything honestly," could have all -- we wouldn't have to do

13    this and then go back and do that and then end up back here

14    again to do this again.

15         THE COURT:  I'm not a big fan of depositions on

16    written questions because I think law- -- you know,

17    lawyers write the answers and they are not helpful.

18         MR. SCHNEIDER:  Your Honor, on -- just one

19    more followup on that; nothing Mr. -- I mean, I know this

20    isn't my case and I -- my -- honestly, I haven't read the

21    Complaint.  I've read I believe it was yours or -- or Judge

22    Lake's opinion on the 12(b)2s that were filed, so I -- that's

23    my context of the background.

24         THE COURT:  It was Lake.

25         MR. SCHNEIDER:  The dispositive motions, I've read.

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1 But as far as I -- my understanding of the facts, Mr. Kaufman

2 doesn't have anything to offer as -- as far as his testimony.

3 So, it's --

4      THE COURT:  He doesn't recall the conversations he

5 had with Mr. Simpson.

6      MR. SCHNEIDER:  I mean, he -- he recalls having them.

7 Certain- -- yes, he recalls having them.

8           He doesn't recall the -- like, he wouldn't -- he

9 couldn't say, I -- I absolutely said this, I absolutely said

10 that, but whatever he said was a very -- was all part of a

11 very stupid and immature response to a fight with a -- to

12 multiple fights with an ex-girlfriend and wasn't based on

13 substantive information.  It was, hey, I designed their

14 website.

15           You should go -- you should keep digging,

16 because you'll find -- you'll find that golden goose, not,

17 yeah -- he -- my client doesn't know about tax credits.  He

18 wouldn't know if they stole confi- -- he didn't work

19 for Alliantgroup.  How would he know what Alliantgroup's

20 trade secrets are to say that they were stolen and used?

21      THE COURT:  Unless he knew what they were doing.

22      MR. SCHNEIDER:  His involvement was designing the

23 website.  I mean --

24      THE COURT:  That's what he --

25      MR. SCHNEIDER:  That's what he was doing.

1          THE COURT:  -- says.

2          MR. SCHNEIDER:  Yes.

3          THE COURT:  But he doesn't really say it very

4    well.  My concern is that this deposition is fairly

5    worthless; it doesn't really say -- he doesn't really

6    acknowledge having any conversations, even if he wants

7    to retract and say, "Well, I said it, but I -- I was

8    being vindictive."

9          MR. SCHNEIDER:  He -- I -- I -- I believe he does

10   admit to having the conversation with Mr. Simpson.  I don't --

11   I think you're right that he says he doesn't remember having

12   the conversation with Cindy -- I think is her name.  Is

13   that --

14         MR. SIMMONS:  He actually --

15         MR. SCHNEIDER:  And -- and if he told me -- I mean,

16   on the phone when I asked him, he told me he doesn't re- -- he

17   doesn't really remember talking to Cindy after that.

18         MR. SIMMONS:  He actually -- he -- he says in his

19   deposition that he recalls speaking to John Simpson at least

20   once, but then whenever John Simpson, to - to your concerns

21   that the questions were too specific right after that, Mr.

22   Simpson said, "What did we talk about?"

23             "I don't recall."

24             So, if the concern is that the questions were

25   too specific, that's about as broad of a question as you

1 can get, and he still said, "I don't recall."  And as -- as

2 far as the other points, you know, just because, I guess, also

3 with the follow up –

4          MR. SCHNEIDER:  The dot, F.com comment, he got –

5          MR. SIMMONS:  He got it because it was --

6          THE COURT:  A cool name.

7          MR. SIMMONS:  -- a lot cooler name or something.

8          THE COURT:  That's a popular name.

9          MR. SIMMONS:  Yeah.

10          THE COURT:  Really.

11          MR. SIMMONS:  I mean, obviously --

12          THE COURT:  Come on.

13          MR. SIMMONS:  -- that has nothing to do with the

14 collusion that happened beforehand that he said he had

15 documents and information about, but it proves he's lying.

16          MR. SCHNEIDER:  Your -- Your Honor, if I can respond

17 on -- on that point.  I -- I agree that that was a sort of BS

18 answer on that one point to a nonrelevant question, to

19 something that happened, but was obviously when you're mad at

20 somebody who's chasing you down and -- and -- and trying to

21 mess with you over something that you have no part of.  He did

22 something immature to -- oh.

23      (Courier enters the courtroom.)

24          THE COURT:  What do you have?

25          MR. SCHNEIDER:  A document for me --

1    THE COURT:  Okay.

2    MR. SCHNEIDER:  -- Your Honor.

3    THE COURT:  All right.

4    MR. SCHNEIDER:  Thank you.

5    They -- the -- the explanation for getting a --

6    for buying the domain name in a company, that's inane, when

7    you're trying to take your deposition, is you were being

8    immature, and -- but that doesn't warrant what's being asked

9    here.  And I would also add that based on the comments in the

10   motion to -- to strike, I believe Alliantgroup said that they

11   aren't moving to compel a deposition; they're moving for

12   sanctions under Rule 37.3(a)(1).  And that's why we would not

13   be entitled to fees under 37(a) -- 37 5(b), which would be

14   fees for denying a Motion to Compel.

15   MR. SIMMONS:  We're asking for -- to -- to be clear,

16   in the Motions for Sanctions, we're asking for the Court to

17   use your inherent power to control cases under your -- your

18   jurisdiction to sanction Mr. Kaufman, and part of that

19   sanctions, one of the available sanctions, is a re-deposition.

20   To the extent that Rule 37 and Rule 30 apply, which we address

21   in our motion to strike and our response, obviously, those are

22   additional grounds for sanctions against Mr. Kaufman for his

23   evasive, incomplete, and, you know, flat-out lies.

24   So, to -- to respond to that, obviously,

25   there -- there's the Court's inherent power and there's other

1  rules that would justify the Court ordering a re-deposition of

2  a deponent that is lying and is evasive.

3          And to your points about us having to object

4  to the same during the deposition, that's simply not the

5  statute.  That's not the law.  He doesn't cite any cases

6  that say that.

