THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

* * * * *

| | | |
|---|---|---|
| ALLIANTGROUP, L.P. | * | NO. H-16-CV-3114 |
| | * | |
| Versus | * | October 5, 2017 |
| | * | |
| BRAD MOLS | * | 11:15 a.m. - 11:58 a.m. |

* * * * *

**MOTION HEARING**

BEFORE THE HONORABLE NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE

* * * * *

Proceedings recorded by electronic sound recording
Transcript produced by transcription service.

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 * 866-993-1313

1   **APPEARANCES:**

2   For the Plaintiff:

3        MS. KIMBERLY R. MIERS
         MR. ADAM R. PERKINS
4        **Littler Mendelson, P.C.**
         2001 Ross Ave., Suite 1500
5        Dallas, Texas 75201

6   For the Defendant:

7        MR. BRIAN S. HUMPHREY, II
         **Abraham Watkins Law Firm**
8        800 Commerce Street
         Houston, Texas 77002

9   For Uche Okoroha and Christopher Sioco:
10
         MR. UCHENNA OKOROHA
11       **Attorney at Law**
         3039 Clinton Drive
12       Houston, Texas 77020

13  Court Clerk:

14       SHANNON JONES

15  Electronic Recorder:

16       SUZANNE GUEVARA

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**11:15 A.M. - OCTOBER 5, 2017**

1

2

3        COURT CLERK:  Is anyone appearing by phone or

4 is this everyone?

5        MS. MIERS:  I'm not aware of anybody that's

6 appearing by telephone.

7        COURT CLERK:  Okay.

8        THE COURT:  Because we can open the lines.

9 That happens.

10        All right.  Everyone be seated, please.

11        MS. MIERS:  Your Honor, I want to correct

12 myself a little bit.  Mr. Perkins informed me that

13 maybe Mr. Hennig will be attending over the line.

14        MR. PERKINS:  Just because one of my motions

15 is a Motion to Compel against his client, Mr. Lewicki.

16        THE COURT:  Okay.

17        **[Conference line opened]**

18        All right.  Well, I was going to take up

19 that $700 matter, but we'll see if Mr. Hennig joins us

20 by phone.

21        Now, as I understand it, we've got a

22 couple issues to discuss.  One is Mrs. Mols; correct?

23        MR. HUMPHREY:  That's correct, Your Honor,

24 they have filed a Motion to Compel, as well as a

25 deposition.

1          THE COURT:  And you're opposed?

2          MR. HUMPHREY:  I am opposed, Your Honor.

3          THE COURT:  What information do you seek from

4   Mrs. Mols?

5          MS. MIERS:  The information we seek from

6   Mrs. Mols is related to the deposits primarily that

7   were made into their bank account.  As you might recall

8   from the June 2017 hearing, we explained that Mr. Mols

9   claimed that he didn't know where the money came from

10  because his wife handled all the bookkeeping.

11         THE COURT:  Is this money into his personal

12  bank account or the business bank account?

13         MS. MIERS:  The business bank account.

14         THE COURT:  The business bank account?

15         MS. MIERS:  Yes, Your Honor.

16              He claims that his wife handles all of the

17  bookkeeping for both his personal and his work accounts

18  and he doesn't know the answer to the questions.  That

19  led to us seeking to depose Mrs. Mols.

20         THE COURT:  So you wish to talk to her about

21  bookkeeping?

22         MS. MIERS:  In addition to any third parties

23  that might be connected to Alliantgroup coming to the

24  house, any conversations she may have heard that would

25  certainly not be privileged in any way, and any other

1  knowledge she has regarding our claims, the bank's

2  claims against Mr. Mols.

3            MR. HUMPHREY:  Well, Your Honor, first off,

4  there is no business bank account, there is just a

5  personal bank account.  Mr. Mols is not a -- he does

6  not own a business.  He's a consultant -- or was a

7  consultant for Prime Tax Group, but he's not any more.

8  She's not his bookkeeper, his wife.  The only testimony

9  is that she receives the paychecks and she deposits

10 them.  That's it.  And we've produced those checks, all

11 the checks --

12           THE COURT:  Well, apparently not all of them;

13 right?  There's some --

14           MR. HUMPHREY:  Well, we've produced all the

15 checks, Your Honor.  We've produced the checks --

16           THE COURT:  You have all the checks; correct?

17           MR. HUMPHREY:  -- from Prime Tax Group, yes,

18 Your Honor.

19           MS. MIERS:  But we don't have all the checks

20 deposited.  We don't know where these other checks,

21 where the other deposits came from.

22           MR. HUMPHREY:  And that's, I think, an issue

23 that's raised in a Motion to Compel, Your Honor.  They

24 apparently think they're entitled to every single check

25 that's been deposited in this account for that entire

1  year, which is not even responsive to any discovery

2  request.  They're asking for all of his bank records

3  now and all of his checks that have gone into his bank

4  account regardless of source.  So, I mean, they've

5  never even requested that and we'd certainly object to

6  that as a fishing expedition.

