1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    HOUSTON DIVISION

4  ALLIANTGROUP, LP              §    CASE NO. 4:16-CV-3114
                                 §    HOUSTON, TEXAS
5  VERSUS                        §    FRIDAY,
                                 §    MAY 4, 2018
6  BRAD MOLS, ET AL              §    10:01 A.M. TO 10:34 A.M.

7
                        MOTIONS HEARING
8

9          BEFORE THE HONORABLE NANCY K. JOHNSON
                UNITED STATES DISTRICT JUDGE
10

11
                        APPEARANCES:
12

13      FOR THE PARTIES:            SEE NEXT PAGE

        COURT RECORDER:             DESIREE SILLAS
14
        COURT CLERK:                JANET
15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21         JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
           Tel: 281-277-5325 ▼ Fax: 281-277-0946
23              www.judicialtranscribers.com

24
     Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1                          APPEARANCES:

2

3    FOR THE PLAINTIFFS:              MATTHEW LEE SIMMONS, ESQ
                                      Littler Mendelson PC
4                                     1301 McKinney
                                      Suite 1900
5                                     Houston, Texas  77010
                                      Jason Watts, Esq.
6

7

     FOR THE DEFENDANTS:              BRIAN SCOTT HUMPHREY, II ESQ
8                                     Abraham Watkins
                                      800 Commerce St.
9                                     Houston, Texas 77002

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>HOUSTON, TEXAS; FRIDAY, MAY 4, 2018; 10:01 A.M.</u>

2        THE COURT:  All right, we're here in Alliantgroup

3    versus Brad Mols.  Who's here for Plaintiff?

4        MR. SIMMONS:  Matt Simmons here on behalf of

5    Plaintiff, along with Counsel Adam Perkins and General

6    Counsel John Simpson.

7        THE COURT:  Okay, Mr. Humphrey?

8        MR. HUMPHREY:  Yes, Brian Humphrey for the

9    Defendant, Your Honor.

10        THE COURT:  Now, Mr. Humphrey, before we begin

11    talking about spoliation, I do want to conduct an in camera

12    review on those attorney/client documents.

13        MR. HUMPHREY:  Okay, Your Honor.

14        THE COURT:  So, I'm assuming you have them at your

15    office?

16        MR. HUMPHREY:  Yes.

17        THE COURT:  All right.  So, I want you to be back

18    with those documents, let's say at 1:30.  Will that work?

19        MR. HUMPHREY:  Yeah, Your Honor.

20        THE COURT:  And we'll go over those.  All right,

21    so I'll look at those.

22        Frankly, Mr. Humphrey, that was one of the worst

23    privilege logs I've ever seen.  And that's the reason I'm

24    looking at it.

25        I've done a lot of looking at privilege logs

1  lately.  It's the latest thing.  So I am going to look

2  because your privilege log was entirely insufficient.

3          So taking that off the table then, let's talk

4  about the spoliation.  What I'm concerned about is it looks

5  like Mr. Mols, through Mr. Humphrey, is saying that he got a

6  new phone in July of '17.

7          MR. HUMPHREY:  Or August.

8          THE COURT:  August.

9          MR. HUMPHREY:  Around the time, Your Honor.

10         THE COURT:  And nothing was saved prior to that.

11         MR. HUMPHREY:  Well, Your Honor, he got the new

12  phone.  Everything was transferred to the new phone, but

13  before that, the phone was set, as an iPhone can be, to not

14  save things beyond 30 days.  And he didn't realize that that

15  was the case.

16         THE COURT:  Okay.  So my question is:  This

17  lawsuit was filed in 2016.  He had a duty to preserve that

18  arose upon the time of his service of this lawsuit.  And

19  what efforts did he make to preserve evidence at that time?

20         MR. HUMPHREY:  Your Honor, he did not understand

21  that an iPhone would delete after 30 days the way it was

22  set -- his text messages.

23         THE COURT:  Not good enough.  I mean, that's just

24  not good enough.  That a year goes by, he has a duty to

25  preserve and, you know, he took no effort to, you know,

1  preserve anything predating service of the lawsuit.

