1     IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3      HOUSTON DIVISION

4 ALLIANTGROUP, LP   §  CASE NO. 4:16-CV-03114
           §  HOUSTON, TEXAS
5 VERSUS      §  FRIDAY,
           §  JUNE 1, 2018
6 MOLS       §  2:53 P.M. TO 3:27 P.M.

7

       MOTIONS HEARING
8

   BEFORE THE HONORABLE NANCY K. JOHNSON
9    UNITED STATES MAGISTRATE JUDGE

10

11

       APPEARANCES:
12

   FOR THE PARTIES:    SEE NEXT PAGE
13

   COURT RECORDER:    RUBEN CASTRO
14

15

16

17

18

19

20    TRANSCRIPTION SERVICE BY:

21   JUDICIAL TRANSCRIBERS OF TEXAS, LLC
     935 ELDRIDGE ROAD, #144
22     SUGAR LAND, TEXAS 77478
   Tel: 281-277-5325 ▼ Fax: 281-277-0946
23    www.judicialtranscribers.com

24

 Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1                        APPEARANCES:

2

3  FOR THE PLAINTIFF:            MATTHEW LEE SIMMONS, ESQ.
                                 KIMBERLY RIVES MIERS, ESQ.
4                                Littler Mendelson, PC
                                 1301 McKinney
5                                Suite 1900
                                 Houston, TX  77010
6

7  FOR THE DEFENDANT:            RANDALL SORRELS, ESQ.
                                 Abraham Watkins, et al
8                                800 Commerce St.
                                 Houston, TX  77002
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       HOUSTON, TEXAS; FRIDAY, JUNE 1, 2018; 2:53 P.M.

2           THE COURT:  All right, Mr. Humphrey, come on up.

3    Who do you think -- is anyone going to be listening --

4    calling in?  Any of the peripheral players?

5           MR. SIMMONS:  The only person that would be

6    potentially calling in is Kim Miers, an attorney for

7    Alliantgroup on the case.  I just emailed her and said that

8    you're likely ready.  So, I don't think we have to wait.

9           THE COURT:  Well, we can wait a few minutes.  I

10   just --

11          MR. SIMMONS:  Okay.

12          THE COURT:  -- don't want you sitting around for

13   nothing.

14          MR. SIMMONS:  Thank you, Your Honor.

15          MR. SORRELS:  Your Honor, Randy Sorrels.  I'm the

16   -- covering most of the hearing for the Defendant.

17          THE COURT:  All right, thank you.

18       (Pause in the proceedings.)

19       (Telephonic sound.)

20          THE COURT:  Who just joined us?

21          MS. MIERS:  Kim Miers on behalf of Plaintiff.

22          THE COURT:  All right, thank you, Ms. Miers.

23          MS. MIERS:  Good afternoon.

24       (Pause in the proceedings.)

25          THE COURT:  Well let's get started.  I don't see

1  that anyone really has a dog in this fight other than you

2  guys, right?

3          MR. SIMMONS:  Yes, Your Honor.

4          THE COURT:  Mr. Simmons, what's the problem?

5          MR. SIMMONS:  The problem is that Mr. Mols was

6  ordered to provide access to his accounts -- his Converse

7  account on May 18th.  He did not provide access to it.

8          Instead of providing his emails and passwords two

9  weeks before -- whenever the Court ordered it, he waited

10 until the last day.  And it took four to six hours to figure

11 out that gmail factor authorization.

12         And then there was another issue with his Converse

13 email.

14         It seems to me that they're taking the position

15 that it's the vendor's fault, it's not their vault for not

16 complying with the Order.

17         I think that, that goes along with a lot of their

18 other theories on this case.  That, you know, my client's

19 not technically inclined; it's someone else's fault.

20         In this case, it could have easily been taken care

21 of earlier.  Also it could have been taken care of during

22 the Court's Orders if they were pro-active.  They had the

23 vendor's name.  They had vendor's email.  Not once did they

24 reach out to the vendor to say, hey, we need to figure this

25 out because we have a Court Order.

1           Instead, it's been two weeks and we still don't

2    have access to the Converse documents.

3           And so in addition to that, we've been operating

4    under the 90-day Rule 26, Expert Designation Deadline.  That

5    comes to pass on June 6th.  There is no way we would know

6    that we would need a forensic expert a year and a month ago.

