UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


ALLIANTGROUP, L.P.,            )      CASE NO:  4:16-CV-03114
                              )
            Plaintiff,        )            CIVIL
                              )
    vs.                       )        Houston, Texas
                              )
BRAD MOLS, ET AL.,            )      Friday, June 29, 2018
                              )
            Defendants.       )      (2:00 p.m. to 3:11 p.m.)


MISCELLANEOUS HEARING

BEFORE THE HONORABLE NANCY K. JOHNSON,
UNITED STATES MAGISTRATE JUDGE



Appearances:            See next page


Case Manager:           Shannon Jones

Court Recorder [ECRO:]  Jennifer Olson

Transcribed By:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, Texas 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiff:                KIMBERLY R. MIERS, ESQ.
                          Littler Mendelson
                          2001 Ross Ave., Suite 1500
                          Dallas, TX 75201

                          MATTHEW L. SIMMONS, ESQ.
                          Littler Mendelson
                          1301 McKinney, Suite 1900
                          Houston, TX 77010

Defendants:               BRIAN S. HUMPHREY, II, ESQ.
                          Abraham Watkins, et al.
                          800 Commerce St.
                          Houston, TX 77002

## INDEX

| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NOEL KERSH | 4/6 | 28 | 47 | 48 |

| EXHIBITS | RECEIVED |
|---|---|
| 1 | 8 |
| 2 | 13 |
| Report | 19 |
| 4 | 21 |

1        **Houston, Texas; Friday, June 29, 2018; 2:00 p.m.**

2                           **(Call to order)**

3            **THE COURT:**  All right, good afternoon, please be

4    seated.  Mr. Simmons, call your witness.

5            **MR. SIMMONS:**  Plaintiff calls Noel Kersh.

6            **NOEL KERSH, PLAINTIFF'S WITNESS, SWORN**

7            **THE CLERK:**  You may be seated.

8                         **DIRECT EXAMINATION**

9    **BY MR. SIMMONS:**

10   Q    Mr. Kersh, can you state your name for the record?

11   A    Yes, Noel Edwin Kersh.

12           **MR. SIMMONS:**  And then, your Honor, we request Mr.

13   Kersh leave to work on his laptop to show you a demonstration

14   of a CCleaner.  It's a very short demonstration of the

15   methodologies you have to get to to change it from the normal

16   pattern to a secure delete, which is not the default.

17           **THE COURT:**  Okay, so do you want me to stand in back

18   of him?

19           **MR. SIMMONS:**  I -- so we already have it hooked up

20   here so --

21           **THE COURT:**  Okay.

22           **MR. SIMMONS:**  -- I just need him leave to --

23           **THE COURT:**  All right, that's fine.

24           **MR. SIMMONS:**  -- go to the laptop.

25           **THE WITNESS:**  Is it okay?

1          **MR. SIMMONS:**  Yes.

2          **THE WITNESS:**  Okay.

3      **(Witness steps down)**

4          **THE COURT:**  And this is what program again?

5          **MR. SIMMONS:**  CCleaner.

6          **THE COURT:**  CCleaner.

7          **MR. SIMMONS:**  Yes, your Honor.  And whatever you're

8    doing, just go ahead and --

9          **THE WITNESS:**  Navigate.

10         **MR. SIMMONS:**  Yeah.

11         **THE WITNESS:**  And dictate, okay.  So where we're at

12   right now is a CCleaner dot com.  What we're about to do is

13   download the professional version of the software from the

14   website, so I'm going to click on the --

15         **THE COURT:**  Is that how you do it, you don't buy it

16   in a package anymore, you have to download it?

17         **MR. SIMMONS:**  You have to download it.  But for this

18   purpose, you actually also download a seven-day free trial in

19   addition.  But it's the same software.  But you --

20         **THE WITNESS:**  The free --

21         **MR. SIMMONS:**  -- can comment on that actually.

22         **THE WITNESS:**  Yeah, the free trial has the same

23   features as the paid version, it's just after a period of time,

24   the software expires and it forces you to purchase or to

25   uninstall it.

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  So what it's -- what we've done so far

3    is just the download has completed.  And this is --

4       **(Witness/Ms. Speaker confer)**

5          **MR. SIMMONS:**  Okay, let's go ahead and skip this.  I

6    think you need an admin password.

7          **THE WITNESS:**  Okay.

8          **MR. SIMMONS:**  So go ahead and go up, yeah.

9       **(Witness retakes the stand)**

10                   **DIRECT EXAMINATION (RESUMED)**

11   **BY MR. SIMMONS:**

12   Q    So in lieu of this -- just in case, so actually, you know,

13   instead of that, you downloaded the version already on the USB

14   drive?

15   A    Yes.

16   Q    Let's go ahead and do that.

17   A    Okay.

18      **(Witness steps down)**

19          **MR. SIMMONS:**  I apologize, your Honor.

20          **THE COURT:**  It's all right.

21   **BY MR. SIMMONS:**

22   Q    So what are you clicking on?

23   A    What we're doing is we're -- I'm about to install CCleaner

24   version 5.38 Pro.

25          **MR. SIMMONS:**  Okay.

1          **MS. SPEAKER:**  It's the same issue.

2          **THE WITNESS:**  And we have the same problem.

3          **MR. SIMMONS:**  Well, go ahead and go back up.

4          **THE WITNESS:**  Okay.

5      **(Witness retakes the stand)**

6          **MR. SIMMONS:**  You've got a hard copy of the process

7   that one goes through in order to download CCleaner and the

8   prompts that you get --

9          **THE COURT:**  Because he's done that before.

10         **MR. SIMMONS:**  Because he's done this and these are

11  from them.

12         **THE COURT:**  He took screenshots.

13         **THE WITNESS:**  Yes, ma'am.

14         **MR. SIMMONS:**  That is correct, your Honor.

15         **THE COURT:**  Okay, all right.

16         **MR. SIMMONS:**  Here's a copy for the Judge.  May I

17  approach the witness?

18         **THE COURT:**  You may.

19         **THE WITNESS:**  Thank you.

20  **BY MR. SIMMONS:**

21  Q    Mr. Kersh, you're looking at a grouping of screenshots; do

22  you recognize this document?

23  A    Yes, sir.

24  Q    How do you recognize this document?

25  A    I created these screenshots myself.

1    Q    And how did you create these screenshots?

2    A    I went and found a previous version of CCleaner, version

3    5.38, downloaded the application, installed the application,

4    and then took screenshots during the installation and through

5    the operation of the software.

6    Q    And why is version 5.38 an important version in this

7    matter?

8    A    That's the same version that we saw running on the Mols

9    laptop.

10        **MR. SIMMONS:**  Request that this document be admitted

11   as Plaintiff's 1, your Honor.

12        **THE COURT:**  Any objection?

13        **MR. HUMPHREY:**  No objection, your Honor.

14        **THE COURT:**  It's admitted.

15        **(Plaintiff's Exhibit Number 1 was received in evidence)**

16   **BY MR. SIMMONS:**

17   Q    Okay, Mr. Kersh, the first page, is that -- tell me what

18   this first page is and let's just walk through it.

19   A    The first page is the screen you see when the setup

20   begins, right after you double-click the executable for the

21   install, it prompts you with this screen.

22   Q    Okay.  If you can speak up just a little bit.

23   A    Okay, I think the --

24   Q    And on the second page, what does that show?

25   A    The second page is when an install the application, the

1   application went and checked the peer four website and said,

2   hey, there's a newer version of the software available, do you

3   want to install it.  On this of course I selected "no" because

4   I wanted to install version 5.38.

5   Q    And whenever you move to the third page, what are we

6   looking at there?

