UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIANTGROUP, L.P., | ) | CASE NO: 4:16-CV-03114 |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Houston, Texas |
| | ) | |
| BRAD MOLS, ET AL., | ) | Tuesday, July 3, 2018 |
| | ) | |
| Defendants. | ) | (1:58 p.m. to 4:26 p.m.) |

MISCELLANEOUS HEARING

BEFORE THE HONORABLE NANCY K. JOHNSON,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:                MATTHEW L. SIMMONS, ESQ.
                              KIMBERLY R. MIERS, ESQ.
                              Littler Mendelson
                              1301 McKinney, Suite 1900
                              Houston, TX 77010

For Defendants:               BRIAN S. HUMPHREY, II, ESQ.
                              Abraham Watkins, et al.
                              800 Commerce St.
                              Houston, TX 77002

Case Manager:                 Shannon Jones

Court Recorder [ECRO:]    Samantha Warda

Transcribed By:               Exceptional Reporting Services, Inc.
                              P.O. Box 18668
                              Corpus Christi, Texas 78480-8668
                              361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

| DEFENSE WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRAD MOLS | 3 | 23 | 53 | |
| CINDY MOLS | 59 | 73/97 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 5 | 41 |
| 6 | 42 |
| Unidentified | 46 |
| 12 | 76 |
| 16 | 105 |
| 9 | 63 |
| 10 | 70 |
| 11 | 72 |

1          **Houston, Texas; Tuesday, July 3, 2018; 1:58 p.m.**

2                         **(Call to Order)**

3          **THE COURT:**  All right.  This is a continuation of the

4     hearing for sanctions.

5          Mr. Humphrey, do you have a witness?

6          **MR. HUMPHREY:**  Yes, Your Honor.  We call Brad Mols.

7          **THE COURT:**  All right.  Please stand to be sworn.

8          **THE CLERK:**  Would you raise your right, please?

9          **BRAD MOLS, DEFENDANT'S WITNESS, SWORN**

10         **MR. HUMPHREY:**  Excuse me.  We'd like invoke the rule

11    to remove Ms. Mols from the hearing.

12         **THE COURT:**  All right.  Ms. Mols, you also need to be

13    sworn and then I'll excuse you.

14         **MS. MOLS:**  Okay.

15         **THE COURT:**  Raise your right hand.  Ms. Mols, you

16    need to be sworn.

17         **MS. MOLS:**  Oh, sorry.

18         **CINDY MOLS, DEFENDANT'S WITNESS, SWORN**

19         **THE COURT:**  All right.  Mr. Mols, have a seat.

20         Ms. Mols, have a seat outside.

21         **BRAD MOLS, DEFENSE WITNESS, PREVIOUSLY SWORN**

22                        **DIRECT EXAMINATION**

23    BY MR. HUMPHREY:

24    Q    Good afternoon.  Are you Brad Mols?

25    A    I am.

1    Q    Did you used to work for Alliantgroup?

2    A    I did.

3    Q    And when did you work for Alliantgroup?

4    A    2000 -- I started in 2005 through May 1st of 2016.

5    Q    All right.  And why did you leave Alliantgroup?

6    A    I left -- to start out with, I didn't like the way the

7    culture was going at Alliant.  I had problems with some of the

8    practices, whether it was billing or the way we presented

9    opportunities to clients.  It wasn't -- it was always

10   questionable to me, ethically questionable.

11             More importantly, I had worked there 11 years.  It's

12   quite a grind.  It's a great place to learn and to work but

13   you've got to be willing to be on the road and gone a lot.  And

14   I wanted to -- I missed most of my first kid's -- everything

15   that he had done.  He was 12 and my next kid, I wanted to make

16   sure I was there.  So last year I coached for the first time

17   and just wanted to be -- kind of work in a work/life balance.

18   Q    And since leaving Alliantgroup, have you been making more

19   or less money than you made when you were at Alliantgroup?

20   A    Significantly less.

21   Q    How much less?

22   A    Oh, maybe a tenth of what I was making before.

23   Q    In April of 2016 before you left Alliantgroup, did you

24   plug a SanDisk USB drive into your laptop?

25   A    Yes.

1    Q    All right.  And why did you do that?

2    A    I believe I downloaded a diary that I wrote about my kids.

3    I had -- I was always -- it was on my Alliantgroup where I had

4    started it years before and I always just wrote about my kids'

5    games or where they were with sports or school or just private

6    stuff and I wanted to get it and just have it on a thumb drive.

7    Q    All right.  Is this the thumb drive I'm holding --

8    A    Yes.

9    Q    -- in my hand right now?

10   A    Yes.

11   Q    And why didn't you give that to us before?

12   A    I displaced it.

13   Q    Did you -- where did you find it?

14   A    I found it in my kid's drawer.

15   Q    Okay.  I'm handing that to Plaintiff's counsel on their

16   request.

17        **MR. SIMMONS:**  Your Honor, we don't know whether this

18   -- we haven't been afforded an opportunity to view this.  We

19   don't know what it is, what it's purported to be, what's on it.

20   So to that extent, I just want to make that comment on the

21   record.

22        **THE COURT:**  All right.

23   **BY MR. HUMPHREY:**

24   Q    All right.  Now, did you download anything onto that

25   SanDisk?

1    A    I believe just the diary.

2    Q    All right.  Was there anything on the -- on that drive

3    before you downloaded the diary on it?

4    A    Yeah, I looked the other night.  There's about ten items

5    on there.  There are four clients on there -- at least client

6    names.  I don't know what the documents are.  And there's some

7    other personal stuff on there and some investment stuff and

8    things like that.

9    Q    By "investment stuff," what do you mean?

10   A    I had a -- there was a Ponzi scheme that I did not -- I

11   was not the -- I got taken and there was -- I had to do

12   spreadsheets for the IRS to show my losses and so it was just

13   to basically get money back from the scheme that I lost money

14   on.

15   Q    With the client documents, what clients were those?  Do

16   you remember?

17   A    I -- there's four on there.  None of them are open.  The

18   last date on there was 2015 and there's one on there called

19   "Superior."  Superior is a client that has called me, that

20   reached out to me.

21   Q    Have you done any business with Superior --

22   A    I haven't.

23   Q    -- since leaving Alliantgroup?

24   A    I haven't.  We basically talked shop.

25   Q    All right.  Sorry, please wait for me to finish my

1   question.

2   A     Okay.

3   Q     Have you called any of the clients that -- whose documents

4   are on the thumb drives?

5   A     I have not.

6   Q     Would you invite Alliantgroup to contact these clients or

7   subpoena them to verify this?

8   A     Yes.

9   Q     Have you used any of the information on that thumb drive

10  in order to run your business or work with any business since

11  leaving Alliantgroup?

12  A     No.

13  Q     Did you take any other Alliantgroup documents with you?

14  A     No.

15  Q     What -- would any documents you could take from

16  Alliantgroup be useful to you since leaving Alliantgroup?

17  A     No.

18  Q     Why not?

19  A     What we do is we meet with CPAs.  We help them identify

20  opportunities within their client base.  We help them with tax

21  incentives.  I -- you can easily go on -- I have something

22  called "Salesgenie."  It's a listing that you can purchase and

23  you can basically put in -- if I want to know all the Arizona

24  CPAs between five and 50 people, you can put parameters in

25  there.  You can run it on a geographical region.  It gives you

1   every CPA and that's how I go out and get.  I don't need any

2   help from anybody.  It's all right there in the tool that I

3   purchased.

4   Q    Have you done business with any Alliantgroup clients since

5   leaving Alliantgroup?

6   A    Yes, one called Hilgarth (phonetic).

7   Q    And what was your business with Hilgarth?

8   A    So Hilgarth -- the CPA came to us and said Hilgarth was

9   looking for a new R&D provider and would you guys be willing to

10  look at it.

11  Q    And did you contact them?

12  A    I did not.

13  Q    How many clients total have you done business with since

14  leaving Alliantgroup?

15  A    Twenty to 25.

16  Q    Now, after you left Alliantgroup, did you go into business

17  with Angela Torres?

18  A    I did.

19  Q    And why did you do that?

20  A    At the time, I was leaning towards a group called "Ike

21  Bailey (phonetic)."  It's a big national firm.  Loved what they

22  do, I loved their culture but I would have been going back into

23  the same corporate grind, not as bad as Alliantgroup but I

24  would have been traveling and it would have just -- it would

25  have defeated the purpose of quitting Alliantgroup, right, and

1  going right back into that culture again where I have to be on

2  the road and missing everything again.  So --

3  Q    Who ran Prime Tax Group?

4  A    Angela.

5  Q    Did you have access to Prime Tax Group's financial

6  documents?

7  A    I did not.

8  Q    Did you have access to Prime's email server other than

9  your own email account?

10  A    I did not.

11  Q    Who found potential clients for Prime Tax Group when you

12  were working there?

13  A    Angela did.

14  Q    Did you find any potential clients for Prime Tax Group

15  when you were working there?

16  A    I -- just Angela set up a meeting and I would go out.  So

17  she opened the door.

18  Q    Since -- and are you currently working with Prime Tax

19  Group or Angela Torres?

20  A    I am not.

21  Q    Why not?

22  A    She terminated me.

23  Q    When was that?

24  A    Roughly in August of '17.

25  Q    Now, after you were terminated from Prime, did you go into

1  business with yourself or get another job or what did you do?

2  A    I went out -- the agreement -- at least the agreement

3  between the two of us was, we'll let the CPAs choose who they

4  want to work with.  So I immediately made some cards up.  I got

5  a website constructed just kind of -- nothing great but at

6  least I could get out there with some business cards.  I went

7  out to those CPAs and let them know that Angela and I had split

8  up.

9  Q    Was that Converse?

10 A    That was Converse.

11 Q    So was Converse your business?

12 A    It was.

13 Q    And how did you find -- or did you service any clients

14 with Converse?

15 A    I didn't.  Maybe one but it was basically -- it was quick.

16 I wanted to get out and do damage control for myself and make

17 sure that Angela wasn't saying anything bad about me and just

18 damage control.

19 Q    So did -- your split with Angela, was it on good terms?

20 A    No.

21 Q    Do -- did she say you owe her money?

22 A    No.

23 Q    Do you say she owes you money?

24 A    Yeah.

25 Q    Did she underpay you while she -- you were at Prime Tax

1  Group?

2  A    She never paid me while I was there but any of the

3  opportunities that I went out and sold, I did not get paid on.

4  There was probably five, six, seven that I had flown out, done

5  the work on and I did not get paid on.

6  Q    When's the last time you spoke with Angela Torres?

7  A    It's been probably since that time, roughly in August

8  sometime.

9  Q    Now, after doing business as Converse, did you go on to do

10  anything else?

11  A    Yes.  So I've joined up with a guy, Randy Eickhoff.  He

12  owns Acena Consulting.  He's had a practice for about eight

13  years.  So I'm helping him now.

14  Q    And who finds clients for Acena?

15  A    We both -- we both do.  He's a business development guy

16  and also an implementation guy which means he can do the

17  technical work which is write up a report.  I'm not so -- I

18  don't have the expertise in that area.  So we're both tasked

19  with bringing in relationships.

20  Q    And how do you find clients?

21  A    I have -- again, I have Salesgenie which is a great way.

22  I can go in and run parameters on anything.  If I want to

23  manufacturers or engineering or CPA firms in a certain area, I

24  can plug that in.

25  Q    So have you given Alliantgroup's expert access to your

1  email account from Converse?

2  A    Yes, I have.

3  Q    Have you given Alliantgroup's expert access to anything

4  else to do with Converse?

5  A    Anything else beyond Converse or --

6  Q    Well, how about the cloud storage drives?

7  A    Yeah, everything that you asked me for, yeah, I have.

8  Q    Have you given Alliantgroup's vendor access to your Acena

9  email account?

10  A    I did.

11  Q    And did Acena set up a Google drive for you?

12  A    I -- yeah, when we started, he had set up a Google -- it's

13  Google where you can share, where you can go in and -- but he

14  has to log me in and then I can see files that are shared on a

15  drive but I've never been on there.

16  Q    And have you given access to that drive to Alliantgroup's

17  vendor?

18  A    I believe we did but, again, it's under control of Acena

19  and he would have to log me in to go in there.  So you'd have

20  to go to Acena to get access to that and then his files would

21  be in there from the last eight years.

22  Q    Now -- but as far as you have access to it, you've given

23  that access to them?

24  A    Yes.

25  Q    All right.  So early on in this case, there were requests

1  for -- there was a request for you to produce some documents --

2  A    Okay.

3  Q    -- near the beginning of the case; is that right?

4  A    Right.

5  Q    Now -- and that asked for communications dealing with

6  different topics.  How did you search for emails that were

7  responding to that, those topics?

8  A    I searched by anything that was responsive to that

9  interrogatory.  I went through, I looked for anything AG,

10 anything like expenses, clients and went through and I gave

11 everything -- I remember we gave -- I printed out every Gmail

12 that I had because that's what I was using in the beginning and

13 gave them every Gmail up to a certain point until I changed to

14 Prime.

15 Q    And did you search your client email account?

16 A    I did.

17 Q    Did you find any responsive emails in the Prime email

18 account?

19 A    Yeah, the main thing I know that they wanted early on was

20 every CPA that we had worked with and I delivered those.

21 Q    Well, the Prime Tax Group accounts, what happened -- did

22 you produce those at the time?

23 A    I did.

24 Q    The Prime Tax Group emails?

25 A    The -- in the very beginning or after --

1    Q    In the very beginning.

2    A    In the very --

3    Q    We're talking about the very beginning of the case.

4    A    Oh, no, no, no.  No, sorry.  So -- yeah, there's two

5    stages to this.  So I went to Angela and asked her to give us

6    emails and her and her attorney pushed back on that.

7    Q    What do you mean they pushed back?

8    A    Well, she said, "No" and I can tell that if I did, I was

9    threatened.  She'd probably sue me if I did.  So --

10   Q    Now, what did you do to preserve those emails?

11   A    I -- all my emails were on there.  I didn't do anything to

12   preserve them.  I didn't delete them, right.  So I guess that's

13   a form of preservation but every email was on there from the

14   very beginning.  So whether it came from me or her, they were

15   all there.  Nothing was deleted.

16   Q    Do you know -- did you know at the time whether Prime Tax

17   Group had subpoenaed for those emails?

18   A    If they had been subpoenaed for them, I don't know.

19   Q    Do you know if Prime Tax Group ultimately produced emails

20   out of your email account with them?

21   A    I do.

22   Q    Have you seen any of those emails?

23   A    I have, a few.

24   Q    To your knowledge, have all of them been produced?

25   A    Yes.

1  Q    Did you ever delete any emails out of your Prime Tax Group

2  email account?

3  A    No.

4  Q    Did you ever delete any emails since leaving Alliantgroup

5  or even the year before that from your Gmail account?

6  A    No.

7  Q    How about the text messages?  Have you searched for text

8  messages?

9  A    Yes.

10  Q    Why didn't you produce any at the time early on in the

11  case?

12  A    I didn't see any that were responsive to the interrogatory

13  or the production.

14  Q    Did you use text messages in your business at the time?

15  A    No.

16  Q    Now, what did you do to preserve those text messages?

17  A    I -- to preserve them, I just never deleted them again.  I

18  now understand there's a -- you can push one year or you can

19  make them stay longer but I didn't know that at the time.

20  Q    But at that time, did you know that there were any

21  responsive text messages that were --

22  A    I looked through them.  I didn't see any.

23  Q    Or relevant text --

24  A    Or relevant.

25  Q    -- text messages relevant to the case?

1  A    Yeah, relevant to the case.

2  Q    You didn't see any?

3  A    No.

4  Q    Now, do you have access to the Prime Tax Group email

5  account today?

6  A    I don't.

7  Q    Why not?

8  A    I woke up one morning after we were having our bit of an

9  argument and I kind of knew what she was doing and my complete

10 -- everything in my Inbox was gone.  Every single email,

11 whether it was delete, junk, whatever it was, was completely

12 erased.

13 Q    And did you do anything afterwards to try and recover

14 them?

