United States District Court
Southern District of Texas
**ENTERED**
September 17, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIANTGROUP, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-16-3114 |
| | § | |
| BRAD MOLS, | § | |
| | § | |
| Defendant. | § | |

### ORDER

Pending before the court is Plaintiff alliantgroup, L.P.'s Fourth Renewed Motion for Death Penalty Sanctions (Doc. 181). The motion is **GRANTED** for the reasons stated below.

### I.  Procedural Background

On June 6, 2017, Plaintiff filed its first motion to compel related to Defendant Brad Mols' ("Mols") failure to provide complete responses and documents to Plaintiff.[1] This motion centered on Mols' production of only thirty-two Prime Tax Group ("Prime") documents and his claim that he had no control over the records of his employer, Prime. Prime was a company allegedly formed by Angela Torres ("Torres"), Mols' subordinate during his employment with Plaintiff.[2] Plaintiff argued that Torres was merely the nominal owner of Prime and that Mols, Torres, and Daniel Lewicki were its true owners.

---

[1]    See Doc. 34, Pl.'s Opp. Mot. to Compel.

[2]    Both Mols and Torres left their employment with alliantgroup at the same time. See id. p. 2.

Plaintiff also complained that Mols untruthfully claimed in his discovery answers that he had no ability to recall his income from Prime or to provide details of financial transactions because his wife (also "Mrs. Mols" or "Cindy Mols") took care of the family's finances.[3]  Mrs. Mols opposed discovery by claiming a spousal privilege.  Other witnesses related to Prime, including Daniel Lewicki, also resisted responding to Plaintiff's discovery, claiming to have no responsive documents or emails for large periods of time without explanation.[4]

At a hearing on October 17, 2017, Mols argued to the court that, as a mere "consultant," "consultant contractor," or "employee"[5] of Prime, he had no access to Prime records.  His attorney admitted that Mols was paid thirty percent of the Prime's net revenue as compensation but persisted in arguing that Mols had no ownership interest.[6]  The court ordered Mols to answer a majority of the discovery requests propounded by Plaintiff.[7]

On November 28, 2017, Plaintiff filed a motion to compel a

---

[3]    For example, his personal bank records showed that Mols earned in excess of $260,000 but he could not recall the source of those funds.  See Doc. 104, Pl.'s Renewed Mot. to Compel p. 2.

[4]    See Doc. 134, Pl.'s Mot. to Compel Disc. from Daniel Lewicki  p. 7 (stating that at his deposition, Lewicki was at a loss to explain having no emails on his Prime email for a six-month period).

[5]    See Doc. 130, Tr. of Oct. 5, 2017 Hr'g pp. 5, 7, 32.  Mols' attorney stated, "The relationship is not one where he can demand things from her."  Id. p. 29.

[6]    Id. p. 32.

[7]    See Doc. 125, Min. Entry Ord. Dated Oct. 17, 2017.

2

forensic examination of Mols' electronic devices based on his continued discovery stonewalling, evasive deposition testimony, and purposeful redactions of relevant information from his bank statements.[8]  In the motion, Plaintiff outlined discovery that showed that Mols loaned Torres $25,000 for a car,[9] when he had denied loaning Torres money at his deposition.[10]

On December 18, 2017, the court held a hearing on the motion and ordered a partial forensic examination of Mols' and his wife's electronic devices, cautioning that it would shift costs to Mols if the examination revealed that relevant emails or texts had not been produced in response to earlier discovery requests or if there was evidence of spoliation.  That hearing concluded at 11:12 a.m. CST.

On April 5, 2018, Plaintiff filed its Third Renewed Motion to Compel and Renewed Motion for Death Penalty Sanctions complaining of Mols' continued obstruction of discovery.[11]  The motion outlined evidence contradicting Mols' earlier position that he was only an independent contractor of Prime and quoted text messages to Torres that clearly raised an inference that Mols had an ownership

---

[8]    See Doc. 136, Pl.'s 2d Renewed Mot. to Compel & Mot. for Death Penalty Sanctions.

[9]    See id. pp. 7-8.

[10]    See Doc. 136-8, Ex. H to Pl.'s 2d Renewed Mot. to Compel & Mot. for Death Penalty Sanctions, Email Dated Nov. 6, 2016 to Mols' counsel.