7          We actually cite cases that do say that that's

8  not the law.

9  THE COURT:  So, I think you're entitled to try again

10  with Mr. Kaufman.  The question is -- and that will be at --

11  the videographer and the court reporter will be at Mr.

12  Kaufman's expense.  I think, however, there are ways to do

13  that where I'm not going to allow you to get your fees to go

14  out there.  So, there's ways to do that by phone or by

15  videoconferencing that don't involve your travel out there.

16  MR. SIMMONS:  I think that that -- that we --

17  we'd be fine with that, that we can travel out there to

18  the client and eat the expense or we can call in, whatever it

19  may be.  But, you know, him having to pay for the court

20  reporter and videographer for the re-deposition, we're

21  certainly amenable to that.

22          THE COURT:  Not to exceed two hours.

23          MR. SCHNEIDER:  Your Honor?

24          MR. SIMMONS:  Okay.

25          THE COURT:  Mr. Schneider.

1              MR. SCHNEIDER:  I'm sorry.

2                   Yes.  It would be helpful for us if perhaps we

3      could define what -- at this point what the scope of the

4      issues that are going to be discussed in the deposition or

5      like some sort of scope stating, so there's not a -- an

6      opportunity to go into areas that weren't previously discussed

7      at the prior deposition.

8              MR. SIMMONS:  According to -- to Rule 32, the Rule

9      that you cite, if he provides evasive, incomplete answers,

10     those aren't considered answers.  So, there's no regurgitation

11     of anything --

12             THE COURT:  I --

13             MR. SIMMONS:  -- because he didn't answer

14     anything.

15             THE COURT:  I'm not sure what you're talking

16     about.

17             MR. SCHNEIDER:  I just -- I don't want the

18     deposition to explode into other areas that --

19              THE COURT:  Like what?

20             MR. SCHNEIDER:  I have no idea.  I'm just saying I --

21     I would propose --

22             THE COURT:  He's got two hours.

23             MR. SCHNEIDER:  Okay.  Thank you, Your Honor.

24             THE COURT:  Some of the questions here that were

25     objected to as pretty much none of your business, you know, I

1 think some background information on, you know, who you are

2 and where you work, that's kind of typical. So, you know,

3 your -- the objections on relevancy, where the witness gets to

4 determine relevancy I think are inappropriate.

5 So, you know, you've got two hours. If you

6 really want to save some money, I don't know if the Court can

7 assist you in videoconferencing in. I could ask. If you

8 really are interested in that, let me know.

9 MR. SIMMONS: Sure, Your Honor.

10 THE COURT: We've got some videoconferencing ability.

11 MR. SIMMONS: And for -- for the Court to conference

12 in to the deposition?

13 THE COURT: Oh, no --

14 MR. SIMMONS: Conference in?

15 THE COURT: -- I'm not --

16 MR. SIMMONS: Okay.

17 THE COURT: -- volunteering.

18 MR. SIMMONS: Okay.

19 THE COURT: But -- you know, but just we've

20 got things here where we can videoconference.

21 MR. SIMMONS: Understood, Your Honor. And, I

22 guess, just -- just I -- I want to clarify that,

23 Mr. Hennig, you're no longer representing

24 Jared Kaufman, correct?

25 MR. HENNIG: That's correct, Your Honor.

1          THE COURT:  Okay.

2          MR. HENNIG:  Yes.

3          MR. SIMMONS:  Okay.

4          MR. HENNIG:  So -- okay.  And, Your Honor, if

5  I may?

6          THE COURT:  Yes, sir.

7          MR. HENNIG:  I do take seriously the Court's

8  admonitions of my -- of my objections, and I understand.  And

9  I appreciate you giving me a, if you will, the admonition

10  versus – and letting you know -- further out in the future

11  we'll be – we'll certainly be monitoring, because of the

12  Court's admonition, Your Honor.

13          THE COURT:  Good.

14          MR. HENNIG:  Thank you.

15          THE COURT:  All right.  So that takes care of

16  Mr. Kaufman.

17          MR. SIMMONS:  And -- and, sorry, Your Honor,

18  as part of that motion against Mr. Hennig, we were also

19  requesting that we be able to videotape Mr. Hennig.

20              We -- we take that -- we'll even pay for that.

21  Just so -- and any of the other third parties that he

22  represents.  We will pay for a videographer.  We just want to

23  be allowed to have an additional videographer to videographer

24  -- to video graph Mr. Hennig during the deposition as well.

25  So, that's one of the --

1          THE COURT:  For what purpose?

2          MR. SIMMONS:  I believe that if Mr. Hennig'a

3  behavior continues as it was in the Jared Kaufman deposition,

4  that it would be instructive for the Court and everybody

5  involved to understand the true extent of what Mr. Hennig is

6  doing towards his physical movements, which I believe were

7  intimidating towards Mr. Jared Kaufman to get him to say, "I

8  don't recall."  And if he does the same thing in Mr. Lewicki's

9  deposition and the client Parakore corporate representative

10  deposition, I think it would be instructive to allow

11  Alliantgroup to hire itself an additional videographer to

12  videotape Mr. Hennig.

13          THE COURT:  Mr. Hennig?

14          MR. HENNIG:  Yeah, I'll be brief, Your Honor.

15              First of all, Your Honor, the idea that I

16  somehow intimidated Mr. Kaufman -- (sound of objects falling

17  to floor).  Excuse me.

18              Your Honor, the id- -- it kind of takes away

19  your thunder when that happens, Your Honor.

20          THE COURT:  It does.

21          MR. HENNIG:  The idea that I intimidated Mr. Kaufman

22  is just a thin line.  I don't know how else to put it.  That I

23  intim- -- that I somehow got him to answer these questions, "I

24  don't recall; don't recall it," there's zero evidence of this.

25              Mr. Simmons' portrayal of that is - is fiction,

1  and it's meant to defame my character, and it's wholly

2  inappropriate in this courtroom.