7          THE COURT:  So tell me what you think is not

8  relevant that you have not produced that you're not

9  turning over?  What checks are you holding back, in

10 other words?

11         MR. HUMPHREY:  Tax refund checks, Your Honor,

12 and checks from personal matters that have nothing to

13 do with this business.

14         THE COURT:  And what would that be?  What does

15 he get income from other than his business?

16         MR. HUMPHREY:  I am not --

17         THE COURT:  You don't know, that's the problem.

18 No one knows.  You know --

19         MR. HUMPHREY:  If it's relevant, we can produce

20 all the checks that --

21         THE COURT:  You produce all of it, all of it.

22         MR. HUMPHREY:  And there was one month missing

23 from the -- actually, I have not known which month was

24 missing from the bank records.  I've tried to fill the

25 gap by getting the wrong month, so we're getting the

1  right month in December.

2          THE COURT:  All right.  I mean, they're

3  entitled to see all the checks.  And maybe they're not

4  relevant, I don't know, but they're going to see all

5  the checks.  And if you can't find them, then you're

6  going to have to get transit items from the bank.

7          MR. HUMPHREY:  I think they can get them from

8  the bank, Your Honor.

9          THE COURT:  Okay.

10         MR. HUMPHREY:  And I think there was a

11  mention -- I think I didn't address the receipts.

12  Before we get to that, my client can produce them, can

13  make those available for inspection at his house for

14  him to copy and send.  They asked -- they did mention

15  something about expense receipts in there, which I

16  guess are of some relevance.

17         THE COURT:  So he doesn't have a business bank

18  account, he runs his business out of his personal

19  checking account?

20         MR. HUMPHREY:  He's a consultant contractor.

21  It's just his own work.  So, just like I don't have a

22  business bank account with money I get from the law

23  firm, it's just money that he gets paid as a paycheck

24  and he deposits it in his personal bank account.

25         THE COURT:  Right, and I'm certain he keeps

1  expenses somewhere logged in?

2          MR. HUMPHREY:  He keeps receipts.  I don't

3  know how good his records are on that, but he has --

4          THE COURT:  You know, that is so incredible to

5  me that this man is a consultant on tax matters and

6  you're acting like he doesn't keep any books and

7  records for his own deductions.

8          MR. HUMPHREY:  I think he does have his

9  receipts, that's correct, Your Honor.

10          THE COURT:  And I'm certain in some sort of

11  maybe spreadsheet; right?

12          MR. HUMPHREY:  That I don't know.  I don't

13  think he does.

14          THE COURT:  And have you --

15          MR. HUMPHREY:  I have asked him and he said he

16  does not, he's got receipts.

17          THE COURT:  And he's turned those over?

18          MR. HUMPHREY:  He has not turned over the

19  receipts.  We can make those available for inspection --

20          THE COURT:  Are you interested?

21          MS. MIERS:  Yes, Your Honor, we are.  We are

22  seeking a written order from the Court on this because

23  rulings at the hearings are apparently not good enough.

24  This Court ruled on June 12th that Mrs. Mols had to sit

25  for her deposition, and here we are in October and the

1  excuse is there's no written order.  So --

2       MR. HUMPHREY:  There was no such ruling at

3  that hearing, Your Honor.

4       MS. MIERS:  We disagree with your

5  interpretation of the judge's rulings.

6       MR. HUMPHREY:  My recollection and reading the

7  transcript was he offered to produce the bank records,

8  which we did, and the Court -- that was what we're

9  doing and we are presenting her for a deposition.  I

10  don't recall any order that Mrs. Mols sit for a

11  deposition.

12       THE COURT:  I'm not sure I ordered her.  I

13  expressed amazement that you were claiming a privilege

14  on her bookkeeping and activities in depositing a check.

15       MR. HUMPHREY:  Well, Your Honor, there is a

16  broad testimony and privilege under California law.

17       THE COURT:  Well, we'll get to that in a

18  minute, so -- well, I guess we can get to it now.

19  I've looked at the privilege issue.  And under Federal

20  Rule of Evidence 501 in a civil case, state law governs

21  the privilege regarding a claim or defense for which

22  state law supplies the rule of decision.  I think

23  that's exactly what the 501 says.

24       The Fifth Circuit interprets Rule 501 to

25  require the Court to apply the choice of law rules of

1 the forum state to determine the governing law for

2 attorney\client privilege. And that statement is from

3 *Benson vs. Rosenthal,* No. 15-782, 2016 Westlaw,

4 3001129, at page 3. That's out of the Eastern

5 District of Louisiana, May 25, 2016, citing *Miller vs.*

6 *Transamerican Press, Inc.* 621 F2d, 721, page 724.

7 Opinion supplemented on denial of rehearing, 628, F2d,

8 932, Fifth Circuit 1980.