2  MR. HUMPHREY: I would agree that he should have

3  done that, Your Honor. But that said, this is -- I think

4  it's an honest mistake. This is a man who is not a

5  technically inclined person. And there's no evidence here

6  that there was anything there that was relevant; anything in

7  here that's incriminating.

8  THE COURT: We don't know. That's the problem, we

9  don't know. It's just gone.

10  MR. HUMPHREY: Your Honor, if there's a smoking

11  gun in there, there would be a smoking gun in all the other

12  documents they've got here. They know all the people he's

13  talked to. What could there possibly be that would break

14  open this case?

15  THE COURT: This is what I'm concerned about,

16  Mr. Humphrey -- and I think that your client is possibly,

17  you know, is falling into the willfully ignorant category,

18  which is not the good category to be in.

19  Because if he gets served with a lawsuit sometime

20  after June 30, 2016 when the lawsuit was filed, he's got a

21  duty to preserve from that day going back as well as

22  forward. And for him to act like I had no idea and there's

23  so many things missing, that's a problem.

24  It's just a problem, you know, because either you

25  didn't take care of this by advising him you need to

1  preserve or he's just not paying attention.  But no one

2  knows what was there because it's gone, right?

3          MR. HUMPHREY:  That's what happens when evidence

4  gets lost, Your Honor.  I understand that.  And that does

5  not, by itself, justify any sort of sanctions let alone a

6  spoliation instruction or death penalty sanctions.

7          And I understand that we all wish those text

8  messages were here -- were still here.  Brian Mols wishes

9  they were still here.  He tried to get them.  Because based

10  on all the evidence in this case, there wouldn't be anything

11  in there.

12          I mean, Alliantgroup has had this case for a year,

13  they could have talked to the CPAs.  They already subpoenaed

14  all the emails from his former employer.  He had no control

15  over those.  They produced them after he left working there.

16  They have no reason to hide anything.

17          And in all of that, they've got nothing.  They've

18  showed that they've got nothing.  And somehow it's this --

19  these text messages, one medium, is where all the

20  incriminating stuff is.

21          That just doesn't make any sense, Your Honor.

22          THE COURT:  Well there's also missing information

23  from the laptop, correct?

24          MR. SIMMONS:  Absolutely, Your Honor.  Now we

25  weren't able to -- the prior order didn't specify to search

1  for deletion of the laptop or prior scan disk.

2        THE COURT:  So are you asking for that?

3        MR. SIMMONS:  Absolutely, Your Honor.

4        THE COURT:  All right, you've got it.

5        MR. SIMMONS:  I think that that's something that

6  we absolutely need and Mr. Humphreys wasn't willing to give

7  because it wasn't specific in the Order.

8        THE COURT:  Well, you've got it now.  You may

9  search for deletions.

10        MR. SIMMONS:  Thank you.  In addition to that,

11  it's troubling that he's trying to cure his spoliation and

12  his perjury through more testimony that he didn't do

13  anything wrong.

14        This has been their theory all along.  You've

15  already admonished them for this that we don't have to

16  produce these documents because we didn't do anything wrong.

17        You told them that's not going to sit well in a

18  trade secrets case where you are the Defendant.  Now they're

19  saying well you're not prejudice my group because even if

20  the documents weren't destroyed, they wouldn't have mattered

21  because we didn't do anything wrong.

22        THE COURT:  So how long will it take for you to

23  have your expert look at the computers -- the hard drive --

24  to see what was deleted and when?

25        MR. SIMMONS:  The deletion and -- additionally we

1  only have three devices.  It would -- I would be shocked if

2  he didn't also have tons of thumb drives that was tucked

3  into it and taken out of that laptop.

4          So, that report can also be done by the expert.  I

5  believe that would take two weeks for us to go through.  I

6  think that's reasonable to go through all of that data to

7  find deletions, see if there's even deleted documents that

8  can be recovered.

9          In addition to that, the prior laptop -- what we

10 found on the laptop, Mr. Humphreys and Mr. Mols said was

11 never there -- never there.

12          To you, to our responses, we had detailed

13 breakdowns of the accounting, what CPAs it came from, and it

14 showed that Mols wasn't getting 30 percent, he was getting

15 60 percent of this company's profit that he just so happened

16 to work for, his subordinate, who left on the same day as

17 him.