7           There's no way that we would be able to even

8    retain a damages expert a year and a month ago and provide a

9    report and everything that goes along with that until we

10   recently received the documents from this Court's forensics

11   order whereby Mr. Wolf (phonetic) puts a value on the trade

12   secrets.

13          That's the only way -- given the spoliation

14   issues -- that we can even have a damage expert and we

15   couldn't have known that a year and one month ago.  We

16   didn't know that until we really received the Judge's, I

17   guess, authorization to assume spoliation and assume trade

18   secret misappropriations because -- in our trial briefs.

19          Because without that, we can't make the next step

20   to damages.  And so that's what's changed and that's why we

21   need an extension from the 90-day Rule 26 deadline from

22   June 6th to June 20th.

23          THE COURT:  Well, you're completely befuddling me

24   on this.

25          MR. SIMMONS:  Okay.

1        THE COURT:  You want an extension on the expert

2  who will talk to me about spoliation?

3        MR. SIMMONS:  I want an extension on all

4  Plaintiff's destination deadlines.  In addition to,

5  obviously compliance with this Court's Order.

6        THE COURT:  Okay.

7        MR. SIMMONS:  That's the main purpose why we're

8  here today.  We -- they didn't even reach out to Mr. Mols or

9  give Mr. Mols' number to the vendor until after we filed

10  this Motion today.

11        THE COURT:  Okay.  So back in -- and we'll talk

12  about Mr. Mols and his production in a minute.

13        But, back in January of 2017, Judge Lake entered

14  an Order where Plaintiff's expert report was due in April of

15  2017.  Was that modified?

16        MR. SIMMONS:  It was not modified.

17        THE COURT:  All right.  So, --

18        MR. SIMMONS:  We apologize.

19        THE COURT:  Well, --

20        MR. SIMMONS:  We'd be seeking leave to extend the

21  expert designation.  I think there's good cause for it given

22  the spoliation issues.  We didn't even know we'd need a

23  forensic expert --

24        THE COURT:  I'm totally in agreement with you on

25  the spoliation issue --

1     MR. SIMMONS:  Okay.

2     THE COURT:  -- because we've been having

3 tremendous issues getting discovery.  And that has just been

4 kind of a late issue, as far as I'm concerned, on whether or

5 not they've actually destroyed documents and put them out of

6 your reach.

7     But what has never been an issue was your

8 obligation to have the ability to prove your Plaintiff's

9 damages.  So why didn't you name an expert on your

10 Plaintiff's damages?

11     At some point you're going to have to -- you ought

12 to know what your -- what your damages are.  What was stolen

13 and what you think it's worth.

14     MR. SIMMONS:  The reason why we hadn't identified

15 the damages expert to date is because, just like we said, we

16 didn't know it was stolen.

17     The only way we are able to identify damages

18 expert now is because we told them to assume trade secret

19 misappropriation.  Because not only do we not know what is

20 fully stolen, we don't know the value of it or anything like

21 that.

22     The only way that we've been able to get a damage

23 expert -- which we just hired on -- is a document that was

24 suppressed by Mr. Mols that I was just able to provide my

25 expert last week where it shows Mr. Mols' internal

1    calculations of what he projects his business to be.

2            That was just last week.  And we just received

3    that document -- which is a key document to the entire

4    damages analysis -- pursuant to this Court's -- to your

5    Forensics Order that we received in, you know, February,

6    March.  And we were just able to de-designate that document

7    as not attorney's eyes only last week so that we could

8    actually share it with experts.

9            THE COURT:  So you are telling me that until

10   within the last month or so you had no way of knowing what

11   was stolen?

12           MR. SIMMONS:  Correct.  And now the only thing

13   that's changed is that with the Court's Order and with this

14   projections document, we're able to say assumed trade secret

15   misappropriation and this is the value that Mr. Mols places

16   on these trade secrets based on his profit projection that

17   was suppressed for the last year and a half.

18           THE COURT:  So when -- so have you ever had an

19   expert analyze your servers to find out if things were

20   downloaded?