7   A    What this is is the screen that the user has to go to in

8   order to change the default setting that is normal file

9   deletion to the secure file deletion.  And you'll see that

10  secured deletion option right in the middle of that screen.

11  And so the user has to select first options and then they go to

12  settings under that submenu, and that's how you get to the

13  screen.

14  Q    And so the default under this version of CCleaner is

15  normal file deletion faster next to the secure deletion bar; am

16  I reading that correct?

17  A    That's correct.  And I would say that I tested version

18  5.38, version 5.44, and a couple other versions of CCleaner on

19  different, various machines, and every single one of them the

20  default for normal file deletion or secured file deletion was

21  in every case normal file deletion.

22  Q    And how does normal file deletion differ from secure file

23  deletion, which you can see on the next page?

24  A    So on the secure file deletion, once the user selects that

25  as an option, they're offered four different options for

1  severity of the wiping of the data.  Essentially it makes -- it

2  can either make one pass over the data that overrides the data

3  or you can go all the way up to 35 passes across the data to

4  override it.

5  Q    And whenever you override data using the secure file

6  deletion button and change it from the normal setting, is there

7  any unique pattern that you see in the files that's different?

8  A    Yes.  In fact it's a pattern that is unique to CCleaner.

9  From a forensic examiner standpoint, when I have a case that

10  CCleaner's been used on, it's an unmistakable fingerprint

11  that's left on the computer.  And what happens is the -- all

12  the file names are changed from the previous file names to Z's

13  and periods.  So it goes through -- it goes and overwrites the

14  file name 26 different times for each letter in the alphabet

15  from all A's to B's to C's to Z's ultimately.  And so when we

16  see that, we know that that is a fingerprint of the secured

17  delete feature of CCleaner being used on the evidence.

18  Q    And so do I understand you correctly that you wouldn't see

19  Z's in the files if you had the normal file deletion feature,

20  which is the default?

21  A    That's correct.  And I confirmed that by both my testing

22  of the normal file deletion on some of my exam computers, and

23  then also my experience with CCleaner.  This isn't the first

24  case that this has come up before.  And in also talking to one

25  of my other senior examiners and confirming as a peer review

1  step, is this your understanding of the way CCleaner works as

2  well, and he confirmed my --

3          **THE COURT:**  So say that again.  So if --

4          **THE WITNESS:**  Okay.

5          **THE COURT:**  -- it's just the normal delete, what

6  would it show?

7          **THE WITNESS:**  It only shows that the application was

8  run but none of the file names are changed --

9          **THE COURT:**  Are changed.

10          **THE WITNESS:**  -- to Z's, yes, ma'am.

11  **BY MR. SIMMONS:**

12  Q    And then in the normal -- if it was run in the normal

13  setting, which the default is, would you be able to recover the

14  files that it has done a normal file deletion on?

15  A    I believe there -- I believe we could.  I haven't had to

16  do that before but I believe we could because it's not doing as

17  a severe a delete over the files as the secure feature is.

18  Q    Then if someone runs the secure file deletion where you

19  get the Z's from, is it possible to get the full files back at

20  all?

21  A    It's almost impossible to do that.  To get it -- you can't

22  get it back.  It is impossible to get them back in their

23  original form.  It's impossible because what the program is

24  doing is it's taking data and overwriting the Word document, as

25  an example, with just random characters or could be a series of

1   characters that's -- that the program is doing to override the

2   content of that file, making the restoration of that deleted

3   file to its previous original state impossible.

4   Q    Is CCleaner a data recovery software?

5   A    No, it's not.

6   Q    And you state in your affidavit -- let's go ahead and --

7         **MR. SIMMONS:**  May I approach the witness?

8         **THE COURT:**  You may.

9   **BY MR. SIMMONS:**

10  Q    Do you recall -- do you recognize this document?

11  A    Yes, I do.

12  Q    How do you recognize this document?

13  A    This is my affidavit that I submitted, the June 11th,

14  2018.

15  Q    And is that your signature at the bottom of page two?

16  A    Yes, it is.

17        **MR. SIMMONS:**  Move to admit Plaintiff's 2, the

18  affidavit of Noel Kersh.

19        **THE COURT:**  Any objection?

20        **MR. HUMPHREY:**  I object to the attached document as

21  hearsay, your Honor, but other than that, the affidavit --

22        **THE COURT:**  All right, do you want to prove up the

23  affidavit submitted and I'll let you prove up the attached

24  documents?

25        **MR. SIMMONS:**  Thank you, your Honor.

1  **BY MR. SIMMONS:**

2  Q    If you want to look at the attached document behind the

3  affidavit, --

4  A    Yes.

5  Q    -- it's an email from you to me, Matt Simmons, Mr.

6  Humphrey, Mr. Simpson, Ms. Miers, and Matt Marzullo, do you

7  recognize this document?

8  A    Yes, I do.

9  Q    How do you recognize this document?

10 A    I prepared it.

11 Q    And this document's dated June 6, 2018.

12 A    Yes, sir.

13 Q    And did you prepare this document based on your own

14 knowledge?

15 A    Yes.

16        **MR. SIMMONS:**  Move for the admission of the affidavit

17 and its attachment into evidence, your Honor.

18        **THE COURT:**  Objection?

19        **MR. HUMPHREY:**  No objection to the extent it's there

20 to illustrate his testimony, your Honor.

21        **THE COURT:**  Admitted.

22    **(Plaintiff's Exhibit Number 2 was received in evidence)**

23 **BY MR. SIMMONS:**

24 Q    Mr. Kersh, in your affidavit, you state that at some point

25 in time the CCleaner professional was removed from the system.

1   A    Yes.

2   Q    What effect, if any, did the removal of the CCleaner

3   software have on your ability to examine how it was utilized on

4   the computer?

5   A    When the application is uninstalled, it removes

6   information from the Windows registry which would tell us what

7   kind of settings that the person had in the software.  And

8   that's what we're missing from the installation --

9   uninstallation, I should say.

10  Q    Can you --

11          **THE COURT:**  And what does that mean?

12          **THE WITNESS:**  Well, if they had a setting in there,

13  for example, to wipe a specific folder, because that's one

14  thing that you can do in the software, you can specify a

15  specific folder that you want the program to wipe.  If they had

16  specified that in CCleaner and then uninstalled the program,

17  the -- that setting goes away, it's invisible to us and we

18  can't get it back.

19  **BY MR. SIMMONS:**

20  Q    But if they hadn't uninstalled the program, you would have

21  been able to see what selections they had elected to wipe?

22  A    We would have been able to see the last selections that

23  they made in the software.  So unless they had gone back into

24  the software and removed that folder from what they wanted to

25  be included in a wipe, then we wouldn't have seen that.  But if

1   they had left that as a selection, then we would have.

2   Q    If the CCleaner software wasn't uninstalled, would you be

3   able to tell beyond the Z's whether the user had selected

4   secure delete versus the normal delete?

5   A    Yes, that is something we could tell.

6        **THE COURT:**  So how do you uninstall something; do you

7   just delete it?

8        **THE WITNESS:**  No, ma'am.  There's two ways primarily.

9   The program will either come with an uninstallation program

10  that is designed to remove itself from the computer, or you can

11  use the Windows uninstall feature to uninstall a specific

12  software.

13       **THE COURT:**  Okay.