15 A    I did.  I went to her.  We needed them back and we did

16 everything we could to get them back from her.

17 Q    Well, did -- so did you ask Angela Torres for them?

18 A    Asked and the attorney, her attorney.

19 Q    And what did they say?

20 A    They -- I don't remember.  I kind of felt like maybe they

21 were going to do it but they just never did it.

22 Q    Now -- but that was before they ultimately produced the

23 emails to Alliantgroup in this case; is that right?

24 A    Yes.

25 Q    Now, did you do anything to try and recover the emails on

1   your own computer?

2   A      I didn't.

3   Q      Did anyone?

4   A      Yeah, my wife did.

5   Q      Do you know what she did?

6   A      It was a recovery -- you know, again, it was a formality

7   but they just weren't there but she did a -- I don't remember

8   the name of the software but she did a recovery software.

9   Q      You're understanding she ran some software to try and

10  recover those emails?

11  A      I do.

12  Q      Now, why didn't you download the emails onto your hard

13  drive?

14  A      I had no idea that you could do that.  I -- look, if you

15  went onto my Alliantgroup computer at the end of my stint for

16  11 years, if I wanted to go find an email back five years ago,

17  I could go find it and I never pushed a button to save it.  It

18  was just there just like my Prime emails were all there and

19  they were erased via the server that Angela owns or leased or

20  whatever she did.

21  Q      And to be clear, you aren't -- are you saying that they

22  were deleted off of your computer or off of the server?

23  A      The -- I don't know how that works.

24  Q      I'm sorry.  Do you -- well, have you seen emails produced

25  since that time that were --

1    A    Oh, yeah, they were produced since that time.

2    Q    So you're not saying that they were deleted --

3    A    Oh, no, sorry.

4    Q    -- from the universe?

5    A    No, no, no, just deleted from my computer that I'm looking

6    at, right.

7    Q    Now, when were these efforts to recover the Prime Tax

8    Group emails -- when was that going on?

9    A    To recover them, in December.

10   Q    And do you know if -- what was going on with your computer

11   at that time?

12   A    So my computer had been running poorly.  If you moved my

13   mouse around, the arrow wouldn't follow.  If you opened a

14   program, it might not open but the worst part was it would --

15   like it's doing today again, it goes black with gray lines

16   through it.  So it was just not running good.  I could still

17   work on but it wasn't efficient.

18   Q    So what did you do about that?

19   A    I didn't do -- I just -- like I do a lot of things, I give

20   it to my wife and she runs with it.

21   Q    Why is that when you give it to your wife?

22   A    I'm out there trying to make a living and she's taking

23   care of the boys and she's very good at getting things done

24   like that.  So --

25   Q    So do you know what she did with the computer to try to

 1  get it to work?

 2  A    I -- yeah, I do now.  She took it to Best Buy, got a new

 3  computer.  We had the old one dumped onto the new one.  In the

 4  meantime in those three or four days, the guy had mentioned to

 5  her that you could -- you know, this is probably not a bad

 6  virus or anything.  There's ways to take care of it if you want

 7  to run it efficiently again.

 8  Q    And so on December 18th, did you know there was a hearing

 9  in this case?

10  A    I did.

11  Q    Did you know after that hearing that the judge had ordered

12  that your laptop among other devices would be examined

13  forensically?

14  A    Yes, I did.

15  Q    Did you know that the judge had ordered that nothing be

16  deleted off of your computer?

17  A    Yes, I did.

18  Q    Did you tell your wife about this?

19  A    Well, she had known, not during those four days but she

20  had known during the process, just the legal process just all

21  the way from the beginning that we weren't to delete anything

22  and we were supposed to hand everything over.

23  Q    And how did she know that?

24  A    Just talking in the beginning -- probably in the beginning

25  of the case when we started doing production and

1  interrogatories and all that.

2  Q    And do you have an understanding as -- on December 18th

3  whether she understood that nothing was to be deleted off of

4  your computer?

5  A    Correct.

6  Q    Now, did you know she was going to be -- that she was

7  running a computer called "CCleaner" on your computer?

8  A    I didn't.

9  Q    Did you not find out about that until later?

10 A    Yeah.  That's correct.

11 Q    Did -- whatever your wife did, did it make your computer

12 work?

13 A    It did.

14 Q    And did you return the new laptop?

15 A    We did -- she did.

16 Q    Okay.  Have you been on your computer since that day?

17 A    Yes.

18 Q    Is anything -- and you've been in your files since then;

19 is that right?

20 A    I have.

21 Q    Is anything missing from your files that was there before

22 the 18th?

23 A    No.

24 Q    Have you -- so have you looked through work files and

25 anything like that?

1  A    Yeah, there's -- it's all there.

2  Q    And you've given your computer how many times for a

3  forensic examination?

4  A    Twice.

5  Q    Now, on December 18th, did you have a belief as to what a

6  forensic exam would uncover on your computer?

7  A    I did.

8  Q    What did you believe at the time?

9  A    It recovers everything.  That's why --

10 Q    Did you think that you could run a program on your

11 computer and it not be detected by a forensics examiner?

12 A    No.

13 Q    Now, did you keep any work files or notes in your

14 temporary Internet files?

15 A    No.

16 Q    Were there any notes on your computer about trade secrets?

17 A    No.

18 Q    Were there any -- did you have any secrets of

19 Alliantgroup's on your computer?

20 A    No.

21 Q    We've heard that Windows 10 may have been installed in

22 your computer.  Do you know anything about that?

23 A    Just from what you've told me.

24 Q    So did you -- do you know whether Windows 10 is on your

25 computer?

1    A    I do not.

2    Q    Did you ever buy Windows 10?

3    A    I don't think I did.

4    Q    Now, you've given access -- you've been ordered to give

5    access to some accounts and devices but you've also voluntarily

6    given access to some; isn't that right?

7    A    Correct.

8    Q    That includes your Acena email account?

9    A    Correct.

10   Q    Did your -- the owner of Acena, did he have an issue with

11   you doing this?

12   A    You know, he's had issues with the CEO in the past.  So he

13   had some issues with it, yeah.

14   Q    Okay.  Did you --

15   A    But he okayed it.  In the end, he goes, we've got nothing

16   to hide.  So --

17   Q    Have you deleted anything -- to your knowledge, have you

18   ever deleted anything relevant to this case --

19   A    No.

20   Q    -- since the lawsuit was filed?

21   A    No.

22   Q    Or even before the lawsuit was filed?

23   A    No.

24            **MR. HUMPHREY:**  Okay.  Pass the witness.

25            **THE COURT:**  Mr. Simmons.

1     **MR. SIMMONS:**  Thank you, Your Honor.

2                    **CROSS EXAMINATION**

3   **BY MR. SIMMONS:**

4   Q    Mr. Mols, since we're here for a sanctions hearing, I'm

5   going to go ahead and focus on that.

6   A    Okay.

7   Q    Is that fine?

8   A    Okay.

9   Q    Do you understand that you're sworn under oath today and

10  if you don't tell the truth here today that it may lead to

11  possible criminal contempt charges?

12  A    I do.

13  Q    Do you understand that if you're convicted of criminal

14  contempt, there's a possibility of a fine and jail time?

15  A    I do.

16  Q    Do you understand your Fifth Amendment right to not

17  incriminate yourself in a court proceeding?

18  A    I do.

19  Q    Are you aware that you have a duty to preserve documents

20  and data related to this lawsuit?

21  A    I do.

22  Q    When did you become aware of that duty to preserve

23  documents?

24  A    Sometime after the lawsuit was filed.

25  Q    Was it before or after you retained an attorney?

1  A    I would say after.

2  Q    Was it before or after you started working for Prime Tax

3  Group?

4  A    Before.

5  Q    And when did you start working at Prime Tax Group?

6  A    Probably late May.

7  Q    Of what year?

8  A    '16.

9  Q    So in May 2016 whenever you were aware of your dirty --

10 your duty to preserve documents, did you inform your wife at

11 that time of the duty to preserve documents?

12 A    I don't remember when the lawsuit was filed but it was in

13 June and then once attaining an attorney, I believe I probably

14 did.

15 Q    So would you say sometime in June of 2016, you informed

16 your wife of the duty to preserve documents?  Is that fair?

17 A    It's possible.

18 Q    After May 2016 when you became aware of your duty to

19 preserve documents, did you back up your Prime emails?

20 A    I've never backed up at any place I've ever worked.  I've

21 never done that.

22 Q    Did you back up your Prime emails?

23 A    I did not.

24 Q    Did you back up your Gmail emails?

25 A    I did not.

1  Q    Did you save all the USB thumb drives?

2  A    I believe I have now that we've -- I think we've covered

3  all of them.

4  Q    Okay.  I'm going to hand you what has been previously

5  marked as Plaintiff's Exhibit 4.

6       **(Discussion off the record)**

7            **MR. SIMMONS:**  Oh, she's got it right on top,

8  Plaintiff's Exhibit 4.

9            **THE COURT:**  Okay.

10            **MR. SIMMONS:**  Yes, Your Honor.  May I approach the

11  witness?

12            **THE COURT:**  You may.

13       **(Counsel approaches)**

14  **BY MR. SIMMONS:**

15  Q    I'm handing you a document that's already been admitted

16  into evidence as Plaintiff's Exhibit 4.  As you can see in the

17  document, there's two holes there, a SanDisk Cruzer and a

18  SanDisk Cruzer Mini.

19  A    Okay.

20  Q    Are you aware that neither one of those documents at the

21  time of this email have been turned over to Alliantgroup or its

22  forensics examiner?

23  A    I am.  I think we just handed one in.

24  Q    So you would agree with me that at least there may be one

25  additional USB drive --

1   A    Oh, there --

2   Q    -- that you have not turned over?

3   A    There could be.  You're showing me that there is.  So --

4   Q    And whenever you turned over the USB drive today, are you

5   aware that the judge ordered you to turn over all of your

6   electronic devices no later than May 18th?

7   A    That --

8   Q    Are you aware of that?

9   A    No.

10  Q    At the time from May 2016 when you became aware of your

11  duty to preserve documents, did you save all of your electronic

12  devices?

13  A    I believe I did.  I'm finding them now.  Are you talking

14  about the devices that I'm handing?

15  Q    Any electronic devices.

16  A    Any electronic?  Yeah, I believe I have.

17  Q    So I thought we just heard before that your wife returned

18  a laptop to Best Buy the day after the Court ordered you not to

19  delete anything.  Did I mishear that?

20  A    It was -- we had it for a day, right, and we returned it

21  because it was working again.

22  Q    Did that --

23  A    You're talking about the new computer?

24  Q    Did that new computer have your files on it?

25  A    It did.

1   Q    And you no longer have that computer?

2   A    I don't.

3   Q    And you've never turned that computer over to Alliantgroup

4   or its forensics vendor; is that correct?

5   A    We didn't.

6   Q    Have you tried to retrieve that laptop from Best Buy?

7   A    No.  It's the same information.

8   Q    After you knew you had a duty to preserve, did you do

9   anything to preserve files in hard copy only?

10  A    From that new computer?

11  Q    No.

12  A    No.

13  Q    Just in general since you were aware of your duty to

14  preserve documents in May 2016, did you do anything to preserve

15  hard-copy documents that may be responsive to this lawsuit?

16  A    Yes, and I've handed -- what I had at my house, I handed

17  it in.

18  Q    What did you have at your house that's a hard-copy

19  document that you produced in this case?

20  A    I can't remember.  I think there was a presentation.  It

21  was stuff I had sent to Brian a long time ago.

22  Q    So other than a presentation, can you think of any other

23  hard-copy document that you've turned over in this case?

24  A    I can't remember.  There might be a couple other things

25  but I can't remember.

1  Q    Are you aware that Jared Kaufman (phonetic) told Mr. John

2  Simpson that both you and Ms. Torres had a plethora of

3  Alliantgroup documents that you had printed out prior to

4  leaving Alliantgroup?

5  A    I am not.

6  Q    Whenever you became aware of your duty to preserve

7  documents, did you turn off any auto-delete features in your

8  phone?

9  A    No.

10 Q    After you became aware of your duty to preserve documents,

11 have you backed up any of your new computer emails at Converse?

12 A    I haven't.

13 Q    Have you backed up any of your emails at Acena?

14 A    I haven't.

15 Q    Is the reason why you're not preserving these emails

16 because -- and other documents because you think this lawsuit's

17 a nuisance?

18 A    No, no, no.  I'm not deleting them.  They're there and I

19 know that they're not going to -- they're my emails.  I can't

20 erase them --

21 Q    I'm talking to you about -- sorry.

22 A    Yeah.

23 Q    I'm talking about any and all documents that we just went

24 through that you didn't preserve that you didn't turn off auto-

25 delete features, that you didn't keep, that you turned into

1  Best Buy is the reason why you didn't preserve all these

2  documents and devices that you think this lawsuit is a

3  nuisance?

4  A    No, not at all.

5  Q    When did you become aware of the Court's order and your --

6  that you and your wife are not to delete any electronic

7  devices?

8  A    Delete electronic devices?

9  Q    Delete anything from any device or any document anywhere.

10 A    I've known since I, you know, hired Brian.

11 Q    No, no.  I'm saying after the Court's December 18, 2017

12 hearing --

13 A    Oh.

14 Q    -- when did you become aware that you weren't supposed to

15 delete documents?

16 A    I would imagine sometime that day.

17 Q    Okay.  And were you aware that the Court ordered not just

18 you --

19 A    Yeah.

20 Q     -- but also your wife not to delete documents?

21 A    Absolutely, yeah.

22 Q    And I thought I heard you testify that you didn't tell

23 your wife until days later that the Court ordered that.  Did I

24 understand that correctly?

25 A    Huh-uh.

1   Q    I'm sorry?

2   A    I don't -- I don't know.  I don't remember.  What are you

3   -- say it again, please.

4   Q    Did you tell your wife that the judge specifically ordered

5   you and her not to delete any documents?

6   A    No, I did not in those four or five days.  She only knew

7   from previous -- just the legal process that we shouldn't

8   delete anything.  That's --

9   Q    So you didn't feel that it was important to tell your wife

10  that the judge specifically ordered her --

11  A    No.

12  Q    -- not to delete any documents?

13  A    She knew -- she already knew not to.

14  Q    At this time, have you turned over every electronic device

15  that you have in your possession?

16  A    I -- there could be this other that we will look for.  So

17  I think this is the one that's still missing and --

18  Q    Why --

19  A    -- I'll look for it.

20  Q    -- why haven't you looked for it previously?

21  A    We have.  We looked everywhere.  I'm lucky I found that

22  one.  They're just -- they're -- they get lost but I think I've

23  turned over most of them that you've asked for except one now.

24  Q    Do you believe that it's your fault that you didn't back

25  up your Prime emails?

 1    A    No, because from my experience, I've never done it before

 2    and I didn't know that you could do that.  Like I said, at

 3    Alliant, I can go back ten years and find an email.

 4    Q    Do you believe it's your fault that you didn't back up

 5    your Gmail emails?

 6    A    It's ultimately my fault for not knowing.  Okay, so I

 7    agree to that but I had an assistant for 11 years and they did

 8    all this stuff for me.  I just didn't -- I wasn't savvy to that

 9    and --

10    Q    You --

11    A    -- this --

12    Q    Sorry, go ahead.

13    A    No, you're right.  At the end of the day, it's my fault

14    for not doing it.

15    Q    Do you believe it's your fault for not saving all your USB

16    devices?

17    A    I wasn't thinking about those in the beginning because I

18    didn't really -- I didn't use them.  I mean, most of them, like

19    my wife's were pictures and things like that.  So --

20    Q    Do you believe it's your fault for not saving all your

21    electronic devices like the laptop that went back to Best Buy?

22    A    Quite frankly, we had it for a day.  It copied the same

23    exact information over.  I never even thought about that.

24    Q    But now we know that that information that it copied over

25    onto that Best Buy laptop --

1    A    Uh-huh.

2    Q    -- at least 57,000 files of that we don't have anymore

3    because CCleaner was run, correct?

4    A    Correct.

5              **MR. HUMPHREY:**  Objection, facts not in evidence.

6              **THE COURT:**  Overruled.