[11]    See Doc. 163, Pl.'s 3d Renewed Mot. to Compel & Mot. for Death Penalty Sanctions.

interest in Prime.[12]  The text messages recovered from Mols' phone contradicted Mols' earlier testimony that: (1) Prime belonged to Torres; (2) Torres was his boss; and (3) he had no access to the Prime emails or records for purposes of production in discovery.

In an August 14, 2017 text string to Torres, Mols: (1) called Prime "our business;" (2) described Torres as his "friend and partner;" (3) stated he paid over $100,000 to keep Prime going; (4) described his role at Prime as taking Torres "under his wing;" and (5) lamented the loss of Prime, stating, "You and Dan [Lewicki] keep Prime. You know how much it pains me to give Prime up.[13]

In the same text conversation where Torres and Mols were discussing his leaving Prime, Torres stated, "Ok, I'll remove your access today," agreed to meet with Mols later in the week, and concluded, "Let's not say anything bad about each other.  Agreed? Let's talk about it when we meet."[14]

In a November 30, 2017 email, Mols also stated, "Angie, I'm sure you've heard about the sanctions [motion].  It's just more nuisance stuff."  Mols asked Torres to forward any emails she had sent to him and to forward all emails from a particular certified

---

[12]    See Doc. 164, Pl.'s 3[d] Renewed Mot. to Compel Disc. & Renewed Mot. for Death Penalty Sanctions pp. 9-10.

[13]    See Doc. 164-1, Ex. A, to Pl.'s 3[d] Renewed Mot. to Compel & Mot. for Death Penalty Sanctions, Text Messages Between Mols and Torres; see also Tr. of Oct. 5, 2017 Hr'g pp. 41-43.

[14]    See Doc. 164-1, Ex. A, to Pl.'s 3[d] Renewed Mot. to Compel & Mot. for Death Penalty Sanctions, Text Messages Between Mols and Torres.

public accountant.[15]

Plaintiff also produced evidence that showed that the limited forensic examination ordered by the court recovered documents that contradicted portions of Mols' sworn deposition testimony where he claimed that he never used his gmail account.  On December 1, 2017, Mols told Torres in a text message that he had used his gmail account through early August and commented "So if you decide to send me those emails, please send them from that time and on."[16]

At the hearing, Mols attempted to excuse his failure to produce emails and over a year's worth of text messages on a "default" setting on his phone that deleted text messages after thirty days.  The court found that Mols violated his duty to preserve evidence and proceeded to consider Plaintiff's request for sanctions pursuant to Federal Rule of Civil Procedure 37 ("Rule 37"), including death penalty sanctions.  The court determined that Mols' failure to preserve electronically stored information would be sanctioned by the shifting of the costs of the forensic examination to Mols.  Mols was ordered to pay costs in the amount of $10,608.

In light of the prior discovery omissions, the court further ordered that Plaintiff could reexamine the previously-examined devices to determine if there were deletions to electronically

---

[15]  Id.

[16]  See id.

stored information, when those deletions occurred, and if any information was downloaded from those devices to other devices. The court indicated that it would consider at trial an award of attorney's fees related to Plaintiff's efforts in obtaining this discovery as an additional sanction for these discovery abuses.

## II.  Death Penalty Sanctions

On November 28, 2017, Plaintiff filed its second motion to compel discovery from Mols along with its first motion for death penalty sanctions, which it renewed several times.

## A.  **The Motion**

On June 12, 2018, Plaintiff filed the pending Fourth Renewed Motion for Death Penalty Sanctions.  In the motion, Plaintiff's forensic expert Noel Kersh averred that his latest forensic examination of Mols' devices uncovered that on December 18, 2017, at 4:24 p.m. CST, five hours after the court ordered examination of Mols' devices, a trial version of Drive Recovery Wizard was run on Mols' laptop.[17]  On December 18, 2017, at 10:41 p.m. CST, the laptop was used to purchase CCleaner Professional ("CCleaner"), a software application used to delete or "clean" a hard drive.[18]

Between 12:55 a.m. and 1:01 a.m., CST, on December 19, 2017, CCleaner permanently deleted 57,440 files on Mols' laptop.[19]  After

---

[17]    See Doc. 181-2, Ex. B to Pl.'s Mot. for Death Penalty Sanctions  Aff. of Noel Kersh.