3          Secondly, Your Honor, I would ask -- you know,

4  it's interesting because the only -- you know, I did raise

5  this in the brief.  Mr. John Simpson, who took the deposition,

6  lied to me when he said that I was being videotaped.  So, in

7  the courtroom, in the transcript he -- says, "You are being

8  recorded."  And, in fact, I was not.  And I want to know why

9  Mr. Simpson made a material misrepresentation as to my own

10 being video recorded under -- in this courtroom or I should

11 mean in the deposition.

12         THE COURT:  Well, "recorded" has a lot of different

13 meanings, so --

14         MR. HENNIG:  Well --

15         THE COURT:  -- I wouldn't interpret "recording" -- I

16 mean, you've got a videographer, you've got a court reporter,

17 and a lot of times the court reporters have tapes going as

18 well.

19         MR. HENNIG:  He clearly -- I - my understanding was

20 he clearly meant that I was being on the video.  But be that

21 as it may, Your Honor, this idea that I'm somehow -- that they

22 need to record my conduct, there's no evidence of this, Your

23 Honor, and I take -- I take exception to it.

24         THE COURT:  All right.  So, this is what we're

25 going to do.  Denied as to recording Mr. Hennig.  However, you

1  know, people can still give affidavits on what people do, and

2  you've all got video phones.  So, you know, I mean, the point

3  is you are a very intense man.  You just are.  And maybe you

4  don't mean to be intimidating, but maybe you are.  I don't

5  know, but I'm not -- I don't -- I don't see that the

6  videotaping Mr. Hennig is appropriate.  So, denied on that.

7       MR. HENNIG:  Thank you, Your Honor.  And -- and I

8  have a lighter side, but sometimes, you're right, and I -- and

9  I do have to remember that --

10       THE COURT:  Dial it back.

11       MR. HENNIG:  Thank you.

12       THE COURT:  All right.  So, what are we doing on

13  Plaintiff's Opposed Motion for Protective Orders?  I

14  understand that Mr. Hennig will not agree to turn over

15  documents under the extent Protective Order.

16       MR. SIMMONS:  Correct.  Yes, Your Honor.  So

17  Mr. Hennig agreed at – during our June 12th hearing to produce

18  documents, and he agreed to the same Protective Order that Mr.

19  Mols' counsel and I agreed to.  He then filed a motion, Doc.

20  63, where he said that the court ordered that the -- there be

21  a provision and that contains an attorneys' eyes only outside

22  counsel only provision within the order.  The Court

23  obviously never said that.

24       THE COURT:  Yeah.  I don't think I did.

25       MR. SIMMONS:  But he still put it in the motion, and,

1  actually, the Court did order that in response to that Rule

2  63.  So since the court ordered it, I went ahead and added a -

3  - even though we didn't agree on it; we didn't agree on the

4  Court's order, especially since we had this motion for

5  protection requesting the same Protective Order between Mols

6  and ourself to be entered, I went ahead and I said, okay,

7  fine, we'll do an attorneys' eyes only --

8        THE COURT:  It gets --

9        MR. SIMMONS:  -- outside counsel --

10       THE COURT:  -- designated, as I understood it, but if

11 you have a problem with it, you can always ask me to get off

12 of the attorneys' eyes only.

13        MR. SIMMONS:  See, and it's not just attorneys' eyes

14 only.  He only wants attorneys' eyes only outside counsel

15 only, because he doesn't want Mr. Simpson and Mr. Marzullo

16 here to look at any documents whatsoever.  That really hinders

17 us, because how are we supposed to do -- we as outside counsel

18 supposed to be able to tell which clients are properly being

19 solicited versus which clients are not properly being

20 solicited.  Mr. Simpson and Mr. Marzullo here are officers

21 of the Court.  They're named -- Mr. Simpson's the lead

22 counsel in the case, and, yet, he can't be at any of the

23 depositions where third parties are being deposed and he

24 can't see any documents until they have been

25 de-designated through the Court's jurisdiction to outside

1  counsel only.  That's -- that -- that's going to

2  prolong the litigation.  And as further evidence of that, Mr.

3  Hennig sent over all the documents that he believes are

4  non-confidential documents.  It was ten pages of documents.

5  That's it.

6           And in those documents that Prime and Parakore

7  produced -- by the way, Mr. Lewicki is less, produced a single

8  document, even though the Court ordered him to.  Even though

9  they produced ten documents and I believe they produced a few

10 documents before the deposition, their main concern that they

11 raise is that it'll show their trade secrets to us.  That's

12 why they want outside counsel and they've excluded.  Well, in

13 the documents that they've produced to us, not marked

14 confidential whatsoever, on July 17th -- well, I guess they

15 sent it on July 12th and I believe it was June 8th -- within

16 the documents that they actually produced are communications

17 between Prime and Parakore and their clients/customers' CPAs.

18           So, this is again a tactic that both Mr.

19 Mols and the third parties involved; they're using a shield

20 and sword -- a sword and shield gamesmanship.  They're only

21 giving us the communications between them and their client CPA

22 firms that they believe help their argument, but whenever it

23 comes to anything else that we're requesting, they say, no, it

24 it attorneys' eyes only, but it's attorneys' eyes only outside

25 counsel only because you don't get to know who we're dealing

1 with, or Mr. Simpson and Mr. Marzullo don't need to know what

2 -- who we're dealing with. And it makes it an impossible

3 task for us as outside counsel to be able to understand these

4 documents, to be able to get input from the in-house attorneys

5 who have this institutional knowledge of what Alliantgroup

6 clients are, what Alliantgroup CPA firms are, and so it -- it

7 -- it makes it impossible for us. And even in the draft that

8 I sent them, which he just com- -- actually, not even him. He

9 didn't even respond to it. Some other attorney in California

10 responded to my meet and confer letter, which the Court asked

11 us to do, saying that she represents the Hennig Ruiz law firm

12 and every third party, including Mr. Kaufman. And she

13 responded and said, hey, by the way, I haven't talked to

14 Hennig or -- or anybody else, but here are my issues. And

15 then she came back and said, okay, here's my huge red line.