9         Now, so the Court concludes that the

10 Federal Choice of Law Rules apply here because Texas

11 is the forum state. Under the Texas Choice of Law

12 analysis, Texas law applies even if another state has

13 the more significant relationship with the parties and

14 the dispute when the parties have entered a choice of

15 law agreement, such as the employment agreement in this

16 case, unless application of the chosen state's law

17 would contravene a fundamental policy of the state with

18 the more significant relationship. And I'm citing

19 *Cardoni vs. Prosperity Bank,* 805 F3d, 573, 585 to 586,

20 Fifth Circuit, 2015. No fundamental policy of

21 California law has been asserted here.

22         So the Court finds that Texas law applies

23 to the dispute. Even if Texas law applies to the

24 dispute, Texas Courts will identify the state of the

25 most significant relationship with a communication when

1 determining whose law of privilege should apply. *Ford*
2 *Motor Company vs. Leggat,* 904 S.W.2d, 643 at 647.
3 That's Texas 1995. In this case California has the
4 most significant relationship with the communications.

5       In step 4, when the evidence is privileged
6 under the local law of the state which has the most
7 significant relationship with the communication, but
8 which is not privileged under the local law of the
9 forum, the evidence will be admitted unless there is
10 some special reason why the forum policy favoring
11 admission should not be given effect. And that's again
12 *Ford Motor Company,* 904 S.W.2d at 647.

13       Factors that the Court is considering when
14 determining whether a special reason is present are:
15 Number one, the number and nature of contacts of the
16 forum with the parties or the transaction; two, the
17 materiality of the evidence, this factor favors Texas
18 in this case; the kind of privilege, I consider that
19 neutral to spousal privilege; and fairness to the
20 parties, that factor favors Texas in this case because
21 Mr. Mols himself has pointed to his wife as the person
22 who has the information.

23       Therefore, I find that Texas law applies
24 to the spousal privilege. And the Texas rule on
25 spousal rule on spousal privilege is that a person has

1  a privilege to refuse to disclose and to prevent any

2  other person from disclosing a confidential

3  communication made to the person's spouse while they

4  were married.  That's Rule of Evidence 504.  The

5  spousal privilege is limited to confidential

6  communications between married persons and not intended

7  to be disclosed to any other person and does apply to

8  acts.  That's *Cooper vs. Cochran* 288 S.W.3d, 522 at

9  539.  That's Texas appellate 2009.

10            Therefore, I'm finding that the spousal

11  privilege only applies to what Brad Mols told Cindy

12  Mols, not to her actions, not to her observations, and

13  not to her knowledge of his conversations with third

14  parties.

15        MR. HUMPHREY:  Understood, Your Honor.

16        THE COURT:  All right.  So does that take care

17  of that?

18        MR. HUMPHREY:  I think it does.

19        THE COURT:  You know, I'm entering minute

20  entry orders.  So that is an order even if you're not --

21  it's not in a little form.

22        MR. HUMPHREY:  Oh, I'm aware of that, Your

23  Honor.  I just don't remember an order actually being

24  pronounced at all at the last hearing.

25        THE COURT:  I think you're right.  I think I

1   expressed doubt.  I thought that, frankly, her argument

2   was, well, without merit based on he's pointing to her

3   and then she says, you know, can't talk to me about

4   checks.

5           MR. HUMPHREY:  I understand.

6           THE COURT:  All right, so we've resolved Cindy

7   Mols; right?

8           MS. MIERS:  Yes, Your Honor, I believe so.

9           THE COURT:  Right.

10          MS. MIERS:  So it would confirm that counsel

11  understands that Cindy Mols needed to appear for her

12  deposition?

13          MR. HUMPHREY:  I believe I just said that.

14          THE COURT:  Okay, good.

15               Now, we also have the issue on the Motion

16  to Compel and Motion for Protection with Mr. Sioco and

17  Mr. Okoroha.

18               Is that you, sir?

19          MR. OKOROHA:  Yes, Your Honor.

20          THE COURT:  Up.  So, are you asking to

21  represent Mr. Sioco in this court?

22          MR. OKOROHA:  Correct, Your Honor.

23          THE COURT:  And you're licensed in?

24          MR. OKOROHA:  In Maryland; correct.

25          THE COURT:  In Maryland.  Did you attach a

1  Certificate of --

2          COURT CLERK:  It was just one page.

3          THE COURT:  This was all you had?

4          MR. OKOROHA:  Yes, that's all I had today,

5  Your Honor.

6          COURT CLERK:  Looks like somebody checked

7  this.  They must have went to a website where he is a

8  member.  So it looks like --

9          THE COURT:  All right.  So you're representing

10 to me -- normally, you have to get a certificate that

11 you're admitted from the state.  You are admitted and

12 you have not been sanctioned?

13         MR. OKOROHA:  Yes, Your Honor.

14         THE COURT:  And you want to represent yourself

15 and Mr. Sioco; correct?

16         MR. OKOROHA:  Yes, Your Honor.

17         THE COURT:  And what is this Precision Systems

18 Engineering?

19         MR. OKOROHA:  Precision Systems Engineering is

20 one of the businesses referenced in this case.  I

21 received information that they had been subpoenaed for

22 information and they gave me a call and said that a

23 Alliantgroup, a plaintiff, had been harassing them in

24 calls and that they have now received a subpoena.  So

25 they asked me to represent them, as well, as far a

1 Motion to Quash that subpoena and also objecting to it.

2          THE COURT:  And did you file anything on that

3 company's behalf?