18          This whole shell game that Mols has played has

19 cost Alliantgroup -- just Alliantgroup going after these

20 third parties in California that Mols says he didn't have

21 access to the documents even though he was getting a

22 majority of the profit, cost the Alliantgroup $170,000 just

23 to get those 11,000 pages that we got.

24          And even in those 11,000 pages, half of them are

25 client-specific items, meaning they are client records.

1  They're client tax documents.  They're client employee lists

2  -- things that they used to build these tax studies.

3        So the remainder of them have, you know, already

4  been produced or -- but there's still huge holes.  So

5  there's this program called "Sales Force."  I'm sure every

6  sales company has it.

7        Sales Force was not produced at all by the Prime

8  Parakore people, even though almost every email Brad Mols

9  says:  Hey, send this to Sales Force, send this to Sales

10  Force.  Those were never produced.  And that's where they

11  keep track of all the client names, just like Alliantgroup

12  does.

13        You know, when the entries were made, what the

14  entry said, that is specifically what we think that they

15  took from us -- one of the many things.

16        There's not a single text message that has ever

17  been produced of Brad Mols ever, other than the ones that we

18  just got from his phone.

19        There's not a single text message in this Prime

20  production.  Both Lewicki and Torres and Prime and Parakore

21  swore an affidavit that they produced all text messages that

22  were responsive to the subpoena -- every single one of them.

23  They produced none because Lewicki broke his phone three

24  times, Torres broke her phone two times, then lost the

25  number.  Seems like Mols has the same story.

1    There's no metadata in any of the documents that

2  we've received -- none.  There's no forms or templates other

3  than beginning of drafting the website which Mols did

4  immediately after he left Alliantgroup, even though he was

5  just a contractor, right?

6    There's no discussion of Mols starting the

7  company.  And one of the more troubling things that I got

8  from the 11,000 pages from Prime and seeing Mr. Mols'

9  declaration saying:  I've produced all of my relevant

10 Gmails.  I've got 14 additional Gmails that Prime produced

11 of Brad Mols' Gmails that Brad Mols did not produce.

12    Brad Mols only produced four total emails in his

13 entire production -- four.  Now I've got here 14 additional

14 Bradmuls@Gmail.com emails that he did not produce even

15 though he swears in this recent declaration, their response

16 to our dec motion:  I looked through all my Gmails.  I

17 didn't destroy any of them.  And I produced all of them.

18    I've got 14 additional ones here and this likely

19 isn't even a complete production either.  Because the only

20 ways these Prime people get these Gmail emails is they get

21 sent to them.  So all the Gmails that he just sent to

22 clients -- just sent to -- maybe Torres' Gmail.  Those are

23 no where to be found.

24    And that is the time frame that we really need to

25 focus on because he admits in these text messages up until

1  August of 2016 he may have used his Gmail.  So -- and he's

2  only produced four emails and only, I guess, three of them

3  are Gmails.

4        And he's saying:  Oh well, during that time I

5  really wasn't working that much.  I've got 14 additional

6  ones here that he never produced, that we never had access

7  to.  Him communicating with clients, him communicating with

8  Torres and Lewicki about clients, and he still says:  I

9  produced everything.  I produced everything.

10        And so along that line, in addition to the search

11  for deletion, I think it's appropriate to search his

12  Gmail -- with the same search terms the Court has already

13  approved for the same information.

14        We'll see what else he destroyed.  Maybe he didn't

15  destroy some things, but likely he did.  Not just his Gmail,

16  but also his new company Confers (phonetic) that email, to

17  see what else -- same search terms -- to see what else he

18  has because Mr. Humphreys only focuses on this is a 12-month

19  non-solicitation case.

20        But this is so much more than a 12 month non-

21  solicitation case.  This is misappropriation of trade

22  secrets case.  And we haven't gotten any metadata.  We

23  haven't gotten anything from his Converse email.

24        THE COURT:  What would that show?  Your best day,

25  what's it going to show?