21           MR. SIMMONS:  We have, yes and that's part of the

22   forensics expert.  Those are documents that he produced in

23   this litigation, but the value of those documents we

24   can't -- our expert's not able to assign a value for that

25   because they will do -- assign a value to trade secrets

1  generally based on Mr. Mols' profit projection on his

2  Converse company.

3          THE COURT:  All right.  So you've known that Mols

4  downloaded stuff before he left --

5          MR. SIMMONS:  Torres.

6          THE COURT:  -- yes or no?

7          MR. SIMMONS:  Sorry, no.

8          THE COURT:  No.

9          MR. SIMMONS:  No.  Ms. Torres is --

10          THE COURT:  Ms. Torres?

11          MR. SIMMONS:  Ms. Torres downloaded stuff and we

12  just --

13          THE COURT:  And you've know that?

14          MR. SIMMONS:  Correct.

15          THE COURT:  I mean, you had an expert, but you

16  didn't know what it was?

17          MR. SIMMONS:  We knew what -- we absolutely knew

18  what the documents were that that Torres downloaded from her

19  Alliantgroup laptop that she took with her and kept for

20  three months.

21          THE COURT:  Okay, so why didn't you have an expert

22  for that?

23          MR. SIMMONS:  The reason why we didn't have -- the

24  expert couldn't value those particular trade secrets.

25          THE COURT:  Why not?

1      MR. SIMMONS:  It's -- I honestly can't tell you
2  why.  All --
3      THE COURT:  Because they can't assign a value to
4  it?
5      MR. SIMMONS:  That's my understanding, Your Honor.
6  But they could assign an amount to the profit projection
7  that we just received a month later, March.  And we're just
8  able to de-designate last week.
9      THE COURT:  So what's -- you're loosing me on
10 why -- so you knew that Ms. Torres downloaded stuff.  Your
11 expert has looked at that and --
12     MR. SIMMONS:  No, the expert has not looked at
13 that.
14     THE COURT:  Expert has not looked at that?
15     MR. SIMMONS:  Correct.
16     THE COURT:  And again, tell me why they haven't?
17     MR. SIMMONS:  The projection -- there's different
18 ways that we could have gone about the expert analysis.  One
19 of those ways is to value what Mr. Mols values the documents
20 as.  And that's what we have chosen to do based on the
21 recent profit projections.
22         So that the expert that we just recently retained
23 has not seen those documents.  It may be something that we
24 show to him.  I haven't even had an extensive conversation.
25 We have a meeting with him on Tuesday to discuss the report.

1        So until I'm able to talk to them in detail about

2    that, until they can read the depositions and everything --

3    again, they were just retained -- you know, I can't fully

4    formulate the full extent of the damages model because I

5    don't know what it is yet.

6        THE COURT:  And so you're basing your

7    damages -- you've been waiting to formulate your damages on

8    something that you were hoping to get from Mr. Mols?

9        MR. SIMMONS:  Absolutely, Your Honor.  Mr. Mols

10    has all the documents.  He has his own projections.  He had

11    all the accounting for disgorgement of fees.

12        All that information is not in evaluation of some

13    documents that Ms. Torres may have taken that we attribute

14    to Mr. Mols.  All those documents were in the possession of

15    Mr. Mols, but it's taken four, five Motions to Compel to get

16    those documents.

17        THE COURT:  All right, Mr. Sorrels?

18        MR. SORRELS:  On that issue, Your Honor, and just

19    addressing that issue.  If you want me to go further, I'm

20    happy to.

21        On that issue, they had an expert designation last

22    year.  They filed suit for damages.  You know, you have to

23    have a damages expert even if you don't know the underlying

24    basis because you need to get that.  They failed to disclose

25    the damages expert.

1    What I hear them now saying is that there's some

2  projections -- probably business projections.  I don't know

3  what they are.  And based upon his speculative projections,

4  we're going to give you a speculative damages report saying

5  here's our damages based upon his speculative projections.

6    There's no basis for that and that's what we have

7  been saying -- Mr. Humphrey has been saying all along.

8  There's no damages in this -- in the case.  And you've heard

9  it before, but Alliantgroup is very aggressive litigation.

10 They just keep coming after us and coming after us.

11   Which is why I'm here today to talk about yet

12 another assumption.  And in the end, I guess, this Court or

13 whatever Court hears this is going to say these damages are

14 highly speculative, what do you have?

15   Whatever they have in designation time period they

16 have today.  They don't have -- they just didn't designate a

17 damages expert.

18   MR. SIMMONS:  And it's not speculative.  It's

19 based on Mr. Mols' own interpretation of how he values the

20 business.  And all of Mr. Sorrels' arguments about the

21 speculation or that the damages model won't be accurate,

22 that can be addressed in a Dauber Motion.