14       **MR. SIMMONS:**  And then Mr. Humphrey didn't question

15  his qualifications as an expert.  I'm more than happy to prove

16  him up.  Do you want me to?

17       **MR. HUMPHREY:**  It's unnecessary, your Honor.

18       **THE COURT:**  All right.

19       **MR. SIMMONS:**  Mr. Humphrey also didn't challenge

20  chain of custody or authenticity or anything.  I can prove that

21  if you up want.

22       **MR. HUMPHREY:**  Unnecessary, your Honor.

23       **THE COURT:**  All right.  Chain of custody on the

24  laptop?

25       **MR. SIMMONS:**  Correct, your Honor.

1          **THE COURT:**  Okay.

2    **BY MR. SIMMONS:**

3    Q    After reviewing your affidavit that's been entered as

4    Plaintiff's 2, do you notice any typographical errors in it?

5    A    Yes.  In paragraph four, I stated "on December 15, 2016."

6    That should read "on December 15, 2017."

7    Q    So it says 2016, it should be 2017.

8    A    That's correct.

9    Q    And is there anywhere else where it shows why it should be

10   2017 in the attachment?

11   A    If you look at paragraph five, paragraph seven, paragraph

12   eight, paragraph nine, I reference dates in 2017.  Again, if

13   you flip to the attachment, there's also dates in there that

14   are pointing to 2017 as a correct date.

15   Q    Do you want to look at page four of your attachment?

16         **(Pause)**

17   A    Yes, if you look at the middle of the page there where it

18   says "use of CCleaner/mass deletion and override of data," the

19   second paragraph there says:  "The user assist shows the setup

20   for the free version of CCleaner was run on 12/15/2017 at

21   1405."

22   Q    And "1405," is that Pacific Time or Central Time?

23   A    It was Pacific Time, I'm sorry.

24   Q    And your affidavit is in Central time, correct?

25   A    Correct.

1    Q    So whenever you were reviewing Mr. Mols's laptop, his

2    personal laptop, did you find any evidence of usage of a data

3    wiping software?

4    A    Yes.

5    Q    What'd you find?

6    A    The use of CCleaner.

7    Q    Are the files that were wiped by CCleaner recoverable?

8    A    I don't believe they are.

9    Q    And what's the basis for your belief?

10   A    The nature of the data wiping program and then the way

11   that it overwrites the data that it is trying to delete makes

12   it impossible to recover to its original state.

13              **THE COURT:**  Did you try?

14              **THE WITNESS:**  We're trying currently, your Honor.  At

15   best, I think we might be able to get back some small fragments

16   of files.  But the issue is -- one of the many issues with this

17   process is that if it does find any data, the dates on those

18   files are going to be -- they're gone.  And then of course the

19   file names as we've already seen have been changed, so I don't

20   have any way of identifying what that file was named, when it

21   was on the computer, any information about the files so -- but

22   we are trying to undertake a process to recover what we can

23   from the laptop.

24   //

25   //

1   **BY MR. SIMMONS:**

2   Q    And then my understanding looking back to Plaintiff's 1

3   with slides, there was different options within secure delete,

4   one pass versus 35 passes.  If it's more than one pass, would

5   you be able to see any fragments whatsoever of any of the

6   documents?

7   A    The more passes that it makes, the less likely we are to

8   recover any data from the computer.

9   Q    And what's the reason why you just started to try to

10  identify whether you can identify fragments of the data?

11  A    Well, it was -- it's a very expensive process.  It's I

12  think estimated between five and 10,000 for us to do the

13  recovery and, if necessary, the reconstruction of fragments

14  into the files in their original state.  And so I didn't want

15  to -- we've already spent a lot of time and money on this case

16  so I waited to get client authorization to do that.  It came up

17  yesterday when we were doing prep and I brought up and said, we

18  haven't done that yet.  But I need approval to do that.  It's

19  above my -- it's above what we would normally do without prior

20  approval.

21  Q    I'm going to hand you --

22       **MR. SIMMONS:**  May I approach the witness?

23       **THE COURT:**  You may.

24       **(Pause)**

25  //

1    **BY MR. SIMMONS:**

2    Q    Mr. Kersh, this appears to be a document dated June 18th,

3    2018, forensics examination report, it's a 32-page document; do

4    you recognize this document?

5    A    Yes, sir, I do.

6    Q    How do you recognize this document?

7    A    It's my expert report.

8         **MR. SIMMONS:**  Move for admission of the report, your

9    Honor.

10        **THE COURT:**  Any objection?

11        **MR. HUMPHREY:**  No objection, your Honor.

12        **THE COURT:**  It's admitted.

13    **(Plaintiff's Report was received in evidence)**

14   **BY MR. SIMMONS:**

15   Q    Did you through your searches through Mr. Mols's laptop

16   and the other devices that are mentioned in this report, did

17   you locate any other evidence of the usage of CCleaner?

18   A    We found the presence of CCleaner on the desktop computer,

19   the Mols desktop computer.  It had been installed on the

20   desktop computer in 2011 and was still present on the computer

21   when we imaged it in January of 2018.  I believe there was a

22   web search that was done for CCleaner in 2014 on the desktop as

23   well.

24   Q    And if you don't mind flipping to page 24 of the report.

25        **THE COURT:**  Was the web search for CCleaner in 2016,

1  did you say?

2         THE WITNESS:  Fourteen, ma'am.

3         THE COURT:  Fourteen.

4         THE WITNESS:  Yes, ma'am.

5  BY MR. SIMMONS:

6  Q    You on page 24?

7  A    Yes.

8  Q    And is that an accurate recitation of what data you found

9  on the Mols desktop computer?

10 A    Yes, it is.

11 Q    Was the CCleaner on the Mols desktop computer uninstalled

12 at the time of examination like the laptop computer?

13 A    No, it was not.

14     **(Pause)**

15        **MR. SIMMONS:**  May I approach the witness?

16        **THE COURT:**  You may.

17     **(Pause)**

18 BY MR. SIMMONS:

19 Q    I handed you with -- what is an email from you to Mr.

20 Humphrey, myself, and Mr. Sorrells (phonetic) CCing John

21 Simpson, Kim Miers, and Matt Marzullo.  It's an email dated

22 this morning, and do you recognize this document?

23 A    Yes, I do.

24 Q    How do you recognize this document?

25 A    It's an email that I sent this morning.

1    Q    And then at the very end of the document, there's a

2    picture.

3    A    Yes.

4    Q    Do you recognize that picture?

5    A    Yes, I do.

6    Q    Did you take that picture?

7    A    One of my examiners did.

8    Q    And did you attach that picture to this email?

9    A    Yes, I did.

10          **MR. SIMMONS:**  Move for admission of the email chain

11   and picture as Plaintiff's 4, your Honor.

12          **THE COURT:**  Any objection?

13          **MR. HUMPHREY:**  No objection, your Honor.

14          **THE COURT:**  It's admitted.

15       **(Plaintiff's Exhibit Number 4 was received in evidence)**

16   **BY MR. SIMMONS:**

17   Q    According to this email in -- you -- can you describe for

18   me what this email is stating from you to Mr. Humphrey and

19   myself?

20   A    Yes.  We did our -- we conducted our initial analysis, the

21   USB device analysis, and we identified certain USB devices that

22   had been connected to the computers.  We provided those reports

23   to both sides simultaneously as agreed in the agreed protocol.