7    **BY MR. SIMMONS:**

8    Q    Do you think it's your fault that you didn't turn off any

9    auto-delete features on your cell phone?

10    A    Ultimately, it would be my fault.

11    Q    Do you think it's your fault that you have yet to back up

12    your Converse emails?

13    A    I haven't because I know I'm not going to go in and erase

14    them.  It was an outside influence that did that to me --

15    Q    Do you believe it's --

16    A    -- not myself.

17    Q    Sorry.

18    A    Okay.

19    Q    Do you believe it's your fault that you haven't backed up

20    your Acena emails?

21    A    I should learn my lesson but he's a good friend of mine

22    and I can't imagine he would ever strip me of those but I will

23    do that.

24    Q    Now, my understanding there's also an additional email

25    address, Necro713@yahoo.com.  Are you aware that that --

1   A     Uh-huh.  I saw the email.

2   Q     -- showed upon the forensics report?

3   A     I am.

4   Q     Are you aware at all of that email address?

5   A     I've never heard of it.

6   Q     Do you recall when you purchased your personal laptop?

7   A     I don't.

8   Q     Was it after you left Alliantgroup?

9   A     We had purchased laptops before, sometime during '15 or

10  '16 and then I know we purchased more in '16.

11  Q     Okay.  Because my understanding from your deposition

12  testimony is that both you and Ms. Torres went and purchased

13  the laptop that's at issue here today.  Is that a correct

14  statement?

15  A     I can't remember who -- no, I can't remember who exactly

16  purchased them.  I know I purchased one.  I know she purchased

17  some.

18  Q     I'm just asking the timeframe.  Was it after you left

19  Alliantgroup?

20  A     Yeah.  I mean, if I was with Angela, yes.

21  Q     And in your declaration and your testimony here today, you

22  said that your wife Cindy, rather than yourself, took you

23  laptop to Best Buy in December of 2017 --

24  A     She did.

25  Q     -- is that correct?  Were you aware that she was taking

1  your laptop to Best Buy in December 2017?

2  A    Yes.

3  Q    How?

4  A    Because I gave it to her.

5  Q    Did you tell her to take it to Best Buy?

6  A    Yeah.  It wasn't working.  So --

7  Q    What did she say in response to you telling her to take it

8  to Best Buy?

9  A    She'll get it done like she does everything else.

10 Q    So other than you asking her to take it and her saying,

11 yeah, I'll take care of it, was there anything else said?

12 A    Well, just that it's -- she knows why because it's not

13 running good.

14 Q    And you testified that you knew that she bought another

15 laptop while she was at Best Buy, correct?

16 A    Correct.

17 Q    And how did you become aware that she bought another

18 laptop at Best Buy whenever she was there?

19 A    She just told me.

20 Q    What did you say in response?

21 A    I don't remember.

22 Q    So other than her telling you that she bought -- purchased

23 a laptop, you don't recall anything else about her purchasing a

24 laptop.  Is that a fair statement?

25 A    Yeah.

1  Q    And you previously said that you were aware that she

2  returned the laptop, correct?

3  A    Yes.

4  Q    How did you become aware that she returned the laptop?

5  A    I couldn't tell you specifically.

6  Q    Did you ever tell her to try to get the laptop back after

7  she returned it?

8  A    The new laptop?

9  Q    Correct.

10  A    No.

11  Q    Did you ask her to return the new laptop or did she do

12  that on her own?

13  A    Came back and said the guys at Best Buy had a way to -- it

14  wasn't a virus or probably not and she could fix it.  So she

15  went about fixing it and then we just didn't need a new laptop

16  anymore and at that time, I was spending a ton of money.  So

17  saving --

18  Q    Yeah.  I'm just asking --

19  A    No, okay.

20  Q    -- did you tell her to return it or did she return it and

21  then tell you?

22  A    Oh, I don't remember.  I'm sure we talked about it.  I

23  don't remember.

24  Q    Were you present at Best Buy with your wife during any of

25  her --

1   A    I wasn't.

2   Q    -- trips in December of 2016?

3   A    I was not.

4   Q    Were you aware that your wife was going to delete over

5   57,000 files from your laptop?

6   A    No.

7   Q    After your wife ran CCleaner, did she tell you that she

8   had deleted any files from your laptop?

9   A    No.

10  Q    Do you know what files that she deled from her -- from

11  your laptop?

12  A    Just from talking to her now, it's the -- and we've done a

13  lot of research on it.  It shows the files and they are the

14  Internet items, temporary files, cash -- they call it "Pre-

15  fetch, pop-ups, all that stuff.

16  Q    So you did a lot of research on it.  What research did you

17  do on it?

18  A    I've been looking to see because when -- you know, I

19  wanted to find out more about it because I hadn't looked into

20  it because I know my wife wouldn't just take personal important

21  files and delete them.  So we wanted to make sure and see what

22  it looks like and see what files are exactly deleted and it

23  brings a window up.  It's like a default.  It brings them up

24  and it shows you all Internet files.

25  Q    Do you -- are you aware through this process of research

1   whether it prompts you to say, are you sure you want to delete

2   these files?

3   A    I'm not.

4   Q    Through your research, did you find out that the secure

5   delete feature is not the default on CCleaner?

6   A    We had a guy at -- we called a guy at CCleaner and he was

7   saying it was -- it could be automatic.  He -- we got told a

8   lot of different things.  We had an IT guy that said it only

9   deletes -- does not delete emails.  It does not delete personal

10  files.  It's used for deleting useless files on your computer

11  and that's all my wife was doing.

12  Q    So who are these guys that are telling you different

13  things about what it would potentially delete?

14  A    CCleaner.  So technical reps and then we have another

15  CCleaner technical guy that sent us an email.  Talked to an IT

16  guy.  We asked him if he uses CCleaner.  He said the same

17  thing, I've never heard of anybody using it to delete emails.

18  I had a tech tell us you can't delete emails or personal files.

19  So we did -- you know, we looked around just to see.

20  Q    So they just said delete emails, right, not delete

21  documents?  You can delete documents, right?

22  A     No, no.  Well, no, that's -- our understanding was -- even

23  talking to people today, they're telling us that this is used

24  to delete things that pop up off the Internet that -- they call

25  it "clutter" and that's what you're deleting.

1  Q    Have you produced any of your communications with these

2  people in this lawsuit to Alliantgroup regarding your

3  communications with CCleaner customer support or all these

4  other people from Etsy and wherever else?  Have you produced

5  those documents?

6  A    Etsy?  No.

7  Q    So other than you stating that you believe your wife just

8  deleted clutter files --

9  A    Uh-huh.

10 Q    -- do you have any evidence of what those 57,000 files

11 that were deleted are?

12 A    I'm assuming they are the clutter.

13 Q    Do you have any evidence --

14 A    I --

15 Q    -- to prove that they are the clutter?

16 A    I do not.  The only thing I've seen is the window that

17 comes up, has all the files in it and is all Internet files

18 because my -- for one, my wife is not going to drag anything.

19 She doesn't know how to do that and, one, we didn't even know

20 that there was an opportunity to do that, to take files or

21 emails and --

22 Q    Do you -- sorry, go ahead.

23 A    So we've talked.  We've talked to people.  We've called

24 people.  We have an email and they said that it's used, again,

25 to delete useless files and that's what we did.  It was just

1  maintaining.

2  Q    And do you have any information or evidence that the

3  57,000 files that you deleted --

4  A    I don't.

5  Q    -- do not contain Alliantgroup files?

6  A    I don't.

7  Q    Did you ask your wife to uninstall CCleaner from the

8  laptop?

9  A    I did.

10 Q    Were you aware that she was going to uninstall CCleaner

11 from the laptop?

12 A    I wasn't.

13 Q    So I thought the whole purpose of CCleaner was to get rid

14 of junk files.  Wouldn't you continue to want to use it?

15 A    I don't know.  I had never used it.

16 Q    Mr. Mols, do you remember taking your deposition in May of

17 2017?

18 A    Yes.

19 Q    During your deposition, you testified that you were a

20 consultant for Prime Tax Group; is that correct?

21 A    Yeah, consultant, contractor, working for them.

22 Q    While working for Prime Tax Group, were you ever not a

23 consultant or a contractor at Prime Tax Group?

24 A    Was I ever not one?

25 Q    Correct.

 1   A    I don't understand the question.  I was one.

 2   Q    Right.

 3   A    What do you mean not one?

 4   Q    At any time, were you anything else at Prime Tax Group?

 5   A    No, I wasn't working anywhere else, no.

 6   Q    No, no.  At Prime Tax Group --

 7   A    Okay.

 8   Q    -- at any time that you were working there, were you any

 9   -- ever anything other than a contractor or a consultant?

10   A    No, that's what I did, consultant.

11   Q    And prior to the Court ordering you to turn over your

12   phone, had you produced a single text message from yourself in

13   this lawsuit?

14   A    I haven't.

15        **MR. SIMMONS:**  May I approach the witness?

16        **THE COURT:**  You may.

17        **(Counsel approaches)**

18   BY MR. SIMMONS:

19   Q    You're aware part of the forensics examination of your

20   cell phone resulted in the production of hundreds of texts,

21   correct?

22   A    Uh-huh.

23   Q    Is that a "Yes"?

24   A    Yes -- yes, sir.

25   Q    And this document appears to be a text chain between

1   yourself and Ms. Torres.  And it starts on August 12, 2017 and

2   ends on this particular chain.  The third page is December

3   20th, 2017.  Is that your phone number --

4   A    Yes.

5   Q    -- right there, 310-709-2817?

6   A    It is.

7          **MR. SIMMONS:**  I move to admit this as Plaintiff's

8   Exhibit 5, Your Honor.

9          **MR. HUMPHREY:**  No objection, Your Honor.

10         **THE COURT:**  It's admitted.

11      **(Plaintiff's Exhibit Number 5 received in evidence)**

12  **BY MR. SIMMONS:**

13  Q    On Line 89 -- so on the very first row towards the bottom

14  of that text --

15  A    Okay.

16  Q    -- you state to Ms. Torres, "Okay, you come up on Monday

17  and save yourself and save our business."

18  A    Uh-huh.

19  Q    Did I read that correctly?

20  A    You did.

21  Q    On the next page, Line 255 --

22  A    Yeah.

23  Q    -- "If there's any heart left, I've paid out over a

24  hundred K to keep the business going."  Did I read that

25  correctly?

1   A    That's correct.

2           **MR. SIMMONS:**  May I approach the witness?

3           **THE COURT:**  You may.

4        **(Counsel approaches)**

5   **BY MR. SIMMONS:**

6   Q    This is also a text string between yourself and Ms. Torres

7   dated 8/12/2017 and the last one on this is 8/13/2017.

8   A    Okay.

9   Q    Is that your number in Column A and B?

10  A    Yes.

11          **MR. SIMMONS:**  I move to admit this as Plaintiff's

12  Exhibit 6.

13          **MR. HUMPHREY:**  No objection, Your Honor.

14          **THE COURT:**  It's admitted.

15       **(Plaintiff's Exhibit Number 6 received in evidence)**

16  **BY MR. SIMMONS:**

17  Q    Do you want to look at Line 164?

18  A    Okay.

19  Q    The very top one.

20  A    Yeah.

21  Q    "You disappeared on your friend and partner."  Did I read

22  that correctly?

23  A    You did.

24  Q    Now, let's turn to the second page.  On Line 188, it's a

25  text from you to Ms. Torres and it states, "Like I've said

1  before, I would kill for a seasoned businessman to take me

2  under his wing when I was 34 and give me this opportunity."

3  A    Correct.

4  Q    "I would have approached differently than what you're

5  saying above.  Have fun."  Did I read that correctly?

6  A    You did.

7  Q    Am I also correct that you received a portion of Prime Tax

8  Group's profits?

9  A    I did.

10 Q    You also stated that the reason why you left Prime Tax

11 Group was because Ms. Torres terminated you, correct?

12 A    Uh-huh, correct.

13 Q    Let's stay on this same exhibit, same page.  So second

14 page, Line 195, this is a text message from Ms. Torres to you.

15 Line 195, "You said you were settling with Duval (phonetic) and

16 quitting Prime.  I already told the attorney (indisc.)."

17 A    Uh-huh.

18 Q    Did I read that correctly?

19 A    You did.

20 Q    And if you turn to the next page, Line 218.  In the middle

21 of that long paragraph that you texted -- so this is attached

22 from you to Ms. Torres.  "You and Dan keep Prime.  You know how

23 much it pains me to give Prime up."  Did I read that correctly?

24 A    You did.

25 Q    And importantly, let's look at 226, same page.  It's a

1  text from Ms. Torres to you.  "Okay.  I'll remove your access

2  today."  Did I read that correctly?

3  A    Yes.

4  Q    When Ms. Torres told you that she was going to cut off

5  your access to Prime email accounts, did you do anything to

6  preserve your Prime email account at that time?

7  A    No, I didn't think we were arguing.  This whole chain of

8  events here is arguing and I'm -- I'm fearing that I'm not

9  going to get paid.  I'm getting screwed over at this whole

10 chain.

11 Q    Do you recall testifying in your deposition that you had

12 not as of May 4th, 2017 --

13 A    Uh-huh.

14 Q    -- made any loans to Prime, to Parakore --

15 A    Correct.

16 Q    -- or to Ms. Torres?

17 A    Correct.

18 Q    And I thought we just covered over a text that you told

19 her that you had spent over a hundred thousand dollars to run

20 the business.

21 A    A hundred thousand dollars --

22 Q    Did I hear that incorrectly?

23 A    -- paying Brian.

24 Q    So your testimony is that if you hadn't spent a hundred

25 thousand dollars on attorney's fees that Ms. Torres wouldn't be

 1  able to run Prime?

 2  A    No.  I am saying that -- I'm trying to get someone who I

 3  can see is leaving me and about to let me go for no reason

 4  except for money and not to pay me.  I'm fearing.  This whole

 5  string is me panicking and I'm letting her know that I have

 6  spent a hundred thousand dollars when I could have taken a

 7  settlement in the beginning with you guys when we were -- or

 8  mediating.  I would have just left for a year and gone out of

 9  the market but here I am defending and putting time and money

10  into this and I'm also fearing that she's leaving me at the

11  same time.  So everything in here is trying to get her to come

12  back to me and try not to -- she's losing it and she's leaving

13  me.  That's it.  I'm just fearing.  So that's what this is.

14  Q    And you and your wife also allegedly provided Ms. Torres

15  either gifts or loans; is that correct?

16  A    That's right.

17  Q    And I'm going to go ahead and provide you --

18            **MR. SIMMONS:**  May I approach the witness?

19            **THE COURT:**  You may.

20       **(Counsel approaches)**

21  **BY MR. SIMMONS:**

22  Q    Mr. Mols, do you recognize this document?

23  A    I do.

24  Q    How do you recognize this document?

25  A    I remember paying her.

1   Q    And if you wouldn't mind looking at this document --

2        **MR. SIMMONS:**  Actually, I'll go ahead and move to

3   admit this into evidence.

4        **MR. HUMPHREY:**  No objection, Your Honor.

5        **THE COURT:**  It's admitted.

6        **(Plaintiff's Exhibit received in evidence)**

7   BY MR. SIMMONS:

8   Q    If you look at these checks --

9   A    Uh-huh.

10  Q    -- there's one thing redacted out of each one of them.

11  What is that?

12  A    I don't know.

13  Q    Do you see a signature on any of these texts that you

14  provided us?

15  A    I didn't do -- this black -- these black lines right here?

16  Q    Right.

17  A    I did not do that.  I don't know where that came from.

18  Q    Do you have any belief that these aren't the documents

19  that were provided to Alliantgroup at Cindy Mols' deposition as

20  it's stamped at the very bottom?

21  A    Yeah.  I'll save you time.  I know I signed this.

22  Q    Okay.

23  A    If that's what you're looking for.  I didn't -- I don't

24  know why this is blacked out like that.