[18]    See id.

[19]    See id.

the files were deleted, CCleaner and Drive Recovery Wizard were uninstalled from the laptop.[20]

On January 3, 2018, the laptop's operating system was upgraded to Windows 10 Home Edition.[21]  As a result of the system upgrade, the USB-device history stored on the laptop's registry was overwritten, deleting all records of the dates and times that any USB device was connected to the laptop prior to January 3, 2018.[22]

**B.**    **The Hearing**

On June 29, and July 3, 2018, the court heard argument and testimony on Plaintiff's Fourth Renewed Motion for Death Penalty Sanctions.  Noel Kersh ("Kersh") testified for Plaintiff; Mols and Cindy Mols testified in response.

**1.**    **Noel Kersh**

Kersh, Plaintiff's computer expert, explained the procedures necessary to install and delete files on a computer.[23]  CCleaner offered the user the opportunity to make one pass at overriding data, the "default" button, or to make up to thirty-five passes to override data, the "secure" file deletion button.[24]  Kersh believed that if one pass were made at the default setting, it would be

---

[20]    See id.

[21]    See id.

[22]    See id.

[23]    See Doc. 197, Tr. of June 29, 2018 Hr'g pp. 8-10.

[24]    Id. p. 10.

7

possible to recover data from a hard drive but, if the secure deletion option was requested by the user, it would be impossible to restore the files to their original form.[25] Based on the extreme number of "Z's" found on the laptop's hard drive that overrode the stored data, Kersh was able to confirm that the default deletion option was not used.[26] Kersh stated that CCleaner was not considered a data recovery software.[27]

Kersh explained that, by uninstalling CCleaner on the laptop, the settings used by CCleaner were also removed, making it impossible for him to deduce what file/folder names the user had elected to delete permanently from the laptop.[28] To uninstall a program, the user must use either an uninstallation program that is included within the software itself or a Windows uninstall feature, both of which require affirmative steps to effectuate the process.[29]

Kersh testified that his firm was still attempting to recover the deleted material, but believed that he would only be able to recover small fragments of files.[30]

---

[25]    Because the "secure delete" option was selected, Kersh was unable to tell the court the type of files that were deleted or the number of times the data was overridden. Id. p. 47.

[26]    Id. p. 11.

[27]    Id. p. 12.

[28]    Id. pp. 14-15.

[29]    Id. p. 15.

[30]    Id. p. 17.

Kersh stated, that after analyzing the USB drives that were plugged into Mols' personal laptop, there was evidence that a SanDisk Cruzer Mini USB was plugged into Mols' alliantgroup laptop on April 4, 2016, less than a month before he left alliantgroup.[31] That same USB had been plugged into Mols' personal laptop, but the files that were accessed from that USB drive were removed when the Windows upgrade was installed in January 2018. After that point, the only way to determine what was on that USB drive was to examine the USB drive itself, and Mols claims it is missing.[32]

Kersh stated that thirty-five files were wiped from Torres' laptop in April 2016 and it was impossible to tell from Torres' laptop if Mols accessed it as an alternate user.[33]

The court finds the testimony of Kersh to be credible.

### 2.  Brad and Cindy Mols

On July 3, 2018, the court heard from Mols and his wife, Cindy Mols.[34]   Mols began his testimony by turning over a USB drive that he located in his child's bedroom.[35]  Mols stated that he believed he had only uploaded his alliantgroup diary on the thumb drive.[36]

---

[31]   Id. p. 26.

[32]   Id. p. 42.

[33]   Id. p. 46.

[34]   See Doc. 198, Tr. of July 3, 2018 Hr'g.

[35]   Id. pp. 5-6.

[36]   Id. p. 6.