16 　　　　　　　　One of the things she red lined out of it was

17 the provision that's in all of the agreed Protective Orders

18 that any document of Alliantgroup's that they've produced or

19 that they have, that is not confidential; that is not an

20 attorneys' eyes only outside counsel only. They struck that

21 provision. They wouldn't even agree that our documents that

22 we can -- that John Simpson can see our own documents. So,

23 this is, along with the pattern of practice of delay, delay,

24 delay that we've had to go through with Mr. Mols and that

25 we're having to go through with all the third parties. And

1 that's why during the June 12th hearing, I asked Mr. Hennig

2 point blank if he would agree to the same agreed Protective

3 Order as Mr. Mols had agreed to, because I expected this

4 delay.  And he said, yes.  And the Court confirmed that.  And

5 now he says, nope.

6        THE COURT:  All right.  So, William, could you -- I

7 didn't think when I was signing 63 that it meant attorneys' --

8 attorney -- outside attorney only.

9          So --

10        MR. SIMMONS:  And that's what I was assuming --

11        THE COURT:  -- let me --

12        MR. SIMMONS:  -- Your Honor.

13        THE COURT:  William, print out 63 and 78.

14     (Pause in proceedings.)

15         THE COURT:  Let me just see what I -- let me see

16 what I did; 78, I think, the order on 63.  I thought I was

17 giving you more time.

18        MR. HENNIG:  Yes, Your Honor.

19        MR. SIMMONS:  Which, by the way, he didn't need that

20 time, Your Honor, that he asked for.

21        THE COURT:  So --

22        MR. HENNIG:  Your Honor, you gave us until the 17th,

23 as I recall the order, to produce the non attorneys' eyes only

24 provision, now which we did as the Court said.

25        MR. SIMMONS:  You know, the --

1            MR. HENNIG:  Per the Court's order.

2            MR. SIMMONS:  -- the -- the order that the judge

3    entered was on July 11th.  You requested until July 7th.  And

4    then, you didn't --

5            THE COURT:  But I changed it --

6            MR. SIMMONS:  -- produce the document --

7            THE COURT:  -- to the 17th.

8            MR. HENNIG:  Yes, you did --

9            MR. SIMMONS:  Right.

10           MR. HENNIG:  -- Your Honor.

11           MR. SIMMONS:  Yes, Your Honor.  But he didn't

12   know that.  My point is that he didn't know that you had

13   changed it to the 17th whenever he only requested until

14   the 7th and he still only produced his documents on the 12th.

15           MR. HENNIG:  So -- so --

16           THE COURT:  All right.  So, let me just say this.

17   When I signed this, I was thinking this was just attorneys'

18   eyes only, and I didn't really appreciate the whole outside

19   counsel issue.  So, let's talk about that now, Mr. Hennig.

20   Why cannot lead counsel see these documents?

21           MR. HENNIG:  Well, obviously, this was a request

22   we're making of the Court.  We don't do so, you know,

23   carelessly.  We think that the issue is that -- and from what

24   we've seen of the Houston press, our concern is that --

25           THE COURT:  The what?

1          MR. HENNIG:  There's been a series of articles about

2    Alliantgroup in the press.  We're --

3          MR. SIMMONS:  That Mr. Hennig's leaking.

4          THE COURT:  Well -- okay.  I've --

5          MR. HENNIG:  Okay.

6          THE COURT:  -- missed --

7          MR. SIMMONS:  Admittedly so.

8          THE COURT:  -- this.

9          MR. SIMMONS:  Anyway.

10         THE COURT:  Go ahead.

11         MR. HENNIG:  That Mr. Simpson is unfortunately --

12   what's -- what's happened, Your Honor, is that a number of

13   these suits come, okay, and that this is not the first time

14   that Mr. Mols or Ms. Torres is also facing the exact same

15   lawsuit in California, that Alliantgroup uses these suits

16   based upon -- and they're competing against us or filing a non

17   compete group in our area, Your Honor.

18         THE COURT:  Um-hmm.

19          MR. HENNIG:  And then they track down the folks who

20   are the potential clients and -- and essentially mess with the

21   business.  So, Ms. Torres' concern -- and this is just -- Ms.

22   Torres' concern is this, is that what she has understood is

23   that Alliantgroup has used this in the past to go after what

24   they argue is now a competitor, Prime -- Prime Tax Group and

25   Parakore, and essentially does get the business.  And that's

1  why Mr. Simpson, we believe, needs to be excluded, because as

2  we understand it, he has been the filer of a lot of these

3  lawsuits that have -- that have happened in the past.  But I

4  do want to recognize that this is an unusual request, and --

5  and -- and I'll say that that is our concern as far as the

6  process.

7          THE COURT:  All right.  I appreciate your concern,

8  but I've -- I've got to amend that order, and attorneys' eyes

9  only is all counsel; Mr. Simpson and the in-house counsel have

10 -- are included in the allowed attorneys' eyes only group.

11              So, I'm amending that.

12         MR. HENNIG:  Your Honor, if I may.  And I do

13 appreciate the Court's modification.  I do want, if possible,

14 obviously, that in the Protective Order that we do have a

15 specific thing about it being walled off in terms of

16 disclosure of this information, even -- you know, because one

17 of the things is that the attorneys can see the information.

18         THE COURT:  Um-hmm.

19         MR. HENNIG:  And -- and that – that makes sense to --

20         THE COURT:  Okay.

21         MR. HENNIG:  -- give Mr. Simmons the thing, but if he

22 walled off in some way from other folks at Alliantgroup in

23 terms of sharing this information.

24         THE COURT:  Well, that's part of attorneys' eyes only

25 is they can't tell anyone else.  I think we're clear on that.

1      MR. SIMMONS:  Absolutely, Your Honor.

2      MR. HENNIG:  Fair enough.  And --

3      THE COURT:  So -- I mean, so Mr. Simpson cannot go

4 out and say, we're going after these clients now.