4          MR. OKOROHA:  I have not yet.  I just reviewed

5 the information last night, Your Honor.

6          THE COURT:  Any objection?

7          MS. MIERS:  Your Honor, this was filed after

8 we had already headed to the courthouse.  Based on what

9 I know, we don't have objections to assert, but we want

10 it clear that we're not intending to waive any

11 objections after we've had opportunity to review the

12 pro hoc motion.

13          THE COURT:  Well, there's not much here.

14          MS. MIERS:  And lack thereof of support.

15          THE COURT:  I'll sign it.

16          MR. OKOROHA:  I apologize, Your Honor, this is

17 my first time in court here.

18          THE COURT:  That's what I'm worried about.

19 I'm worried that you are completely over your head.

20          MR. OKOROHA:  Yes, Your Honor.

21          THE COURT:  You know.

22          MR. OKOROHA:  Your Honor, all I have is my --

23          THE COURT:  So why are you doing it?  I mean,

24 that's --

25          MR. OKOROHA:  Your Honor, all I have is my

1　knowledge of the law and knowledge of what's right and

2　wrong, and I believe that's enough for me to assert.

3　And defend ourselves in court, as well as the client's

4　welfare.

5　　　　THE COURT:  Well, I read your deposition

6　answers objecting on the grounds of relevance and, you

7　know, I would question your ability to represent

8　somebody in court.  But that's your lookout.

9　　　　　All right, I've signed that.

10　　　　　So let's talk about the Motion to Compel.

11　Specifically, what do you want these two men to answer?

12　The issue about Parakore; right?

13　　　　MS. MIERS:  Certainly the issue about

14　Parakore, certainly their activities related to

15　companies HOJ and Precision.  I think it's now

16　abundantly clear that there is absolutely some

17　connection to Precision, and I think it's important

18　for the Court to understand that Alliantgroup had two

19　people and only two people who ever communicated with

20　HOJ and Precision and those two people just happened to

21　be Mr. Mols and Angela Torres.  So we think that's an

22　important topic that needs to be covered during the

23　deposition.

24　　　　　THE COURT:  And you asked questions and they

25　refused to answer?

1        MS. MIERS: Yes. Mr. -- and I apologize if I

2  don't pronounce your name properly.

3        MR. OKOROHA: Okoroha.

4        MS. MIERS: -- Okoroha objected on relevance a

5  couple of times because he thought it was improper to

6  ask leading questions. And Mr. Sioco, for the most

7  part, said he just preferred not to answer.

8        THE COURT: All right. Well, let's just get

9  that off the table. The fact that you prefer not to

10  answer, you know, maybe you've seen too many police

11  shows. Those kind of things where you want to shut

12  down communications and say "I need to get a lawyer"

13  does not work in a civil deposition. So you have to

14  answer those questions.

15        And, Mr. Okoroha, an objection on the

16  grounds of relevance --

17        MR. OKOROHA: Yes, Your Honor.

18        THE COURT: -- it's not viable. I mean, these

19  are questions, just because you choose to find that,

20  you know, you really don't want to answer them, it's

21  not relevant to you or what you think is relevant, you

22  know, these are matters that generally you don't refuse

23  to answer in a deposition. You can object on the

24  grounds of relevance and then you answer anyway.

25        MR. OKOROHA: Your Honor, I do understand

1  that.  At the same time, we weren't briefed onto what
2  the deposition was going to be about.  We saw Alliant
3  would be Brad Mols.  We haven't ever been mentioned in
4  the case, so we thought Alliantgroup is calling us in
5  for our experience at Alliantgroup and we thought he'd
6  likely work with us at Alliantgroup.  So we weren't
7  able to consult an attorney before we went in, we
8  weren't able to bring an attorney.  So, when we went in
9  and he started asking us about our personal business
10 dealings, we didn't know what to do.  "I object on the
11 grounds of relevance" might have been improper.  He
12 said, "I don't wish to continue unless at the
13 deposition."  That might have been improper.  But we
14 did not know that deposition was going to be about us,
15 so we didn't have time to consult with an attorney
16 about that matter before proceeding into the
17 deposition.
18         THE COURT:  Well, as an attorney, I would
19 expect you to know that you can call up somebody and
20 ask about, "What are the topics I need to be prepared
21 about?"  I mean, these are not good reasons, that you
22 weren't expecting to be asked about things that are
23 relevant to this case.
24         MR. OKOROHA:  But as far as the clients being
25 brought up and the reasons for deposing us, we answered

1　all of their questions related to Parachor and Parakore

2　with a k, any relation to Brad Mols, Angela Torres, any

3　of those parties, and the defendant as well.  There is

4　no connection between us and any of them and their

5　company at all.  So we have no connection --

6　　　　　　THE COURT:  You know, you say that, sir, but

7　that doesn't even pass the laugh test.  It really

8　doesn't.