1      MR. SIMMONS:  It's going to show his usage of

2  Alliantgroup documents in his business.  Because if he

3  stole --

4      THE COURT:  And how will you prove that?

5      MR. SIMMONS:  We prove that by metadata in the

6  particular document he said he uses in conference because it

7  should be assigned to an authorized user or we can match it

8  up with our own documents like we have on one document that

9  he has produced.

10     So there's a calendar entry in June of 2016 -- I

11 actually have it here -- where the client information that

12 is written down is the exact same as the client information

13 written down in Alliantgroup's records.

14     They used this in a calendar entry for a client

15 call.  That is a direct evidence of a trade secret

16 misappropriation.  And I guarantee there is a plethora of

17 those that were either spoliated or will be in Coverse's

18 records.

19     I mean, other than that, we don't have anything to

20 go on.  We're with the Plaintiff in the case.  He held all

21 the documents.  And he destroyed all the documents.

22     THE COURT:  All right, so you want to search his

23 Gmail?

24     MR. SIMMONS:  Yes, ma'am.

25     THE COURT:  Using the same search terms?

1          MR. SIMMONS:  Yes, ma'am.

2          THE COURT:  And you want to search the Converse

3   account?

4          MR. SIMMONS:  Yes, ma'am.

5          THE COURT:  You want to do a forensic examination

6   on the hard drive?

7          MR. SIMMONS:  On all the electronic devices that

8   we have, the three.

9          THE COURT:  You want to search for metadata?

10          MR. SIMMONS:  Yes, ma'am.

11          THE COURT:  Anything else?

12          MR. SIMMONS:  One the things that Your Honor

13   pointed out during the last hearing is:  We found additional

14   information that -- as again, he said he's produced

15   everything.  There was nothing in there.

16          THE COURT:  That's right.

17          MR. SIMMONS:  There's a plethora of documents that

18   he said were never there, he never kept, or he produced

19   everything.  And we found them.  I guess, he didn't have a

20   chance to spoliate everything -- and including text

21   messages, there's accounting records, everything.  And the

22   Court said:  I'll shift the cost.

23          So the cost of the forensic exam, the attorney's

24   fees and reviewing, producing, all that stuff ended up being

25   $58,000 -- $58,562.

1       THE COURT:  How much was the forensic examination

2  by itself?

3       MR. SIMMONS:  Just the cost from the vendor was

4  $10,608.50.

5       THE COURT:  All right.  And when you're talking

6  about your attorneys fees, was this fees seeking the

7  documents or fees reviewing documents once you got them from

8  the vendor?

9       MR. SIMMONS:  So reviewing the documents,

10  producing the documents, and the (indiscernible) motion.

11  Those are the three things.  So, not even seeking was

12  included in that $58,000.

13       Now seeking them and everything, that comes to a

14  complete combined total of -- I believe it was -- I want to

15  believe -- I have it written down.  So it's $58,562, plus

16  all the motions to get to these documents, all the motions

17  to compel against Mols and everything -- just Mols was

18  76,559 in addition to the 58,562.

19       I'm not good at math right now, but those --

20       THE COURT:  No lawyer is.

21       MR. SIMMONS:  And then additionally, like I said

22  before, since he's playing the shell game of:  I didn't have

23  access to these documents, these people are in charge of

24  them, and you know I was just an independent contractor of

25  that company, it took Alliantgroup over $170,000 just to get

1  the documents from the company that he got the majority of

2  the profit from.

3          THE COURT:  So, you got those documents in

4  proceedings in California?

5          MR. SIMMONS:  We got them actually, pursuant to

6  your Lewicki Order.  They said:  Okay we'll produce

7  everything even if it's a duplicate.  Clearly they didn't

8  produce everything, but they went ahead and swore under oath

9  -- I have a copy of that -- that they produced everything in

10  response to our subpoena.  They have no texts, they have no

11  templates, they have none of the other gaps -- they have no

12  Sales Force.

13          All the other gaps that I noted in their

14  production that Mols had access to that he didn't preserve

15  because he was playing this game that, hey, I'm just an

16  independent contractor, I don't really have access to these

17  documents.  But he's getting the majority of the profit.

18          And so by playing that game, it forced

19  Alliantgroup to spend an additional 170,000-plus to get the

20  documents because he didn't preserve them because he was

21  playing games with his real position at that company.