23   I think that based on spoliation, based on the

24 issues that we've had with obtaining documents to be able to

25 give to a damages expert that there's been cause exist that

we can designate a damages expert and talk about a Dauber

Motion if he believes that the damages expert's assumptions

are incorrect or that it's based on speculative information.

THE COURT:  All right.  So what is the situation

with the passwords?  Have you gotten the information now

that your expert -- your forensic guy needs?

MR. SIMMONS:  No, Your Honor.

THE COURT:  Why not?  I mean, what's the problem?

MR. SIMMONS:  Apparently Mr. Mols is not going to

be home 5:00 p.m. Central and then he'll maybe work on it.

But that wouldn't have even happened --

THE COURT:  You know, Mr. Sorrels, I'm getting up

to here with Mr. Mols' excuses.  This has gone on long

enough.

MR. SORRELS:  May I respond, Your Honor?

THE COURT:  Uh-huh.

MR. SORRELS:  Okay.  I want to take you through

the timeline.  And I can see what you're saying, but the

tone that my astute Counsel uses apparently when he gets

home he might work on it.  It's just wrong and insinuating.

THE COURT:  It's a cheap shot.  But the fact is,

you know, we're down here all the time.  It is always

something with Mr. Mols on why this is not working out

today.

MR. SORRELS:  All right, can I give you a

1 timeline?

2         THE COURT:  Sure.

3         MR. SORRELS:  Okay, so in compliance with the

4 Order, he provides them the email address.  That day

5 they -- all these are exhibits to our response -- so I'll

6 take you through the timeline.

7         So on the 18th at 2:04, before that they say, "Hey

8 there's a double verification process.  So please give

9 us -- we're going to send you -- gmail's going to send you a

10 request and we're going to put it in."

11         So at 2:04 Mr. -- or before 2:04 Mr. Humphrey

12 sends it to him.  Their forensics person says, "Hey, it

13 didn't work.  Probably because of the delay in time.  Let's

14 try it again."

15         At 2:05, Mr. Humphrey -- so one minute later --

16 Mr. Humphrey says, "Here it is right now."  We can't get

17 much more responsive than one minute on the same day.

18         And at 4:26 that same day, they give a response

19 saying we're having problems with this other email account.

20 So the first email account is fine.  So we're having

21 problems with the other email account.

22         That's at 4:26 on that day.  And as you'll see

23 Mr. Humphrey says, "Well let me know what's going on."  Now

24 I'm not blaming them because we all get busy.  I get it.

25 But they wait until May 31st -- I'm not saying it

derogatorily.  It's in their schedule.  On May 31st at
10:26, Mr. Garcia says, "Brian, do you have a few minutes to
chat this morning?  Where can we reach you at?"  That's
Exhibit Number 4.  That's at 10:26.

At 10:33 -- so seven minutes -- eight minutes --
seven minutes later, Mr. Humphrey responds -- again on the
same date, seven minutes later, "Yes, I'll be available in
about 10 minute.  Here's my direct line."  That's Exhibit 5.

And then at 11:01 after calling Mr. Mols -- so now
we're still within 40 minutes of his first conversation --
Mr. Humphrey responds, "My client is the admin for the
Converse account.  He's not technically a client, which
means he's not mechanically inclined, not savvy.  But this
is something where you can send -- is this something you can
send instructions to me relayed by email?  I prefer that to
be a direct call if at all possible."

So we're responding 30 minutes, what do you need
and we'll put you in direct contact.  Had they done it on
the 18th, we'd have done the same thing.  Instead a cheap
shot as to say well when he gets home after 5:00 o'clock
maybe he'll get to it.

Every day within minutes we're responding.  So at
11:20, 19 minutes later, Rick responds -- this is Exhibit 7.
"I don't know off the top of my head where these changes
need to be made.  That said, if your client has an

1  administrative login separate of what we've already had, I

2  could poke around and ultimately make the necessary changes.

3  I could also then revert the changes once we're done.  Does

4  that work for you and your client?"

5        That's at 11:20.  And then sent -- an email is

6  sent in Exhibit Number 8, "Rick, I asked him for the admin

7  log in.  This is first thing this morning.  I don't think he

8  understood because he sent me the same login the night

9  before.  It might be better if you talked through it

10 directly with him.  Here's his cell phone number."