24   And then what this is -- and then there was a period of time

25   when Mr. Mols was producing USB drives that he found to us for

1   examination.  And so what this is -- and we received the last

2   USB device yesterday morning from Mr. Humphrey.  And what this

3   is is just a -- stating essentially of the five devices that

4   were connected to the laptop, we --

5   Q    What laptop?

6   A    I'm sorry, the Mols laptop, we have received three of

7   those devices.  And you can see in there, they're highlighted

8   with the evidence number, those are Pathway evidence numbers

9   that we've assigned to those devices.  Then there are two

10  devices there that are not highlighted and those are two

11  devices that we have not yet received.

12  Q    And so just to be sure, all five of these devices that are

13  cited in this particular email are devices that you know were

14  plugged into Mols's personal laptop.

15  A    That's correct.

16  Q    And what methods and techniques did you utilize to find

17  out that these devices were plugged into Mols's personal

18  laptop?

19  A    We analyzed the Windows registry.  There's several

20  different artifacts on the computer that record USB device

21  connections to the computer, so among those would be the

22  Windows registry.  We also analyzed the setup API logs.

23  There's a number of different artifacts, I won't bore you with

24  all of them, but we analyzed each one of those to look for the

25  connection details of the USB devices, including the make and

1    model and the serial number of those devices.  And if they're

2    there, we also extract the connection dates and times of those

3    devices.

4    Q    And the method that you utilized to locate whether you --

5    what USB devices were plugged into Mr. Mols's personal laptop,

6    are those methods that are the industry standard for a

7    forensics expert?

8    A    Yes, they are.

9    Q    Let's go ahead and focus on a very important drive.  It's

10   the SanDisk Cruzer Mini.  The serial number is right next to

11   it.  I'm not going to make the court reporter type all that in.

12   As part of your exam in this matter, were you asked to also

13   image Mr. Mols's Alliantgroup laptop?

14   A    Yes, I was.

15   Q    And is there a record of that?

16   A    Yes, there is.

17   Q    Where is it?

18   A    There was an email that I sent with the USB device report

19   from -- that was generated from his Alliantgroup computer.

20   Q    And is it also included in your forensics report?

21   A    Yes, it is.

22   Q    Can you tell me what page that is on your forensics

23   report?

24   A    It starts on page 12 of the report.  And that's also the

25   same page that has the USB device activity on his Alliantgroup

1    computer.

2    Q    Okay, and when reviewing Mr. Mols's Alliantgroup computer,

3    were you able to determine how many user files were on his

4    Alliantgroup laptop?

5    A    Yes.

6    Q    How many?

7    A    There's approximately 8,400 user-created files, and those

8    are specific file extensions that we looked at.  So -- and I'm

9    differentiating user-created files from the system files that

10   are executables and databases and things that the computer

11   needs to run itself, so just of the user-created files, it's

12   about 8,400.

13   Q    Can you give the Court some examples?  I'm not too sure

14   what user-created files are.

15   A    Right.

16   Q    Can you give the Court some examples, and me, of what

17   user-created files are?

18   A    Sure.  Just like a Microsoft Office Word document or an

19   Excel spreadsheet, PDF documents, even some compound files like

20   ZIP files and seven Z's and things like that.

21   Q    So if you were to save all of these 8,400 user files on

22   Mr. Mols's Alliantgroup laptop, how much space would you need

23   to save?

24   A    So I did a size on that and it was 5.6 or 5.7 gigabytes of

25   data in user files.

1    Q    And along with this report on page 12, were you able to

2    identify any USB devices that were plugged into Brad Mols's

3    Alliantgroup laptop?

4    A    Yes.

5    Q    Is one of those devices the highlighted one actually,

6    SanDisk Cruzer Mini?

7    A    Yes, it is.

8    Q    And did you use the same technique and methodology to find

9    these USB drive devices than you did on the Mols's personal

10   device?

11   A    Yes, I did.

12        **(Pause)**

13   Q    And how many gigabytes would this SanDisk Cruzer Mini

14   potentially hold?

15   A    So without the device and without knowing more details,

16   like the make and model of the device, I had a chat session

17   with a SanDisk support person to ask them what sizes does your

18   SanDisk Mini come in, and just asked them for the ranges.  And

19   they said it starts at eight gigabytes and goes to 256

20   gigabytes -- I'm sorry, it starts at eight gigabytes and goes

21   up to 256 gigabytes is what they told me.

22   Q    So based on your testimony, is the device, the SanDisk

23   Cruzer Mini, large enough to hold all of Alliantgroup's files

24   on Brad Mols's Alliantgroup laptop?

25   A    Yes.

1  Q    And in this report, when was the first date that the

2  SanDisk Cruzer Mini was plugged into Brad Mols's Alliantgroup

3  laptop?

4  A    The first date was April 4th, 2016.

5  Q    And at what time?

6  A    At 11:02 a.m.

7  Q    And then the last time it was plugged into Mr. Mols's

8  Alliantgroup laptop was when?

9  A    On the same day, April 4th, 2016, at 11:36.

10 Q    So am I correct in understanding that the only time this

11 device was -- the only date this device was plugged into Mr.

12 Mols's Alliantgroup laptop was on April 4th, 2016?

13 A    That's correct.

14 Q    And do you have an understanding of when Mr. Mols left

15 Alliantgroup?

16 A    It was early May, May 2nd or May 3rd, from memory.

17 Q    Of what year?

18 A    Twenty-sixteen.

19 Q    Are you able to identify a single document that's on this

20 SanDisk Cruzer Mini USB device?

21 A    No.

22 Q    Why not?

23 A    In order for us to have visibility of the files that are

24 on a USB device, the file has to be copied to the USB device

25 and then it has to be opened from the USB device for us to have

1   visibility of that file on that USB device.

2   Q    And an example of that, if you want to look below, is this

3   an example of a device that was open on the device and the

4   output of files that you could see?

5   A     Yes, it is.

6   Q    Was the SanDisk Cruzer Mini with the same serial number

7   also plugged into Mr. Mols's personal laptop?

8   A    Yes, it was.

9   Q    And if you wouldn't mind looking at page 14 of the

10  forensics report, where on the page 14 does it state that?

11  A    If you look at the table on that page, the USB device that

12  we're talking about is on the fifth line.  The last five digits

13  are 00701.

14  Q    And what can you tell me about the SanDisk Cruzer Mini

15  that's on the Brad Mols personal laptop?

16  A    I can't tell you anything about it.  I don't know what's

17  on it.

18  Q    Is there any information that you cannot derive from the

19  SanDisk Cruzer Mini due to the Windows 10 upgrade?

20  A    Yes.  The -- when the Windows upgrade occurred, it removed

21  the dates that those devices were connected to the computers,

22  so it removes my ability from being able to tell you when that

23  SanDisk Mini was attached to the computer.

24            **MR. SIMMONS:**  Reserve to -- for redirect, your Honor.

25            **THE COURT:**  All right.  Mr. Humphrey?

1      **MR. HUMPHREY:**  Your Honor, may I take one moment to

2  speak with my consultant?

3      **THE COURT:**  Of course.

4    **(Pause from 2:34 p.m. to 2:36 p.m.)**

5      **MR. HUMPHREY:**  Thank you, your Honor.  May I proceed?

6      **THE COURT:**  Absolutely.

7      **MR. HUMPHREY:**  Good afternoon, Mr. Kersh.

8                    **CROSS EXAMINATION**

9  **BY MR. HUMPHREY:**

10  Q    I want to see first if we can agree on a few things.

11  Number one, CCleaner cannot delete emails off of an email

12  server unless it's run on that server.