25  Q    Well, good thing we subpoenaed Ms. Torres and got some

1  documents.  So I'll go ahead --

2  A    Okay, yeah.

3  Q    -- and show those to you.

4  A    Okay.

5        MR. SIMMONS:  May I approach the witness?

6        THE COURT:  You may.

7  BY MR. SIMMONS:

8  Q    Do you recognize these documents, with the exception of

9  the Alliantgroup check at the top?

10  A    I do.  It's the same one, right?  Same one as this one?

11  Q    Except it has a signature line, right?

12  A    Yeah.  I -- again, I don't know what that is.

13        MR. SIMMONS:  And at this point, I'd like to move to

14  admit these into the evidence as a confidential exhibit because

15  it does not have his account information redacted.

16        MR. HUMPHREY:  No objection, Your Honor.

17        THE COURT:  It's admitted.

18    (Exhibit Received into Evidence)

19        THE WITNESS:  We redacted our account numbers.  I

20  know we did that.

21  BY MR. SIMMONS:

22  Q    Right.  But on this --

23  A    But not a --

24  Q    -- the account number is not redacted.  And I don't want

25  in the public record your account information out there.

1    A    Oh, got it.  Okay, got it.

2    Q    So on this check on May 3rd, 2016, to Angela Torres for

3    $10,000; did you sign that check?

4    A    I did.

5    Q    What was that check for?

6    A    I had owed her probably a years' worth of -- we -- the

7    managing directors of Alliantgroup were expected to give the

8    relationship director's bonuses out of own money if it wasn't

9    coming out of Alliantgroup.

10   So I probably owed her maybe a year.  I just -- I hadn't gotten

11   around to paying her.  And so one of the things I wanted to do

12   before I left is give her that money.

13   Q    And this isn't before you left; this is the day after you

14   left, right --

15   A    Yes.

16   Q    -- Alliantgroup?

17   A    Yeah.

18   Q    And Ms. Torres wasn't the only employee that was working

19   with you, right?

20   A    No.  I gave bonuses to everybody.

21   Q    You gave bonus checks to everyone after you left

22   Alliantgroup?

23   A    No.  Because I owed her.  She was the only relationship

24   director working with me at that time.

25   Q    So she just happened --

1   A    I hadn't --

2   Q    Okay, sorry.  Go ahead.

3   A    I've had multiple in the past, but we were very skinny at

4   that time in our office.  There wasn't many people there.  She

5   was the only one that was helping me that last year.

6   Q    Had you ever written a relationship director a check for a

7   bonus in this much money?

8   A    I had --

9   Q    $10,000?

10  A    Over time, added up, yes.

11  Q    In one year?

12  A    In one year, over time?  There's probably a couple if we

13  had good years.  2015 we had a huge year.

14  Q    That you wrote out of your own check?

15  A    I wrote checks -- throughout the last five years I was

16  there, I wrote check to people.  I wrote checks to project

17  managers that are back in Houston that I didn't even know

18  because the CEO had me --

19  Q    But you didn't --

20  A    -- to say thanks.

21  Q    It would be correct to say --

22  A    Yeah.

23  Q    -- that out of all those people that you wrote checks to

24  previously --

25  A    Yes.

1  Q    -- the only person that you wrote a check to after you

2  resigned from Alliantgroup was Angela Torres; is that correct?

3  A    Yes, she was the only one working with me.

4  Q    And if you want to flip to two more pages.  It's a copy of

5  a July 6, 2016 check.

6  A    Okay.

7  Q    It's written to Angela Torres in the amount of $10,000.

8  Is that your signature --

9  A    It is.

10  Q    -- at the bottom?

11  And right next to it, it says "loan."  Did I read that

12  correctly?

13  A    It is.

14  Q    So are you really saying that, even though you signed a

15  check for $10,000, and it has a loan in the memo slot --

16  A    Correct.

17  Q    -- that you didn't loan Ms. Torres any money?

18  A    My wife and Angela became friends.  My -- Angela needed

19  money to take care of her rent, her kids, her uniforms.  So my

20  wife agreed to lending her this money.

21  Q    Are you aware that at the time of your wife's deposition,

22  she didn't even know Ms. Torres' kids names?

23  A    I didn't know her kids names.  I'd worked with her for two

24  years.

25  Q    Are you aware that your wife didn't know Ms. Torres'

1   names?

2   A    I'm not aware.  They had been at our house a few times.  I

3   couldn't remember.  They were swimming in our pool.  I don't

4   remember their names.

5   Q    Now, let's split to the next September check for $5,000;

6   and it says "loan."  Did you sign this check?

7   A    I did -- or I didn't.  No, I didn't.  Cindy did.

8   Right?  Is that Cindy?  Yeah.

9   Q    So Cindy is able to write checks from the account?

10  A    She is.

11  Q    She just didn't write the previous two checks?

12  A    No.

13  Q    And do you share a bank account with your wife?

14  A    We do.

15  Q    Is that the only bank account you have?

16  A    Well, we have the Vanguard money market fund that we can

17  write checks out of.

18  Q    And so you'd agree with me that, since leaving

19  Alliantgroup, from May to September of 2016, that you or your

20  wife gave Ms. Torres at least $25,000?

21  A    I would agree.

22  Q    And if you want to look back to Exhibit Number 5, it's the

23  one that starts at -- on the bottom-right, 2588.  It starts at

24  Line 89, at the top.

25  A    Okay.

1   Q    You see that one?

2   A    I do.

3   Q    So in this document, where it starts at Line 88, the very

4   first page of Exhibit 5, Line 98:  "I want my loan back and

5   taking off your car."

6   A    Yeah.

7   Q    Did I read that correctly?

8   A    You did.

9   Q    You want to switch to the next page, Line 252.  It's a

10  text from you to Ms. Torres -- 252.  "Just tell me when I'll

11  get those two checks; one for 40k and another personal check

12  for 25k."

13  Did I read that correctly?

14  A    You did.

15  Q    If you want to look to the third page.  It's Line 262.

16  It's a text from you to Ms. Torres.  If you look at the very

17  bottom, it says, "And I would just ask for the 25k.  You could

18  keep the Prime money.  It's Christmas, let's move on."

19  Did I read that correctly?

20  A    You did.

21  Q    And then at the top of that text, it says, "Angie, I'm

22  sure you've heard about the sanctions.  It's just more nuisance

23  stuff."

24  A    Uh-huh.

25  Q    Did I read that correctly?

1    A     Correct.

2              **MR. SIMMONS:**  Pass the witness.

3              **MR. HUMPHREY:**  Thank you, Your Honor.

4                        **REDIRECT EXAMINATION**

5    **BY MR. HUMPHREY:**

6    Q    Mr. Mols, stay right where you are on that same exhibit;

7    Exhibit 5, Line 262.

8    A     Okay.

9    Q    Can you read, after nuisance stuff, the next four

10   sentences?

11   A     "Can we put the money stuff to the side and discuss this

12   crap?

13            "In what Prime e-mails?  You already gave them e-mails

14   that I sent.  I need any e-mails you sent to me, or if there's

15   a CPA that sent me an e-mail."

16   Q    Are you trying to comply with discovery through those --

17   that text?

18   A     I am.

19   Q    You trying to get e-mails from Angela in order to produce

20   in this case?

21   A     I am.

22   Q    Do you know how to back up e-mails?

23   A     I don't.

24   Q    Did you know at any time in the last two years how to back

25   up e-mails?

1   A      I have not in my entire career.

2   Q      Did you know how to back up e-mails on the Prime Tax Group

3   account?

4   A      No.

5   Q      Did you know that you could back up e-mails in the Prime

6   Tax Group account?

7   A      I did not.

8   Q      Do you know how to back up Gmail e-mails?

9   A      I don't.

10  Q      Do you know whether you can back up Gmail e-mails?

11  A      Not until now.

12  Q      Do you know today?

13  A      No, I don't know how to do it, but I know you can because

14  I'm -- you're asking why I didn't.

15  Q      Do you know whether you can back up e-mails off the

16  Converse account or the Acima account?

17  A      I don't.  I don't know how to do it.

18  Q      Did you know there was an auto-delete feature in -- you

19  know, before you were ordered to produce the -- your phone, did

20  you know there was an auto-delete feature on it?

21  A      I did not.

22  Q      Did you know that texts were being deleted on your phone?

23  A      I did not.

24  Q      Did you set the phone to delete -- auto-delete after 30

25  days or a year?

 1   A     I didn't.

 2   Q     Before, did you know where -- the USB drive I just handed

 3   to Alliantgroup, did you know where that was before today?

 4   A     No.

 5   Q     Or, sorry -- before a couple days ago?

 6   A     Before a couple days ago, no.

 7   Q     Did you even know you had it?

 8   A     I didn't.

 9   Q     How about the other USB drive that they've asked for?  Did

10   you know whether you had those or not?

11   A     I didn't.  I just don't -- I don't use them.  So --

12   Q     Where did you -- did you look for any of them?

13   A     We have looked.  We've looked and found most of them now,

14   except the one that you had asked for.

15   Q     Are they all kept in one place in your house?

16   A     They're not.

17   Q     We talked about the new laptop before.  Was there anything

18   on that new laptop that wasn't on the old one?

19   A     No.

20   Q     Do you know whether Best Buy transferred any temporary

21   Internet files or cookies or junk files from the old laptop

22   onto the new laptop?

23   A     I have no idea.

24   Q     Do you know whether any of the files that CCleaner deleted

25   were ever, ever on the new laptop?

1   A    I have no idea.

2   Q    Did anyone ever tell you they were?

3   A    No.

4   Q    And we talked about -- we mentioned the research that you

5   had done in CCleaner before.  I just want to clarify, was that

6   research -- research you did before or after December 18th?

7   A    After.

8   Q    Is that research that was done since you learned that

9   there was a problem with CCleaner?

10  A    Yes.

11  Q    Did you ever loan money to Angela Torres?

12  A    No.  My wife agreed to it.  I agreed that I did sign for

13  the check.  It comes out of one account.  And, yeah, I mean,

14  we -- I agreed to it.  So --

15  Q    So when you testified in your deposition --

16  A    Right.

17  Q    -- were you telling the truth?

18  A    I mean, you know, it my wife.  I was mad at the time.  My

19  wife is the one that agreed to it.

20       So does it come out of -- technically, it comes out of

21  both of our accounts.  I don't feel like I lied about it.

22  Q    Does it make any difference to you whether you or your

23  wife loaned money to Angela Torres?

24  A    I didn't think we should at the time, but they were

25  becoming friends, so I okayed it.

1   Q    To you mind, does that have anything to do the language

2   claims in this case?

3   A    No.

4   Q    Were you ever Angela Torres' partner?

5   A    No.

6   Q    Did you ever have a partnership agreement with Angela

7   Torres?

8   A    I did not.

9   Q    Did you ever own any equity in Prime Tax Group?

10  A    I did not.

11  Q    Did you ever own any equity in Parakore?

12  A    I did not.

13  Q    After -- so when you left Prime Tax Group, was it because

14  you decided to leave Prime Tax Group or was it because they

15  terminated you?

16  A    She terminated me.

17  Q    Did you have any say in whether you could stay or not?

18  A    No.  She disappeared on me.

19  Q    Who controls Prime Tax Group's assets today?

20  A    Angela.

21  Q    Have you ever attempted to recover those assets for

22  yourselves?

23  A    We've begged and pleaded and she's blocked our numbers

24  and we -- we were just taken.

25  Q    Now, when you begged and pleaded, you mean the money or

1  assets of Prime Tax Groups?

2  A    No, no, not assets.  Any -- like I -- like I mentioned

3  earlier, there was five, six, seven opportunities that I went

4  out, I sold, that I've never been paid on.

5  My wife loaned her that money; she wants that back.  We want

6  her off -- she hasn't taken us off her car that she drives

7  around.  It's been miserable, and we can't get her to return

8  any phone calls.

9  Q    Have you ever laid a claim on Prime Tax Group's name?

10 A    What do you mean "a claim"?

11 Q    Have you ever claimed that you owned the Prime Tax Group

12 name?

13 A    No, no, no.  Absolutely not.

14 Q    Who came up with the Prime Tax Group name?

15 A    I don't remember.

16 Q    Was it you?

17 A    I don't remember.

18 Q    Have you received any buyout of any equity or partnership

19 interest from Angela Torres --

20 A    No.

21 Q    -- or Prime Tax Group?

22 A    No.

23         **MR. HUMPHREY:**  I'll pass the witness, Your Honor.

24         **THE COURT:**  Anything else, Mr. Simmons?

25         **MR. SIMMONS:**  No, Your Honor.

1          THE COURT:  All right.  Thank you, sir, you may stand

2    down.

3          THE WITNESS:  Okay, thank you.

4          MR. HUMPHREY:  Your Honor, Defendant calls Cindy

5    Mols.

6          THE COURT:  All right.  You may go out and get her.

7    Do you mind if Mr. Mols stays or does he need to leave?

8          MR. SIMMONS:  No, Your Honor, he can stay.

9          THE COURT:  All right.

10          MR. HUMPHREY:  Thank you.  May I proceed, Your Honor?

11          THE COURT:  You may.

12          CINDY MOLS, DEFENSE WITNESS, PREVIOUSLY SWORN

13                      DIRECT EXAMINATION

14    BY MR. HUMPHREY:

15    Q    Good evening.  What's your name?

16    A    Cindy Mols.

17    Q    Are you married to Brad Mols?

18    A    I am.

19    Q    How long?

20    A    Thirteen years.

21    Q    And have you understood through this case that your

22    husband owed a duty to preserve evidence in this case?

23    A    I do.

24    Q    And did you know that from the beginning of the case?

25    A    I do -- did.

1    Q    Have you given a deposition in this case?

2    A    I have.

3    Q    What was talked about in that deposition?

4    A    Well, when I went in, I thought it was a -- supposed to be

5    a deposition on Brad and his soliciting clients for -- from

6    Alliantgroup, talking badly about them, or trying to take them

7    away from Alliantgroup.

8    But when I actually went in, it was all questions about a

9    person named Angela Torres.

10   Q    Did anything happen in that deposition that upset you?

11   A    Yes.  They brought up private information about my

12   children that was on -- posted on a private social media

13   account.  And they also tried to accuse my husband of having

14   multiple affairs.

15   Q    Did you believe any of those accusations?

16   A    No, I didn't.

17   Q    Do you know why they asked you any of that?

18   A    No.

19   Q    Now, did you become aware that your husband's -- there

20   were e-mails on your husband's computer that went missing?

21   A    They were -- yes, he was logged out of the account.

22   Q    Were they deleted?

23   A    Mrs. Torres -- or Ms. Torres had the rights to that

24   account and he was logged out, gone.  Everything was destroyed.

25   He couldn't get in.

1  Q    Did you try and help get those e-mails back?

2  A    I did.

3  Q    What did you do?

4  A    I did a recover on the computer, but I found nothing.

5  Q    Did you -- did you download anything?

6  A    I down -- downloaded a recovery.

7  Q    And did you try to run it?

8  A    I did.

9  Q    So if there was an EaseUS Data Recovery Wizard that was

10 downloaded on the computer, was that you?

11 A    That was me.

12 Q    And what were -- and what was the purpose of you

13 downloading that?

14 A    To try and retrieve those e-mails.

15 Q    And ultimately, did it work?

16 A    No.

17 Q    And what did you do with it after that?

18 A    I deleted it from the -- took it off of the computer.

19 Q    Why'd you do that?

20 A    There was -- it wasn't necessary.  I didn't need it.  It

21 didn't work.

22 Q    Now, were there problems with Brad's computer around that

23 time?

24 A    Yes, there were.

25 Q    What were the problems?

1  A    It was having some gray and black lines run through it and

2  it was running slowly, so I had taken it to Best Buy.

3  Q    And what did you do at Best Buy?

4  A    The first time I went to Best Buy, I left -- I purchased a

5  new one and left the old one and the new one with them to try

6  and see if they could transfer the information from the old one

7  to the new one, and see if the new -- old one was even usable.

8  That was the first time I went.

9           MR. HUMPHREY:  Do you have any exhibit stickers?

10          THE COURT:  We haven't had exhibit stickers in 30

11 years.

12          MR. HUMPHREY:  Well, I'm going to write Exhibit 5 and

13 put a box around it onto this.