He stated that he believed that the thumb drive also included four client names and personal investment information.[37]  He denied using any alliantgroup information after he left its employment.[38]

Mols testified that he believed that he had produced all extant emails and denied deleting emails.[39]  Mols explained that he failed to produce, and later deleted, text messages because he did not think any were responsive to discovery requests.[40]  Mols also stated that he did not produce any Prime emails because they were located on the Prime server and Torres objected to their production.  Later, he was denied access to the emails when he and Torres parted company.[41]  Mrs. Mols tried to recover the emails but was unable to do so.[42]

Mols stated that he was aware that the court had ordered that nothing be deleted from his computer and his wife knew, generally, that they were not supposed to delete anything from the computer.[43]  Mols was not aware that his wife intended to use CCleaner on his

---

[37]    Id. p. 6.

[38]    Id. p. 7.

[39]    Id. pp. 14-15.

[40]    Id. p. 15.

[41]    Id. pp. 15-16.

[42]    Id. p. 17.

[43]    Id. p. 19.

laptop.[44]  Mols admitted that in December 2017 his wife had taken his laptop to Best Buy to purchase a new laptop and to have the old information copied onto the new laptop.[45]  After Mrs. Mols ran CCleaner on the old laptop, she returned the new laptop, along with the copied hard drive to Best Buy.[46]

On cross-examination, Mols admitted that he was aware of his duty to preserve documents and data related to this lawsuit and that he was aware of that duty "sometime after the lawsuit was filed."[47]  Mols stated that it was "possible" that he informed his wife of his duty to preserve documents sometime in June 2016.[48] Mols testified that he never backed up any file or email account.[49] Mols admitted that even after the production of a USB drive at the beginning of the hearing, there was still one USB drive that had not been turned over to Plaintiff.[50]

Mols denied knowing that Jared Kaufman had stated that both Mols and Torres downloaded and printed documents prior to leaving

---

[44]    Id. p. 20.

[45]    Id. p. 19.

[46]    Id. pp. 20, 27.

[47]    Id. p. 23.

[48]    Id. p. 24.

[49]    Id.

[50]    Id. p. 26.

alliantgroup.[51]  Mols denied enabling the auto-delete function for texts on his phone.[52]

Mols admitted that on December 18, 2017, when he learned of the court's order not to delete information, he did not tell his wife because "she already knew not to."[53]  Mols was aware that his wife was taking the old laptop to Best Buy, had purchased a new laptop, used CCleaner on the old laptop, and then returned the new laptop to Best Buy, keeping the old laptop.[54]  Mols testified that he was not aware that Mrs. Mols had deleted over 57,000 files from the old laptop when she ran CCleaner.[55]  Mols assumed that the 57,000 deleted files were "clutter."[56]

Mols admitted that prior to the court's discovery orders, he had not turned over a single text message.[57]  Mols admitted that he took no measures to preserve his emails or other documents from Prime.[58]

Cindy Mols testified that she understood the duty to preserve

---

[51]    Id. p. 28.

[52]    Id.

[53]    Id. p. 30.

[54]    Id. pp. 34-36.

[55]    Id. p. 36.

[56]    Id. p. 38.

[57]    Id. p. 40.

[58]    Id. p. 44.

evidence in this case "from the beginning.[59]  Mrs. Mols stated that after her husband was denied access to the Prime email account, she downloaded a recovery program, Data Recovery Wizard, to retrieve the emails.[60]  The attempt was unsuccessful.[61]

Cindy Mols recounted that in the same time frame, her husband's laptop was running slowly and had gray lines running through the screen.[62]  On December 15, 2017, she took the laptop to Best Buy, purchased a new laptop, and left the old laptop to have its files transferred to the new laptop.[63]  Mrs. Mols returned to Best Buy on December 17, 2017, and was told the old laptop was "usable."  She returned home with the old laptop and the new laptop.[64]  She stated:

> And so I asked them again about the CCleaner and that they told me again, it does not remove any e-mails or any personal files . . . I went back again on the 18th to speak to a Geek Squad [member].  He suggested I run the CCleaner, that it's usually just clutter on your e-mail that's making the computer not run well."[65]

When asked if she knew if all the "clutter" would be transferred to the new laptop, Mrs. Mols responded, "Everything

---

[59]    Id. p. 59.

[60]    Id. p. 61.

[61]    Id. p. 61.

[62]    Id. p. 62.

[63]    Id. p. 62.