5      MR. SIMMONS:  Absolutely, Your Honor.

6      THE COURT:  I mean, this is --

7      MR. SIMMONS:  And -- and that's in the agreed

8 Protective Order.

9      THE COURT:  Okay.

10      MR. SIMMONS:  That I sent Mr. Hennig.

11      THE COURT:  All right.

12      MR. HENNIG:  Thank you --

13      THE COURT:  Let --

14      MR. HENNIG:  -- Your Honor.

15      THE COURT:  Let me know --

16      MR. HENNIG:  Appreciate it.

17      THE COURT:  If there's problems with that --

18      MR. HENNIG:  Okay.

19      THE COURT:  But --

20      MR. SIMMONS:  And then -- thank -- thank you,

21 Your Honor.

22           Then just -- just for -- because I foresee

23 this to be a continuous issue with Mr. Hennig and -- and

24 myself, or, I guess, whoever is now in charge of drafting the

25 APO, whoever this new law firm is that, apparently,

1   represents all third parties.  What attorneys' eyes only

2   is supposed to be, we'll obviously, you know, fight any

3   designations, but the definition of what attorneys' eyes

4   only will be is likely going to be something that Mr. Hennig

5   and I will never agree on just because he thinks everything

6   will be attorneys' eyes only and we will have to be in front

7   of the Court every 15 days for whatever rolling production

8   that they have.  So, I guess --

9           THE COURT:  You can't --

10          MR. SIMMONS:  -- if Mr. Hennig --

11          THE COURT:  -- designate everything attorneys' eyes

12  only.

13          MR. HENNIG:  Yes, understood --

14          THE COURT:  You just can't.

15          MR. HENNIG:  Understood, Your Honor.  And -- and let

16  me make a suggestion.  I will offer to the extent that there -

17  - there -- there are disagreements to provide these documents

18  to the Court informally in camera and make -- you can make a

19  decision to expedite this process.  Because I don't -- I don't

20  think the motion, order is helpful.  I think let's just get

21  this worked, and let's get this done, Your Honor.

22          MR. SIMMONS:  If that's truly an offer, why

23  didn't you bring the documents here today to have an in camera

24  inspection?

25          THE COURT:  A what?

1          MR. SIMMONS:  Do an in camera inspection of the

2    documents he believes are attorneys' eyes only outside counsel

3    only?

4          MR. HENNIG:  All right.  I'm not volunteering Your

5    Honor to do that.  I'm saying there's a disagreement, Your

6    Honor.

7          THE COURT:  All right.

8          MR. SIMMONS:  Okay.  And -- and we – we can work that

9    out, I believe, Your Honor.  I hope, with your instructions.

10         THE COURT:  I hope you can.  Because this seems to be

11   the latest fad is everyone wants me to look at their document

12   production.  It's like I'm a super fun special master, and

13   it's -- you know, I've had it --

14         MR. SIMMONS:  Understood, Your Honor.

15         THE COURT:  -- up to here, because I don't have time

16   to looking at everyone's document production.

17         MR. HENNIG:  Thank you, Your Honor.

18         THE COURT:  All right.  So, get this worked out.  If

19   you can't, call me, and let's maybe we can work this out on

20   the phone.

21         MR. SIMMONS:  Yes, Your Honor.

22         THE COURT:  So, then moving to third party Lewicki's

23   Motion to Quash, I ask that why didn't you file this in the

24   District of production, why here, if other clients think I

25   don't have authority to do anything?

1              Mr. Hennig?

2         MR. HENNIG:  Mr. Lewicki is in Houston, Your Honor.

3         THE COURT:  He's in Houston?

4         MR. SIMMONS:  That's correct.

5         MR. HENNIG:  Yes, that's --

6         THE COURT:  Oh.

7         MR. HENNIG:  So you do have jurisdiction --

8         THE COURT:  Oh.

9          MR. HENNIG:  -- over Mr. Lewinski.

10         THE COURT:  Then let's -- let me find that one.

11 That was 27.

12          MR. SIMMONS:  Yes, Your Honor, 27.  And then also

13 his motion to reconsider that we submitted.

14          THE COURT:  So, let's talk about this.  When I

15 looked at your subpoena, it looked extremely broad.

16          MR. SIMMONS:  We actually did discuss this a

17 little bit during the June 12th hearing, and -- and

18 essentially what we did, we asked seven broad questions and

19 then we asked a bunch of more specific questions about

20 specific clients, about specific interactions between himself,

21 Mr. Mols, Mr. Kaufman and Prime Parakore.  So, it's

22 actually -- it can be distilled down to essentially seven

23 questions, even though there's a lot of questions there.  It

24 wasn't -- the objections were not timely filed.  They -- like

25 the Court noted in -- in the June 12th hearing.  And there's a

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1   lot of baseless objections that Mr. Hennig even said that may

2   be they weren't artful enough or too artful I think is maybe

3   what he said.  And despite the Court's -- what I believed

4   was -- was the intent of the order, and it specifically

5   ordered the Motion to Quash be denied through a review of the

6   transcript, but I thought from the communications between you

7   and Mr. Hennig that it had been quashed, mainly because it was

8   untimely.  But even after that, Mr. Lewicki still did not

9   produce a single document, not one.

10          Prime Parakore have even produced documents.

11   Mr. Jared Kauffman's produced documents.  All the other

12   third parties that we've requested documents from have

13   produced documents but not Mr. Lewicki.  Not a single

14   document.

15        THE COURT:  So where are we on this?

16        MR. HENNIG:  Well, as I understand it, Your Honor,

17   the documents that Mr. Lewicki would produce are actually in

18   the possession of Prime Tax Group or Parakore because it's an

19   e-mail server is what I understand it to be, Your Honor.  So,

20   we were -- we were rolling that into the production for Mr.

21   Lewicki as to Prime Tax Group, Parakore.  That's -- that's

22   what I understand.  He does not have separate documents is my

23   Understanding, so that if -- if Mr. Simmons wants these

24   documents -- and we understand that -- they have to be - well,

25   they're from Prime Tax Group --

1          MR. SIMMONS:  Mr. --

2          MR. HENNIG:  -- production.

3          MR. SIMMONS:  Mr. Lewicki's never said that, and I

4    don't know how his communication with --

5          THE COURT:  How can he not have --

6          MR. SIMMONS:  -- Mr. Jared Kaufman --

7          THE COURT:  Yeah, how can he not have possession of

8    these for production purposes?