9　　　　　　MR. OKOROHA:  I understand, Your Honor.

10　　　　　THE COURT:  I don't know if you do.  You need

11　to answer the question.  For you to say that there is

12　no connection and you have no idea how you came up with

13　almost identical names, it's ludicrous.

14　　　　　MR. OKOROHA:  Your Honor, I do understand that

15　there is a coincidence --

16　　　　　THE COURT:  It is not a coincidence.

17　　　　　MR. OKOROHA:  I understand, Your Honor.  But

18　as far as saying that Parachor "ch" and Parakore with a

19　"k" have any connection.  Legal arguments aside, I'm

20　not sure what the motive would be.  If we're plotting

21　with somebody to steal Alliantgroup trade secrets or

22　whatever it may be, then why would we pick a company

23　name that's exactly the same as the company that

24　they're involved with.  We wouldn't do that.  We would

25　take a different company name.  That, Your Honor, it is

1  a coincidence that these two companies have a similar

2  name, and we do not have any type of legal connection

3  to them or any type of ever connection with them as

4  well.

5           And as far as the businesses they're

6  asserting, Alliantgroup ostensibly has hundreds of

7  thousands of clients on potential client lists.  They

8  can't merely assert that a client is a potential client

9  or a former client or current client -- I'm not sure,

10  you know, if they call them all of these things -- just

11  to say that it is relevant.

12           What's more -- what's happening here is

13  these clients may have been on a potential client list

14  of, you know, Alliantgroup, but they said that they

15  were working with them.  I'm not sure what "working

16  with" means in the term of a potential client.  They

17  say that Brad Mols hasn't been working with

18  Alliantgroup since May of 2016, a year and a half later

19  is he still a potential client.  Is Alliantgroup still

20  working with them?  What interest do they have in these

21  clients?

22           They're alleging that it is a trade secret

23  when it's clearly not a trade secret, these company

24  names.  All of it is public information and Mr. Sioco

25  answered in his deposition exactly how we came upon the

1 clients.  It's a sales service called Sales Genie.  You

2 pay a hundred dollars, you type in "Engineers in Utah,"

3 and up pots the name, and we attached that as part of

4 our response there.  It is impossible that these client

5 names are a trade secret or in any way related to

6 Alliantgroup or Brad Mols or anybody related to this

7 case.

8          THE COURT:  So, if someone goes and talks to

9 HOJ or Precision, they will have never heard of you?

10          MR. OKOROHA:  They would -- they would have

11 heard of me and Mr. Sioco.  They would have not heard

12 of Alliantgroup, Brad Mols, or any other parties to

13 this case.

14          THE COURT:  And how would they have heard of

15 you?

16          MR. OKOROHA:  Because we have contacted them

17 in the course of our business deals.

18          THE COURT:  When?

19          MR. OKOROHA:  This was back earlier this year,

20 over the summer.

21          THE COURT:  After you left Alliant?

22          MR. OKOROHA:  Correct, after we left Alliant.

23          And if it would be helpful, Your Honor, I

24 can get signed statements from both of these companies

25 that say they have no idea who Alliantgroup is, who

1 Brad Mols is, who Angela Torres is, who anybody to this
2 case is at all.

3          THE COURT:  You know, I really have a hard
4 time figuring out what's going on in this case when the
5 thing that I cannot get over is the similarity of --
6 they're the same names, they're homonyms.  And for you
7 all to act like this is just some big coincidence is
8 completely incredible to me.  And therefore, I think,
9 because I'm jaded and I've been around for a long time,
10 I think there's something going on and you're covering
11 it up, that someone is up to something.  When I think
12 that, then that warrants additional discovery so they
13 can figure it out because obviously they think
14 something is up, too, because it is incredible the tale
15 you two are telling.

16          MR. OKOROHA:  Honestly, Your Honor, I
17 understand how being of a coincidence that would be.
18 But at the same time, I would like to know the scope of
19 what they wish to discover.  In the deposition they
20 asked us if we had contacted their clients.  And it is
21 clear that we do have a connection with these clients,
22 but another deposition isn't going to help uncover any
23 relevant evidence in this case.

24          THE COURT:  Well, I'm going to allow a short
25 additional deposition on each one up to one hour, but

1  let me just say this:  If it turns out that they

2  uncover evidence that proves that you have lied in

3  those depositions, you will be sanctioned.

4          MR. OKOROHA:  I understand, Your Honor.

5          THE COURT:  Because the Court cannot

6  countenance people perjuring themselves, acting like

7  they have very convenient memories.  That is not the

8  way the court system works.

9          MR. OKOROHA:  I understand, Your Honor.  And

10  in that aspect, would the further deposition be limited

11  to any specific questions asked from the first --

12          THE COURT:  No, no, it is -- they can ask and

13  you are going to answer, and the Court will decide

14  later on whether or not they can get the answer into

15  evidence.

16              And if you think something is still

17  outrageous, that you think you need to get sanctions

18  for the questions, then I'm sure you'll be back.

19              But, you know, it's a deposition, it's

20  uncomfortable.