22          THE COURT:  Okay.  Interesting.

23          Your response.

24          MR. HUMPHREY:  Where to begin?  First off, there's

25  no shell game here.  I think the text messages show that

1  Mols was begging Prime for money.  How does he control a

2  company he's begging them for money?  He's begging them to

3  give him the emails so that he can produce them.

4        I mean, where -- just because he's getting a

5  portion of the profits, does not make him a controller of

6  the company.  I don't know what else we can do about that.

7  He's -- we've got testimony of everybody involved saying the

8  same thing.

9        Yet because he gets some profits, somehow he's

10 responsible for everything that Prime does, everything that

11 Angela Torres does, everything Daniel Lewicki does.  And

12 other than all the evidence being contrary to that, what

13 else can I say to it?

14        MR. SIMMONS:  So all the -- sorry.

15        MR. HUMPHREY:  I didn't interrupt you.

16        MR. SIMMONS:  I thought he was done with his

17 point.

18        THE COURT:  All right.  Go ahead.

19        MR. HUMPHREY:  So we point that out in our

20 response.  I don't know what else we can possibly say about

21 this other than point to all the deposition testimony, the

22 contract he has with them, and the simple fact that from

23 their own exhibits that he obviously doesn't have control

24 over it or he wouldn't have to ask for and beg for money.

25        I mean what else -- if he controlled that company

1  then why doesn't he find cash group today and not her.  That

2  doesn't make any sense.

3        So, with regard to their claim for attorney fees,

4  you know, first off, I haven't seen any of these emails that

5  he's pointing to that he says weren't produced.  I don't

6  know whether their responsive to a request.  I know we

7  objected to many of them.  We talked about some of the

8  objections.

9        My client searched based on, you know, the request

10 and our objections to them.  So I can't respond to whether

11 they were responsive or why they weren't produced here

12 because I didn't see these emails yet.

13       THE COURT:  But what, I mean, in this text message

14 he says, "You and Dan keep Prime.  You know how much it

15 pains me to give Prime up."

16       MR. HUMPHREY:  Okay, he wasn't working with Prime

17 any more.  He felt like he was part of the company because

18 he was working with it, but that doesn't mean that he has

19 control over them, Your Honor.  It really doesn't.

20       Can we actually make one person responsible for

21 the preservation of documents by a non-party based on that

22 text message?

23       THE COURT:  We're talking about his own

24 preservation, much less crime.  This is the problem that

25 I've got and I am going to allow you to search the Gmail.

You can search the Converse accounts and look for metadata
to see if there's any stealing of Alliant documents.

You can do a forensic examination on the three
electronic devices to determine deletions. You may search
for metadata. Show that I am shifting costs -- I am going
to just at the outset grant you the 10,000- -- what is it,
608 dollars and some-odd cents for the forensic examination
because I said I'd do that because there's clearly things
that that examination brought up that are relevant to this.

I am going to hold off on any other attorney's
fees and I will take that up at the time of trial.

Let's talk about trial for a minute. You've got a
Motion for Summary Judgment.

MR. HUMPHREY: Correct, Your Honor.

THE COURT: This is a bench trial and so I think
it's going to be more efficient for it because there are so
many disputed facts. There's no way I can do a summary
judgment without fully understanding what the facts are.

So, you're summary judgment will be carried along
with the case. And I just -- I'm going to have to hear
everyone's sad story about what happened. I think that
that's the most efficient way to deal with it.

I know you want to get out on legal issues, your
client did nothing wrong, okay. But I need to know what he
did in the first place before I make any determinations

1  because right now it's highly disputed what's going on.

2         MR. HUMPHREY:  And Your Honor, right now I've got

3  a Plaintiff who has not yet disclosed a dollar's worth of

4  damages in this case that has --

5         THE COURT:  And that's the best thing you've got

6  going for you.

7         MR. HUMPHREY:  I think I've got more than that.

8  They can't even identify a single trade secret they even

9  believe was taken that's an actual trade secret.  They know

10 all of the people that he contacted because they've got a

11 list of all of them from Prime.

12        And they haven't even identified any of his

13 former clients.

14        THE COURT:  Okay, and your client did not turn

15 over -- hasn't preserved any documents so they're at a lost

16 to prove things.