11       So this is the next morning.  Which is today.  And

12 today he says, "Yeah, as soon I get home I'll get you the

13 information."

14       So they say well he waited until the 31st.  No, he

15 waited to respond until the 31st, because they said they

16 need more information, we put them in direct contact and

17 they're going to get it.

18       If they'd done this on the 18th, it would have

19 happened on the 18th.

20       My concern is this is typical of the company and

21 how they do it.  We need to rush down here now because they

22 didn't provide us all the information.  Yeah, we really have

23 provided the information that we know of.  If you need more

24 and he's not technically savvy, we're giving them more.

25       But for a reason to rush down here without a

response to hear on this and say we want death penalty

sanctions and we want to extend our expert deadline, this is

an unnecessary waste of our time and the Court's time when

he might have had a complaint next week.

But they don't want to.  They want to rush down

here and say we told you they're bad guys.  They're bad guys

and we caught them yet again.

They haven't caught anything this time.  We're

complying with the Court's Order.  We're cooperating with

Counsel.  In my opinion, the question should be Counsel, why

didn't you wait to see what happened today?

THE COURT:  So, I share everyone's frustration,

mostly yours, on getting discovery from Mr. Mols.  It has

been pulling teeth.  And I really don't ever hear a good

reason why it has to be so difficult.

And you're giving me reasonable explanations on

this, but the cumulative effect is that there's foot

dragging, things don't happen very quickly.

We are set for trial on this matter September 4th.

And we're going to go.

MR. SORRELS:  And we're fine with that.  And as I

said we would have done that on the 18th had they asked.

So, I'm not accusing them of foot dragging because people

get busy.

THE COURT:  I get it.

1    MR. SORRELS: But we didn't foot drag on the issue

2 the 31st.

3    THE COURT: But he has to turn -- you know we have

4 to get this done. So it is a priority.

5    And this is the thing, Mr. Sorrels, and, you know,

6 you're new to this case. But I still have under advisement,

7 you know, monetary sanctions for the fact that we are down

8 here all the time talking about your client's forensic

9 issues.

10    And I'm taking that up. I'm taking that up at the

11 time of trial along with your Motion for Spoliation because

12 I want to hear everyone's explanation on that. I haven't

13 really heard a lot of credible explanations on what happened

14 to documents and, you know, happened to the computers.

15    It seems interesting. I mean, it just sometimes

16 defies common sense. But I'm willing to hear that, but we

17 are going to trial.

18    I am going to give you an extension, but, you

19 know, let me just say this. You know, unfortunately for you

20 I'm not a big believer in speculative damages. So it needs

21 to be something that I can put my hands on.

22    So, you know, I'm saying this because these cases,

23 I think, are particularly difficult to value. They just

24 are. I've got quite a few of them right now.

25    And, you know, as far as a Motion in Limine,

1  there's going to be no Motion in Limine.  I'm going to hear

2  it all at trial.  And if I think the guy is a goof ball, you

3  know, I'm not going to listen to it.

4          But, I mean, we're not going to -- let's just not

5  spend a lot time on this.  I mean, I'm sure going to listen

6  to cross-examination and where we are on damages.  But as

7  far as, you know, this is a bench trial.  I think it all

8  just comes in and it just gets shaken out.

9          MR. SORRELS:  I will this -- I know that

10  Mr. Humphrey told me you're not going rule on the Motions

11  for Summary Judgment.

12          There's a one cause of action of computer fraud

13  and abuse act claim.  I believe that's the only claim that

14  has -- keeps jurisdiction in federal court.  You're

15  certainly entitled to wait until that time of trial, but if

16  you ruled on that that would eliminate --

17          THE COURT:  Oh, tempting me.

18          MR. SORRELS:  -- yeah, that would eliminate

19  federal court jurisdiction.

20          THE COURT:  The case has been pending so long.

21  It's a 2016 case.  And --

22          MR. SIMMONS:  Just to let the Court know, Mr. Mols

23  removed it to Federal Court.  It wasn't originally filed in

24  Federal Court, so.  It was moved here.

25          In addition to them saying that they complied with

1 the Order. The Order says that we should get access not

2 passwords and user names. They should have known that they

3 had to go through different factor authorizations. They

4 went through it with the gmail on the same day.