13  A    Yeah, if it's run on the server, it could certainly be

14  used to do that.

15  Q    But he could not -- for example, Mr. Mols could not run

16  CCleaner on his computer and delete files off of the Gmail

17  server.

18  A    That's correct.

19  Q    Or any emails that weren't only on his computer.

20  A    He wouldn't -- he would only be able to delete data that's

21  on his computer if he used CCleaner.  It's not -- you can't

22  jump up to the network and delete emails out of Gmail and

23  things like that, that's correct.

24  Q    So whatever files that you're testifying were deleted by

25  CCleaner, that does not include emails in the Gmail account,

1  Prime tax Group account, Converse email account, or any of the

2  accounts that you examined.

3  A    Well, the only exception I would take to that, Mr.

4  Humphrey, is if he had downloaded the Gmails to his computer

5  and that was the only place that they existed, and then in

6  effect when CCleaner was run on the computer, it would have

7  deleted those emails and that's the only place that they would

8  ever have been, if that makes sense.

9  Q    But for him to do that, he would have had to delete them

10 off of a Gmail account before or at some point.

11 A    That's correct.

12 Q    Without CCleaner.

13 A    Correct.

14 Q    You agree with me that you don't -- in your examination --

15 well, you examined not just the laptop and the desktop, you've

16 also examined Mr. Mols's Gmail account; is that right?

17 A    Correct.

18 Q    And a separate Converse email account that was hosted by

19 Gmail; is that right?

20 A    Yes, sir.

21 Q    Converse being another company that he worked with.  And

22 an email account for an Ascena company that was also hosted on

23 Gmail.

24 A    Yes, sir.

25 Q    You've had a chance now to examine his wife's Yahoo

 1  account; is that right?

 2  A    Correct.

 3  Q    You -- did you examine his Alliantgroup email account

 4  before this lawsuit was filed?

 5  A    I don't recall.  If I did, it was back at the beginning of

 6  this engagement so I need to go back and look at my notes and

 7  see.  I don't recall.

 8  Q    Do you know whether Alliantgroup had access to that

 9  account?

10  A    I'm sure they did.

11  Q    Have you had the opportunity to examine some Google drive

12  accounts associated with those same Gmail addresses; is that

13  right?

14  A    Yes, sir.

15  Q    Now, in all of that, have you seen any evidence that Mr.

16  Mols deleted any emails after December of 2017?

17  A    Well, again, we're talking about web accounts.  And so

18  when an email is deleted on a web account, the only record of

19  those deletions would be on that provider's website or their

20  server, rather.  So, for example, if he were to have deleted

21  Gmail, as an example, just you would have to go to Google

22  servers and subpoena that information from Google to say, give

23  me all the deleted email that this person's ever had.  Now,

24  they only keep a very small portion of that after it's been

25  deleted and emptied out of his mailbox, and so the likelihood

1  that that's -- the information's going to come back is only --

2  that kind of request is only successful if it's made, if that

3  request is made, in a very short time period after those emails

4  have been deleted.

5  Q    Well, my question, Mr. Kersh, is in your exams, have you

6  seen any such evidence?

7  A    No, I have not.

8  Q    You also agree that CCleaner's not really marketed as a

9  data wiping software, is it?

10  A    It's a -- it's marketed as a -- one of the features that

11  it offers is a -- it's a privacy protector, which in my

12  experience is code word for a data wiping tool or some way to

13  keep your information private and keep it away from going to be

14  your employer or your spouse or whoever you're trying to keep

15  information from.  So it may not use those words as a data

16  wiping tool but it certainly has those features and it

17  certainly uses language that's similar to that.

18  Q    Well, does data wiping appear anywhere on its marketing

19  materials, the website, that you're aware of?

20  A    Not that I'm aware of.

21  Q    Why do you use the term "data wiping" then?

22  A    It's -- that's my -- I mean that -- in the forensic world,

23  that is the net effect of what the tool does.  It wipes data.

24  Q    So when you call it data wiping software, you're using

25  your industry term, not the term the general public uses for

1  CCleaner; is that right?

2  A    I'm using a term that describes what it's doing to the

3  data, and in this case evidence that's part of litigation.  So

4  it is wiping data that is not to be wiped, not to be deleted.

5  Q    That's not what I --

6        **THE COURT:**  Okay, but if I were going to -- if I were

7  looking for data wiping software and I went on the internet and

8  googled "data wiping," what would come up, if you know?

9        **THE WITNESS:**  I don't know.  I know that CCleaner is

10 a very popular tool and it's -- it comes up quite a bit

11 whenever you're looking for software to do similar to what was

12 done here.  So -- but I don't know the answer, direct answer,

13 to your question without doing it myself.

14 **BY MR. HUMPHREY:**

15 Q    Well, similar to what was done here for what purpose,

16 because one of the purposes of deleting files is to make the

17 computer run better and, in fact, that's what CCleaner's

18 marketed for, isn't it?

19 A    It's one of the primary things it's marketed for, yes,

20 sir.

21 Q    And to follow up on what the Court asked you, if you were

22 to search for other types of data wiping software, there are

23 actually freely available data wiping software that is

24 purposely made for that, isn't that right?

25 A    I don't know.  Like I said, I haven't googled that recent

1    enough to know exactly what comes up.

2    Q    How long have you been a forensic examiner?

3    A    Twelve years.

4    Q    Are you saying you don't know about free data wiping

5    software that's available?

6    A    No, I think the question that the Court asked me was what

7    happens when you google data wiping software, and I don't know

8    that off the top of my head.

9    Q    The question I'm asking you is, is there free data wiping

10   software available on the market and you can just google and

11   find?

12   A    Yes, you -- yes, absolutely.

13   Q    And it's actually marketed for that purpose, unlike

14   CCleaner, isn't that right?

15   A    Yes.

16   Q    It's just a google search away, isn't it?

17   A    Yes.

18   Q    As one popular one called "Eraser."

19   A    Right, that's correct.

20   Q    Now, CCleaner claims, and do you have any reason to doubt,

21   that 130 million people use CCleaner?

22   A    Can you state that --

23   Q    Sure.  CCleaner's a popular, commonly used piece of

24   software, isn't it?

25   A    I only know from my experience.  I've seen it come up in

1   other cases.  It's a pretty common one that we come across in

2   this field.  I don't know about its popularity or its usage

3   worldwide.  I just don't know that personally.

4   Q    So if CCleaner says that it's been used by 130 million

5   people, you have no reason to doubt that.

6   A    I don't.

7   Q    Now, you said that you don't -- well, actually let me ask

8   you this about the method that you walked through in the slides

9   that were shown to the Court.  If that's what was done, what

10  would be securely deleted by CCleaner?

11  A    If you were to do that, you go and you enable the feature,

12  and then in order to specify, you have to specify the different

13  pieces of data that you want the software to wipe, so it gives

14  you a number of checkboxes and options to select.  And then

15  when you run the software, it goes and deletes those things.

16  Q    And what are the defaults?  Are those files that would be

17  in your Documents folder or are they something else?

18  A    No, it's -- it would be things like your web history and

19  things like that.

20  Q    So it'd be things like temporary internet files; is that

21  right?

22  A    Yes.

23  Q    Cookies.

24  A    Could be.

25  Q    Data that you get from a website just to make a website

1   run.

2   A     I think that's one of the checkboxes on the software.

3   Q     Registry entries.

4   A     Yes.

5   Q     In your experience as a forensic examiner, are those the

6   types of files in which people place notes as to what they do

7   for their business?