14          Your Honor, may I approach the witness?

15          THE COURT:  Of course.

16 BY MR. HUMPHREY:

17 Q    Ms. Mols, do you recognize this document?

18 A    I do.

19 Q    What is this?

20 A    It's the receipt for the new computer I had purchased.

21 Q    So what did you do with that computer on the 15th?  Did

22 you take it with you?

23 A    I left it there with them to transfer the stuff from the

24 old to the new and see if the old was okay.

25 Q    Did you talk to them about the old computer as well?

1  A    I talked to them -- old computer and I asked them what

2  could be done if there was a virus.  And they say it might just

3  be that there was clutter and they had suggested to me a

4  program called "CCleaner."

5  Q    Did you ask about the -- the e-mails, too, that you were

6  trying to find?

7  A    I asked them about the e-mails.  They recommended to try

8  and do the recovery, which didn't work.  And then I asked them

9  about CCleaner, and I specifically asked, if I use the

10 CCleaner, would it delete any e-mails or personal files, and

11 they assured me, no.

12        **MR. HUMPHREY:**  Your Honor, I move to admit Exhibit 9.

13        **THE COURT:**  Any objection?

14        **MR. SIMMONS:**  No, Your Honor.

15        **THE COURT:**  Admitted.

16     **(Defense Exhibit Number 9 was received in evidence)**

17 BY MR. HUMPHREY:

18 Q    What happened next with the computers?

19 A    So I went back on, I guess, the 17th, and they said the

20 old one is usable.

21 And so I asked them again about the CCleaner, and that they

22 told me again, it does not remove any e-mails or any personal

23 files.  Took them home.

24 I went back again on the 18th to speak to a Geek Squad.  He

25 suggested I run the CCleaner, that it's usually just clutter on

1   your e-mail that's making the computer not run well -- computer

2   on the -- clutter on the computer, making it not run well.

3   Excuse me.

4   And he said -- he suggested the way I run it.  And I went home

5   and I ran the program.  But he did -- I asked him three times,

6   on each occasion, three -- I went back three times -- if it

7   deleted e-mails and personal files, and he said, no, it's just

8   regular maintenance that removes cookies and cache and regular

9   old stuff that you pick up from the Internet.

10  Q    Why did you ask him that so many times?

11  A    Because I was very concerned that I was going to delete

12  anything from Brad's computer that wasn't supposed to be

13  deleted.

14  Q    What was your intention when you ran it?

15  A    Just regular maintenance on the computer to make it run

16  well.

17  Q    So now, going back to the 15th to the 17th, when they were

18  transferring documents from one -- do you have an understanding

19  as to what was being transferred from one computer to the

20  other?

21  A    Just all the files.  Everything that Brad had on the old

22  computer is transferred onto the new so we wouldn't lose

23  anything.

24  Q    Did they say whether it would transfer any of the clutter

25  onto the new computer?

1   A    Everything could be transferred.  I don't know.  I don't

2   know.  They just transferred his files.

3   Q    Now, when you ran CCleaner on the 18th -- or did you run

4   CCleaner on the 18th?

5   A    Uh-huh, I did.

6   Q    Did you follow the instructions that he Best Buy person

7   gave you?

8   A    I followed all the suggestions from the Best Buy guy.

9            **MR. HUMPHREY:**  I'm going to hand the witness -- was

10  previously been marked as Exhibit 1.  You still have those

11  exhibits?  If not, I can just hand her a new copy of it and

12  mark it new.

13           **THE COURT:**  What does it look like?

14           **MR. HUMPHREY:**  It is the slide show, Your Honor, This

15  is Pathway Forensics (indiscernible.)  I've marked this again

16  as Exhibit 1.

17           **THE COURT:**  Thank you.

18  **BY MR. HUMPHREY:**

19  Q    Now, does -- on the first page of this exhibit, does

20  this -- does this look familiar to you?

21  A    Yes, it does.

22  Q    Does that look like what you ran?

23  A    Yes, it does.

24  Q    Now, why don't we turn to the -- the third page of this

25  exhibit.  Do you see this screen where it says secure

1    deletion -- normal file deletion; secure file deletion in the

2    middle of it?

3    A    Yes, I do.

4    Q    What -- do you remember doing anything on that screen?

5    A    I do not.

6    Q    Do you know whether you did or not?

7    A    I -- I'm not sure if I did.  It's possible.  Or I don't

8    know if it's default or I hit it.  I'm not really sure.

9    Q    So do you know whether you ran the secure delete or not on

10   that computer?

11   A    I don't.

12   Q    Now, I --

13   A    I did follow the directions of the -- the suggestions of

14   the Best Buy guy.  And his suggestion was to use the secure

15   delete, but I don't know if I actually did it or I don't know

16   if it automatically comes up.  I'm not really sure.

17   Q    Now, in your declaration, you said that you did not select

18   secure delete; is that right?

19   A    That is correct.  I did --

20   Q    Why did you say that?

21   A    I said it because when my husband had told me that we -- I

22   had ran this program and that I had, somehow, deleted seven

23   times -- like it was sent delete, delete, delete.

24   And I didn't -- I didn't press delete, delete, delete.  I just

25   said analyze and run CCleaner.  So I was -- misunderstood it

1    about what secure deletion meant.

2    Q    So what you're -- what you just described was you

3    understanding what secure deletion meant when you signed the

4    declaration?

5    A    Right.

6    Q    Is that what your understanding is today?

7    A    That's what my understanding is.

8    Q    Now, today, is that what your understanding is?

9    A    My -- that is, today, what my understanding is; that I was

10   pressing secure -- I was pressing delete over and over and

11   over, which I wasn't.

12   Q    Okay, do you know what secure delete means today?

13   A    I don't.

14   Q    Did you -- when you ran CCleaner -- let's go to the second

15   to the last page of this Exhibit 1.  I see this little pop-up

16   window --

17   A    Uh-huh.

18   Q    -- in the middle with a prompt on it.

19   A    Uh-huh.

20   Q    Do you see that?

21   A    I do see that.

22   Q    Did you see that when you ran CCleaner?

23   A    I -- I don't recall seeing that when I ran CCleaner.  What

24   I did was, I did the analyze button on the bottom, and what

25   came up was all the stuff that was in the Internet.

1    There was no files in there; there was no e-mails in there.  It

2    was just underneath, you can see what's underneath.  It's all

3    windows and -- they said it was cache and cookies, and I ran

4    "Run Cleaner."

5    Q    Why were you -- why did you click "Run Cleaner"?

6    A    Because I -- I was trying to make the computer run better.

7    It was just regular maintenance.  I wasn't deleting any files.

8    Q    Now, did you -- so did you have an understanding at the

9    time whether you were deleting any files that you were supposed

10   to preserve in this case?

11   A    I believe that I was not deleting any files at all that

12   was from -- pertaining to this case.

13   Q    And were you trying not to do that?

14   A    I was absolutely trying not to do that.  And I was told by

15   the people at Best Buy -- and since this has come out, I have

16   researched it and spoke to IT people and CCleaner themselves,

17   and nobody said that you can delete personal files or e-mails.

18        **MR. HUMPHREY:**  I'm going to mark this as Exhibit 10

19   and hand it to the witness.

20        Your Honor, may I approach the witness?

21        **THE COURT:**  You may.

22        **THE WITNESS:**  Thank you.

23        **MR. HUMPHREY:**  Your Honor.

24   //

25   //

1  **BY MR. HUMPHREY:**

2  Q    Your Honor -- or Ms. Mols, do you remember -- do you

3  recognize this document in front of you?

4  A    Yes, I do.

5  Q    What is it?

6  A    I sent an e-mail to the support people at CCleaner asking

7  them if this removes e-mails.

8  Q    And what did they say?

9  A    They said it does not remove e-mails.

10 Q    Does it also -- does it say anything as to whether you

11 could delete your personal files?

12 A    It says, in short, "CCleaner cleans out junk that

13 accumulates over time: temporary files, broken shortcuts,

14 browsing history, registry entries."

15 Q    Is this a true copy of the e-mail that you received?

16 A    It is a true copy.

17       **MR. HUMPHREY:**  Your Honor, I move to admit Exhibit

18 10.

19       **THE COURT:**  Any objection?

20       **MS. MIERS:**  Yes, Your Honor.  We object to the

21 admission of this exhibit because it wasn't previously produced

22 to us.  It's been in existence since the 26th.

23       **THE COURT:**  All right.  I will admit it and I will

24 give you extra time if you want to do something to rebut it.

25       **MS. MIERS:**  Thank you, Your Honor.

 1          **THE COURT:**  All right?

 2          **(Defense Exhibit Number 10 was received in evidence)**

 3          Go ahead, Mr. Humphrey.

 4    **BY MR. HUMPHREY:**

 5    Q    So you have an understanding today as to what CCleaner

 6    does on your computer?

 7    A    I do.

 8    Q    What does it do?

 9    A    It removes the junk that you pick up from the Internet,

10    like cookies and cache, and they said prefetch, and it does not

11    remove your personal files and your e-mails.

12    Q    What do you mean by "personal files"?

13    A    I would say like spreadsheet or a Word document.  That's

14    what -- personally what I would say a personal file -- any kind

15    of presentation.

16    Q    Now, you saw -- you testified before, you saw what it was

17    going to delete before it deleted it?

18    A    Uh-huh.

19    Q    Was there anything on there that looked like a document or

20    perhaps --

21    A    Absolutely not.  Absolutely not.

22    Q    -- make it look -- a work document?

23    A    No.

24    Q    Any spreadsheets?

25    A    No.

1  Q    Any Word documents?

2  A    No.

3  Q    So what did you do -- it's been stated that you

4  uninstalled CCleaner?

5  A    Uh-huh.

6  Q    Did you -- did you do that?

7  A    I did.

8  Q    Why did you do that?

9  A    Because I -- it was -- they said more clutter -- just

10 clutter keeps your computer running slowly.  I didn't need it.

11 I ran the cleaner, so I got rid of it.

12 Q    Did it work?

13 A    Yeah, it made it work better.  It still has issues with

14 the computer, but it's running faster.

15 Q    So what did you do with the new computer after that?

16 A    I returned it.

17 Q    Why did you return it?

18 A    Because he didn't need it.  It was Christmas time, we have

19 a lawsuit going.  Any expense, we don't need right now, so I

20 returned it.

21 Q    Did you have an understanding as to whether there was

22 anything on that computer that was not on the old one?

23 A    No.

24 Q    Was your understanding that there wasn't?

25 A    That there was -- that was nothing.  It was all the same.

1          **MR. HUMPHREY:**  Your Honor, may I approach the

2  witness?

3          **THE COURT:**  You may.

4  **BY MR. HUMPHREY:**

5  Q    Hand you the (indiscernible) Exhibit 11.

6  A    Thank you.

7          **MR. HUMPHREY:**  Your Honor.

8  Q    Do you recognize this document, Ms. Mols?

9  A    I do.

10  Q    What is it?

11  A    It's the receipt for the return of the computer.

12  Q    And is this a true copy of that receipt?

13  A    It is.

14          **MR. HUMPHREY:**  Your Honor, move to admit Exhibit 11.

15          **THE COURT:**  Any objection?

16          **MS. MIERS:**  No, Your Honor.

17          **THE COURT:**  Submitted.

18      **(Defense Exhibit Number 11 was received in evidence)**

19  **BY MR. HUMPHREY:**

20  Q    Now, when you ran CCleaner, did you make any selection to

21  remove any particular files?

22  A    No, I did not.

23  Q    Go back to Exhibit 1, the very last page of the Exhibit.

24  The page says "Custom files to --

25  A    Uh-huh.

1  Q    -- delete and folders to empty."  Did you ever use this

2  page?

3  A    I did not.

4  Q    You said before you understood that -- that your husband

5  and you have a duty to deserve -- to preserve documents in this

6  case?

7  A    Yes, we did.

8  Q    Have you ever deleted a document you thought was relevant

9  in this case?

10  A    Never.

11         **MR. HUMPHREY:**  I'll pass the witness, Your Honor.

12                        **CROSS EXAMINATION**

13  **BY MS. MIERS:**

14  Q    Ms. Mols, did you run the DRW software before or after you

15  went to Best Buy on December 15th --

16  A    I don't --

17  Q    -- 2017?

18  A    I don't know what the DRW --

19  Q    Didn't you just testify that you ran DRW software to try

20  and recover some e-mails?

21  A    I don't know that name.  Sorry.  I think it was different

22  name he gave me.

23  Q    He called -- I think he referred to it as "Easy DRW"?

24  A    Oh, yes.  Yes, yes.

25  Q    Did you do that before or after you went to Best Buy on

1  December 15th, 2017?

2  A    I did that before.

3  Q    You did that before?

4  Ms. Mols, you took an oath to tell the truth, right?

5  A    Yes, I did.

6  Q    And you understand that if you don't tell the truth at the

7  hearing today, you'll be subject to perjury, right?

8  A    Yes, I do.

9  Q    Do you remember me taking your deposition back in November

10 of 2017?

11 A    I do.

12 Q    And you testified that your understanding of the

13 consequences of committing perjury would be that you could go

14 to jail, right?

15 A    Uh-huh, correct.

16 Q    So sitting here in the courtroom --

17 A    Uh-huh.

18 Q    -- today, do you still understand that committing perjury

19 could result in jail time?

20 A    I do.

21 Q    Do you understand your Fifth Amendment right to

22 incriminate yourself -- not to incriminate yourself in court?

23 A    You mean I could say I take the Fifth.

24 Q    You understand you have the right to --

25 A    Yeah, I do.

1  Q    -- do that?

2       You and your husband both testified that you became aware

3  of your duty to preserve documents and data related to this

4  lawsuit as far back as May of 2016; is that right -- or June of

5  2016?

6  A    I'm not sure of the date, but I learned about it, yes, in

7  the beginning of the case, I believe.  I don't know -- I'm not

8  accurate -- sure on the date.

9  Q    Somewhere around May or June of 2016 fair enough?

10 A    Somewhere around there.

11 Q    And you understand that that included an obligation not to

12 delete anything, right?

13 A    Correct.

14 Q    And those were your words in your declaration, right?

15 A    Uh-huh.

16 Q    Not to delete anything, right?

17 A    In my declaration here?

18 Q    Yes.

19 A    Yes.

20 Q    And you've got your declaration in front of you?  Is that

21 what you're pointing to?

22 A    No.

23 Q    No?  I thought you were pointing to it.

24      **MS. MIERS:**  Your Honor, may I approach the witness?

25      **THE COURT:**  You may.

**BY MS. MIERS:**

Q    I believe we are on Exhibit 12; is that right?

A    I think that's right.

Q    Ms. Mols, do you recognize this declaration?

A    I do.

Q    Is it the declaration that you signed on June 24th, 2018?

A    Yes.

        **MS. MIERS:**  Your Honor, we move to admit this Exhibit 12 --

        **THE COURT:**  Any objection?

        **MS. MIERS:**  -- into evidence.

        **MR. HUMPHREY:**  No objection, Your Honor.

        **THE COURT:**  Admitted.

        **(Plaintiff's Exhibit Number 12 was received in evidence)**

**BY MS. MIERS:**

Q    Did you read this declaration before you signed it?

A    I did.

Q    Did you understand by signing the declaration that you were creating sworn testimony?

A    I did.

Q    Have you read it since June 24th when you signed it?

A    I have.

Q    How many times?

A    Probably five times.

Q    Anything in this declaration that isn't truthful?

1  A    Well, yes.  And I said that -- that I misunderstood what

2  it meant by "secure delete."

3  Q    What paragraph is that?  Is that nine?

4  A    Yes, that's correct.

5  Q    So is it your testimony now that the sentence "I did not

6  select any secure delete feature on CCleaner.  If such a

7  feature ran, it must have done so automatically" -- that's not

8  truthful, right?

9  A    Because I misunder -- I misunderstood what "secure delete"

10 meant.

11 Q    Anything else that's not truthful in this Exhibit?

12 A    No.

13 Q    That's it?

14      **MS. MIERS:**  I'm going to do my best, Your Honor, to

15 try not to go back over some things that we already covered, so

16 bear with me for just a few seconds.