[64]    Id. p. 63.

[65]    Id. pp. 63-64.

could be transferred. I don't know. I don't know. They just transferred his files."[66] Mrs. Mols installed CCleaner on the old laptop but could not recall if she used the default setting or opted for the "secure delete" function.[67] Mrs. Mols later admitted that she used the "secure delete" option but claimed that she did not know what it meant.[68] Mrs. Mols stated that she was unaware that she was deleting files.[69] In support, she produced an email from CCleaner that stated that CCleaner only deleted "temporary files, broken shortcuts, browsing history and registry entries."[70] Mrs. Mols uninstalled the CCleaner program to reduce the clutter in the computer.[71] She returned the new laptop after using the CCleaner on the old laptop because the old laptop was running faster and the new one was no longer needed.[72]

On cross-examination, Mrs. Mols conceded that the Best Buy Geek Squad employee might have told her that another program, not CCleaner, could recover lost files.[73]

---

[66]    Id. p. 65.

[67]    Id. pp. 65-66.

[68]    Id. p. 67.

[69]    Id. p. 68.

[70]    Id. p. 69.

[71]    Id. p. 71.

[72]    Id.

[73]    Id. p. 81.

The court finds that the testimony of Mols and Cindy Mols concerning the purchase and use of CCleaner to be not credible. The court does not consider the actions of Cindy Mols to be independent of or without the knowledge and concurrence of Mols.

### 3. Chris Graham

In a post-hearing affidavit, Chris Graham of Pathway Forensics testified that, after additional forensic efforts, he was unable to recover any fragment of data from the deleted files from Mols' laptop.[74]  Graham also averred that, from another device, he obtained several emails on a "Cindy Mols<cindyberkson@yahoo.com" address directed to "Brad," directly contradicting Mols' testimony that he never used Cindy Mols' yahoo email address.

## C. Factual Findings

The court finds that Mols had a duty to preserve evidence that arose in June 2016 and that he was aware of this duty.  The court finds that Mols has acted with the specific intent to deprive Plaintiff of discovery of documents accessed via his laptop.

The court finds that Mols violated court discovery orders compelling production of documents when he allowed over 57,000 files to be deleted from his laptop's hard drive and installed a Windows update that removed any ability to determine the identity of files accessed from USB drives after the court ordered a

---

[74]    See Doc. 200, Aff. of Chris Graham.

forensic examination.  In doing so, Mols faces the full range of sanctions authorized by Rule 37(b)(2).

The court finds that Mols concealed his control over Prime files and failed to produce those files in discovery before they were compromised by Torres and others.  He failed to preserve emails and text messages.  In light of his deliberate conduct, the court deems Mols' evasive and incomplete answers to discovery and in his deposition to violate Rule 37(a)(3) and (4).

### III.  Legal Standard

Routine deletion of electronically stored information is generally not considered spoliation unless there is a duty to preserve information, and the duty to preserve evidence arises when a party has notice that certain documents are relevant to litigation.  See Quantlab Tech., Ltd. v. Godlevsky, Civil Action No. 4:09cv4039, 2014 WL 651944, *8 (S.D. Tex. Feb. 19, 2014).

Rule 37 permits the court to impose a wide range of sanctions for discovery violations.  Rule 37 sets forth examples of the sanctions the court may impose, including prohibiting a disobedient party from supporting or defending a claim, striking pleadings in whole or in part, or rendering a default judgment.  See Fed. R. Civ. P. 37(b)(2)(A)(ii), (iii), (vi).  The court may also consider whether a spoliation instruction to the trier of fact would adequately address the discovery misconduct of a party.  Quantlab Tech., Ltd., 2014 WL 651944 at *8.

In <u>Moore v. CITGO Ref. & Chems. Co., L.P.</u>, 735 F.3d 309 (5th Cir. 2013), the Fifth Circuit found that the following four factors must be present before a district court may enter death penalty sanctions:  (1) "the refusal to comply results from willfulness or bad faith and is accompanied by a clear record of delay or contumacious conduct; (2) the violation of the discovery order must be attributable to the client instead of the attorney; (3) the violating party's misconduct must substantially prejudice the opposing party; and (4) a less drastic sanction would not substantially achieve the desired deterrent effect."  <u>Moore</u>, 735 F.3d at 316 (internal quotations omitted).