9           MR. HENNIG:  Well, the -- the correct answer

10   to that is I'm not sure.  I do not know.  That was my

11   understanding of his terms.  In terms of the documents they --

12   the substantive documents they want in terms of these clients,

13   those I believe are the Prime Tax Group and Parakore.  The

14   reason for that is because Mr. Lewicki worked for Prime Tax

15   Group and Parakore.  In other words, he was doing work for

16   them, so they -- he didn't necessarily have possession of

17   those documents.  With regard to the documents in terms of

18   communications --

19         THE COURT:  Well, no, I don't understand that,

20   because if he is doing work for them, then he ought to have

21   something on his own computer that shows what he's doing.  I'm

22   not understanding how this is all working --

23         MR. HENNIG:  Well, Your Honor --

24         THE COURT:  -- I guess.

25         MR. HENNIG:  -- that is my understanding.  I haven't

1    had a conversation with Mr. Lewicki about this -- this --

2    about that, so this is what I would offer to the Court.  To

3    the extent the Court -- and I understand the production should

4    -- should happen, of course.

5          THE COURT:  He needs to produce the documents.  I'm

6    not impressed by everything's private, and it's none of

7    your business.

8          MR. HENNIG:  Okay.  To the --

9          THE COURT:  That's overruled.

10         MR. HENNIG:  Fair enough.  And so what -- let's just

11    set a date for production, then, Your Honor.

12         THE COURT:  All right.  Two weeks.

13         MR. HENNIG:  Thank you.

14         THE COURT:  Two weeks.  If there's a problem, come on

15    in, and we'll talk about it.

16         MR. SIMMONS:  Understood, Your Honor.

17         MR. HENNIG:  Understood, Your Honor.  Okay.

18         THE COURT:  And so six- -- you say I haven't ruled on

19    69?

20         MR. SIMMONS:  I believe it's 69.  It's Lewicki's

21    motion -- it's either 68 or 69.  It's Lewicki's motion to

22    reconsider the sanctions the Court imposed upon him for being

23    a no-show and failing to file a Motion to Quash at his

24    previously scheduled deposition.  I believe the costs we're

25    seeking, through an active me, is like $700.  This is a part

1  of the verbal order of that Court ordered right here.

2          THE COURT:  All right.  Well, that is overruled.

3          MR. SIMMONS:  Thank you, Your Honor.

4          THE COURT:  Now, on Plaintiff's Motion for

5  Continuance, let's get some dates that are workable.

6          MR. SIMMONS:  And just as a note, Mr. Humphreys did

7  agree during the June 12th hearing to the Motion for

8  Continuance.  It's actually at --

9          THE COURT:  So we did --

10          MR. SIMMONS:  I'll find the date.

11          THE COURT:  Did we get -- get dates?

12          MR. SIMMONS:  We -- we -- he agreed to – he -- he

13  withdrew his opposition to the motion for a continuance --

14          THE COURT:  Okay.

15          MR. SIMMONS:  -- at that time.  I have subsequently,

16  as part of our -- meet and con- -- meet and confer efforts

17  asked Mr. Humphreys for an additional 30 days since the

18  documents that the Court ordered Mr. Mols to produce weren't

19  produced until like three days ago, more than 30 days -- more

20  than a month after.  So I said, hey, listen, you know, Brian,

21  like, your guy hasn't even produced his documents.  Obviously

22  the third parties haven't produced their documents.  It's been

23  30 days.  Can you give me another 30 days beyond what you

24  agreed to during the June 12th hearing.  He said, no, that his

25  client's not going to agree to any other extension beyond what

1  he agreed to in the June 12th hearing, which was --

2        THE COURT:  All right.

3        MR. SIMMONS:  -- what documents he's --

4        THE COURT:  So what are you proposing, Mr. Simmons?

5        MR. SIMMONS:  I'm proposing a -- an additional

6  30-day continuance on all the deadlines that we requested and

7  Mr. Mols agreed to in document 36 -- 26.  At the end of the

8  day, we'll agree to document 26, and -- but with the

9  difficulties that we've gone through so far and Mr. Mols' own

10 lack of production in the last 30 days, complete lack of

11 production, I think that it's reasonable to tack another 30

12 days on the deadlines that are in there, since there hasn't

13 been any documents or -- or other information provided in the

14 last 30 days.

15        THE COURT:  All right.  So, have you -- let's go back

16 to the Docket Control Order that was entered in January.  Have

17 you turned over your expert report?

18        MR. SIMMONS:  Yes.

19        THE COURT:  You've turned over yours?

20        MR. SCHNEIDER:  Yes, Your Honor.

21        THE COURT:  Discovery was supposed to cut off June

22 30, but now you want --

23        MR. SIMMONS:  And the Court, at least preliminary,

24 did order the discovery deadline since Mr. -- Mr. Humphreys

25 withdrew his opposition.  We wanted September 28th as the

DIGITAL SCROLL TRANSCRIPTION                    281.382.9862

1  discovery cut-off, but since there hasn't been any discovery
2  from anybody in the last 30 days, we're now requesting an
3  additional just 30 days on top of that, which would be October
4  31st for the discovery cut-off.  The last thing we want to do
5  is have to come back here again and ask for yet another motion
6  for continuance.
7          THE COURT:  And you're --
8          MR. HUMPHREY:  It may --
9          THE COURT:  -- opposed.
10         MR. HUMPHREY:  -- still be necessary, but --
11          MR. HENNIG:  I am, Your Honor.  We don't have
12  any other requests pending or anticipated.  We've produced the
13  documents they asked for.  My client was laggardly in getting
14  his banking statements.  We produced them a week ago.  I'm not
15  sure why we need to go through September.  And I believe they
16  asked us for it, in the 30-day letter he asked for a January
17  trial date, which I think is way too long for this case.  My
18  client really needs to get this case over with.  And --
19         THE COURT:  So have you filed a Motion for Summary
20  Judgment?
21         MR. HUMPHREY:  No.  When we spoke last time, I
22  believe we talked about an August deadline which I'm trying to
23  meet, Your Honor.
24         MR. SIMMONS:  Well, and also, Your Honor, the --
25  Judge -- under Judge Lake's Scheduling Order, the

1  dispositive motion deadline was, I believe, 30 days after

2  impasse with a mediator.  That happened way more than 30 days

3  ago, and --

4          MR. HUMPHREY:  The mediator has never declared an

5  impasse.