21              And as for, you know, the argument on this

22  Parakore thing, that may be the best fact ever because

23  it looks so bad for you.  You know, it puts you in the

24  conspiracy.

25          MR. OKOROHA:  I understand, Your Honor.

 1          THE COURT:  I don't know if you do.  I don't

 2   know if you do.

 3          MR. OKOROHA:  I just don't understand, Your

 4   Honor, and it is that coincidence that they're hoping

 5   to capitalize on by bringing us into this deposition

 6   when we have no ties to Brad Mols or any of the other

 7   parties in this case, and they won't be able to uncover

 8   any connection because there aren't any.  If they have

 9   another deposition, if they send us interrogatories,

10   whatever they want us to provide, we can, but there's

11   no connection there, Your Honor.  I can assure you of

12   it.

13          MS. MIERS:  And that's the point of discovery.

14          THE COURT:  Yeah, yeah.  I mean --

15          MR. OKOROHA:  You did have a discovery and

16   this is an additional one.  That's a burden.

17          THE COURT:  Excuse me?

18          MR. OKOROHA:  I said they already had their

19   chance and had that discovery from us, and we believe

20   that the additional discovery would be burdensome and

21   that's why we objected.

22          THE COURT:  All right.  Well, that objection

23   is overruled.

24          MR. OKOROHA:  I understand, Your Honor.

25          THE COURT:  All right.  And if we have

1  problems again, you'll be down here explaining this all

2  and I haven't heard anything that sounds burdensome

3  yet.  So each of you will be deposed for one hour for

4  followup questions and other matters that you think are

5  relevant to this case.

6              Now, does that take care of that issue?

7         MS. MIERS:  I believe so, Your Honor.

8         THE COURT:  All right.  And so let me go back

9  to this Mr. Lewicki.  He wants an order on the payment.

10  I'm signing your proposed order, except I'm not finding

11  that they're in contempt of court and not sanctioning

12  him and any other costs.  So he owes you the $727, and

13  that will be payable in five calendar days.

14              All right.  So what else is going on in

15  this case?

16         MS. MIERS:  Well, I think we have Docket Entry

17  104.

18         THE COURT:  104?

19         MS. MIERS:  Maybe it's not for -- it's not on

20  the schedule.  We are --

21         THE COURT:  Oh, on Brad Mols?

22         MS. MIERS:  On Brad Mols.

23         THE COURT:  Well, we talked about the checks.

24         MR. HUMPHREY:  That's correct.

25         MS. MIERS:  The only remaining issue is the

1  emails.  So, as you may recall in June, the story we
2  heard was, "Yeah, you know, I had those emails, but
3  they're not my emails, so I can't produce them."

4          Now we're hearing, "Well, now I can't
5  produce them because I no longer have a relationship
6  with Prime Tax, so I have no access to those emails."

7          Well, Your Honor, this is a clear
8  spoliation of evidence.  He had possession of these
9  emails, he produced the emails that he believed were
10 helpful to his defense, withheld the rest of the emails
11 under the guise of "They don't belong to me, they
12 belong to Prime Tax," and now they're gone, now he has
13 no access to them.

14         THE COURT:  Okay.  Can you get them from Prime
15 Tax?

16         MS. MIERS:  We have served a request on Prime
17 Tax, but we believe we have the right to see what is in
18 the possession of Brad Mols, too.  He was in possession
19 and he failed to preserve that evidence and now it's
20 gone.  And he had this issue addressed by a Court
21 before in California.

22         THE COURT:  Okay.

23         MR. HUMPHREY:  So I'm trying to understand the
24 argument for spoliation, that he didn't download all
25 those emails from his work email before he stopped

1 working with them?

2       MS. MIERS: Just like a company would be

3 required to do.

4       MR. HUMPHREY: I mean, I will tell you what

5 has happened with that and --

6       THE COURT: Well, let's talk about it.

7       MR. HUMPHREY: Sure.

8       THE COURT: So you subpoenaed him, you asked

9 for his emails when?

10       MS. MIERS: Seven months ago. I don't know

11 the exact date, Your Honor, I apologize. Mr. Simmons

12 has been largely in charge of this case. He's -- his

13 wife is having her first baby right this minute.

14       THE COURT: Wow!

15       MS. MIERS: So I am afraid he's --

16       THE COURT: Glad it's not me, right, Shannon?

17       COURT CLERK: Amen.

18       THE COURT: Been there, done that.

19       MS. MIERS: So we're very excited for them,

20 but I can't give you an exact date. I believe it's

21 seven months.

22       THE COURT: Okay, seven months ago he asked

23 for all available emails or whatever it says, and what

24 did you turn over?

25       MR. HUMPHREY: We turned over the emails that

1  were in his personal email account, what he had.  But

2  he has -- so he has a personal email account and then

3  there is the PrimeTaxGroup.com.  I don't know the exact

4  URL email.

5          THE COURT:  So he had two email accounts?

6          MR. HUMPHREY:  Right.

7          THE COURT:  One personal, one with Prime Tax?

8          MR. HUMPHREY:  One with Prime.  We asked --

9  we, of course, asked his employer, Ms. Torres, at Prime

10  Tax Group, you know, can you produce these other

11  emails?  And she said, "No."