17        So, you know, he can't sit back, not preserve

18 evidence, not do anything and act like well you can't pin it

19 on me because I didn't preserve anything.  I'm not playing

20 fair.  He's not playing by the rules.  We know he's not.  He

21 has a duty to preserve, and he didn't.

22        Now how that all shakes out.  How many tears I see

23 from the witness stand on how believable that is, I don't

24 know.  But right now, you know, I've just got affidavits.

25 I've heard you talk for the last year and a half, or two

1  years, about he has no control, he has nothing.  And then I

2  see these emails and it seems like that seems a little

3  inconsistent with independent contractor at the mercy of

4  Angela Torres who's pulling all the strings.

5         Kind of doesn't look, in some of these emails,

6  like Angela Torres is the big boss.  And I'm just saying

7  that because that's the impression that I get from those

8  emails.  Maybe he can explain that, put a different gloss on

9  it about how she's controlling everything and he's just an

10 independent contractor at her mercy.

11        But, you know, there's no way I can, you know,

12 look at your summary judgment without hearing a trial.  I'm

13 going to have to ride out of it anyway on a bench trial so I

14 might as well just have a trial.  Sounds like super fun.

15        MR. SIMMONS:  You know, I wish it wasn't this way

16 either, Your Honor.  I wish we had the documents and we

17 could win on summary judgment, but it's --

18        THE COURT:  You know and the problem on your side

19 generally -- and I don't know what you've got -- but I've

20 seen a lot of these cases and that is you have employees who

21 do things like this, but you really can't monetize that.

22 You can't, and so you've got a great, maybe, liability case,

23 but your damages, you know, are mushy.

24        MR. SIMMONS:  At a minimum we have the

25 disgorgement of the money he earned, which is already

1  $170,000.  We've got other damages that we can prove through

2  testimony, but I understand your point, Your Honor.

3        On the Order for the search of the devices, I just

4  want to clarify that that also includes a search for other

5  devices that were plugged into it, whether it be hard

6  drives, thumb drives, or whatever.

7        THE COURT:  If you can identify that, yes.

8        MR. SIMMONS:  Okay.

9        THE COURT:  If he's got other thumb drives and

10  that kind of thing, that's -- I'm over the age of 15, so

11  that is a little vague to me how it all works, but.

12        MR. SIMMONS:  And then a deadline for Mr. Mols

13  providing us access or our vendor access to his Gmail,

14  Converse email, as well as his Converse documents to see if,

15  you know, because obviously for his new company I'm sure he

16  started over from complete scratch, too, and already made it

17  into a multi-million company.

18        So if we can have a deadline for Mols' production

19  to our forensic vendor.

20        THE COURT:  Two weeks.

21        MR. SIMMONS:  Two weeks.

22        THE COURT:  Two weeks.  He's got two weeks to pay

23  you the 10,608-dollars-and-change, whatever that is.

24        Let's look for a trial date.

25        MR. SIMMONS:  So just to be clear, he has two

1   weeks to produce the --

2           THE COURT:  Devices to your --

3           MR. SIMMONS:  -- devices and activation.  And then

4   we'll have another probably two weeks to run the forensics,

5   review it.

6           THE COURT:  Sure.

7           MR. SIMMONS:  Okay.

8           MR. HUMPHREY:  I thought they'd already taken

9   forensic images of the devices.  They need the devices

10  again?

11          MR. SIMMONS:  We have the devices again.  But we

12  already have the devices, so the only thing that would need

13  to be produced is the account or the accounts of all the

14  Converse accounts, the -- his Gmail account and passwords,

15  so that the forensic examiner can go in there.

16          THE COURT:  Okay.

17          MR. HUMPHREY:  Okay.

18          MR. SIMMONS:  And also look for deletions.  I just

19  want to be clear --

20          THE COURT:  Yeah, you're looking for deletions.

21  Yeah.

22          MR. SIMMONS:  -- the examiner can look for that,

23  too.

24          THE COURT:  Yeah, that's fine.

25          So how long do you think your case will be?

1          MR. SIMMONS:  I would think, I mean, four to six

2     days.