5       THE COURT: I agree with you, Mr. Simmons. It's

6 just -- there's a lot of just slow go and foot dragging

7 that's going on and -- but I'm not going to enter death

8 penalty sanctions. I am going to wait and see what happens

9 at trial as far as spoliation.

10       I'm very concerned about the issues in this case.

11 I mean, there's some things that frankly, factually make no

12 sense to me. I'm not sure what they mean in the big picture

13 of things, but.

14       MR. SORRELS: And just to respond, there was -- we

15 believed there was diversity in the case at the time of

16 removal in discovery, there is no (indiscernible). So, just

17 to give the Court (indiscernible).

18       We'll be ready in September. There's good chances

19 we'll be filing additional motions for summary judgment on

20 damages as well.

21       THE COURT: And on damages, I'll have to just take

22 that up -- I mean, that's just --

23       MR. SORRELS: Well, he invited a Daubert challenge

24 and so, you know, we probably will do that Daubert challenge

25 as well.

1      What he said is he'd base damage -- his expert

2 says he's going to base it upon our guy's projections.  We

3 don't know what projections.

4      THE COURT:  Well, I'm going to listen to it.

5      MR. SIMMONS:  Thank you, Your Honor.

6      THE COURT:  Thank you.

7      So the only reason we're here is CFAA or whatever

8 it's called?

9      MR. SORRELS:  Right.

10      MR. SIMMONS:  I don't believe that's correct.

11 They have claimed all along that CFAA, I believe there's

12 also they claims under California law.  We have a Uniform

13 Trade Secret Act claim in Texas law.

14      THE COURT:  How does California law get you into

15 Federal Court --

16      MR. SIMMONS:  I'm just --

17      THE COURT:  -- if there's no diversity.

18      MR. SIMMONS:  I apologize, Your Honor.  I'm just

19 trying to recitate all the different the arguments that

20 we're making in this case and for all the different claims.

21      And so they removed it.  I don't recall.  I wasn't

22 involved in the case whenever they removed it to Federal

23 Court.  So I can't speak to diversity or proper removal.

24 It's the first I've ever heard of it.

25      THE COURT:  All right, but you sued under CFAA

1  and --

2       MR. SORRELS:  Yes, Your Honor.  That was after

3  removal.

4       THE COURT:  I think that's still --

5       MR. SORRELS:  I just want to make sure --

6       THE COURT:  I think that still keeps a toe in the

7  door.

8       MR. SORRELS:  It does.

9       THE COURT:  What section of CFAA, do you remember?

10       MR. SIMMONS:  I do not remember off the top of my

11  head, Your Honor.

12       THE COURT:  So, let's what it looks like.

13     (Pause in the proceedings.)

14       THE COURT:  Jan, pull up the complaint.  Can you

15  pull up the complaint in this case?  17-3114.

16       COURTROOM CLERK:  (Indiscernible).

17       MR. SIMMONS:  I believe it's in doc seven.

18       COURTROOM CLERK:  Okay, second amended complaint.

19  Do you want me to print it out for you, Judge?

20       THE COURT:  Let me.  How many pages?

21       COURTROOM CLERK:  Twenty-eight.

22       THE COURT:  I'll come down in a minute.  Hold on.

23  I think you're looking at 1030, right?  Section 1030 of

24  Title 18?

25       MR. SIMMONS:  I cannot tell you off the top of my

1  head.

2        THE COURT:  Okay.  I think it's intentionally

3  accessing a protected computer without authorization.

4        MR. SIMMONS:  I believe that is the claim.  There

5  may be additional claims under CFAA, but I know that that's

6  one.

7        THE COURT:  But under that --

8        MS. MIERS:  And I -- this Kim Miers.  I'm also

9  trying to find it.  I just couldn't --

10       THE COURT:  It's 18 USC 1030 is what -- that's

11  CFAA, but I'm just.  And it has to -- there's got to be some

12  loss.

13       MR. SIMMONS:  And I have seen case law where the

14  loss can be, you know, taking of business as far as CFAA is

15  concerned.

16       THE COURT:  Sounds like a fact issue.

17       MR. SORRELS:  If the Court -- I'm sure in their

18  response if they had a fact issue, they didn't raise it.

19       THE COURT:  All right.  So, two weeks after your

20  forensic expert gets access to these documents, you need to

21  designate an expert on damages.

22       And I'm assuming that can happen very quickly as

23  far as getting access and, you know, right, Mr. Sorrels?