8   A     Not typically, no.

9   Q     They save it in their documents, isn't that right?

10   A     I would think most of the time, yes.

11   Q     Do you have any evidence that anything other than

12   temporary internet files, cookies, registry entries, were

13   deleted using CCleaner?

14   A     I don't.  And the reason is, is because, I mean, you saw

15   the file listing of files.  You can't make anything about the

16   content or what those files previously were because of their

17   current state, and it can't be determined.  What it did do,

18   though, is when I did a test, I went and selected secure delete

19   and then selected all the default options for web history, for

20   cookies, for all the things, the registry entries, all the

21   things you just listed out, ran the software and examined it to

22   see how many of those Z files appeared on my computer, and it

23   never even got close to 57,000.  And that's my testing but

24   that's -- and that's my -- that's the test that I ran to try to

25   get to that 57,000 number.

1   Q    Well, how many total files were on Mr. Mols's laptop?

2   A    I don't know.  I mean, I can tell you how many are on

3   there now but I don't know how many were on their before he ran

4   the software.

5   Q    How many are on there now?

6   A    I'd have to look at my -- look at the image itself and

7   give you a total count.

8   Q    Can you give me an estimate?

9   A    I think -- I went and did the same user file filter on Mr.

10  Mols's personal laptop that I did on his Alliantgroup computer.

11  On his Alliantgroup computer, there were around 8,400 user-

12  created file types.  I did the same filter on his laptop and

13  there were a little bit over 500 user-created files on it.

14  Q    User-created files, that's not what the 57,000 number is,

15  is it?  You're talking about the files deleted, those weren't

16  just user-created files or you don't know if they were user-

17  created files.

18  A    I don't think that that is something that anybody is going

19  to ever be able to know.

20  Q    Those could be non-user-created files, correct?

21  A    It could.  You know, like I said in my test, I went and

22  ran on my exam machine that test to try to get to -- try to

23  approach the 57,000 number.  And in all of the tests that I

24  ran, I never could get anywhere close to 57,000 on test.

25  Q    But how many total items are on the computer that could be

1   something that's (indiscernible) files, how many total items in

2   the entire computer that you searched?

3   A    I'd have to go and look at the computer image itself and

4   give you a full count.  I don't know off the top of my head.

5   Q    I can tell you I just searched my computer and came up

6   with more than 200,000; does that sound out of the ordinary to

7   you?

8   A    No, that sounds about right.  There's a lot of files on a

9   computer.

10  Q    So comparing 57,000, it's not fair to compare it with an

11  8,400 number of user files.  It has to compare with all the

12  files on a computer, isn't that right?

13  A    Yes, sir.

14  Q    So as far as you know, it could be a very small percentage

15  of the total files that are on the computer, which include all

16  kinds of files that the internet just puts on your computer;

17  isn't that right?

18  A    Yes, sir.

19  Q    So you can't sit here and tell us that 57,000 files is a

20  lot or a little, can you?

21  A    Like I said, the only thing I can tell you is that in my

22  testing, I think the most -- the highest number I ever got in

23  my testing was around 2,500.  And so we're talking about a

24  delta of between 57,000 and 2,500 from my test and what was

25  done on the laptop.  So I don't -- but I can't sit here and

1    tell you what those files are, again, because they're all Z's

2    and it's deleted.

3    Q    But again, to be clear, that 2,500, that's through a

4    filter of user files, not -- and these 57,000 are unfiltered.

5    A    No, sir, these 2,500 files were the default checkmarks on

6    CCleaner for registry for my web history, for my cookies, and

7    things like that, and the most it deleted was 2,500 not 57,000.

8    Q    Do you never remove temporary files from your computer?

9    A    I don't know what the setting is on the test computer that

10   I ran.  I don't know that.

11   Q    Are there -- is there software or system resources on the

12   computer that regularly deletes these files in order to keep

13   the computer running well?

14   A    Yes, sir.

15   Q    Do you know whether that was running on your test

16   computer?

17   A    I don't.

18   Q    And if it was, you would expect to find fewer files

19   deleted by CCleaner using those same settings.

20   A    Yes, sir.

21   Q    Now, you also agree that you forensically imaged between

22   email accounts and devices at least 19 devices and accounts at

23   this point in this case.

24   A    I believe that's right.

25   Q    So what we're talking about here is a -- some fraction of

1  data on one device, correct?

2  A    Correct.

3  Q    Now, do you know whether you've uncovered any document on

4  anything that's personally owned by Brad Mols that's a trade

5  secret of Alliantgroup's?

6  A    That's not my area of expertise.

7  Q    So you can't say here that that's been found anywhere

8  else?

9  A    Again, that's -- I'm running the protocol and producing it

10 to you guys and you all argue over what's what, so --

11 Q    Now, you understand that Mr. Mols at least some point or

12 his wife went to Best Buy; have you heard about this at all?

13 A    I read that in her declaration, yes, sir.

14 Q    Couldn't a Best Buy tech have advised them in how to --

15 instructed them how to use CCleaner to click on secure delete?

16 A    They could have.

17 Q    Now that -- and you talked of dates and times of when this

18 was run, now that depends on the system having the correct date

19 and time on it, doesn't it?

20 A    Yes, sir.

21 Q    Right, because there's not some objective way that dates

22 and times are implanted onto these actions, it comes from the

23 computer system time, right?

24 A    Yes, sir.

25 Q    And that time can be off on some systems, isn't that

 1  right?

 2  A    Well, that's why when we image the computer, we check the

 3  time clock on the computer against the current time to make

 4  sure that the time clock was accurate, and it was on the laptop

 5  and the desktop.

 6  Q    But that doesn't show you what the time clock looked like

 7  when CCleaner was running, other than it shows you what time it

 8  was but it doesn't tell you that that time was accurate.

 9  A     It tells us what time -- it tells us that the time clock

10  at the time that we imaged the computer on January 16th was

11  accurate.  If we wanted to go and answer -- go down this rabbit

12  trail, forgive me, we can do that.  There's log files that

13  record when those time clocks are changed so that's something

14  we could certainly examine and figure out.

15  Q    And malfunctioning and slow running computers can have

16  time clocks that are off, isn't that right?

17  A    I'm not sure I follow your question.

18  Q    Well, sir, computers sometimes malfunction and have

19  timestamps and date stamps that are not current.

20  A    I've never encountered that before.

21  Q    Now, I just want to clarify, you can't sit here today just

22  generally and say that -- you're certainly not here to testify

23  that Mr. Mols stole any trade secrets from Alliantgroup, right?

24  A    That's correct.

25  Q    You don't have any evidence of that yourself.

1   A    I am not -- again, I am not the expert on what is

2   Alliantgroup proprietary information or not.

3   Q    So you're currently attempting to recover the files that

4   are -- the Z files and files that are deleted by CCleaner; is

5   that right?

6   A    Yes, sir.

7   Q    You don't know whether that's going to be successful or

8   not at this time.

9   A    That's correct.

10  Q    It could be successful to some extent as far as you know

11  sitting here today.

12  A    It could be, but I -- to be completely candid, I think

13  it's a fool's errand.  I don't think we're going to be able to

14  be very successful with it.  But I want to do everything we can

15  to assist the Court in resolving this particular issue.

16  Q    Now, there was some testimony earlier that there's more

17  than one type of secure delete, between one, three, seven, and

18  35 passes; is that right on CCleaner?