17 **BY MS. MIERS:**

18 Q    The day you bought the new laptop, on December 15th --

19 A    Uh-huh.

20 Q    -- 2017, that was the day that Brad's attorney filed a

21 response to Alliantgroup's motion for sanctions, right?

22 A    I don't know.

23      **MS. MIERS:**  For the Court's benefit, that's Docket

24 Entry 144.

25 //

1    **BY MS. MIERS:**

2    Q    After you bought the new laptop, you instructed Best Buy

3    to transfer all of Brad's files on -- from the old laptop to

4    the new one.  You don't dispute that, right?

5    A    No, I don't dispute that.

6    Q    And this was after you knew that you had an obligation to

7    preserve evidence?

8    A    They were copying it -- removing it from one.  They were

9    copying it, right?  So making a copy.

10   Q    So is your answer "yes"?

11   A    Yes.

12   Q    Okay.

13   A    Uh-huh.

14   Q    And this was after you knew that you were not supposed to

15   delete anything?

16   A    I wasn't deleting anything.  They were just making a copy.

17   Q    Is that a "yes"?

18   A    No, I wasn't deleting it; they were just copying it.

19   Q    That's not my question.

20   A    Okay.

21   Q    My question is about timing.

22   A    Okay.

23   Q    Right?  Did you have them copy all of the files from the

24   old laptop to the new laptop after you knew that you were not

25   supposed to delete anything?

1    A    Yes.

2    Q    And talk -- in Paragraph 4 -- about asking someone at Best

3    Buy if they could assist you in recovering the Prime e-mails.

4    A    I recovered it.

5    Q    There with me?

6    A    I just asked them how they could -- what they recommend.

7    Q    Right.  So you just asked for their verbal --

8    A    Uh-huh.

9    Q    -- advice?

10   A    Right.

11   Q    You didn't ask them to help you --

12   A    No.

13   Q    -- recover those e-mails?

14   A    I did not.

15   Q    It wasn't important enough for you to pay them to help you

16   recover those e-mails?

17   A    No.  I had already tried to recover it, so I was just

18   asking if there was another way to -- they had already

19   suggested that, but there was no other way.

20   Q    You --

21   A    I already tried to do it.

22   Q    You discovered that you were not able to recover the e-

23   mails?

24   A    Correct.

25   Q    But you didn't make the decision to then go to Best Buy

1   and ask them to try to recover the e-mails?

2   A    No, I did not.

3   Q    And when was this that you were asking Best Buy about

4   advice on how to recover the e-mails?

5   A    I had asked them on the 15th and I had asked them on the

6   17th.

7   Q    Okay, why was it that you waited until December 15th and

8   17th of 2017, to ask for help in recovering the Prime e-mails?

9   A    Because everybody wanted the Prime e-mails at that point,

10  correct?

11  Q    When did you first --

12  A    I was trying --

13  Q    -- become aware --

14  A    I can't --

15  Q    -- that everybody wanted the Prime e-mails?

16  A    I don't know.

17  Q    Was well before December of 2017, right?

18  A    I'm not sure.

19  Q    What is your understanding of why Brad didn't just produce

20  the Prime e-mails while he still had access to the account?

21  A    Because Angela wouldn't let him.

22  Q    So you talked to Brad about that?

23  A    Uh-huh.

24  Q    In Paragraph 4, you also state that someone from the Geek

25  Squad told you that CCleaner is a program that can recover

1   files?

2   A    Yeah.  But I didn't use the CCleaner to recover files.

3   Q    But I want to make sure we got your testimony right.

4   You're testifying that someone from the Geek Squad told you

5   that CCleaner can be used to recover files, right?

6   A    It's -- either it was CCleaner or that other -- I'm not

7   sure what the program was, actually.

8   Q    So it's quite possible that there's yet another statement

9   in your sworn declaration that isn't true, right?

10  A    It -- I just didn't know the name of it.  They didn't tell

11  me the program.  I might have not given the right name.

12  Q    When you signed this declaration --

13  A    Uh-huh.

14  Q    -- did you think it was important for it to be accurate?

15  A    I did.

16  Q    Because it's sworn testimony, right?

17  A    I understand that.

18  Q    And we agree that Paragraph 4 isn't necessarily accurate,

19  right?

20  A    Well, I'm just not sure of what program they actually

21  suggested.

22  Q    You didn't do anything to make sure that your testimony

23  was accurate, right?

24  A    No.  I just didn't know if that was the program they

25  suggested or not.  It was back in December.

1  Q   What was the person's name who helped you on the 15th?

2  A   I don't know.

3  Q   Can you describe that person?

4  A   No.

5  Q   Was it male or female?

6  A   It was male.

7  Q   And about how old was that person?

8  A   I don't know.

9  Q   Give us your best guess.

10 A   Thirty.

11 Q   How much time did you spend talking to this 30-year-old

12 man?

13 A   Ten minutes.

14 Q   What color was this person's hair?

15 A   I don't know.

16 Q   Have you told us everything you remember about this

17 person --

18 A   I have.

19 Q   -- that you talked to?

20 At the time that you were in Best Buy talking to the Geek Squad

21 guy -- and I'm talking about on the 15th -- you already knew

22 about CCleaner, right?

23 A   Yes.  He had mentioned CCleaner, yes.

24 Q   I'm talking about your first visit to Best Buy --

25 A   Yes, I do.

1  Q    -- on the 15th.

2  A    Yes, uh-huh.

3  Q    You already knew it?

4  A    Uh-huh.

5  Q    Because you had it on your desktop?

6  A    Right.

7  Q    Are you the one that downloaded it --

8  A    I am.

9  Q    -- on the desktop?

10 A    Yes.

11 Q    You didn't uninstall it when you were finished?

12 A    No.

13 Q    Right?

14 A    I wasn't -- I didn't run it then.  I was just looking and

15 I downloaded the program.

16 Q    But you never uninstalled it, right?

17 A    No.

18 Q    Sitting here today, based on all the research that you've

19 done --

20 A    Uh-huh.

21 Q    -- you and Brad both testified about it -- do you now

22 believe that CCleaner is a program that could be used to

23 recover files rather than delete them?

24 A    No.  I didn't try -- I believe it's to clean out the

25 clutter.  That's my understanding; to remove the clutter that

1  you pick up from the Internet.  That is my understanding.

2  Q    You don't believe now that it's used to recover files?

3  A    No.

4  Q    You state the Geek Squad that walked you -- to how to

5  download CCleaner, but you didn't do it there in the store?

6  A    No, I did not.

7  Q    And it's your testimony that you ran the recovery software

8  and then you went to Best Buy?

9  A    Correct.

10  Q    Right?

11       Take a look at the declaration, Exhibit 12, and please

12  turn to Exhibit A-1.

13  Let me know when you're ready.

14  A    Where -- where did you want me --

15  Q    Look at Exhibit A-1 to your declaration.  You see it?  You

16  keep turning the pages, you'll eventually get to the first

17  receipt.  I think it's the --

18  A    Oh.  Oh, got it.

19  Q    -- fourth, fifth page.

20  A    Keep going.  Uh-huh.

21  Q    Are you with me now?

22  A    Uh-huh.

23  Q    All right.  So we're looking at the receipt for December

24  15th --

25  A    Uh-huh.

1   Q    -- 2017, right?

2   A    Uh-huh.

3   Q    And what time were you at Best Buy?

4   A    It looks like I was there at 2:03.

5   Q    And is that Pacific Standard Time?

6   A    It is.

7           **MS. MIERS:**  This is Exhibit 2 that's already been

8   admitted into evidence, but I'll hand the Court a courtesy

9   copy.

10  **BY MS. MIERS:**

11  Q    If you'll take a look at -- and we'll mark it for you so

12  you don't get (indiscernible).  If you'll take a look at

13  Exhibit 2, have you ever seen the affidavit of the forensics

14  expert?

15  A    No, I have not.

16  Q    Go with me down to Line 7.

17  A    Uh-huh.

18  Q    What time does it say you ran the trial version of DRW on

19  the laptop?

20  A    4:24 Central Standard Time.

21  Q    And what time would that be in Pacific Standard Time?

22  A    I don't know.

23  Q    You don't know the time difference --

24  A    No, I don't.

25  Q    -- between --

1  A    I don't know where central is.

2  Q    -- Pacific Standard Time and Central --

3  A    Is central --

4  Q    -- Standard Time?

5  A    Central is here?  Are you in central right now?  Okay, so

6  two-hour time difference.

7  Q    So what time would it be?

8  A    2:24.

9  Q    2:24.  So you were at Best Buy at 2:03 p.m.?

10  A    Correct.

11  Q    And you ran the recovery software at 2:24?

12  A    2:24, yes.  I am mistaken.

13         **THE COURT:**  What are we talking about?  Are we

14  talking --

15         **MS. MIERS:**  I'll just clarify.

16         **THE WITNESS:**  I ran the recovery.

17         **THE COURT:**  But that says --

18         **THE WITNESS:**  I mixed up the dates.

19         **THE COURT:**  Number 7 says "December 18th"; not

20  "December 15th."  Paragraph 4 says "December 15th."

21         **MS. MIERS:**  Sorry, I'm sorry.  Paragraph 5.

22         **THE COURT:**  At 4:05?

23         **MS. MIERS:**  Yes, Your Honor.  Sorry.

24         **THE COURT:**  Okay, all right.

25         **MS. MIERS:**  So that would have been 2:32 p.m.,

1   Pacific Standard Time.  I just got the wrong (indiscernible).

2   Thank you for putting the --

3   **BY MS. MIERS:**

4   Q    Besides asking Best Buy to copy all of the files from

5   Brad's old laptop to the new one, did you ask him to do

6   anything else?

7   A    No.

8   Q    You didn't ask them to fix the clutter?

9   A    No.  They told me how to fix the clutter.

10  Q    You didn't ask them to do it for you?

11  A    No.

12  Q    And you've already established --

13  A    I didn't want -- I didn't want anyone else to -- if I'm

14  going to do something, I have to do it right.

15  Q    If you're going to delete the files, you're going to do

16  it?

17  A    No.  I'm not deleting any files.  But if I'm going to run

18  a program, I'd rather do it at this time myself while --

19  normally, I would let them do it, but not during a court case.

20  That's why I went back multiple times to try and find out what

21  would be deleted.

22  Q    So you knew -- you knew this was important?

23  A    Yes.

24  Q    You didn't ask for help recovering the Prime e-mails,

25  right?

1    A    No, I didn't.

2    Q    And that wasn't important to you?

3    A    That was important to me.  But I tried to recover and I

4    didn't -- wasn't able to.

5    Q    Did you pay Best Buy for copying the files from Brad's

6    laptop to the new one?

7    A    I don't -- I don't recall.  I think it's part of your --

8    just your plan.  I don't know.  I'm not really sure.

9    Q    What plan are you referring to?

10   A    Like a -- like, because I bought a computer there.  I

11   don't think they charge me, but I'm not really sure.

12   Q    So you don't know whether you have a receipt for that or

13   not?

14   A    No.  You have all the receipts.

15   Q    These are all the receipts you've ever received from Best

16   Buy?

17   A    For this -- for this?  What I did?  Yes.  I bought and

18   returned.  That's it.

19   Q    You didn't pay them for the transfer of the information?

20   A    I'm not really sure.  If it's on the receipt.  But I

21   don't see -- I don't see it.  There's a $50 charge for Office.

22   Q    Right, we've got receipts for the 15th and the 18th --

23   A    Uh-huh.

24   Q    -- on the 19th, right?

25   A    Right.

1  Q    Is there a receipt -- does a receipt exist for the 17th,

2  when you picked up the laptops?

3  A    No, there does not.

4  Q    Let's take a look at Paragraph 6 of your declaration.

5  You state that you searched for the e-mails.  What e-mails were

6  you searching for?

7  A    The Prime e-mails.

8  Q    And this was on December 18th, right?

9  A    Well, it was still before I was trying to see if they came

10  through -- if anything had come through -- before I ran the

11  CCleaner.

12  Q    What date did you search --

13  A    I probably --

14  Q    -- for the e-mails?

15  A    -- searched every day, looking if anything came up.

16  Q    What did you do to search for the e-mails every day?

17  A    I'm not really sure.  I just tried to find them anywhere

18  on the computer.

19  Q    And is that what you did on the 18th?

20  A    I believe so.

21  Q    Were you searching on the 18th because you thought

22  something new had changed about the laptop --

23  A    No.

24  Q    -- after it was at Best Buy?

25  A    No.

1  Q    Did you check the old laptop?

2  A    I checked the -- I didn't use the new laptop; only the old

3  laptop.

4  Q    You didn't even look on the new laptop?

5  A    No, I didn't use the new laptop at all.

6  Q    You weren't searching on the 18th because you thought Best

7  Buy did something that would cause those e-mails to resurface?

8  A    No.

9  Q    So I'm going to take you back to the 17th of December,

10  okay.  You with me?

11  A    Uh-huh.

12  Q    And you came home and you took the time to search for

13  these e-mails again, right?

14  Is that a "yes"?

15  A    Yeah.  I searched -- I was trying to find anything I

16  could.

17  Q    How much time did you spend on the 17th doing that?

18  A    I don't know.

19  Q    Hours?

20  A    I don't know.

21  Q    Minutes?

22  A    I don't know.

23  Q    The night of the 17th, you didn't run CCleaner, right?

24  A    I did not.

25  Q    When you returned to Best Buy on December 18th, what time

 1  of day was it?

 2  A     I don't know.

 3  Q     Was it before or after you found out about the Court's

 4  order telling you not to delete anything?

 5  A     I didn't find out about the Court order not to delete

 6  anything.

 7  Q     Sitting here today, you know about the Court order?

 8  A     Yes, I do.  Yes.

 9  Q     And you've always known that you had an obligation --

10  A     Yes, I did.

11  Q     -- not to delete anything?

12  A     Correct.

13  Q     Correct?

14  A     Yes.

15  Q     But you don't remember what time of day you were there?

16  A     I don't.

17  Q     And you don't have a receipt from the 18th, right?

18  A     No.

19  Q     I think we've already established through you and Brad

20  that on December 18, after the Court issued an order reminding

21  you, do not delete anything at all, you purchased, you ran and

22  you downloaded CCleaner, right?

23  A     Correct.

24  Q     But you didn't download and run the free version, correct?

25  A     Correct.

1   Q    You paid extra for the professional version, right?

2   A    Correct.

3   Q    And is that because along with the professional version,

4   it's basically the same except that you get a one-year

5   subscription, right?

6   A    No, it's just what the Best Buy guys had suggested.  I

7   didn't even know about the one-year subscription.

8   Q    Are you denying that CCleaner Professional includes a year

9   of automatic updates?

10  A    I have no idea.

11  Q    Are you denying that CCleaner Professional includes a year

12  of free scheduled cleanings?

13  A    I have no idea.

14  Q    Is it your testimony that you didn't understand a program

15  called CCleaner Professional wouldn't remove anything from a

16  laptop?

17  A    I don't understand your question?

18  Q    Are you testifying here today --

19  A    Uh-hmm.

20  Q    That you didn't understand a program called CCleaner

21  Professional would not remove -- would remove anything from the

22  laptop?

23  A    My understanding of CCleaner is it removes the clutter

24  that you pick up from the internet, not emails and not personal

25  files.  That's my understanding, and it still is today.

1   Q    So you did understand and you understand now that you were

2   removing something from the laptop?

3   A    I was taking clutter that is not relevant to this case,

4   that comes on from the internet like regular means, like a

5   virus scan.  It's regular maintenance.

6   Q    Would you agree with me that removing things is the same

7   as deleting them?

8   A    Well, it -- it depends what your removing, right?  If it's

9   not relevant to the case --

10  Q    Is that what the Court order said?

11  A    I felt -- I felt -- I didn't see the Court order.  But,

12  what I felt was I wasn't doing any harm.  I was running a

13  regular maintenance on the computer to make it run better.

14  Q    Was it your understanding that it was okay for you to

15  delete things if you in your own opinion made the determination

16  that something wasn't relevant?

17  A    No, I was -- I didn't feel like I was -- I was removing

18  clutter.