### IV.  Analysis

### A.  Imposition of Fees and Expenses

Pursuant to Rule 37(a)(5), upon the granting of a motion to compel, the court may award the movant its reasonable expenses, including attorneys' fees.  Because the second forensic examination uncovered evidence of intentional spoliation by Mols, Plaintiff is awarded its costs of the second forensic examination as well as its reasonable attorneys' fees expended in the investigation of the spoliation, and the preparation, filing and prosecution of its Second Renewed Motion to Compel and Motion for Death Penalty Sanctions (Doc. 136), its Third Renewed Motion to Compel and Renewed Motion for Death Penalty Sanctions (Doc. 164), and the pending Fourth Renewed Motion for Death Penalty Sanctions (Doc.

181).  Plaintiff has spent considerable effort and expense to obtain discovery in this action and has been hampered and obstructed in this pursuit since this suit's inception.  Such costs are appropriately awarded.  See Rimkus Consulting Grp., Inc. v. Cammarata, 688 F.Supp. 2d 598, 647-48 (S.D. Tex. 2010).

**B.  Appropriateness of Death Penalty Sanctions**

As Plaintiff persuasively argues, an award of costs and fees alone will not compensate Plaintiff for the loss of evidence and the loss of its ability to prove its claims.  The court must therefore consider whether an adverse inference instruction or default judgment/dismissal of Mols' affirmative defenses and counterclaims are warranted pursuant to Rule 37(b)(2)(violation of a court order) and Rule 37(e)(failure to preserve electronically stored information).

Rule 37(e) states that, "only upon a finding that the party acted with the intent to deprive another party of the information's use in the litigation" may the court presume that the lost information was unfavorable to the party, instruct the jury that it may or must presume that the information was unfavorable to the party or dismiss the action or enter a default judgment.  Fed. R. Civ. P. 37(e)(2).  The sanctions of dismissal or default judgment pursuant to Rule 37(e)(2)(c) are only appropriate if the spoliation or destruction of evidence resulted in "irreparable prejudice" and no lesser sanction would suffice.  See Rimkus, 688 F. Supp. 2d at

644-45.  The Fifth Circuit has set out the four factors that must be present before death penalty sanctions may be imposed.  <u>See</u> <u>Moore</u>, 735 F.3d at 316.  The court proceeds to consider the present facts in light of the <u>Moore</u> factors.

The first <u>Moore</u> factor, whether there is evidence of a refusal to comply with discovery that results from willfulness or bad faith and a "clear record of delay and contumacious conduct," is clearly present.  Both Mols and his attorney admitted that Mols was informed shortly after the December 18, 2017 hearing concluded that his electronic devices were to be forensically searched.  Mols was aware that his wife intended to wipe the laptop's hard drive and he instructed her to uninstall the CCleaner program which shows his knowledge that she used CCleaner on his laptop's hard drive after the court's order.  In addition to the destruction of 57,000 files on the laptop's hard drive, a USB drive accessed by Mols via his laptop is still missing.

There is also a clear record of delay and contumacious conduct.  Mols implemented a thirty-day automatic delete function on his cell phone that destroyed text messages.  Although he claimed to be unaware of setting, it strains belief that Mols remained unaware of the setting after he was served with discovery requests for those text messages in early 2017.  The partial text messages obtained in discovery also showed that Mols had an ownership interest in Prime despite his arguments to the court that

he had no control over those records.  That delay in production compromised the document production of Prime records.  Even after Torres notified Mols that she was removing his access to the Prime server in mid-2017, approximately a year after this suit was filed and months after he had been served with discovery requests for those documents, Mols was still on good terms with Torres and they agreed to meet in the future.[75]

Based on his evasive discovery responses, evidence that Mols obstructed and delayed the discovery process from the outset by concealing his ownership interest in Prime, deleting relevant email and text messages, and providing evasive or incorrect answers at his deposition, the court concludes that Mols' refusal to comply with his obligations in discovery was a conscious decision made in bad faith.