6          MR. SIMMONS:  When was the last time you spoke

7  to Mr. Levin?

8          MR. HUMPHREY:  I spoke to him, asked him if has he

9  declared an impasse, and he said no, I have not.  So --

10          MR. SIMMONS:  He hasn't spoken that to us.

11              And when did you say that?

12          MR. HUMPHREY:  When did I --

13          MR. SIMMONS:  When did you talk --

14          MR. HUMPHREY:  -- say that to him?  A couple months

15  ago.

16              Your Honor, the docket order says 30 days after

17  he declares an impasse.  That hasn't happened.  I don't know

18  what else to say about that other than there's no --

19          THE COURT:  Other than we're going to change that.

20          MR. HUMPHREY:  Of course.

21          THE COURT:  So all right.  Discovery ends October

22  31st.  All motions must be filed by November 9th.  The sooner

23  you file your dispositive motion, the sooner it gets in line,

24  because --

25          MR. HUMPHREY:  Yes, Your Honor.

1          THE COURT:  -- there's a lot of things on that pile

2     right now.  And we'll set trial when I -- I'm done with the

3     dispositive motions.  So get it on file.  I'm assuming there's

4     some legal ground that you think you can get out on that

5     doesn't require discovery.

6          MR. HUMPHREY:  At least on some of the claims, Your

7     Honor.

8          THE COURT:  All right.  Good.  All right.  So we've

9     taken care of that.

10          What else do we need to talk about?

11          MR. SCHNEIDER:  Your Honor --

12          MR. SIMMONS:  Well --

13          MR. SCHNEIDER:  Go ahead.

14          MR. SIMMONS:  Sorry.  Yeah, just along with -- I

15     guess we also have Jared Kaufman, the motion for sanctions

16     regarding his evasion, and the motion against Ms. Dee Nguyen

17     for her false affidavits.  And just to let the Court know, Mr.

18     Hennig informed me that Ms. Nguyen is no longer in the case,

19     no longer with the law firm, but she clearly filed several

20     false affidavits in support of the evasion argument that Mr.

21     Kaufman told her and actually threw Mr. Jared Kaufman under

22     the bus in her declaration, saying, I just said what he told

23     me, which was clearly not true.  So we're -- we're asking for

24     our fees related to the service of Mr. Kaufman because, just

25     as Mr. Schneider said, he was trying to avoid us and maybe

1  was being a little childish in doing so.  That's a paraphrase,

2  but that's essentially what he said.

3          THE COURT:  And how is that not precluded by

4  Rule 45?

5          MR. SIMMONS:  I believe that through Mr. Jared

6  Kaufman's numerous motions in this case, he has consented to

7  this Court's jurisdiction, and under Rule 45, if -- if a party

8  consents to the Court's jurisdiction, then they can't just

9  say, "Oh, by the way, we want all these things from you, but

10  if you decide against us, you can't touch us."  That -- you

11  can't do that.  But that goes along with their sword and

12  shield games and gamesmanship that they've been doing.  So,

13  it's not a surprise that they're trying to argue that.

14  But it -- it's clear that Mr. -- Mr. Kaufman has been seeking

15  affirmative relief in this court on several occasions and has

16  consented to the jurisdiction and now -- and is just now

17  saying, "Oh, you don't have to consent.

18          THE COURT:  How did Mr. Kaufman consent to the

19  jurisdiction?

20          MR. SIMMONS:  By showing up.  By asking for an

21  extension of his deadline to produce documents.  All these

22  other things that -- that he's done.  And along with that,

23  we're not just filing that under Rule 45, we're also filing it

24  under the Court's inherent power to control its cases.  It's -

25  - at least in my view, it's absurd to think that he can come

1  in here and ask for -- for leave and then say, "Oh, by the

2  way, you can't touch me if I'm doing this or this."

3          THE COURT:  I didn't get the impression that

4  Mr. Kaufman was asking for relief.

5          MR. HENNIG:  Your Honor --

6          THE COURT:  He was --

7          MR. HENNIG:  -- no --

8          THE COURT:  He was responding to your request

9  for sanctions, right?

10          MR. HENNIG:  Yes, Your Honor.

11          THE COURT:  Mr. Hennig.

12          MR. HENNIG:  At no point that I'm aware of did Mr.

13  Kaufman ever ask for affirmative relief, and if Mr. Simmons

14  can identify a specific motion, we would be able to respond to

15  that, but this general accusation here, I don't understand --

16          THE COURT:  I would tend to agree.  I think that this

17  is an issue that -- if you want to seek fees of Mr. Kaufman

18  for the service attempts, then you need to that in the service

19  District.  So, to the extent you need a denial, denied.  What

20  else?

21          MR. SCHNEIDER:  Your Honor, can I get – can we have a

22  clar- -- just everything I've seen in this case and the

23  disputes back on what happened on June 12th, on the -- on the

24  deposition issue in terms of what Mr. Kaufman's going to pay

25  for, it's the transcript, the -- the court reporter, and the

1   actual someone to be in the courtroom video -- videoing the

2   deposition, not the video link up if they want to do it

3   from --

4           THE COURT:  Correct.

5           MR. SCHNEIDER:  And it's not a -- it's the usual turn

6   around time, not a --

7           THE COURT:  Not expedited.

8           MR. SCHNEIDER:  -- daily turn- -- it's one copy.

9           THE COURT:  Yeah.

10          MR. SCHNEIDER:  Like the standard rules, whatever the

11  court reporter's ordinary practice is at the regular price.

12          THE COURT:  Correct.

13          MR. SCHNEIDER:  Not expedited or anything.

14          THE COURT:  Not any --

15          MR. SCHNEIDER:  Yeah, no --

16          THE COURT:  -- super-duper stuff.  Yeah.

17          MR. SCHNEIDER:  -- H D hyphen whatever like it is.

18          MR. SIMMONS:  Right.  We'll -- yeah.  We're not going

19  to ask -- I prefer it to be synced.  But we -- we will

20  obviously ask for the transcript costs and the costs of the

21  videog- -- videographer to -- to make the video, I mean.