12          So, under the case law, they are not his

13  emails, they're their emails, and he --

14          THE COURT:  But he had access to them, come on.

15          MR. HUMPHREY:  He had access to them, but

16  access is not possession under the law, and so --

17          THE COURT:  Okay, this is, you know --

18          MR. HUMPHREY:  Well, that's what I'm saying,

19  Your Honor.  He didn't have the right to view it

20  without her permission and that's why we objected to

21  it.  The difference now is he has actually been frozen

22  out of that email account.

23          THE COURT:  Okay.  So try to get it from Prime

24  Tax.  If they've deleted it, then you move for a

25  spoliation and you can explain it to a jury on why, you

 1  know, he couldn't download it because Ms. Torres, his

 2  friend, told him no.  So, I mean --

 3          MR. HUMPHREY:  The relationship is not one

 4  where he can demand things from her.

 5          THE COURT:  Well, I don't know what the

 6  relationship is.  A jury -- you're going to have to

 7  explain that.  I mean, that's -- this case is a mess.

 8  It's like Peyton Place.

 9          MR. HUMPHREY:  I'm not sure what else we could

10  do to take emails that someone resists to produce it,

11  other than having them subpoena them, which they did,

12  and they produce the emails.

13          THE COURT:  If he's got access to an email

14  account that he has and he's asked to download those

15  emails, you know, I think you'd at least take steps to

16  preserve them and fight about it.

17          MS. MIERS:  Your Honor, may I approach?

18          THE COURT:  Sure.

19          MS. MIERS:  I'm going to hand you an email.

20  It is not from Mr. Mols' personal account, it's from

21  his Prime Tax account.  That's a document that is

22  produced by Mr. Mols.  So, just to make sure the record

23  is clear here, he produced emails beyond his personal

24  emails.  He did produce emails that he thought favored

25  his defense that were from his Prime Tax email records.

1       THE COURT:  You want to talk about that?

2       MR. HUMPHREY:  Either he added it also in his

3  personal email account or he was able to download that

4  with his employer's permission.

5       THE COURT:  All right.

6       MR. HUMPHREY:  I mean, Your Honor, I did cite

7  the case out of Kansas, Your Honor, that says that and

8  I figured that was --

9       THE COURT:  Okay.

10      MR. HUMPHREY:  I can't go and -- just because

11 you walk into your office and take things out of your

12 employer does not mean you have possession of them.

13 You don't have the right to do so if your employer is

14 not a party in the case.

15      MS. MIERS:  And may I approach one more time,

16 Your Honor?

17      THE COURT:  Yes.

18      MS. MIERS:  I'm handing you a case.  It's the

19 Schneider Logistics case out of the Central District of

20 California, and Schneider Logistics attempted to make

21 the same exact argument.  They had emails.  They

22 delivered things for WalMart.  They had emails that

23 were *Walmart.com* emails that said Schneider Logistics

24 emails.  They tried to avoid producing the WalMart

25 emails and the Court ruled that they, in fact, did have

1  to produce the WalMart emails.

2          MR. HUMPHREY:  And, Your Honor --

3          THE COURT:  So, I mean, this is -- I think

4  that this is -- you know, you're risking a spoliation

5  instruction from the jury.  If he's producing some

6  things from Prime Tax, but acting like, "Oh, I can't

7  get everything else," you know, a jury is going to have

8  to draw some inferences.

9          MR. HUMPHREY:  I would say that if they were

10 destroyed, he did not destroy them.

11         MS. MIERS:  It's actually a failure to

12 preserve that's in issue here, not destruction.

13         MR. HUMPHREY:  I would simply say I have a

14 hard time buying that an employee has an obligation to

15 take documents from an employer in order to preserve

16 them for discovery.  It's just -- I see what the Court

17 is ruling on and I --

18         THE COURT:  Well, his position with that

19 company is subject to some interpretation.  Sometimes

20 he's an employee, like you just said.  Sometimes he's a

21 consultant.  Sometimes he's an investor.  I don't know

22 what he is.

23         MR. HUMPHREY:  There's no evidence he's an

24 investor, Your Honor.

25         THE COURT:  He doesn't have 30 percent

1  ownership?

2      MR. HUMPHREY:  No, he gets a 30 percent --

3      THE COURT:  He's got 30 percent of something?

4      MR. HUMPHREY:  He gets 30 percent commission

5  of the revenue.

6      THE COURT:  Okay, all right.

7      MR. HUMPHREY:  I say he's an employee.  He's a

8  contractor and you could make an argument whether he's

9  an employee or not based on a common law -- because he

10  has a contract that says he's an independent

11  contractor, he does work for this company.  And so

12  either way --

13      THE COURT:  You're going to have a hard time.

14      MR. HUMPHREY:  I don't really know if that

15  distinction really has a --

16      THE COURT:  You're going to have a hard time.

17  There's so much fun stuff for the jury to think about.

18      MR. HUMPHREY:  Yeah.

19      THE COURT:  Try to get it from Prime Group.

20  I mean, you're going to have to file a motion to get a

21  spoliation instruction.