3          THE COURT:  How about you?

4          MR. HUMPHREY:  In response to that, probably need

5     another two or three, but --

6          THE COURT:  I was thinking this would be about a

7     two-week trial?

8          MR. HUMPHREY:  Sounds like it, Your Honor.

9          THE COURT:  Okay, then what are we looking at?

10    Maybe July, August, September?

11         MR. SIMMONS:  September looks great for me.

12         MR. HUMPHREY:  Fine with me.  Works for me, too,

13    Your Honor.

14         THE COURT:  September.  Shannon, what am I doing

15    in September?

16         COURTROOM CLERK:  Which week do you want me to

17    look?

18         THE COURT:  Just start at Labor Day.  Okay, so I'm

19    free the week of Labor Day and then the next week?

20         COURTROOM CLERK:  (Indiscernible).

21         THE COURT:  Okay, the week of the 17th.

22         COURTROOM CLERK:  You're also available that week,

23    too.

24         THE COURT:  Okay

25         COURTROOM CLERK:  And the next week --

1         THE COURT:  All right, it looks like I'm free in

2 September.  So, -- and I think we've got some flexibility

3 being a bench trial, so if something comes up on a day, you

4 know, we can not have trial.

5         Do you want to look at your calendars or do you

6 want to commit now?

7         MR. SIMMONS:  I think we can commit now.

8         THE COURT:  Okay.

9         MR. SIMMONS:  This is obviously a priority.

10         MR. HUMPHREY:  Judge, I have a September 17 trial

11 in State Court.  This would take priority over that.

12         THE COURT:  Will they agree with that, maybe?

13         MR. HUMPHREY:  We'll find out before then.

14         THE COURT:  You could get this case resolved

15 before that, too.

16         MR. HUMPHREY:  Got an offer on the table, Your

17 Honor.

18         MR. SIMMONS:  Wow.

19         THE COURT:  All right.  So well then, let's just

20 start this the day after Labor Day and we'll book out two

21 weeks.  Yeah, the 4th through the 14th.  That's nine trial

22 days.

23         And Janet, block out the 16th on that Monday,

24 just --

25         COURTROOM CLERK:  The 16th is a Sunday.

1          THE COURT:  Oh, the 16th is a Sunday, you're

2    right.  The 17th then.

3          COURTROOM CLERK:  Through the 17th, okay.

4          THE COURT:  And see where we go.

5          All right, anything else we need to talk about?

6          I'll see you at 1:30 with your document.

7          MR. SIMMONS:  I don't need to be there for that

8    1:30 hearing, correct?

9          THE COURT:  No, no.  Correct.

10          MR. SIMMONS:  Okay, I appreciate your time, Your

11   Honor and your considerations.

12          THE COURT:  Well, I'm sorry we've all come to

13   this.  I don't like to sanction people, but you're entitled

14   to that examiner fee.  I may give other fees on not for your

15   looking at the documents because if he had turned them over

16   initially you would be looking at them anyway.

17          But all the effort you've had to go to find these

18   documents, that'll be something I'd take up at trial, so.

19          MR. SIMMONS:  Thank you, Your Honor.

20          THE COURT:  So, anything else we need to talk

21   about?

22          MR. HUMPHREY:  Nope.

23          THE COURT:  Your pretrial order then, let's give

24   that date.

25          Final pretrial order due August 24 and that will

1  also include your proposed Finding of Facts and Conclusions

2  of Law.

3       MR. SIMMONS:  And then since like we'd hamstring

4  by the spoliation issue, just put that as a general

5  overtone?

6       Thank you, Your Honor.

7       THE COURT:  Absolutely.  Absolutely.

8       Good.  All right.  You-all have a good day.

9       MR. SIMMONS:  Thank you, Your Honor.

10      (Proceeding adjourned at 10:33 a.m.)

11                    *  *  *  *  *

12      *I certify that the foregoing is a correct*

13  *transcript to the best of my ability produced from the*

14  *electronic sound recording of the proceedings in the above-*

15  *entitled matter.*

16  */S/ MARY D. HENRY*

17  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

18  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

19  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

20  *JTT TRANSCRIPT #58665*

21  *DATE FILED:  MAY 16, 2018*

22

23

24

25