24       MR. SORRELS:  Your Honor, honestly I'm not worried

25  about if you're going to give them a chance to designate an

expert and damages, I'm really not worried about because they are what they are and you've already heard our line is it's purely speculative.

You can have three weeks and we'll get them the stuff as quick as I can. It's not going to change whether his damages are sustainable or not.

THE COURT: All right. So let me just -- yeah. So two weeks after you get all the information to your forensic guy. And then you'll have 30 days after he gets your expert's report to designate your own if you feel like you need it.

MR. SORRELS: Very well.

THE COURT: So that takes us pretty much right up to the trial, yay.

And I have a feeling the trial is just going to be, you know, everyone coming in and dumping all the evidence, but I think that's just the fastest way to get this all sorted out.

Because I can't look at your Motion for Summary Judgment when there's issues of spoliation and I don't know what was not available.

So I know you've got a No Evidence Summary Judgment, but if the allegation is that you've spoliated, then --

MR. SORRELS: Understand.

1          THE COURT:  -- you're not going to be rewarded for

2  that behavior.

3          So we're just going to have to see.  But, you

4  know, these cases are generally not worth a whole lot of

5  money.

6          MR. SIMMONS:  And, Your Honor, --

7          THE COURT:  It's hard to prove.

8          MR. SIMMONS:  -- these cases could have gone away

9  without spending about a million dollars in attorney's fees.

10         MR. SORRELS:  You're right, Your Honor.  And I'll

11  respond to that.  Reasonable dollars were offered and they

12  didn't consider accepting reasonable dollars.  I agree with

13  that.

14         MR. SIMMONS:  It's been offered.

15         MR. SORRELS:  It has been offered, I agree.

16         MR. SIMMONS:  Didn't mean it, sorry.

17         THE COURT:  I mean, you know, I'm not here to

18  twist arms and legs in this forum since I'm the trier of

19  fact.  But, you know, if this weren't my case, I'd be

20  twisting your, you know, everyone's arms and legs.  I mean,

21  come on.  But you know, everyone's got their opinion.  I'm

22  willing to hear it.

23         MR. SORRELS:  I don't know if any of your co-

24  judges mediate for (indiscernible) you in the cases you have

25  because (indiscernible).

1    THE COURT:  Yes, but I really can't do that and
2  there's a lot of reasons I can't.  But why -- you know,
3  there's 900 pound mediators, you know, gorilla mediators out
4  there that, you know, why can't the parties find one that
5  they liked.

6    MR. SIMMONS:  We have Allen Leven.  He's been
7  retained.  He's been involved.  That's who --

8    THE COURT:  All right.

9    MR. SIMMONS:  -- along with (indiscernible)--

10    THE COURT:  Was he giving head smacks?  What was
11  he doing?

12    MR. SIMMONS:  I don't think he's given hard enough
13  hard smacks, but he's definitely -- you know, he's keeping
14  in touch with the parties.  And we've relayed our demands
15  through him and also through directly to Mr. Humphrey and
16  they've done the same using both avenues.

17    So, certainly if they now think that another stab
18  at it may do something, you know, that's something we can
19  discuss.  But we don't need to bother you with.  News to me.

20    THE COURT:  All right.  But as far as, you know,
21  seeing if one of my colleagues.  It really doesn't work that
22  way because I can't presume to use their time.  That belongs
23  to their district judges.  And that's very closely guarded.

24    MR. SORRELS:  Fair enough.

25    THE COURT:  So, we're not going to go there.

1    MR. SORRELS:  So time is (indiscernible).

2    THE COURT:  All right.  Well you-all have a good

3 day.

4    MR. SIMMONS:  Thank you, Your Honor.

5    MR. SORRELS:  Thank you, Your Honor.

6    COURTROOM CLERK:   All rise.

7    (Proceeding adjourned at 3:27 p.m.)

8                    *  *  *  *  *

9    *I certify that the foregoing is a correct*

10 *transcript to the best of my ability produced from the*

11 *electronic sound recording of the proceedings in the above-*

12 *entitled matter, and this is an accurate transcript, as best*

13 *as is possible, due to the conditions of the recording.*

14 */S/ MARY D. HENRY*

15 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

16 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

17 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

18 *JTT TRANSCRIPT #58835*

19 *DATE FILED:  JUNE 18, 2018*

20

21

22

23

24

25