19  A    Yes, sir.

20  Q    Do you know which one of those was run?

21  A    No, sir.

22  Q    It could have been the one pass, right?

23  A    It could have been.

24  Q    And your -- in addition to not knowing what was in the

25  files, you don't know whether these files were in a temporary

1    internet files folder or somewhere else in that computer; is

2    that right?

3    A    That's correct.

4    Q    With the -- and forgive me for jumping to another topic of

5    this, you did talk about the -- Mr. Mols's Alliantgroup

6    computer, which you did examine.  Now, did you see any evidence

7    that he downloaded anything onto any hard drive or any thumb

8    drive?

9    A    We saw -- I think we were having -- we had -- I was

10   questioned about the missing SanDisk thumb drive, the mini --

11   the missing mini SanDisk thumb drive.  That device was

12   connected less than a month before his last day.  And if he had

13   dragged files to it, we wouldn't see that.  If he had right-

14   clicked and send to this device, or there's a lot of different

15   methods you can use to transfer data to a thumb drive that are

16   undetectable to forensics.  So really the only way for us to

17   determine what he did or didn't do is to have that device, and

18   then I can answer your questions about what did he copy to it

19   and when and what happened with it after it was copied to it.

20   Q    When was it attached to his personal laptop?  You

21   testified that it was.

22   A    It was attached to his personal laptop.  I can't answer

23   your second question, which is when was it connected, because

24   the Windows upgrade that was done on January 3rd wiped out

25   those connection dates for those devices.

1   Q    Let's talk about that.  Would you expect an average user

2   to understand that installing Windows would do anything to the

3   ability to find what USB drives were attached to a computer?

4   A    No, sir.

5   Q    So it's not -- is that something you would expect someone

6   to do in order to deliberately destroy evidence, is install

7   Windows 10 on a computer?

8   A    An advanced user would know that but I don't think the --

9   a layperson would understand or know that it's going to have

10  that effect, no, sir.

11  Q    Well, wouldn't an advanced user have easier ways of

12  accomplishing that than installing an entirely new operating

13  system?

14  A    I would imagine so, yes, sir.

15  Q    And isn't it true that Microsoft was aggressively

16  marketing upgrades to Windows 10 throughout the last two years?

17  A    Yes, sir.

18  Q    In fact, they automatically installed Windows 10 on a

19  number of people's computers, isn't that right?

20  A    Yes, sir.

21  Q    So there are actually people who woke up a day, did not

22  buy Windows 10, did not choose to download Windows 10, and woke

23  up with Windows 10.

24  A    Yes, sir.  I don't find the upgrade of Windows 10 to be

25  notable.  I don't think it was something intentional that was

1  done to subvert our examination.  But the fact is it was done

2  and those dates are no longer there because of that.  But,

3  again, I don't take that as something that she or whoever

4  upgraded the laptop did so -- intentionally.

5  Q    I agree.  Do you know -- and tell me if you've got an

6  estimate of this -- that of everything you forensically

7  examined in this case, do you know how many bytes or gigabytes

8  or files or any number that you can attach to that?

9  A    No, sir, not offhand.  I could find that out but I don't

10  know it right here.

11  Q    But it was at least 19 different accounts and devices,

12  right?

13  A    Well, some of those computers were -- we examined twice,

14  or we imaged twice, so there's some duplicates in there.  But

15  there's about 19 evidence items, yes, sir.

16  Q    Nineteen to date, but you've got at least one or two more

17  since that 19 came in.

18  A    I think we've got --

19  Q    The duplicates would bring it down to 17 but then you've

20  got --

21  A    Our last evidence item is number 19.

22  Q    And that doesn't include April Torres's laptop, does it?

23  A    No, it doesn't.

24  Q    And you examined that one, didn't you?

25  A    Yes, sir.

1  Q    Did you find any evidence of trade secrets deleted off of

2  that computer?

3  A    I --

4        **MR. SIMMONS:**  Objection, your Honor, he's already

5  testified that he doesn't -- he's already testified that he's

6  not here to testify as to what's a trade secret and what's not

7  a trade secret.

8        **MR. HUMPHREY:**  Let me ask you something different

9  then.  I'll withdraw that question.

10 **BY MR. HUMPHREY:**

11 Q    Do you have any evidence that that computer was wiped with

12 anything?

13 A    Can you give me a second to --

14 Q    Sure, absolutely.

15 A    -- look at my report?  On page 29 of my report, I state

16 that on April 27, 2016, there were 35 files deleted from the

17 computer.  The table on that page that continues on page 30

18 includes the list of files that were deleted off of the

19 computer.

20 Q    So you were able to recover these files.

21 A    I don't recall.  If they're in the recycle bin, there's a

22 good chance that we could get those back, yes, sir.

23 Q    Have you attempted to recover those files?

24 A    I don't recall.

25 Q    And in your examination of Ms. Torres's computer, did you

1  find any indication that Mr. Mols ever accessed it after

2  leaving Alliantgroup, after May of 2016?

3  A    I -- the answer to that question is a little more

4  complicated than you would think because we always get asked

5  the question about who did this on this computer, who ran this

6  search, who did whatever action was done on the computer.  And

7  we don't have video cameras to be able to say it was him or

8  her.  I don't know if Mr. Mols had her password.  I know that

9  there was not a Mols B (phonetic) user name that was on that

10 computer that -- like we saw on his other devices, but I don't

11 -- I can't tell you if he had her password and he accessed the

12 computer using her password, and I just can't -- I can't

13 accurately answer that question.

14 Q    You haven't seen anything that would lead you to believe

15 that that's what happened, that Mr. Mols accessed it.

16 A    I haven't analyzed the computer to see if his personal

17 email account was accessed.  That would be an indicator that he

18 used the computer or that he conducted personal communications

19 that -- of topics that he would know about.  I haven't analyzed

20 the computer from that frame.  We've looked at this to

21 determine if data was transferred off the computer but not to

22 focus on the questions that you just asked.

23 Q    But my question's just now what you did or could have done

24 but what you know today.

25 A    I don't know today.

1      **MR. HUMPHREY:**  I'll pass the witness, your Honor.

2      **THE COURT:**  Mr. Simmons?

3                         **REDIRECT EXAMINATION**

4    **BY MR. SIMMONS:**

5    Q    We heard a lot about why you cannot tell why -- whether

6    the 57,000 plus files were temporary internet files or registry

7    files or Word documents with every Alliantgroup trade secret on

8    it.  Is there a reason why you can't tell us what type of files

9    were contained within that 57,000 files?

10   A    Because they were securely wiped.  If they had been

11   deleted using the normal procedure, the normal default in the

12   software, there's a chance that I could be able to tell you

13   what was affected.  But using secure delete features makes it

14   impossible to answer that question.

15   Q    And if you wouldn't mind turning back to Plaintiff's 1,

16   second page from the back.  It's the slides, Plaintiff's 1.  We

17   have the screenshots.  What's -- what is this a screenshot of,

18   Mr. Kersh?

19   A    So what I did in my test to make these screenshots is I

20   went and specified a specific folder which there's -- it's a

21   featured called "include" that's in the software, and it allows

22   the user to specify a folder of user files or whatever, or

23   system files or whatever folder they want to on the computer,

24   or even individual specific files, you can specify that in the

25   software.  And then when you run the software, to delete those

1   files or that folder, this is the user prompt that tells you

2   the selected files will be deleted from your PC, do you wish to

3   continue, and they're given the option of continuing or

4   canceling.