19  Q    Before you did that, ran the CCleaner Professional

20  Version, did you ask anyone if it was okay to run CCleaner

21  Professional?

22  A    Who did I ask?

23  Q    Brad's attorney?

24  A    No, I did not.

25  Q    Did you ask Brad?

1   A     Nope.

2   Q     Did you call the Geek Squad?

3   A     I asked the Geek Squad about running --

4   Q     And it's your testimony that three times you asked them.

5   A     I did about running --

6   Q     Did you ask any attorney?

7   A     No, I did not.

8   Q     Did you reach out to the Court and request permission from

9   the Court?

10  A     I did not.

11  Q     Alright.  Let's go back to Exhibit One.  Do you have that

12  in front of you?  That's the screen shots.

13  A     Yes.

14  Q     On the first page, that one that looks like this -- you've

15  already testified that you saw this and you clicked install,

16  right?

17  A     Correct.

18  Q     Can you explain to the Court how the secure delete

19  function was labeled and run on the laptop?  Do you have any

20  explanation to the Court for that?

21  A     I do not.

22  Q     Are you testifying to the Court -- I'm going to turn you

23  to the third page.  The one that has the secure file delete

24  section in it.  Are you testifying that you selected normal

25  file deletion?

1  A    I don't recall.  I don't know what I selected.

2  Q    You don't know which one you selected?

3  A    Exactly.

4  Q    But either way you were selecting something that was going

5  to delete files, right?

6  A    Delete clutter, was my -- was the suggestions from Best

7  Buy.

8  Q    I hear your sworn testimony.  So go in the middle of the

9  page, if you would.  Do you see the word secure deletion?

10  A    I do.

11  Q    And what does the first choice say?

12  A    Normal --

13  Q    What does it say the --

14  A    -- file deletion.

15  Q    That's right.  What does the second --

16  A    Secure file deletion.

17  Q    Turning next to the next page, if you select secure file

18  deletion, there's a drop-down box.  Do you see that?

19  A    I do.

20  Q    Which option did you select?

21  A    I can't recall, but apparently I was told seven.  That's

22  what I misunderstood.  I thought I hit delete seven times.  I

23  can't get -- this is what I was told.  I'm not sure what I was

24  -- I don't know what I actually pressed.  It's hearsay what

25  people had said from your forensic person.

1   Q    Who told you it was complex override?

2   A    I believe it was the attorney.

3   Q    Turning to the next page, there's a pop-up, right?

4   A    Uh-huh.

5   Q    And it states the selected files will be deleted from your

6   PC.  Do you wish to continue?  Did I read that correctly?

7   A    You did.

8   Q    And you clicked continue?

9   A    I don't recall.

10  Q    Looking at page 6.  You see there's a tab that says

11  include?  What files did you identify here?

12  A    None, and I never went into this page.

13  Q    Where was Brad when you were doing all this?

14  A    He was sleeping.

15  Q    How long did it take you to run CCleaner Professional?

16  A    Not very long.  I was just -- you let it download and then

17  you just analyze and run the cleaner.

18  Q    How long did it take?

19  A    I'm not sure.

20  Q    Did it take hours?

21  A    I'm not sure.

22  Q    But could have?

23  A    I don't know.

24  Q    I'm really bad about exhibits.  I think we're on Exhibit

25  13.

1      **THE COURT**:  Let's take a break right now and lets be

2  back in 10 minutes.

3      **(Recess taken from 3:43 p.m. to 3:53 p.m.)**

4      **THE COURT:**  Alright.  Be seated.  Go ahead.

5               **CROSS EXAMINATION (CONTINUED)**

6  **BY MS. MIERS:**

7  Q    Mrs. Mols, we took a short break.  Did you talk to your

8  husband during the break?

9  A    I did.

10  Q    Did you talk to him about his testimony here at the

11  hearing?

12  A    I did not.

13  Q    I'd like to get you to pick back up with Exhibit 12, your

14  declaration, if you would.  Clarify for the court when it is

15  you found out about the Court's order?

16  A    I'm not sure.

17  Q    Brad testified earlier that he didn't tell you about the

18  Court order for several days.  Do you agree with that

19  testimony?

20  A    I do.

21  Q    So, could you turn to page 10 of your sworn declaration.

22  Could you read the first sentence of paragraph 10 for the

23  Court, please?

24  A    On the evening of December 18, 2017 when I ran CCleaner, I

25  knew that Brad's computer would undergo a forensic examination.

1   Q    Okay, so which one is true, you knew on December 18 when

2   you ran CCleaner of the order or you didn't find out for

3   several days.

4   A    I didn't find out for several days.

5   Q    Why did you say under oath in your declaration that on the

6   evening of December 18, 2017, when you ran CCleaner, you knew

7   that Brad's computer would undergo forensic examination.  I

8   would never believe that I could delete files off of Brad's

9   computer without a forensic exam being able to detect it?

10  A    Because I knew that they were trying to, I guess.  I'm not

11  really sure.  Everything had gone your way, you had gotten

12  everything from us, so I figured that was the next -- you had

13  already been trying, but he hadn't told me that it was actually

14  happening.

15  Q    Were talking about the prohibition against the deleting

16  things, right?  And let's just make sure that this is clear in

17  the record.  You used the term -- you understood you weren't

18  allowed to delete anything, right?  Those were your words?

19  A    Correct.  Anything pertaining to the case, was what I

20  believed.

21  Q    And in the last paragraph, paragraph 10, you stated that

22  you knew Brad's computer would undergo a forensic examination.

23  Did you know that?

24  A    I did not know that.

25  Q    Handing you a page from the CCleaner website.  In all of

1    the research that you and Brad conducted, did you run across

2    this page on the CCleaner website?

3    A    I'm not really sure, maybe I did after the fact when we

4    were researching it, but I don't recall.

5    Q    And earlier, when you testified about all of the research

6    that you did, you just told the Court that you had no reason to

7    believe, based on your research, sitting here today, that

8    CCleaner could be used to delete files, right?

9    A    Correct.

10   Q    Could you read the first sentence in the big lettering on

11   Exhibit 13 for us?

12   A    Can data cleaned by CCleaner be recovered?

13   Q    Okay.  And right above the numbering it states, if you run

14   CCleaner with its default settings you'll thwart most attempts

15   at recovery.  Did I read that correctly?

16   A    I don't know where you are.

17   Q    See where the numbering is?

18   A    Yup.

19   Q    Right above that, there's a sentence that says if you run

20   CCleaner.

21   A    Uh-huh.

22   Q    You with me?

23   A    Yup.

24   Q    So, it says if you run CCleaner with its default settings,

25   you'll thwart most attempts at recovery, but you can decrease

1  the chances that someone will be able to recover files as

2  follows.  Did I read that correctly?

3  A     You did.

4  Q     And then it goes on to give you three ways to increase the

5  chances of cleaning with CCleaner in a way that it can't be

6  recovered.  You agree with me there?

7  A     Correct.

8  Q     The first plan advised, from CCleaner, is to use secure

9  deletion, right?

10 A     Correct.

11 Q     And the reason is because the more passes that CCleaner

12 uses to override the data, the harder it will be to recover,

13 right?

14 A     That's what it says.

15 Q     And it uses the word final, right?  It says, and I'm back

16 at the line above number one, that you can decrease the chances

17 that someone will be able to recover files as well, right?

18 A     That's what it says, yes.

19 Q     Then, if you -- there's a second plan of advice that says

20 wipe free space, right?

21 A     Uh-huh.

22 Q     And then the third one says for the utmost in security,

23 use recover to find the files that have already been deleted

24 but are still recoverable, and that's so that you can go, oh, I

25 didn't quite get rid of these and so I can go back and try and

1   get rid of those, right?

2   A    Uh-huh.

3   Q    And you're familiar with recover, right?

4   A    I'm familiar with recover because I thought maybe you

5   could recover what -- after we researched this and we were

6   looking into trying to recover what was lost.  I never ran

7   recover.  I don't even know how it works.

8   Q    Did you purchase recover?

9   A    No, I never did.

10  Q    Your Honor, I move to admit Exhibit 13 into evidence.

11          **THE COURT:**  Any objection?

12          **MR. HUMPHREY:**  Your Honor, I object.  This is hearsay

13  and there's no foundation.  There's no indication the witness

14  ever seen this document, nor have I.

15          **THE COURT:**  I agree.

16          **MS. MIERS:**  Your Honor, just for the record, he's

17  just delaying the inevitable because there are several ways

18  that we can prove this up.  Do we have permission to prove this

19  up via affidavit after today's hearing?

20          **THE COURT:**  Yes.

21          **MS. MEIRS:**  And I can also, if the Court would like me

22  to, I can read the website into the record, so the Court can

23  determine that this is a valid representation of the website or

24  I can even pull it up on my laptop, if you prefer, any of those

25  methods.

1          **THE COURT:**  You'll need to do it through some self-

2    authenticating means.

3          **MS. MIERS:**  Thank you, we'll do that.

4    **BY MS. MIERS:**

5    Q    Do you recognize Exhibit 14 that I just handed you?

6    A    I do not.

7    Q    You see at the top in the to line, where it states

8    cindyberkston@yahoo.com?

9    A    Yeah.

10   Q    And you agree with me this is a receipt for the purchase

11   by someone named Cindy Mols for Recover Professional software?

12   A    Uh-huh.  I never saw this receipt.

13   Q    Does Brad ever use your email?

14   A    No.

15   Q    Your Honor, I move to admit Exhibit 14.

16         **MR. HUMPHREY:**  Your Honor, same objection as before.

17   Hearsay, lack of foundation.  Not authenticated.

18         **THE COURT:**  It's not authenticated, Ms. Miers.

19         **MS. MIERS:**  Yes, Your Honor.  We'll prove it up

20   through the forensic expert, with the other affidavit.

21   **BY MS. MIERS:**

22   Q    Would you take a look at Exhibit 15 for me?  Do you

23   recognize Exhibit 15?

24   A    I do not.

25   Q    Do you agree with me that it's a document that looks like

1   an email from Cindy Mols?

2   A    Yeah.

3   Q    And just a little below the to/from section, the address,

4   the email address listed is cindyberkson@yahoo.com?

5   A    Uh-huh.

6   Q    And it looks like this is an email from

7   cindyberkson@yahoo.com to brad.mols@primetaxgroup, right?

8   A    Uh-huh.

9   Q    But if you go on down, you see on a Friday it's really an

10  email from someone named Thomas Johnson.

11  A    Uh-huh.

12  Q    Following me?  And it's actually to Brad, right?  See

13  where it says Brad, see attached.

14  A    Uh-huh.

15  Q    Is it still your testimony that Brad never used your Yahoo

16  email address?

17  A    He does not.

18  Q    Pardon me?

19  A    He doesn't use my email address.

20  Q    Do you have any explanation to the Court as to how the

21  last two exhibits that you looked at ended up in your email?

22  A    I do not.

23  Q    Let's talk about the infamous loan for a few minutes.  You

24  testified at your deposition that you loaned Angela Torres

25  (phonetic) a total of $25,000, right?

1  A    Correct.

2  Q    You admitted you've never been to dinner with Angela,

3  right?

4  A    Never been to dinner.

5  Q    Never been to lunch?

6  A    Nope.

7  Q    Never been to her house?

8  A    Nope.

9  Q    Don't know the names of her children?

10  A    Nope.

11  Q    That in your lifetime you've never loaned anyone else

12  $25,000?

13  A    I wasn't in the position, I said, to loan someone that

14  type of money.

15  Q    So is that a yes?

16  A    Correct.

17  Q    Brad gave you permission to make the loan?

18  A    I made the loan.

19  Q    But Brad gave you permission to make the loan, correct?

20  A    I didn't really ask him.  I gave her the loan.  She asked

21  me mother to mother.  She needed money for her and her children

22  to live.

23  Q    Do you recall testifying at your deposition that Brad gave

24  you permission to give the loan to Angela?

25  A    I don't recall.

1  Q    I'm giving you what I marked as Exhibit 16 and I'll

2  represent that it is your deposition transcript from November

3  7, 2017.

4  A    Right.

5  Q    And you recall sitting at the deposition with me, right?

6  A    I do.

7  Q    Okay.

8         **MS. MIERS:**  I move to admit, I've already forgotten

9  the exhibit number -- 16 into evidence.

10         **THE COURT:**  Any objection?

11         **MR. HUMPHREY:**  For the purpose of this hearing, no

12  objection, Your Honor.

13         **THE COURT:**  Admitted.

14    **(Plaintiff's Exhibit Number 16 was received in evidence)**

15  **BY MS. MIERS:**

16  Q    If you could -- have you looked at your deposition

17  transcript before?

18  A    Yes I have.

19  Q    Okay.  So you see the page numbers and then you have line

20  numbers.  Can you see that?

21  A    Uh-huh.

22  Q    If I could get you to turn to page 20.  You with me?

23  A    Uh-huh.

24  Q    If you'll read page 20, line 25 through the first few

25  lines of 21.  Out loud for the Court.

1    A        "QUESTION:  Did Brad know that you were loaning

2             Angela Torres $25,000.

3             ANSWER:  Yes.

4             QUESTION:  He gave you permission to do that?

5             ANSWER:  Yes."

6    **BY MS. MIERS:**

7    Q    Does that refresh your memory?

8    A    Yes.

9    Q    Do you recall testifying that the sole source of the money

10   that you loaned Angela was Brad's income?

11   A    Well, it's our money.  It's not just his money.  I work

12   hard too.

13   Q    Do you recall testifying that the sole source of the

14   money --

15   A    That is --

16   Q    -- loaned to Angela was from Brad's income?

17   A    Brad works, yes.  But it's our money together.

18   Q    Is that a yes?

19   A    Yes.

20   Q    At your deposition, we talked about this loan as you

21   testified earlier, right?  And you testified that you exchanged

22   text messages with Angela Torres about the loan, right?

23   A    I don't recall, no.  I believe I changed that in the --

24   Q    Turn to page 33.  Let me know when you're there.

25   A    I'm here.

1    Q    So, on page 33 starting at line 8.  Are you with me?

2    A    Uh-huh.

3    Q    How many times have you asked Angela Torres to repay the

4    $25,000?  I don't recall.  More than five times.  No.  Did you

5    do this over the phone, via text and writing?  I don't recall.

6    You don't recall whether you asked in writing?  Asked in

7    writing, I don't -- I don't know.  I don't recall how I did it.

8    I probably texted her.  Did I read that correctly?

9    A    You did.

10   Q    You go on, I say, using the phone number that you just

11   provided earlier and you correct, right?

12   A    Uh-huh.

13   Q    And if you'll turn the page to 34, starting at line nine,

14   can you read until I ask you to stop?

15   A        "QUESTION:  What was Angela's response when you asked

16            her to repay the money?

17            ANSWER:  No response.

18            QUESTION:  So, you texted her and she just didn't

19            respond?

20            ANSWER:  Correct.

21            QUESTION:  So you do remember how you communicated

22            with her?  It was via text.

23            ANSWER:  I guess, probably.  I didn't speak to her.

24            QUESTION:  How many times did you text Angela?

25            ANSWER:  I don't recall."

1  **BY MS. MIERS:**

2  Q    Okay, that's good.  Thank you.  So does that refresh your

3  memory regarding the testimony at your deposition?

4  A    Yes.  I still don't recall how I communicated with her.

5  Q    You also testified that you turned that phone that you

6  texted Angela with into Apple, right?

7  A    Uh-huh.

8  Q    And that was the week right before your deposition, right?

9  A    But I have a cloud, it was on my cloud.  Everything was

10  transferred onto the new phone.

11  Q    Yeah, that's great.  That was my next question.  So, you

12  testified at your deposition that you downloaded all those text

13  messages from the old phone, right?

14  A    Uh-huh.

15  Q    Even though you said it was dead.

16  A    Right.

17  Q    You somehow downloaded all those text messages --

18  A    No, it wasn't -- it was cracked.  I believe that's what it

19  was.

20  Q    You testified that you downloaded all of the messages from

21  your own phone to the desktop computer?