The record supports a finding that this bad faith conduct was attributable to Mols and not his attorney, the second Moore factor. Even after Mols' attorney represented to the court that Mols had no access to these records, leaving the court with the impression that Torres had unilaterally terminated his access to Prime's records, the evidence shows that Mols agreed to the split from Prime and was in contact with Torres for months thereafter.  Mols referred to Plaintiff's sanctions motion as "nuisance stuff."

---

[75]    See Doc. 130, Tr. of Oct. 5, 2017 Hr'g p. 27.

Turning to the third Moore factor, the court finds that Plaintiff has been severely prejudiced by Mols' conduct. Plaintiff's case rests on its ability to determine what information Torres and Mols downloaded to Torres' laptop before she left alliantgroup to form Prime with Mols and who had access to this information after it was downloaded by Torres. Torres and Mols shared that alliantgroup laptop at Prime until she was compelled to return it to alliantgroup and new laptops were purchased. Therefore, it was paramount for Plaintiff to discover if Mols had its information on his laptop to support its breach of employment contract claim, misappropriation/wrongful use of trade secrets claim, breach of confidential relationship claim and claims for violations of the Computer Fraud and Abuse Act. Plaintiff has no ability to prove what alliantgroup documents Mols stored on his laptop or what alliantgroup files were accessed by Mols via any USB drive prior to January 2018. The spoliation was massive and prejudicial.

The court finally turns to the fourth Moore factor, whether a lesser sanction would achieve the necessary deterrent effect. The court is mindful of the fact that Rule 37 death penalty sanctions are "justified only in the most egregious cases, such as . . . intentionally destroying evidence by burning, shredding or wiping out computer hard drives.'" Quantlab Tech., Ltd., 2014 WL 651944 at *9 (quoting Nursing Home Pension Fund v. Oracle Corp.,

254 F.R.D. 559, 569-70 (N.D. Cal. 2008).  But this is such an egregious case.  A computer hard drive has been wiped of 57,000 files hours after a court order was entered requiring the examination of those files.  Discovery has been delayed and compromised.  Text messages were deleted.  Evidence is irretrievably lost, and Plaintiff has no other means to obtain that information from third parties.  There is clear evidence of bad faith.

The court has held numerous hearings on discovery in this action with the goal of obtaining a complete production of relevant material from Mols and Prime.  Those efforts were met with obfuscation and outright lies.  The court finds that a less drastic sanction would not achieve the desired deterrent effect as numerous warnings have had no effect on Mols' litigation behavior. The court concludes an appropriate sanction for Mols' actions is entry of a default on Plaintiff's affirmative claims.  And, because Mols' affirmative defenses and counterclaims for declaratory relief are related to his employment contract, dismissal of those claims is appropriate.

The court hereby **GRANTS** Plaintiff an entry of default on its claims for (a) breach of contract related to his employment/non-solicitation agreement with Plaintiff; (b) misappropriation and wrongful use of trade secrets; (c) breach of confidential relationship; and (d) violations of the Computer Fraud and Abuse

Act.

It is **ADJUDGED** that Mols' affirmative defenses and counterclaims are **DISMISSED** with prejudice.

It is further **ORDERED** that Plaintiff is awarded the entire cost of the second forensic examination, its expert costs, as well as its reasonable attorneys' fees expended in the investigation of the spoliation, the preparation, filing and prosecution of its Second Renewed Motion to Compel and Motion for Death Penalty Sanctions (Doc. 136), its Third Renewed Motion to Compel and Renewed Motion for Death Penalty Sanctions (Doc. 164), and the pending Fourth Renewed Motion for Death Penalty Sanctions (Doc. 181).

Although Plaintiff has asked that exemplary damages be awarded and that Mols be fined $50,000 for contempt of court, the court denies these requests. The court also determines that a referral to the United States Attorney for prosecution for contempt of court is not appropriate.

This matter will be set for a trial on damages to be assessed based on the court's entry of default. Mols may contest the amount of damages appropriately awarded on any cause of action and may also contest the amount of reasonable attorneys' fees or costs that should be awarded as a Rule 37 sanction in conformity with this order.

**SIGNED** this 17<u>th</u> day of September, 2018.

23

U.S. MAGISTRATE JUDGE