22          MR. SCHNEIDER:  At the --

23          MR. SIMMONS:  You're not -- you're not –

24  you're not --

25          MR. SCHNEIDER:  The standard whatever like, the

1 standard reporter.

2 THE COURT: Yeah, original --

3 MR. SCHNEIDER: Make one copy.

4 THE COURT: -- plus one.

5 MR. SCHNEIDER: And one, yes.

6 MR. SIMMONS: Absolutely.

7 MR. SCHNEIDER: Yes.

8 THE COURT: All right. We're clear. What else?

9 MR. HUMPHREY: Nothing from me, Your Honor.

10 MR. HENNIG: I think we're done, Your Honor. I

11 appreciate --

12 THE COURT: All right.

13 MR. HENNIG: -- the Court's time. Thank you, Your

14 Honor.

15 THE COURT: Thank you for coming.

16 So why --

17 MR. SIMMONS: We do --

18 THE COURT: Just out of curiosity, why hasn't

19 Mr. Levin declared an impasse if he's not talking to you-all

20 and you're not talking to him?

21 MR. HUMPHREY: Your Honor, he told me, "I'm just not

22 going to do that," because he wants to keep working on the

23 case. That's what he --

24 THE COURT: And what's he doing to work on the case?

25 MR. HUMPHREY: He hasn't done anything, Your Honor.

1        MR. SIMMONS: I -- my understanding – I wasn't

2  involved with the mediation, but my understanding is that

3  there was an impasse at the end of the mediation which

4  occurred in I want to say December.

5        MR. HUMPHREY: Well, there was --

6        MR. SIMMONS: And so there was no need for a formal

7  letter to us, "I declare an impasse."

8        MR. HUMPHREY: That's -- that's not right; there was

9  actually -- there -- there was a settlement proposal on the

10  table at the time that we were analyzing. There was some more

11  settlement discussion afterwards. Mr. Levin worked backwards

12  some time. But, regardless, the Docket Control Order says

13  declaration of an impasse, and that's what I need to rely on.

14  So, I didn't have a deadline at the time. I -- I have a

15  deadline now, and I'm going to meet it, Your Honor.

16        THE COURT: The sooner --

17        MR. HUMPHREY: The deadline says so.

18        THE COURT: -- it's on the pile, the sooner it

19  gets --

20        MR. HUMPHREY: Yes.

21        THE COURT: -- ruled on. But -- so who has the last

22  offer outstanding? Was that your proposal, Mr. Humphrey or

23  was that --

24        MR. HUMPHREY: Oh --

25        THE COURT: -- Plaintiff's?

1    MR. HUMPHREY:  -- it's a very complicated proposal,

2  so I'm actually not sure --

3        THE COURT:  You're not sure?

4        MR. HUMPHREY:  -- Your Honor.  It's just talking

5  past.  I think -- well, I think that's something we need to

6  discuss.

7        MR. SIMMONS:  Yeah, I don't want to get into it --

8        MR. HUMPHREY:  Right.

9        MR. SIMMONS:  -- the -- the details or anything.

10  All I will say is that it's -- at no point has there been a

11  proposal where Alliantgroup would get any money, if that makes

12  sense.

13        THE COURT:  Okay.

14        MR. HUMPHREY:  Yes.  I agree with that.

15        MR. SIMMONS:  That's not for settlement.

16        MR. HUMPHREY:  Right.

17        MR. SIMMONS:  In their mind.

18        MR. HUMPHREY:  Well, I have claims for attorneys'

19  fees in this case, and I frankly didn't pursue them, so --

20        MR. SIMMONS:  Then also, Your Honor, we do have a few

21  outstanding motions.  We have an outstanding Motion to Compel

22  against Mr. Mols.  I believe it's Doc. 34.

23        THE COURT:  We talked about that last time, I think.

24        MR. SIMMONS:  That's what I thought, Your Honor,

25  but --

1            THE COURT:  Do we need to reset that and --

2            MR. HUMPHREY:  I don't see why we -- I think we

3    discussed it and we were ordered to produce the -- his

4    financial documents, and that's what we produced last week.

5            MR. SIMMONS:  The financial documents were actually

6    in response to the Motion to Quash by Cindy Mols.

7            THE COURT:  Right.

8            MR. SIMMONS:  And which also there hasn't been

9    technically a written order on that.  We proposed one just

10   saying, hey, we -- we quashed it.  And that's Doc. 44, I

11   believe.

12           THE COURT:  Okay.  I'll look at that.

13           MR. HUMPHREY:  I -- I've responded to --

14           THE COURT:  So what's the problem on 34?

15           MR. HUMPHREY:  Which 34 are you --

16           THE COURT:  A Motion to Compel.  What are we --

17           MR. SIMMONS:  This is far --

18           THE COURT:  What are you seeking?

19           MR. SIMMONS:  It's far more than just financial

20   documents.  And which, by the way, the --

21           THE COURT:  All right.

22           MR. SIMMONS:  -- production –

23           MR. HUMPHREY:  Yeah.

24           THE COURT:  He's not sure what it is.  Talk to him.

25   See what the dispute is.  And come in next week, and we'll

1   talk about it.

2           MR. SIMMONS:  Okay.  That sounds good, Your Honor.

3           THE COURT:  I mean --

4           MR. HUMPHREY:  Thank you, Your Honor.

5           THE COURT:  -- let's move this case.

6           MR. SIMMONS:  Thank you.

7           THE COURT:  All right.  Y'all may be excused.

8           MR. SIMMONS:  Thank you, Your Honor.

9       (Proceedings concluded at 11:03 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                  HOUSTON DIVISION

4

5      I, Linda Griffin, court approved transcriber, certify that

6  the foregoing is a correct transcript from the official

7  electronic sound recording of the proceedings in the above-

8  entitled matter.

9

10 /s/ Linda Griffin                    August 1, 2017
   Linda Griffin                             Date
11 Digital Scroll Transcription

12

13

14

15

16

17

18

19

20

21

22

23

24

25