22      MS. MIERS:  We certainly intend to, Your Honor.

23      THE COURT:  Where are we on dates?  Are y'all

24  going to finish discovery in time?

25      MS. MIERS:  We were actually going to talk to

1  you about that, Your Honor.  Discovery is October 31st.

2  We have four depositions teed up and now we've got

3  these remaining two.

4          THE COURT:  Uh-huh.

5          MS. MIERS:  It's pretty tight.  And we are

6  also waiting on this additional production from Mols

7  and Cindy Mols' deposition.  So we wondered if we

8  couldn't have maybe another 30 days.

9          MR. HUMPHREY:  Based on what they're saying, I

10  don't object to that.  I think we're going to be taking

11  a corporate rep of theirs, anyway, to sew things up.

12          THE COURT:  Yeah, I don't have a problem with

13  30 days.  So that you wanted extended to the end of

14  November?

15          MS. MIERS:  Yes, please.

16          THE COURT:  That's discovery, end of November.

17  And then motions, you want that bumped out?

18          MR. HUMPHREY:  Might as well, Your Honor.  I

19  still had planned to get my motion out in the next week

20  or two.  I was hoping to get it out last month, but the

21  hurricane --

22          THE COURT:  Did you have any damage?

23          MR. HUMPHREY:  Serious at our office, yeah.

24          THE COURT:  Oh, that's right, I heard about

25  that.

1        MR. HUMPHREY:  Yeah, we had to close down a

2   couple of weeks.

3        THE COURT:  So where are you now?

4        MR. HUMPHREY:  We're still in the office.

5   We're repairing it and working in an interesting

6   situation, but --

7        THE COURT:  Yeah, I'm sorry to hear that.

8             So then let's get your motions filed by

9   December 15th.  Responses to the motions, let's do

10  January 5th so you could at least have -- is that

11  right?  Well, that's not giving you any extra time.

12  January 12th.  Merry Christmas.

13            Have you all talked about mediation?

14       MR. HUMPHREY:  Well, we've mediated before.

15       THE COURT:  Who did it?

16       MR. HUMPHREY:  It was -- I forget.

17       MS. MIERS:  Levin.

18       MR. HUMPHREY:  That's right.

19       THE COURT:  Who?

20       MS. MIERS:  Levin.

21       THE COURT:  Oh.

22       MR. HUMPHREY:  That's right.

23       THE COURT:  He must not have hurt you too

24  badly if you can't remember.  No arm twisting, no

25  bruised arm?

1    MR. HUMPHREY:  And back then I think we were

2  looking -- I think basically we've had some settlement

3  discussions, which is the other reason I hadn't filed

4  the motion in the last month.  So we've popped up some

5  numbers, but I think that just kind of has dried up.

6  It was a pretty early mediation we had the first time.

7  But it's a -- we haven't had a response to our last

8  supplement offer, so I've got an agnostic view at this

9  point.

10    MS. MIERS:  And I'd like an opportunity to

11  speak with the client before committing one way or

12  another, Your Honor.

13    THE COURT:  Yeah, I mean, I think these cases

14  are hard on damages.  You know, you've got big

15  aspirations and I always, when I look at these cases --

16  and I'm not the trier of fact, but I just think, you

17  know, to me they're not worth the big billions.

18  They're just not.  So, but then I'm not a jury.  I'm a

19  cynical old woman.  But --

20    MR. HUMPHREY:  I think this case is actually --

21  I don't think anyone has planned a jury in this case,

22  Your Honor.  I think it would actually be the trier of

23  fact in this case.

24    THE COURT:  Oh, really?

25    MR. HUMPHREY:  Unless I missed something.

1        THE COURT:  Okay.  Well, I shouldn't have said

2   anything, then.  I mean, I just think that sometimes

3   these business cases, you know, the plaintiff comes

4   in -- and I'm just not picking on you, you know.  I'm

5   an equal opportunity, I'll pick on anyone.  But

6   sometimes plaintiffs come in and they just want -- they

7   think this is such an outrage and they've stolen our

8   business, but it's very hard to put, in my view, a

9   realistic number on it.

10        MS. MIERS:  I do understand your observations,

11  Your Honor.  This one, you know, there seems to be a

12  lot to hide.  Usually, when there's a lot to hide,

13  there's a lot behind that.  So we're confident.

14        THE COURT:  Interesting.  All right, these

15  new dates will control.  See where you go.  I mean,

16  mediation is always at least you know what's going to

17  happen, but --

18        MR. HUMPHREY:  That is true, Your Honor.

19        THE COURT:  All right.  If there's not

20  anything else, y'all may be excused.

21        MR. HUMPHREY:  Thank you, Your Honor.

22        MS. MIERS:  Thank you, Your Honor.

23        *[11:58 a.m. - Proceedings adjourned]*

24

25

# C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript of the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Gwen Reed
10-31-17