5   Q     So based on your knowledge as a forensics expert and your

6   usage of CCleaner, do you believe it would be possible for a

7   user not to know that they're deleting files?

8   A     I think the layperson would be able to read that message

9   and understand what it means.

10            **MR. SIMMONS:**  Pass the witness, your Honor.

11            **MR. HUMPHREY:**  Just two more questions on recross.

12                          **RECROSS EXAMINATION**

13  **BY MR. HUMPHREY:**

14  Q     One question, I see a -- on the same page -- or, sorry,

15  the page before the one that Mr. Simmons just went over you

16  with, there's a checkbox down the bottom middle that says "wipe

17  MFT free space;" what is that?

18  A     So the MFT is the master file table.  And it's -- all it

19  is, is just talking about the free space on an MFT, to wipe

20  that and -- as part of the secure delete feature.

21  Q     Well could it do that without being a secure delete?

22  A     I don't know -- well, let me look.  Yes, sir, it looks

23  like that's a default option.  If you look to the previous

24  page, where the default is selected for normal file deletion,

25  that checkbox is checked.

1  Q    So after files that are -- have been deleted is then

2  removed from the file index where you can access them, this

3  wipes that, too.

4  A    Correct.

5  Q    Would that result in a Z-out artifact?

6  A    No, sir, not in my testing it didn't.

7  Q    Now, when you uninstall CCleaner, does it securely delete

8  itself?

9  A    I don't believe so, no, sir.

10 Q    Do you think you can recover the CCleaner program or its

11 I-N-I file that shows its settings?

12 A    I attempted to do that and was unsuccessful.

13 Q    Do you know of any other way other than what you used in

14 order to attempt to recover that?

15 A    Not without some more research on how to do that.  But I

16 feel like I use the standard procedures that you would use to

17 try to recover those and I wasn't successful.

18        **MR. HUMPHREY:**  Pass the witness, your Honor.

19        **MR. SIMMONS:**  Nothing further, your Honor.

20        **THE COURT:**  I do have a question.  So on this second

21 to the last screenshot, okay, when you've got the menu going

22 down the left-hand side, some of the boxes, most of the boxes

23 are checked, that is what will be deleted, correct, --

24        **THE WITNESS:**  Yes.

25        **THE COURT:**  -- from the PC?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  So, for example, if you had user files

3     that you had put in the recycle bin, then those would be

4     deleted forever under CCleaner.

5          THE WITNESS:  Yes, ma'am, that's correct.

6          THE COURT:  All right.  But if they weren't put in

7     the recycle bin, would they be deleted under any of these

8     options here?

9          THE WITNESS:  Not under any of these options that

10    you're seeing there in those checkboxes --

11         THE COURT:  What about the ones that are not checked?

12    I can't see all of them.

13         THE WITNESS:  If you could, ma'am, the last

14    screenshot in there, it shows options and then "include," --

15         THE COURT:  Okay.

16         THE WITNESS:  -- this is where the user can specify a

17    folder or a file --

18         THE COURT:  Oh, okay.

19         THE WITNESS:  -- specific file or folder that they

20    want to be --

21         THE COURT:  Okay.

22         THE WITNESS:  -- included in the wipe.

23         THE COURT:  You said you could empty out your Word --

24    you could delete your Word files.

25         THE WITNESS:  Yes, ma'am.

1      **THE COURT:**  Okay, all right.  Any questions prompted

2   by my questions, Mr. Simmons?

3      **MR. SIMMONS:**  No, your Honor.

4      **THE COURT:**  Mr. Humphrey?

5      **MR. HUMPHREY:**  Just one, your Honor.

6                **FURTHER RECROSS EXAMINATION**

7   **BY MR. HUMPHREY:**

8   Q    You did find Word files on Mr. Mols's computer when you

9   imaged it, didn't you?

10  A    Yes, I did.

11     **MR. HUMPHREY:**  Nothing further, your Honor.

12               **FURTHER REDIRECT EXAMINATION**

13  **BY MR. SIMMONS:**

14  Q    So in this "include" portion, if someone had a file folder

15  "Alliantgroup work file," you could select that file

16  specifically and delete everything in the contents; am I

17  understanding that correct?

18  A    Yes, sir, you are, that's correct.

19        **MR. SIMMONS:**  Pass the witness.

20        **THE COURT:**  Anything else?

21        **MR. HUMPHREY:**  Nothing further, your Honor.

22        **THE COURT:**  All right, thank you, sir, you may stand

23  down.

24      **(Witness steps down)**

25  //

1          Is that all you have today?

2          **MR. SIMMONS:**  Yes, your Honor.

3          **THE COURT:**  All right, then I guess I'll see you,

4     what, on Tuesday?

5          **MR. HUMPHREY:**  I think so, your Honor.  And I just

6     wanted to point out that you're going to hear from my clients

7     on Tuesday, but I really do think that one thing to focus on

8     here is not just this idea of what happened there but what was

9     the prejudice.  We have a huge universe of evidence with which

10    Alliantgroup has had access to in order to prove their case.

11    This is a case involving trade secrets dealing with sales.  You

12    can't use those in a secret.  We have not one witness that's

13    come forward to say that he did anything wrong, not one piece

14    of documentary evidence that showed he was taking a trade

15    secret.  Every witness other than Alliantgroup who's testified

16    has said he didn't do anything like this, he didn't source

17    (indiscernible) CPAs or clients or he didn't steal any

18    evidence.  It's not plausible that all of the evidence they

19    have that they could use to prove their case is in these files.

20    And that's why I think that that's an important thing to

21    remember moving forward in this case.  And, frankly, I think

22    it's the reason why the Court should still hear our motion for

23    summary judgment and consider their evidence and what they --

24    their explanation as to why they need this evidence to prove

25    their case at all.  That's all, your Honor.

1          **MR. SIMMONS:** Your Honor, the universe of evidence

2    that we've been provided just from the -- just like the

3    beginning whenever Mr. Mols selectively gave us that one time

4    email, is the universe of documents that they're allowing us to

5    see.  There are two USB devices that were plugged into his

6    Prime laptop that have not been turned over, and Mr. Humphrey

7    says do -- Mr. Mols does not have.  One of those USB devices

8    was plugged into his Alliantgroup laptop and his Prime Tax

9    Group laptop.  Missing.  And that's compounded by the fact that

10   according to their declarations, which we just found out there

11   was yet another entire laptop that contained all of the 57,000

12   files that Ms. Mols allegedly had copied and then returned the

13   day after this Court ordered both her and her husband not to

14   delete anything.  That laptop, its files, are gone forever as

15   well.  So it's not a one off.  It's a whole pattern and it's

16   getting worse and worse as it continues.

17          **MR. HUMPHREY:** I have to say clearly they should not

18   have run CCleaner, and we're going to hear why on Tuesday.

19   But, your Honor, we didn't kidnap and hide away CPAs and

20   clients they could have deposed and talked to about all this

21   stuff.  I mean, the use of a trade secret in a sales context

22   creates other evidence other than what's on this computer.  If

23   it was done, the evidence would be out there.  And it's not.

24          **THE COURT:** Well then, you know -- I'm not going to

25   say anything.  All right, --

1          **MR. SIMMONS:**  Thank you, your Honor.

2          **THE COURT:**  -- we'll see you Tuesday.

3          **THE CLERK:**  All rise.

4      **(This proceeding was adjourned at 3:11 p.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          July 11, 2018

            Signed                            Dated



            *TONI HUDSON, TRANSCRIBER*