22  A    I did it back -- no, I did a backup on the I-Cloud, on the

23  I-Tunes or whatever you call it.

24  Q    On your desktop, right?

25  A    Correct.  But it doesn't go on my desktop, it goes into my

1   cloud.

2   Q    That's not what you testified to at your deposition, is

3   it?

4   A    It's -- I believe -- semantics.  I just download -- you

5   can find it from anywhere.

6   Q    Are you testifying that way now because the text messages

7   are not on the desktop?

8   A    No, no.

9   Q    Are they on the desktop?

10  A    No, they're on my phone.

11  Q    Right now they are?

12  A    I'm sure they are.  If there's text messages, they're on

13  there.

14  Q    Okay.  Did you provide the text messages between you and

15  Angela Torres to Brad or his attorney?

16  A    No, I was not asked to.

17  Q    Was that, you weren't asked to?

18  A    Uh-huh.

19  Q    When you say you weren't asked to, you mean by anyone,

20  right?

21  A    Right.

22  Q    When you assisted Brad in looking for Prime emails, did

23  you look in your own yahoo account?

24  A    No.

25  Q    Because if you had, you would have found one like the one

1    I presented to you in Exhibit 15, right?

2    A    No.

3    Q    You don't know?

4    A    I don't know.

5    Q    According to the forensics report, the long one, your

6    desktop was shut down in January, right, when they first took

7    the image.  Do you agree with me that you shut down that

8    desktop computer in January of 2018?

9    A    I don't know what you mean by shut down.

10   Q    Did you turn it off?

11   A    To give it to them?  Yes, yes.

12   Q    Okay.  And then you got it back at some point?

13   A    Right.

14   Q    When did you get it back?

15   A    I don't recall.

16   Q    Was it within a couple of days.

17   A    I don't recall.

18   Q    Did they come and take it and bring it back, or do they

19   imagine it at your house?

20   A    They took it.

21   Q    So could've been days, could've been weeks, you don't

22   know?  When you got it back, did you turn it back on?

23   A    I believe so, I don't know.

24   Q    The forensics report indicates that you haven't turned

25   that desktop back on.

1   A    I didn't really use my computer.  I have -- my kids have

2   an I-Pad, I use my phone.

3   Q    Do you recall testifying at your deposition that you used

4   your desktop to update your I-Phone, for the kids to update

5   their I-Pads and things like that?

6   A    My kids have their own -- my one son has his own computer,

7   so they use that.

8   Q    Your son has a computer.  When did he get that computer?

9   A    Christmas, two Christmas ago.

10  Q    So that would be Christmas, 2016?

11  A    No.

12  Q    2015?

13  A    No, '17.

14  Q    So, the last Christmas that we had?

15  A    Last Christmas, yeah.

16  Q    So, you bought another electronic device, a computer in

17  December of 2017?

18  A    It was a Christmas present.  We didn't buy it.  He got it

19  for Christmas.

20  Q    Who did he get it from?

21  A    From, well it was from Santa, but --

22  Q    Who funds Santa at the Mols' house?

23  A    We do fund Santa at the Mols' house.

24  Q    So the Mols bought a computer in December of 2017.  Is

25  that correct?

1   A    A gaming computer for my son.

2   Q    What kind of computer is it?

3   A    A gaming computer.

4   Q    What brand is it?

5   A    I don't know.

6   Q    Is it a MAC?

7   A    No.

8   Q    A PC?

9   A    It's a PC, yes some sort of game --

10  Q    I don't know if I'm using the right term, but it's not --

11  it's a non-MAC?

12  A    No, it's not a MAC.

13  Q    Is it a laptop or a desktop?

14  A    Desktop.

15  Q    Have you ever used that desktop?

16  A    No.

17  Q    Has Brad ever used that desktop?

18  A    No.

19  Q    The activities that you used your old desktop for --

20  A    Uh-huh.

21  Q    What computer do you use now since you haven't used that

22  desktop since January?

23  A    My I-Pad or my phone.

24  Q    How do you update your phone?

25  A    I haven't updated my phone actually.  I haven't.  There's

1  no backup on my phone.

2  Q    Is it your sworn testimony that you have not used your

3  son's computer?

4  A    It's my sworn testimony.

5  Q    Other than the computer that you bought in December of

6  2017, have you purchased any other computers?

7  A    I have not.

8  Q    That we haven't discussed?

9  A    No.

10  Q    What day did you purchase the computer for your son?

11  A    I'm not sure, sometime in December.

12  Q    Before or after the Court's order?

13  A    I have no idea.

14  Q    Was it close to Christmas?

15  A    Well, he got it for Christmas, so it was before Christmas,

16  sometime.  It could have been November.  It could've been

17  December.  I'm not sure.

18  Q    Where'd you purchase it?

19  A    I think I did it on Amazon.

20  Q    So, the receipt would be in your email?

21  A    Yes.  I'm sure it would be on my Amazon account.

22  Q    When you send emails and receive emails, what device do

23  you use?

24  A    My phone.

25  Q    So, you think you bought the computer at Amazon?

1   A    Uh-huh.

2   Q    You don't know whether it's possible that it was after the

3   Court order?  Does that summarize your testimony?

4   A    I don't know.  You can have that computer too.  There's

5   nothing on it.

6   Q    If we do ask for the computer, while we've got you under

7   oath, you can understand why --

8   A    I can understand.  You can have it.

9   Q    So you can understand that you can't delete anything.

10  A    I can't delete anything.

11  Q    And you don't get to decide what's relevant?

12  A    That's fine.  You just have to come and tell a 12-year-old

13  you're taking his computer.

14          **MS. MIERS:**  I'll pass the witness.

15          **THE COURT:**  Mr. Humphrey?

16          **MR. HUMPHREY:**  No further questions, Your Honor.

17          **THE COURT:**  Alright.  Thank you, ma'am.  You may

18  stand down.  Mr. Simmons, do you have anything?  Do you want a

19  chance to look at that USB?

20          **MR. SIMMONS:**  We would need a forensics expert to

21  figure out what USB device this is, whether it's, you know, one

22  of the two or if it was purchased yesterday.  So, we'd be

23  willing to supplement once the forensics expert is able to view

24  that, but at the end of the day, it doesn't really matter

25  what's on this unless there's hundreds of Alliant Group files

1 | or all 57,000 files that were deleted on the CCleaner.

2 | The very day that this Court issued the order, and

3 | it's almost like the Court had a third eye, that you

4 | specifically ordered Mr. Mols and his wife not to delete

5 | anything, and the story ended up being that his wife deleted it

6 | without knowledge, even though she swore under oath, in her

7 | declaration that she did have knowledge.

8 | Now she's saying she didn't know about the order.

9 | So, of course, we're going to review this. The forensics

10 | expert is going to review it. I'm sure they'll be other

11 | devices and things that we'll find out through discovery like

12 | the new computer that was purchased at about the same time, the

13 | other Best Buy computer that was purchased then.

14 | But, at the end of the day the status quo right

15 | now is that we're going to trial and I believe that you've seen

16 | today from the testimony that received and the responses that

17 | we received from the sanctions motion, that the status quo does

18 | not scare them. They don't care.

19 | The only change that there can be to lead to a

20 | possible resolution to this case or trial is if there's a

21 | change in the status quo.

22 | **THE COURT:** Mr. Humphrey?

23 | **MR. HUMPHREY:** Yes, Your Honor. Well, first off, the

24 | Court has been able to see the testimony here and the Court can

25 | waive the credibility of the witnesses. They've explained why

1  this happened and if the Court believes their explanation,

2  which I do, then there is no evidence of bad faith here.

3       If the Court does believe there's bad faith, there is

4  still the small issue of the fact that the Alliant Group has

5  failed to provide any evidence whatsoever of relevance of the

6  documents that were destroyed or prejudice, and with the case

7  law very clear, they just can't use their believe that you

8  can't find what's on the documents to prove those matters, and

9  the fact is they cannot prove relevance or prejudice in this

10 case, because, as I've said before, as we pointed out, our

11 motion for summary judgment, there's a large amount of sources

12 of evidence they could have, and if he actually did what they

13 are suing him for, the evidence would be there and it's not.

14      This is not their only way they have to prove their

15 case.  The sole means they have to prove the case, if it had

16 merit, is not their devices.  So, without any evidence of

17 relevance or any evidence that these documents, that their

18 ability put on the case was prejudiced, the Court cannot grant

19 the sanctions are asking for.

20      **MR. SIMMONS:**  We're absolutely prejudiced in this

21 case.  The notion that we could simply go to a client or CPA

22 and ask, hey, did Brad Mols give you our proprietary client

23 list with names, preferences.  That's not something you give to

24 a client's CPA.  That's not something that happens.

25      So, the fact that he's saying we could find out

whether the trade secrets were shared by subpoenaing more third

parties after we've had to spend almost $300,000 subpoenaing

third parties because Mr. Mols decided to play a shell game and

say that he's a consultant of Prime when he's clearly the

owner.  He was receiving 60% of the profits.

I think in this case, definitely motions are

necessitated for prejudice.  We're not able to cross examine

him on any of the documents.  We're not able to rely on the

documents, and Mr. Humphries relied on two cases in his

response, only two cases where someone has used CCleaner where

the Court has not ordered death penalty sanctions.

We cited to about eight.  So there's two cases.  One

of them is the PIC group case.  In that case, the people used

CCleaner but they were able to recover the files, so clearly

they used regular CCleaner which is what that Exhibit 10 is

talking about.  Regular CCleaner is meant to delete junk files,

but secure delete CCleaner permanently removes files.

In the PIC case, they were able to recover the files

which we actually just received notice today, both Brian and I,

that the expert was unable to find any fragments whatsoever of

the clean files.  None.  They're gone forever.  So this is in

the PIC case.

The other case Mr. Humphrey sites, where they used

CCleaner and he claims that they didn't order death penalty

sanctions, is the Victor Stanley case.

1          Now this is just a complete mis-cite.  In the Victor

2    Stanley case, they did order death penalty sanctions on the

3    main claim, which is a copyright claim, absolutely ordered

4    death penalty sanctions.

5          Moreover, the Court ordered the payment of attorney's

6    fees caused by this foliation and if they didn't pay it, the

7    Court ordered that the defendant spend two years in jail.

8          That's the case that he's relying on for no foliation

9    on CCleaner.  Every other case, every other Court where this

10   has happened, where files have been deleted using the same

11   software, have ordered death penalty sanctions, attorney's fees

12   and some of them even referral to the US Attorney for criminal

13   contempt charges.

14         And this case is worse than those cases because, I

15   think it's fairly clear that we have perjury issues and it's

16   not just CCleaner.  It's the missing USB devices, it's the

17   additional computer that they turned back into Best Buy, it's

18   other computers that they continue to hold back from us.

19         You know, giving us a USB device two months after the

20   Court ordered it turned over.  Their behavior has been

21   continuous, repetitive and to think that it'll change without

22   an order from this Court telling them that this isn't okay, is

23   not going to change anything up to the trial.

24         The status quo has to change in order for there to be

25   any possibility of resolution.

1          **THE COURT:**  So, you think I have to enter a default?

2          **MR. SIMMONS:**  I think so, Your Honor.

3          **THE COURT:**  Mr. Humphrey?

4          **MR. HUMPHREY:**  Your Honor, I think what counsel is

5    misconstruing, the reason I cited those cases, counsel's

6    attempting to fashion a black letter rule that the use of

7    CCleaner somehow automatically must lead to death penalty

8    sanctions and that's not the law.

9          The law requires in the Fifth Circuit, very specific

10   elements under Moore to be met.  They have not been, Your

11   Honor.  That's my primary argument here.  The Court does not

12   have to enter death penalty sanctions here.  Alliant Group has

13   plenty of avenues to prove their case.  They have not lost

14   those avenues.

15         If they can't prove their case, it's not because

16   someone ran CCleaner on Brad Mols' laptop.  It's simply not

17   plausible.

18         **THE COURT:**  So, what do you think the sanction should

19   be, if any?

20         **MR. HUMPHREY:**  I think they should be required to

21   properly -- I mean just setting objectively, they should

22   probably have to pay some attorney fees to compensate them for

23   the effort they've gone through to get these documents.  I'm

24   certainly not saying that they should not have run or that they

25   should have run C cleaner.  Obviously not.

1        But it simply -- death penalty sanctions are not

2  warranted here and would create a miscarriage of justice, Your

3  Honor.  These people are -- these do not look like people to me

4  that are not afraid.  They're clearly afraid and they're afraid

5  because they're going to be -- they're afraid they're going to

6  be shanghaied into death penalty sanctions for having a case

7  found against them when they've done nothing wrong.  There's no

8  evidence they've done anything wrong, and it's all because they

9  didn't cooperate properly in discovery and ran a piece of

10  software they shouldn't have.

11        That's not what sanctions are for.  Sanctions are not

12  there to create a causal action where none exists.  So, Your

13  Honor, that's what I would submit.

14        **THE COURT:**  You know, the problem is, the way I'm

15  recalling it, I could be wrong, but we have been fighting

16  discovery from your clients, from the get go, and there's

17  always been some reason why they can't produce anything.  And

18  it's just not credible.

19        **MR. HUMPHREY:**  I would say it's a two-way street,

20  Your Honor.  I've gotten very little discovery from them.  But,

21  of course, I don't have the burden of proof, so I have my own

22  remedies for that, such as, they claim that they've suffered

23  all kinds of attorney's fees in the case.  I haven't seen a

24  single timesheet or invoice from them.

25        I haven't received any disclosure of the business

1  they've done from the clients that were supposedly solicited by

2  Mr. Mols.  Not one of those has been answered yet to date.

3  There just we'll supplement, dated March of 2017.  So, that's a

4  two-way street, Your Honor.

5          **THE COURT**:  I agree.

6          **MR. HUMPHREY**:  I haven't been filing all the motions.

7          **THE COURT**:  Why haven't you been filing motions.  No

8  one else is afraid to.

9          **MR. HUMPHREY**:  That's true, Your Honor.  Because the

10 reason is that stuff can be excluded at trial if they don't

11 produce evidence that can't be used at trial.  I don't need to

12 file a motion to compel.  So, it does look like it's a one-way

13 street, but it's not.

14         And, that's why I filed a motion for summary

15 judgment, because their response would expose that fact, Your

16 Honor.  I did actually cite this in my motion for summary

17 judgment.

18         So, this is a two-way street, Your Honor.  They

19 haven't produced.  That fought me on trying to take it to

20 (indiscernible).  Their own CEO's deposition had pertinent

21 knowledge in this case.  It's not like they're the only ones

22 who had to file a motion to compel in this case.

23         So, if they did something wrong, Your Honor, they

24 should be sanctioned for that, but a lot of what we fought were

25 good faith objections to discovery, objection to things that

1   were relevant, objecting to things that we had a cases that

2   said were not in this position, custody or control.

3           The Court ruled against us on that and we've tried to

4   comply.  These are not a corporation that has the ability to

5   put forth a sophisticated litigation.  It's a family of four,

6   who live in a house, who have Sandisk drives and thumb drives

7   in their kids rooms, just like anyone else in America has.

8           They have a laptop that doesn't work, just like

9   anyone else in America has, Your Honor.  Life happens during

10  cases.  They have to live.  This case is going on for almost

11  two years now. Actually, it's been passed the two-year

12  anniversary now.

13          For these things not to happen during the case in

14  someone's life, they don't have the ability to just get a whole

15  set of computers and put these into storage.  They just don't

16  have that ability, Your Honor.

17          **THE COURT**:  Alright.  Mr. Simmons, I want you to

18  draft me a proposed order awarding death penalty sanctions.

19  I'll see how much I can live with.  I've got to sanction you.

20  This behavior is just beyond acceptable.  How far that goes, I

21  want to see.

22          **MR. SIMMONS**:  Thank you, Your Honor.

23          **THE COURT:**  Alright.  Get it to me in a week.

24          **MR. SIMMONS**:  Yes, Your Honor.

25          **THE COURT:**  Alright.  Thank you.

(Proceedings adjourned at 4:26 p.m.)


## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____              July 11, 2018

            Signed                          Dated




*TONI HUDSON, TRANSCRIBER*